UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____
MICHAEL BELVIN and MICHAEL MAYERS,

                              Plaintiffs,

            -against-

ELECTCHESTER MANAGEMENT, LLC,

                              Defendant.
_____

**MEMORANDUM & ORDER**

**17-CV-6303 (NGG) (PK)**

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiffs Michael Belvin and Michael Mayers bring this employment discrimination action against their employer, Defendant Electchester Management, LLC ("EML"). (Am. Compl. (Dkt. 7).) Mr. Belvin and Mr. Mayers allege hostile work environment, race discrimination, failure to promote, and retaliation claims against under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*; 42 U.S.C. §§ 1981 *et seq.*; the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 296 *et seq.*; and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code §§ 8-101 *et seq.* Mr. Mayers further alleges EML discriminated and retaliated against him because of his disability in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12111 *et seq.* and the NYCHRL. Mr. Belvin also seeks emotional distress damages.

Defendant moves for summary judgment on the federal claims, and requests that the court decline jurisdiction over the remaining state and city claims. (Def. Mot. for Summ. J. ("Mot.") (Dkt. 44).) For the following reasons, Defendant's motion is GRANTED IN PART and DENIED IN PART.

## I. BACKGROUND[1]

Defendant EML was formed in 2007 to manage five housing companies, which previously operated as legally separate entities, that make up the housing complex known as Electchester Housing ("Electchester Co-Op"). (Def.'s R. 56.1 Stmt. ("Def. 56.1") (Dkt. 44-2) ¶¶ 1-2.) Before the formation of EML, each housing company operated independently, separately managing its own staff with no central governing body. (Def. 56.1 ¶ 2.) The complex still maintains the designations used under the co-op arrangement: First, Second, Third, Fourth, and Fifth Housing Company. (Def. 56.1 ¶ 1.) EML's forepersons, handypersons, and porters are represented by the Service Employer's International Union Local 32BJ ("32BJ") and operate under a collective bargaining agreement ("CBA"). (Def. 56.1 ¶¶ 3-4.)

### A. Mr. Belvin's Claims

Mr. Belvin started working for Electchester Co-Op in 1999 as a porter in Second Housing Company, remaining in that role after EML was created in 2007. He was transferred to Third Housing Company in 2016. (Def. 56.1 ¶ 12.; Pl.'s Dispute of Def.'s R. 56.1 Stmt. & Pl.'s R. 56.1 Stmt. ("Pl. 56.1") (Dkt. 46) ¶ 12.) Mr. Belvin is African-American and asserts that, throughout his tenure at EML, he was subjected to a work environment rife with racist imagery and remarks. He describes numerous incidents in which he either observed or was the target of racist conduct.

---

[1] The court constructs the following statement of facts from the parties' Local Rule 56.1 Statements and the admissible evidence they submitted. Except where otherwise noted, the following facts are undisputed. Where the parties allege different facts, the court notes the dispute and credits the Plaintiff's version if it is supported by evidence in the record. All evidence is construed in the light most favorable to the non-moving party with all "reasonable inferences" drawn in its favor. *ING Bank N.V. v. M/V Temara, IMO No. 9333929*, 892 F.3d 511, 518 (2d Cir. 2018).

Mr. Belvin claims that, around the time he started working for Electchester Co-Op in 1999 or 2000 and until about 2015, there was a figurine of a Black man posted to a wall in the coffee area, with a Barbie doll positioned as if it were sitting on the man's penis. (Mar. 6, 2019 Tr. of Belvin Dep. ("Belvin Tr.") (Dkt. 44-3) at ECF p. 331, 87:21-88:6.) When Mr. Belvin complained about the image to his union representative, Gene Schmanski, Mr. Schmanski reportedly replied, "[i]f you want to remain working here, I suggest you keep your mouth shut about things around here." (Belvin Tr. at 49:9-20.)

Mr. Belvin claims that in 2003 Bill Gambrell (also referred to throughout the record as "Bill Graham Bell" or "Bill Grambell"), a former general manager, hung a confederate flag in his office and told Mr. Belvin the confederate flag should have been adopted as the American flag. (Pl. 56.1 ¶ 120; Belvin Tr. at 90:9-13.) Mr. Belvin reported this incident to Mr. Schmanski, who allegedly told him, "[i]f you want to keep your job, I suggest you get with the program, get off this [B]lack stuff." (Belvin Tr. 91:2-5.) Mr. Belvin also claims that Mr. Gambrell would refer to Mr. Belvin and other Black employees using a racist epithet and would regularly tell Black employees to "get your [n-word] ass over here." (Pl. 56.1 ¶ 122.) EML denies these allegations as based on unsupported deposition testimony, and further states that Mr. Gambrell, who was a general manager at the Electchester Co-Op, was never employed by EML. (Def.'s Reply to Pl.'s 56.1 ("Def. Reply") (Dkt. 50) ¶¶ 6, 120, 122.)

Mr. Belvin claims that in 2009 a photo of President Obama displayed on the wall in the bulk room was defaced, with President Obama's face replaced with the image of a monkey. (Pl. 56.1 ¶ 114; Belvin Tr. at 54:10-55:22.) Mr. Belvin reported this incident to Juan Martinez, his foreman, who allegedly responded that whoever defaced the image was merely joking. (Belvin Tr. at 57:20-25.)

Starting as early as 2012, Mr. Belvin was frequently called "moreno," a derogatory word for a Black person in Spanish, by certain of EML's Spanish-speaking employees. (Pl. 56.1 ¶ 124; Belvin Tr. at 99:3-20.) He also alleges that other employees would refer to him as "[n-word]". (Pl. 56.1 ¶ 125; Belvin Tr. at 98:3-99:7.)

In 2013, Mr. Belvin's co-workers hung a stuffed monkey from his locker. (Pl. 56.1 ¶ 111; Belvin Tr. at 34:18-35:7.) Mr. Belvin reported this incident to Mr. Martinez. (Belvin Tr. at 34:18-35:7.) Mr. Martinez then reported the incident and Mr. Belvin's complaint to Tom Prezioso, the general manager, who reportedly responded, "I don't want to hear about that shit." (Belvin Tr. at 44:21-45:13.)

Mr. Belvin claims there were several other incidents involving stuffed monkeys, or other jungle animals, and plastic figurines of monkeys being placed in the locker room, the lunch break area, and the garbage compactor room. Mr. Belvin asserts that this kind of behavior was a regular occurrence, and that he did not always report it to management. (Belvin Tr. at 83:12-84:11.) Mr. Belvin also claims the other employees would harass him by turning off the lights in the locker room, or in rooms where he was eating, and saying, "[y]ou can't see Mike." (Belvin Tr. at 78:2-7.)

Mr. Belvin claims that in 2013, when he asked manager Anthony Caiozzo to provide help in stripping floors, Mr. Caiozzo told Mr. Belvin to shut his "fucking black mouth." (Pl. 56.1 ¶ 123; Belvin Tr. at 106:3-8, 115:15-16.) EML disputes this claim and asserts Mr. Belvin never reported these comments to anyone at EML. (Def. Reply ¶ 123.)

Mr. Belvin claims that in 2014 his manager Ed Wiley told him he had to stop using his personal hand truck at work, and instead use the hand truck that was issued to him by EML. (Belvin Tr. at 232:8-23.) After Mr. Belvin was told he could no longer use his personal hand truck, he learned that two Hispanic employees,

who used the same type of personal hand trucks, were apparently allowed to keep using their hand trucks. (Belvin Tr. at 235:21-236:8, 237:8-12, 241:6-13; Pl. 56.1 ¶¶ 128-29.) EML asserts that Mr. Belvin was told not to use his personal hand truck for safety reasons, and that he was not disciplined and suffered no decrease in pay, benefits, or position for using the unauthorized hand truck. (Def. Reply ¶¶ 128-29.)

Mr. Belvin claims that in 2014 he was passed over for a promotion to foreman because he did not have a good relationship with the general manger, Mr. Prezioso, although Mr. Belvin admits he never applied for the position. (Pl. 56.1 ¶ 127; Belvin Tr. at 212:21-213:11; Def. Reply ¶¶ 127, 130.) He also claims that Mr. Prezioso offered the foreman job to Jose, a Hispanic employee who was not as senior as Mr. Belvin, and whom Mr. Belvin had trained as a porter. (Pl. 56.1 ¶ 130; Belvin Tr. at 285:13-286:10.)

Mr. Belvin testified that in 2015, he was assaulted while on the job and called for help over the employees' radio system. (Belvin Tr. at 226:6-10.) Mr. Wiley arrived on the scene about 15 minutes later, accompanied by an electrician, and Mr. Belvin expressed frustration that it had taken so long for Mr. Wiley to respond to his call. (Belvin Tr. at 226:13-19.) Mr. Wiley allegedly said to the electrician, of Mr. Belvin, "[h]e's always complaining about something. They complain about that shit in South Carolina, about that church thing," which Mr. Belvin understood to be a reference to the massacre of nine African-American churchgoers at Emanuel African Methodist Episcopal Church in Charleston, South Carolina by a white supremacist on June 17, 2015.  (Belvin Tr. at 226:13-24; Def 56.1 ¶ 40.) EML asserts that Mr. Belvin never made a complaint about these alleged statements. (Def. 56.1 ¶ 40.)

Mr. Belvin claims that on December 24, 2015, a white male coworker, David Bourgade, greeted Mr. Belvin by saying "[w]hat's up boy"; after Mr. Belvin told Mr. Bourgade to stop and

complained to supervisors, EML claims that it suspended Mr. Bourgade from work for one day. (Def. 56.1 ¶¶ 37-38; Pl. 56.1 ¶ 37.) Mr. Belvin disputes that EML disciplined Mr. Bourgade, (Pl. 56.1 ¶ 38), and there is no evidence in the record that Mr. Bourgade was formally disciplined. Mr. Belvin claims that in December of 2016, another employee, Ray Zayas, repeatedly called Mr. Belvin "boy" after Mr. Belvin told him not to. (Def. 56.1 ¶ 41; Pl. 56.1 ¶ 41; Belvin Tr. at 215:4-14, 216:2-20.) After Joseph Capasso, Manager of First and Second Housing, heard Mr. Zayas make these remarks over the radio, Mr. Zayas was suspended for one day. (Def. 56.1 ¶ 41; Pl. 56.1 ¶ 41; Belvin Tr. at 219:2-14.)

Mr. Belvin claims he experienced emotional distress as a result of the years of racist abuse he allegedly experienced while working for EML. (Belvin Affidavit ("Belvin Aff.") (Dkt. 47) ¶ 7.) EML asked Mr. Belvin during his deposition whether he was making a claim and seeking damages for emotional distress, to which Mr. Belvin replied at the time he was not. (Def. 56.1 ¶ 66; Belvin Tr. at 326:6-9.) However, Mr. Belvin has since stated that he was confused about the requirements for making such a claim, and mistakenly believed he could not bring a claim for emotional distress unless he had verification from a mental health expert. (Pl. 56.1 ¶ 66; Belvin Aff. ¶ 7.) Mr. Belvin confirmed in his affidavit that he wishes to maintain his claim for emotional distress damages. (Belvin Aff. ¶ 7.)

EML contends that, over the course of his employment, Mr. Belvin received numerous warnings and other forms of discipline for failing to abide by employee protocols. For example, Mr. Belvin allegedly received a written warning on February 26, 2015 for wearing a non-EML-issued jacket, wearing a cell-phone earpiece while working, and because of issues with his weekly timesheets. (Def. 56.1 ¶ 14.) The warning stated that Mr. Belvin's next infraction could lead to suspension. (*Id.*) EML also asserts Mr.

Belvin received a written warning for video-recording his coworkers during his shift on June 25, 2015. (*Id.* ¶ 15.)

EML points to several other write-ups and disciplinary actions taken against Mr. Belvin which occurred after Mr. Belvin filed his initial complaint with the EEOC. (*See* Def. 56.1 ¶¶ 15-20, 22-27.) Specifically, EML states Mr. Belvin was either issued a written warning or was otherwise disciplined for the following infractions: failing to answer multiple calls over his EML-issued radio on August 12, 2015 (Def. 56.1 ¶ 16); wearing headphones while working on September 2, 2015 (*id.*); not wearing proper uniform while working in the winter of 2015 (*id.* ¶ 17); removing a piece of a kitchen floor from an apartment that he believed contained asbestos without first notifying management in March 2016 (*id.* ¶ 18); disrupting a safety meeting in April 2016 (*id.*); taking photos of work areas when he was supposed to be working in April 2016 (*id.*); entering apartments in which he was not assigned to work in April 2016 (*id.*); arriving 15-20 minutes late to a training session in December 2016 (*id.* ¶ 20); taking two unauthorized days off in the spring of 2017 (*id.* ¶ 24); and failing to clock out after working unauthorized overtime on May 11, 2017 (*id.* ¶ 25). Sometime after he filed his EEOC complaint, EML's general counsel, Vito Mundo, allegedly told Mr. Belvin that he would make Mr. Belvin's disciplinary record, "go away" if Mr. Belvin dropped his EEOC complaint. (Pl. 56.1 ¶ 138; Belvin Tr. at 246:11-247:25.)

In July 2015, EML suspended Mr. Belvin for three days for throwing a garbage bag and giving Caiozzo and Prezioso "an aggressive look and using an aggressive tone." (Def. 56.1 ¶ 58; Pl. 56.1 ¶ 58.) After arbitrating the suspension in November 2016, the arbitrator ruled in Mr. Belvin's favor and concluded that his conduct did not justify the suspension, although the arbitrator did note Mr. Belvin had an "attitude." (Def. 56.1 ¶ 59; Pl. 56.1 ¶

59.) EML repaid Mr. Belvin for the three days of work he had missed. (Def. 56.1 ¶ 59; Pl. 56.1 ¶ 59.)

On August 16, 2016, EML suspended Mr. Belvin for one day without pay after he said over the radio, "Enis, you need to come here now, we have asbestos wall paper in my recycling area." The suspension was later converted into a final warning letter, and EML repaid Mr. Belvin for the day of work he missed. (*See* Def. 56.1 ¶ 19; Pl. 56.1 ¶ 19.)

EML states that on February 2, 2017, Mr. Belvin received a written warning after Richard Bonette, 32BJ shop steward, filed a complaint about Mr. Belvin. (Def. 56.1 ¶ 22; Pl. 56.1 ¶ 22.) EML instructed Mr. Belvin to stay away from Mr. Bonette and to stay out of Second Housing, where Mr. Bonette worked. (Def. 56.1 ¶ 22; Pl. 56.1 ¶ 22.) EML issued Mr. Belvin a written warning after Mr. Belvin subsequently entered Second Housing. (Def. 56.1 ¶ 23; Pl. 56.1 ¶ 23.)

Mr. Belvin asserts that, around 2017 or 2018, he was disciplined for working past the end of his scheduled shift. (Belvin Tr. at 138:8-142:5; Def. 56.1 ¶ 131.) Mr. Belvin contends that, by contrast, a Hispanic coworker was permitted to sleep in the laundry room, apparently without being reprimanded. (Pl. 56.1 ¶ 131; Belvin Tr. at 138:18-139:14.) EML disputes this claim. (Def. Reply ¶ 131.) Mr. Belvin also claims he was taken out of the overtime pool, and was given overtime opportunities only for snow removal work. (Pl. 56.1 ¶¶ 64-65.) EML states that it offers overtime to employees based on a rotating list, and that they also call out overtime requests over the radio. (Def. 56.1 ¶ 64; Def. Reply ¶¶ 64-65.)

### B.   Mr. Mayers's Claims

Mr. Mayers started working for the Electchester Co-Op as a porter in the Second Housing Company in 2004, became an EML employee in 2007 when EML was formed, and since 2013 has

8

worked in the First Housing Company. (Def. 56.1 ¶ 67; Pl. 56.1 ¶ 67.) Mr. Mayers is African-American and was diagnosed with leukemia on July 1, 2014. (Pl. 56.1 ¶ 154; Mar. 7, 2019 Tr. of Mayers Dep. ("Mayers Tr.") (Dkt. 44-3) at ECF p. 721, 30:5-10.)

In 2013, EML transferred Mr. Mayers to two buildings, with 72 units total, that lack elevators. (Pl. 56.1 ¶ 150; Def. 56.1 ¶ 77; Mayers Tr. at 61:11-25, 64:7-65:4.) He asserts that when he was transferred, he had to make up work that the previous porter had failed to do, including stripping the floors, which had become black from apparent neglect. (Mayers Tr. 76:3-21.) Mr. Mayers claims he and the only other Black porter in his housing unit, David Hewitt, were told to cover multiple other buildings when the porters in charge of those buildings went on vacation, when the typical protocol is that each porter is only responsible for covering one other building when the assigned porter goes on vacation. (Mayers Tr. at 68:18-71:5.) Mr. Mayers asserts this is not the normal practice, and he does not know of any other porters being asked to cover more than one other building's vacation time. (Mayers Tr. at 71:24-72:18.)

Mr. Mayers asserts that Mr. Prezioso, the general manager, constantly monitored his work. (Def. 56.1 ¶ 75; Pl. 56.1 ¶ 75; Mayers Tr. at 44:16-21, 59:11-14.) For example, Mr. Mayers testified that he and Mr. Hewitt were targeted by Mr. Prezioso, who directed Mr. Wiley to remind them multiple times a week that their buildings were not sufficiently clean. (Mayers Tr. at 49:19-50:25.) When Mr. Mayers asked for clarification about what he was doing wrong, he never received a clear answer. (Mayers Tr. at 51:6-19, 54:8-56:4.) Mr. Mayers claims Mr. Prezioso did not monitor non-Black employees in his housing unit in this manner. (Mayers Tr. at 49:19-50:17.)

Around 2013, Mr. Mayers was assigned to strip a floor by himself, even though this task typically requires four people. (Mayers Tr. at 80:5-10.) When he asked for help carrying the floor-stripping

machine, his request was denied (Pl. 56.1 ¶ 150; Mayers Tr. at 87:10-19.) Mr. Mayers claims that only Black porters were asked to perform this task without any help, and that non-Black employees were allowed to work in teams when stripping floors. (Pl. 56.1 ¶¶ 148, 150; Mayers Tr. at 44:16-45:4, 47:12-48:5, 84:2-24, 90:20-92:2.) EML disputes Mr. Mayers's allegation and contends that several non-Black porters attended the meeting at which management announced that porters would be expected to strip floors on their own. (Def. Reply ¶ 148; Mayers Tr. at 82:2-83:10.) Mr. Mayers also claims that he was asked to put up Christmas decorations without assistance in 2013; he alleges that he filed a grievance, and that EML no longer expects porters to complete this task without help. (Def. 56.1 ¶ 86; Pl. 56.1 ¶ 86.)

Mr. Mayers asserts he was taken out of the overtime pool some time in 2013 and not offered overtime except for snow removal. (Pl. 56.2 ¶ 142; Mayers Tr. at 202:22-25, 205:10-22, 207:18-22.) In early 2013, Mr. Mayers complained to Mr. Bonnette, the shop steward, that overtime was not being distributed according to seniority; after Mr. Bonnette spoke to Mr. Mayers's supervisors, Mr. Mayers received overtime compensation. (Def. 56.1 ¶ 91; Mayers Tr. at 205:15-22.) EML asserts Mr. Mayers chose not to work overtime after he returned to work from his medical leave because of his health issues. (Def. 56.1 ¶ 94; Pl. 56.1 ¶ 94.) Mr. Mayers does not dispute that he did not seek overtime after returning from sick leave, but he asserts that he sought and was denied overtime opportunities prior to his leave. (Mayers Tr. at 202:22-25; 203:4-20.)

Mr. Mayers claims he was passed over for a promotion in favor of another employee who was white; however, EML disputes this claim. (Pl. 56.1 ¶ 145; Def. Reply ¶ 145.) Mr. Mayers also witnessed the monkey hanging from Mr. Belvin's locker. (Mayers Tr. at 306:19-308:10.) Mr. Mayers and Mr. Belvin complained to

Juan, the foreman, about the locker incident, but Mr. Mayers asserts that management did not take the situation seriously. (Pl. 56.1 ¶ 145; 307:20-308:6.) Mr. Mayers also alleges that a coworker, Louie Orego, told him that "Black girls . . . smell" and that Michelle Obama looked like a gorilla. (Pl. 56.1 ¶ 145; Mayers Tr. at 317:17-318:23.) In April 2014, Mr. Mayers was suspended for one day after telling Mr. Belvin to "stop sucking management off" during a meeting. (Def. 56.1 ¶ 71; Pl. 56.1 ¶ 71; Mayers Tr. at 179:9-19.) After Mr. Mayers challenged the suspension, EML repaid him for the lost day of work. (Def. 56.1 ¶ 71; Pl. 56.1 ¶ 71; Mayers Tr. at 179:9-180:8.)

Following Mr. Mayers's leukemia diagnosis, he took an extended leave of absence for approximately twelve months, beginning in early July 2014. Mr. Mayers was diagnosed with leukemia on July 1, 2014, and his last day at work before taking sick leave was July 3, 2014. (Pl. 56.1 ¶ 154; Mayers Tr. at 31:24-33:13, 47:15-18, 140:10-22.) Mr. Mayers alleges that despite the fact that he worked for the first six months of 2014, he was not awarded a bonus that year. (Mayers Tr. at 191:6-193:13.) On May 18, 2015, while still on leave for cancer treatment, Mr. Mayers filed his initial EEOC complaint. About two months later, on July 24, 2015, Mr. Mundo, EML's general counsel, terminated him due to his absence pursuant to the 32BJ CBA. (Pl. 56.1 ¶ 158; Def. Reply ¶ 158; Mayers Tr. at 126:23-127:23, 138:4-23.) However, after Mr. Mayers challenged the termination, EML agreed to reinstate him, and he returned to work on August 17, 2015. (Def. Reply ¶ 158; Mayers Tr. at 130:6-132:17.) Upon returning to work, Mr. Mayers requested reasonable accommodations so he could attend chemotherapy treatment. (Pl. 56.1 ¶ 155; Sept. 21, 2015 Dr. Pinkal Desai Letter ("Dr. Desai Letter") (Dkt. 46-1) at ECF p. 8.) Mr. Wiley sent Mr. Mayers a letter stating his reasonable accommodation request could be approved only if Mr. Mayers gave Mr. Wiley permission to discuss his medical status with other employees. (Pl. 56.1 ¶ 159; Sept.

10, 2015 Ed Wiley Letter ("Wiley Letter") (Dkt. 46-1) at ECF p. 5.) EML asserts that it granted Mr. Mayers's several disability-related absences and allowed him to switch shifts with other employees so he could attend chemo treatment. (Def. Reply ¶¶ 155, 159).

In November 2017, Mr. Mayers got into an argument with foreman Enis Zudjelovic, in which he said, "[w]hat do I look like? Your little [n-word] slave?" EML suspended Mr. Mayers for two days as a result of the incident. (Def. 56.1 ¶ 73; Pl. 56.1 ¶ 73; Mayers Tr. at 185:11-186:17.) Mr. Mayers filed a grievance to dispute the suspension to no avail. Around this same time, management approached other employees to inquire whether Mr. Mayers bullied them. Pursuant to this investigation, management apparently solicited written statements from seven people. Six of the statements are type-written and describe interpersonal issues with Mr. Mayers, and the seventh is a hand-written note describing Mr. Mayers as "kind hearted." (See Nov. 30, 2017 Written Statements (Dkt 44-3) at ECF pp. 1,534-40.) Mr. Mayers asserts that when management approached him about these bullying allegations, it referred to the subject of its investigation as "playing" rather than "bullying." (Mayers Tr. at 253:14-254:18.) Mr. Mayers claims he inquired whom he had upset by his "playing," but management would not tell him who had made the complaints. (Mayers Tr. at 253:20-24.) Mr. Mayers disputes that he bullied anyone (Pl. 56.1 ¶ 168), and did not face any formal discipline as a result of the complaints.

EML asked Dr. Mark Siegert to evaluate Mr. Mayers on May 29, 2019 as part of the discovery process. (See June 30, 2019 Forensic Psych. Eval. Rep. ("Psych. Rep.") (Dkt. 44-3) at ECF p. 1,542.) Dr. Siegert concluded that Mr. Mayers "has such a high level of paranoia, episodic psychosis . . . that . . . make it impossible to have a high level of confidence in how he interprets events at the

12

workplace." (Def. 56.1 ¶ 105.) Dr. Siegert noted that Mr. May-
ers's psychiatrist prescribes him a high dose of an antipsychotic
medication, and that this in addition to the results of Dr. Siegert's
own evaluation led him to believe Mr. Mayers has a serious men-
tal illness. (*Id.*) Dr. Siegert extrapolates from this diagnosis that
"it is not possible to have confidence that his work-place claims
are accurate." (*Id.*) Dr. Siegert concluded that Mr. Mayers has a
"Histrionic Personality Type," a "Negativistic Personality Type,"
that he is "Interpersonally Contrary," and has a "Paranoid Per-
sonality Style." (*Id.* ¶¶ 109-10.)

### C.   Procedural History

Both Mr. Belvin and Mr. Mayer filed, and then amended, com-
plaints with the EEOC. Mr. Belvin filed a complaint with the
EEOC on May 21, 2015 alleging race discrimination, which he
amended on July 23, 2015 to include a retaliation claim, and the
EEOC issued a Right to Sue letter on July 31, 2017. (May 21,
2015 Belvin EEOC Compl. ("Belvin EEOC Compl.") (Dkt. 46-1)
at ECF p. 16; July 23, 2015 Belvin EEOC Amended Compl. ("Bel-
vin EEOC Amend.") (Dkt. 46-1) at ECF p. 15; P. 56.1 ¶ 13.) Mr.
Mayers filed his initial EEOC complaint on May 18, 2015, which
he amended on August 26, 2015, and the EEOC issued a Right
to Sue letter on July 31, 2017. (May 18, 2015 Mayers EEOC
Compl. ("Mayers EEOC Compl.") (Dkt. 46-1) at ECF p. 10; Aug.
26, 2015 Mayers Am. EEOC Compl. ("Mayers Am. EEOC") (Dkt.
46-1) at ECF p. 9.) Plaintiffs filed their complaint in this court on
October 29, 2017. (Am. Compl.) EML filed a fully briefed motion
for summary judgment on April 13, 2020. (Mot.; Def. Mem. in
Supp. of Mot. ("Mem.") (Dkt. 49); Mem. in Opp. to Mot. ("Opp.")
(Dkt. 45).)

## II. LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a). "The role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried. In determining whether summary judgment is appropriate, this [c]ourt will construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011).[2] "A 'material' fact is one capable of influencing the case's outcome under governing substantive law, and a 'genuine' dispute is one as to which the evidence would permit a reasonable juror to find for the party opposing the motion." *Figueroa v. Mazza*, 825 F.3d 89, 98 (2d Cir. 2016) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The movant may discharge its initial burden by demonstrating that the non-movant "has 'failed to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Lantheus Med. Imaging, Inc. v. Zurich Am. Ins.*, 225 F. Supp. 3d 443, 451 (S.D.N.Y. 2015) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986)).

While the court must draw all inferences in favor of the non-movant, the non-movant "may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995). Finally, in considering the movant Defendants' motion, the court is mindful that the Second Circuit "has long

---

[2] When quoting cases, and unless otherwise noted, all citations and quotation marks are omitted and all alterations are adopted.

recognized the need for caution about granting summary judgment to an employer in a discrimination case where . . . the merits turn on a dispute as to the employer's intent." *Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 74 (2d Cir. 2016). Nevertheless, "[t]hough caution must be exercised in granting summary judgment where intent is genuinely in issue, summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 40 (2d Cir. 1994).

## III. DISCUSSION

Because Plaintiffs bring multiple claims under several federal, state, and city statutes, the court addresses them by theory of discrimination.

### A.   Hostile Work Environment

Plaintiffs assert claims for hostile work environment under Title VII, NYSHRL, and NYCHRL. Analyses of hostile work environment claims under federal and state law are coextensive. *Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 670 (S.D.N.Y. 2012). To succeed on a hostile work environment claim under federal and state law, a plaintiff must show first that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," and second that "a specific basis exists for imputing the conduct that created the hostile work environment to the employer." *Howley v. Town of Stratford*, 217 F.3d 141, 153-154 (2d Cir. 2000). Incidents of harassment must be continuous and not merely episodic. *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 102 (2d Cir. 2010). Courts consider several factors in evaluating hostile work environment claims, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and

whether it unreasonably interferes with the employee's work performance. *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003). As such, "simple teasing, offhand comments, and isolated incidents (unless extremely serious)" are generally insufficient to sustain a hostile work environment claim. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Although courts are generally reluctant to grant summary judgment in such matters, "courts use a totality of the circumstances approach for determining whether a plaintiff's work environment is sufficiently hostile to support a hostile work environment claim." *Love v. City of N.Y. Dep't of Consumer Affs.*, 390 F. Supp. 2d 362, 371 (S.D.N.Y. 2005).

Consistent with its broad remedial purpose, the standard for hostile work environment claims under the NYCHRL is considerably less stringent than under NYSHRL and federal law. Under the NYCHRL, there is no requirement that conduct be severe or pervasive before a hostile work environment claim may be sustained and "even a single comment may be actionable in appropriate circumstances." *Gorokhovsky v. N.Y.C. Hous. Auth.*, 552 F. App'x 100, 102 (2d Cir. 2014). As such, for the NYCHRL claim, the court must determine only whether "there is a triable issue of fact as to whether the plaintiff has been treated less well than other employees because of" his membership in a protected class. *Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 671 (S.D.N.Y. 2012). "With that said, the NYCHRL, like Title VII and the NYSHRL, is still not a general civility code, and petty slights and trivial inconveniences are not actionable." *Id.*

### 1.   Mr. Belvin

Mr. Belvin has adduced sufficient evidence from which a reasonable juror could find he was subjected to a work environment permeated with racial enmity sufficient to alter the terms and conditions of his employment. Mr. Belvin testified that both he and Mr. Mayers were referred to as "[n-word]" on multiple occasions, and that his manager, Juan Martinez, would frequently

refer to him as "moreno" over the radio. (Belvin Tr. at 99:3-25). In 2013, Mr. Caiozzo, a manager, reportedly told Mr. Belvin to "shut his fucking black mouth" when Mr. Belvin asked Mr. Caiozzo for help stripping floors. (*Id*. at 103:16-106:8.) Mr. Belvin also had to endure his coworkers frequently calling him "boy," even after one co-worker, Mr. Bourgade, had been specifically instructed not to refer to Mr. Belvin or any Black employee in this manner. (*Id*.. at 196:13-197:8.)

In addition to being on the receiving end of racist language, Mr. Belvin found toy monkeys or images of monkeys placed in his various work areas on multiple occasions. (*See id*. at 34:18-35:7, 38:4-39:4, 54:10-55:25; *see also* Pl.'s Photo of Plastic Monkey (Dkt. 46-1) at 2; Pl.'s Photo of Stuffed Monkey (Dkt. 46-1) at 3; Pl.'s Photo of Figurine (Dkt. 46-1) at 4.) In 2013, after finding the stuffed monkey hanging from his locker, Mr. Belvin complained to his manager, Mr. Martinez, who then told Mr. Prezioso; Mr. Prezioso reportedly responded that he did not want to hear about it and no further investigation was undertaken.[3] (Belvin Tr. at 44:14-45:23.) Mr. Belvin also asserts that around 2012 and 2013 stuffed monkeys and other jungle animals were placed in the area where he and Mr. Mayers ate lunch. (*Id*. at

---

[3] The court notes that Mr. Prezioso asserts a different version of events with respect to the incident involving the toy monkey hanging on the locker. He testified during his deposition that he first learned about the problem from Mr. Wiley over the phone, around the time it happened—although he did not remember when this was. (Prezioso Tr. (Dkt. 44-3) at ECF p. 117, 50:11-52:25.) He asserts he told Mr. Wiley to investigate, and that Mr. Wiley did not find evidence of a monkey or anyone willing to admit they were responsible for hanging it from Mr. Belvin's locker. (*Id*. at 50:21-52:8.) Mr. Prezioso then apparently spoke to EML's general counsel, Mr. Mundo, about it, and no further investigation was made. (*Id*. at 52:9-18.) While this conflicts with Mr. Belvin's account, it does not undermine a finding that Mr. Belvin has succeeded in raising a genuine issue of fact for trial, especially in light of the requirement that the court draw all reasonable inferences in favor of the non-moving party.

59:25-60:19.) And, even after alerting management to the situation, Mr. Belvin found yet another plastic monkey in the compactor room in 2015. After Mr. Belvin complained to Mr. Wiley about these stuffed animals, Mr. Wiley took unspecified actions to put a stop to it. (*Id*. at 80:19-83:18; *see also* Pl.'s Photo of Plastic Monkey.) Taken together, a reasonable jury could conclude that these facts, if proven at trial, establish that Mr. Belvin was subjected to a hostile work environment because of his race.

Further, Mr. Belvin has established a sufficient basis to impute the harassment to EML. "When the source of the alleged harassment is a co-worker, the plaintiff must demonstrate that the employer failed to provide a reasonable avenue for complaint or [that] it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action." *Howley*, 217 F.3d at 154. "When . . . the alleged harasser is in a supervisory position over the plaintiff, the objectionable conduct is automatically imputed to the employer." *Gorzynski*, 596 F.3d at 103. Although Mr. Belvin did not complain to management about every racist remark or figurine, the record shows EML was aware of the ongoing, racialized abuse. (*See* Dec. 19, 2014 Saliche Memo. (Dkt. 44-3) at ECF p. 1,491 (memorializing Mr. Belvin's complaint against Mr. Saliche for referring to him as "moreno"); Dec. 29, 2016 Zayas Memo. (Dkt. 44-3) at ECF p. 1,502 (suspending Mr. Zayas for referring to Mr. Belvin as "boy"); Belvin Tr. at 36:22-37:21 (Mr. Prezioso saying he did not want to hear about the monkey on Mr. Belvin's locker); *id*. at 103:16-106:8 (Manager Anthony Caiozzo telling Mr. Belvin to "shut his fucking black mouth").) And while there is evidence management took steps to remediate some of the racist language used by specific coworkers by disciplining them, there is scant evidence they did the same when it came to the toy animals. Accordingly, Mr. Belvin has adduced facts sufficient to impute the harassment by his coworkers and supervisors to

EML. [4] *See Faragher*, 524 U.S. at 789 ("[T]he combined knowledge and inaction may be seen as demonstrable negligence, or as the employer's adoption of the offending conduct and its results, quite as if they had been authorized affirmatively as the employer's policy."). Therefore, EML's motion for summary judgment on Mr. Belvin's federal, state, and city hostile work environment claims is denied.

2.  Mr. Mayers

Mr. Mayers has likewise adduced sufficient evidence from which a reasonable juror could conclude EML subjected him to a hostile work environment. Mr. Mayers's harassment claim rests on largely the same facts as Mr. Belvin's. Mr. Mayers witnessed the stuffed monkey hanging from Mr. Belvin's locker, as well as the monkey hanging from the door of the room that Mr. Belvin used to change clothes. (Mayers Tr. at 307:2-308:6, 308:11-309:13.) He also witnessed the defaced image of President Obama, and further alleges that a co-worker, Louie Orego, "used to say Michelle Obama looks like a monkey, like a gorilla . . . ." (Mayers Tr. at 317:17-19.) Mr. Orego allegedly also told Mr. Mayers that

---

[4] Defendant's argument that Mr. Belvin cannot rely on his own deposition testimony to create a fact issue for summary judgment is misguided. "Although summary judgment is proper where there is nothing in the record to support plaintiff's allegations other than plaintiff's own contradictory and incomplete testimony, district courts should not engage in searching, skeptical analyses of parties' testimony in opposition to summary judgment," *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014). Rather, "[i]n the ordinary case where a district court is asked to consider the contradictory deposition testimony of a fact witness, or where the contradictions presented are not real, unequivocal, and inescapable, the general rule remains that a district court may not discredit a witness's deposition testimony on a motion for summary judgment, because the assessment of a witness's credibility is a function reserved for the jury." *In re Fosamax Products Liability Litig.*, 707 F.3d 189, 194 n.4 (2d Cir. 2013). Because EML does not argue that Mr. Belvin's testimony is impermissibly contradictory or incomplete, there is no basis for the court to disregard it at this stage.

"he don't mess with black girls because they got a smell." (Mayers Tr. at 318:12-13.) Mr. Mayers also claims he complained to Mr. Prezioso when another employee, Giovanni Trochia, called Mr. Mayers "boy." (Mayers Tr. at 332:24-334:25.) Mr. Prezioso apparently investigated and spoke to Mr. Trochia about the incident, although it is not clear whether any disciplinary measures were taken. (Mayers Tr. at 334:18-23.) Mr. Mayers also claims that Mr. Belvin told him that Mr. Zayas called Mr. Belvin "boy" over the radio, and about Mr. Wiley's comments about the church shooting. (Mayers Tr. at 335:2-336:25.)

Because Mr. Mayers witnessed many of the facts supporting Mr. Belvin's harassment claim, in addition to the claims specific to Mr. Mayers described above, Mr. Mayers has established a pattern of racist harassment sufficient to establish a hostile work environment claim under Title VII, NYSHRL, and NYCHRL. *See Gorzynski*, 596 F.3d at 103 ("[I]ncidents of . . . harassment directed at employees other than the plaintiff can be used as proof of a hostile work environment claim because one of the critical inquiries is the general work atmosphere as well as specific hostility to the plaintiff."). Accordingly, EML's motion for summary judgment on Mr. Mayers's federal, state, and city hostile work environment claims is denied.

### B.   Race Discrimination

Plaintiffs next argue that they were discriminated against on the basis of their race because they were treated less favorably than their non-African-American co-workers in the terms and conditions of their employment. Such disparate treatment claims brought under Title VII, NYSHRL, and 42 U.S.C. § 1981 are analyzed under the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Walsh*, 828 F.3d at 74-75 (applying framework to Title VII and NYSHRL); *Littlejohn v. City of N.Y.*, 795 F.3d 297, 312 (2d Cir. 2015) (applying framework to § 1981). Disparate

treatment claims brought under the NYCHRL must be analyzed "separately and independently from any federal and state law claims . . . construing the NYCHRL's provisions broadly . . . to the extent that such a construction is reasonably possible." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013).

First, a plaintiff must establish a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. The plaintiff's burden at this first step is "not onerous," *see Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981), and "minimal". *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). To establish a prima facie case under any of these statutes, including NYCHRL, a plaintiff show that: (1) he is a member of a protected class; (2) he was qualified for and satisfactorily performing his job; (3) he suffered an adverse employment action; and (4) the circumstances of the adverse action raise an inference of discrimination. *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008). Second, once a plaintiff makes a prima facie showing, a presumption of discrimination arises and the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment action. *Id.; see also Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 136 (2d Cir. 2000) ("After a plaintiff demonstrates a prima facie case of discrimination, the defendant must produce evidence which, taken as true, would permit the conclusion that there was a non-discriminatory reason for the adverse action."). Third, the burden shifts back to the plaintiff, who then must "prove by a preponderance of the evidence that the reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 123 (2d Cir. 2004). To meet this burden, "the plaintiff may, depending on how strong it is, rely upon the same evidence that comprised her prima facie case, without more." *Id.* at 124. Furthermore, to defeat summary judgment, "the plaintiff is not required to show that the employer's

proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors." *Id.* at 123.

EML does not dispute the first two elements of Plaintiffs' prima facie cases—that Plaintiffs, both African-American men, are members of a protected class and qualified for their position as porters—but contends that neither Plaintiff has demonstrated the third and fourth element, *i.e.* that he suffered an adverse employment action and that any alleged adverse employment action occurred under circumstances giving rise to an inference of discrimination.

The Second Circuit has established that an adverse employment action is a "materially adverse change in the terms and conditions of employment," *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008), meaning an action "which is more disruptive than a mere inconvenience or an alteration of job responsibilities." *Terry*, 336 F.3d at 138. Some examples "include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Id.* In addition, courts in this Circuit have found that "[t]he assignment of a disproportionately heavy workload, in itself, may constitute an adverse action." *Joseph v. Brooklyn Developmental Disabilities Servs. Off.*, No. 12-cv-4402, 2016 WL 6700831, at *20 (E.D.N.Y. Sept. 30, 2016) (citing *Feingold v. New York*, 366 F.3d 138, 153 (2d Cir. 2004)).

An adverse employment action can be shown to have occurred under circumstances giving rise to an inference of discrimination through evidence of, *inter alia*, "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group;

22

or the more favorable treatment of the employees not in the protected group; or the sequence of events leading to plaintiff's discharge." *Littlejohn*, 795 F.3d at 312. Where, as in this case, a plaintiff relies on disparate treatment evidence to raise an inference of discrimination, he "must show [that he] was similarly situated in all material respects to the individuals with whom he seeks to compare [him]self." *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003); *see also Blaise v. Verizon N.Y. Inc.*, 804 F. App'x 68, 70 (2d Cir. 2020) ("An employee is similarly situated to co-employees if they were (1) subject to the same performance evaluation and discipline standards and (2) engaged in comparable conduct.").

### 1.   Mr. Belvin

Mr. Belvin alleges numerous adverse employment actions, each of which he claims occurred under circumstances giving rise to an inference of discrimination: (1) he was told not to use his personal hand truck even though Hispanic employees were permitted to use their personal hand trucks; (2) he was removed from the overtime pool, and only permitted to earn overtime pay by performing emergency snow removal; (3) he was subject to a series of disciplinary actions for "small things"; and (4) he was subjected to a hostile work environment.

### a.   Hand Truck

Mr. Belvin claims that he suffered an adverse employment action when EML prohibited him from using his personal hand truck. According to Mr. Belvin, he used his personal hand truck, which is larger than the EML-issued hand trucks, because it allowed him to more efficiently carry the many items, such as garbage bags, he was responsible for disposing of each day. (Belvin Tr. at 232:6-233:20.) As a result of being forced to use the smaller, EML-issued hand truck, Mr. Belvin asserts that his workload increased substantially: while he was able to move up to nine garbage bags at a time with his personal hand truck, the smaller

hand truck only allowed him to move two at a time. (Belvin Tr. at 232:6-16.)

While the use of the EML-issued hand truck might have made Mr. Belvin's garbage disposal duties less efficient, he fails to establish that the requirement that he use an EML-issued hand truck was "more disruptive than a mere inconvenience" to the conditions of his work. *Terry*, 336 F.3d at 138. Likewise, the evidence does not suggest that the change in hand truck constituted an assignment of a "disproportionately heavy workload" for Mr. Belvin. *Cf. Feingold*, 366 F.3d at 153 ("assignment of a disproportionately heavy workload" can constitute an adverse employment action). Accordingly, Mr. Belvin has failed to establish a prima facie case of discrimination on his hand truck claim, and the court grants summary judgment to EML on that claim.

### b. Overtime pool

Mr. Belvin next claims he suffered an adverse employment action when he was removed from the overtime pool while other Hispanic and white porters were allocated overtime in the usual course. (Pl. Mem. at 6; Def. 56.1 ¶¶ 63-65; Pl. 56.1 ¶¶ 63-65.) Removal from an overtime pool can often constitute an adverse employment action. *See, e.g.*, *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 217-18 (E.D.N.Y. 2014) (collecting cases). Here, however, the evidence does not support Mr. Belvin's assertion that EML removed him from the overtime pool. To the contrary, Mr. Belvin's own testimony corroborates EML's assertion that it used a rotating system to offer overtime as new projects become available and also called out requests for overtime work over the radio, to which anyone could respond. (Def. 56.1 ¶ 64.) For example, Mr. Belvin testified that he heard calls on the radio for overtime work, and that he could have accepted those offers (and that, on one occasion when his foreman offered him overtime, he took it). (Belvin Tr. at 25:9-28:2.) Further, despite his claims that he was denied overtime as a result of filing his EEOC complaint

24

in the summer of 2015, he could not recall a time since 2009 or 2010 when another porter took an overtime shift that Mr. Belvin had wanted to work. (Belvin Tr. at 296:5-18). Accordingly, Mr. Belvin has failed to adduce sufficient evidence from which a reasonable juror could conclude that EML removed him from the overtime pool.

### c.   Unfair discipline

Mr. Belvin also claims he was subject to a series of disciplinary actions for small infractions, and that Hispanic and white employees were not disciplined for similar infractions. (Def. 56.1 ¶¶ 49-50; Pl. 56.1 ¶ 49.) For example, Mr. Belvin was written up for staying at work past the end of his scheduled shift (Belvin Tr. at 144:16-18, 144:25-145:12), wearing an EML-issued hat improperly (*id.* at 143:22-144:13), and arriving twenty minutes late to a meeting (*id.* at 147:16-148:17), and he was suspended for throwing a bag of garbage. (*Id.* at 144:22-24.) However, Mr. Belvin has not provided any evidence to support a finding that EML's responses to these infractions amount to anything more than his "employer merely enforc[ing] its preexisting disciplinary policies in a reasonable manner," *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012). Accordingly, he cannot establish that these disciplinary measures constitute an adverse employment action. *See id.* (finding the plaintiff's suspension with pay pending an investigation into wrongdoing was not an adverse employment action); *Joseph*, 2016 WL 6700831, at *21 (E.D.N.Y. Sept. 30, 2016) ("Workplace reprimands/disciplinary write-ups . . . do not constitute adverse employment actions unless they result in a material change in benefits or to the terms and conditions of employment."). Thus, he has failed to establish the third prong of a prima facie case of discrimination based on these allegations of unfair discipline.

Morever, Mr. Belvin likewise fails to establish that the alleged unfair discipline was racially motivated. To the contrary, EML has

offered evidence that other employees were disciplined for similar infractions to those described by Mr. Belvin. (*See* Verbal Warning to Joe McCormick (Dkt. 44-3) at ECF p. 1,504 (staying at work past his scheduled shift without permission); Warning Letter to Rufino Quintana (Dkt. 44-3) at ECF p. 1,506 (same); Suspension Letter to Rufino Quintana (Dkt. 44-3) at ECF p. 1,508 (one day suspension for staying late without permission); Written Warning to Luis Herrera (Dkt. 44-3) at ECF p. 1,447 (failing to wear proper attire); Written Warning to David Bourgade (Dkt. 44-3) at ECF p. 1,445 (same).) Accordingly, Mr. Belvin's allegations of unfair discipline fall short of establishing a prima facie case of discrimination, and EML is entitled to summary judgment on this claim.

### d.  Hostile Work Environment

Mr. Belvin asserts that his co-workers' and supervisors' racist language and comments, as well as the repeated placement of toy and/or stuffed monkeys and images of monkeys in his work areas, constitute adverse employment actions sufficient to sustain his prima facie case of discrimination. The court construes his hostile work environment claim, *supra*, to satisfy the adverse employment action and disparate treatment prongs of his discrimination prima facie case. *See, e.g.*, *Feingold*, 366 F.3d at 149 ("A plaintiff may establish a claim of disparate treatment under Title VII . . . by demonstrating that harassment [on the basis of, *inter alia*, race] amounted to a hostile work environment.") Because Mr. Belvin has succeeded in establishing sufficient evidence to allow a reasonable factfinder to conclude EML subjected him to a hostile work environment, his disparate treatment claim may proceed on the same basis. Accordingly, EML's motion for summary judgment is denied with respect to this aspect of Mr. Belvin's discrimination claim.

### 2.   Mr. Mayers

Mr. Mayers claims he suffered the following adverse employment actions, each of which he claims occurred under circumstances giving rise to an inference of discrimination: (1) he was removed from the overtime pool; (2) he was told to strip floors alone without any help, although non-Black employees were allowed assistance in stripping floors; (3) he was subject to Mr. Prezioso's micromanagement, whereas non-Black employees were free from such scrutiny; (4) he was transferred to a 72-unit walk-up building; and (5) he was subjected to a hostile work environment.

#### a.   *Overtime pool*

First, Mr. Mayers claims he suffered an adverse employment action when EML removed him from the overtime pool following an argument between Mr. Mayers and his manager, Mr. Wiley. (Mayers Tr. at 202:3-22, 205:10-13, 218:9-219:7.) As explained above, removal from the overtime pool can constitute an adverse employment action. Unlike Mr. Belvin, Mr. Mayers has proffered evidence that he was in fact removed from the overtime pool, thus satisfying the third prong of the prima facie case. (Mayers Tr. at 218:9-219:7; 210:14-26; 221:3-19.) Mr. Mayers has also adduced evidence that the circumstances surrounding his removal were racially motivated. (*sSee id.* at 209:6-16 (explaining that all the non-black porters in Mr. Mayers's housing unit were not removed from the overtime pool).)

However, EML has proffered a non-discriminatory reason for Mr. Mayers's removal from the overtime pool, arguing that it was the result of an argument between Mr. Mayers and Mr. Wiley. And Mr. Mayers has failed to adduce evidence to suggest that this reasoning is pretext. To the contrary, Mr. Mayers himself attributes his removal from the overtime pool to an argument he had with his manager about his workload and his inability to help a coworker before finishing his own work. (*Id.* at 209:17-24.) The

only evidence he offers to suggest that the argument was mere pretext is the conclusory statement that "[e]verything they done was based on race." (*Id*. at 209:8-9.) Accordingly, Mr. Mayers has failed to establish a genuine issue of material fact as to his overtime pool claim, and summary judgment is granted in favor of EML.

> b.   *Stripping floors*

Mr. Mayers next claims he suffered an adverse employment action when he was told to strip floors alone even though EML's general policy was for porters to strip floors in teams. (*Id*. at 80:5-22; 83:7-10; Def. 56.1 ¶¶ 82-83.) Such a directive could well constitute an adverse employment action should it significantly increase the employee's workload. *See Joseph*, 2016 WL 6700831, at *20 (stripping floors, among other evidence of increased workload, found to be evidence of adverse employment action). Here, however, Mr. Mayers has not proffered any evidence that he actually stripped floors alone after the directive. (Mayers Tr. at 87:23-88:4.) He therefore has failed to demonstrate that his workload increased in a manner that would constitute an adverse employment action. Accordingly, EML is granted summary judgment on this claim.

> c.   *Micromanagement*

Mr. Mayers next claims he suffered an adverse employment action when he and the other Black porter in his housing unit, Mr. Hewlitt, were singled out by Mr. Prezioso and Mr. Wiley for having insufficiently clean buildings. (*Id*. at 51:6-15.) According to Mr. Mayers, Mr. Wiley commented on this deficiency during informal morning meetings several times a week. (*Id*.) At these meetings, none of the non-Black porters were similarly criticized. When Mr. Mayers sought clarification about what exactly was not clean, he did not receive an answer. At one point, at the direction of Mr. Prezioso, Mr. Wiley accompanied Mr. Mayers inside his building to show him what was wrong. (*Id*. at 55:15-

19.) However, once inside, when Mr. Mayers again asked for clarification about what he was doing wrong, Mr. Wiley apparently responded, "I don't know Mike. Just clean the building." (*Id.* at 55:25-56:4.) Mr. Hewlitt was subject to similar scrutiny, and the same week Mr. Wiley purported to show Mr. Mayers what was wrong with his building, Mr. Bonnette, at the behest of Mr. Wiley, and Mr. Mayers took a tour of Mr. Hewlitt's building to assess its cleanliness. (*Id.* at 57:6-58:6.) Mr. Bonnette apparently agreed with Mr. Mayers that there was nothing wrong with Mr. Hewlitt's building. (*Id.* at 59:11-14.)

Mr. Mayers has failed to establish that he suffered an adverse employment action due to EML's alleged micromanagement. In fact, while "there are no bright-line rules for determining whether an employee has suffered an adverse employment action . . . close monitoring by a supervisor or excessive scrutiny . . . [will not] constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation." *Jaeger v. N. Babylon Union Free Sch. Dist.,* 191 F. Supp. 3d 215, 226 (E.D.N.Y. 2016). Here, Mr. Mayers has not presented evidence of any "other negative results"—indeed, he does not even allege he was actually disciplined for failing to clean his building properly, only that he was repeatedly told his building was not clean. Accordingly, EML's apparent micromanagement does not qualify as an adverse employment action and EML is therefore entitled to summary judgment on this claim.

### d.   *Transfer to 72-unit walk-up*

Mr. Mayers claims he suffered an adverse employment action when EML transferred him from Building 9 in Second Housing to Buildings 1 and 6 in First Housing because it resulted in an increased workload. (Mayers Tr. at 63:20-65:4.) As previously discussed, "a disproportionately heavy workload above that which [an employee] already bore," may constitute an adverse employment action. *Joseph*, 2016 WL 6700831, at *21. Here, Mr.

Mayers testified that: (1) his transfer caused him to do extra cleaning work because Buildings 1 and 6 had been neglected such that it required extra work to clean them; and (2) he was required to cover two additional buildings as the back-up porter, even though the general practice was that porters were only required to serve as back-up to one other building. (*See* Mayers Tr. at 43:2-9; 63:2-11; 64:25-65:3.) In addition, Mr. Mayers testified that while Building 9 in Second Housing had an elevator, Buildings 1 and 6 in First Housing did not. (*Id.*)

Even assuming that Mr. Mayers has established that his transfer constitutes an adverse employment action because his workload increased, he has failed to adduce evidence that the circumstances surrounding the transfer give rise to an inference of discrimination. Mr. Mayers testified that he believed he was transferred due to his race, "[b]ecause the way the building is designed it's designed for you to fail." (*Id*. at 64:11-12.) However, beyond Mr. Mayer's conclusory assertion that EML wanted to punish or harass him because of his race, he points to no evidence to support this supposition. To the contrary, he acknowledges that other non-Black porters had been assigned to the same buildings both before and after he worked there. In addition, the porters who worked in Buildings 1 and 6 before and after Mr. Mayers all had the same workload and responsibilities that he did. (Def. 56.1 ¶ 79.) Accordingly, Mr. Mayers has failed to establish a prima facie case of discrimination, and EML is granted summary judgment on this claim.

### e.   Hostile work environment

Like Mr. Belvin, Mr. Mayers asserts that his co-workers' and supervisors' racist language and comments, and the repeated placement of toy and/or stuffed monkeys and images of monkeys in various work areas, constitute adverse employment actions sufficient to sustain his disparate treatment claim. As with Mr.

Belvin, the court again construes Mr. Mayers's hostile work environment claim, *supra*, to satisfy the adverse employment action and disparate treatment prongs of his discrimination prima facie case. Accordingly, EML's motion for summary judgment is denied with respect to this aspect of Mr. Mayers's discrimination claim.

### C. Failure to promote

Both Plaintiffs allege that EML discriminated against them by failing to promote them because of their race. "To establish a prima facie case for discriminatory failure to promote, a plaintiff must demonstrate that: (1) he is a member of a protected class; (2) he applied for promotion to a position for which he was qualified; (3) he was rejected for the position; and (4) the employer kept the position open and continued to seek applicants." *Mauro v. S. New Eng. Telecomms., Inc.*, 208 F.3d 384, 386 (2d Cir. 2000). Further, "unless an employee can demonstrate that the job at issue was not posted and that he had no knowledge of the vacancy before it was filled or otherwise attempted to apply for it through informal procedures endorsed by the employer, the plaintiff must show that he actually applied for the position in question and was rejected—the so-called 'specific application rule.'" *Joseph*, 2016 WL 6700831, at *32. The Second Circuit has explained that in determining whether a plaintiff was qualified for a position, he must establish "basic eligibility for the position at issue," *Aulicino*, 580 F.3d at 81, and that "being 'qualified' refers to the criteria the employer has specified for the position." *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 127 (2d Cir. 2004).

#### a. Mr. Belvin

Mr. Belvin argues EML discriminated against him by improperly passing him over for a promotion to foreman. Mr. Belvin did not apply for the foreman position, so he must demonstrate that the position "was not posted and that he had no knowledge of the vacancy before it was filled or otherwise attempted to apply for it through informal procedures." *Mauro*, 208 F.3d at 386. Mr.

Belvin has failed to adduce non-hearsay evidence that EML did not post the vacancy, as it was required to do by the CBA. (CBA (Dkt. 44-3) at ECF p. 1,682 (requiring EML to post vacancies in the building where the vacancy arises for a seven-day period to allow union employees the chance to apply).) In fact, he admits to the possibility that it could have been posted, and he simply neglected to check the bulletin board where it would have been located. (Belvin Tr. at 287:7-8.) In addition, the record suggests that even if Mr. Belvin had been aware of the position, he would not have applied. For instance, at his deposition, Mr. Belvin testified that when a manager indicated to him that he would make a good supervisor, he responded that he would not be interested in such a position if it meant working more closely with either Mr. Prezioso or Mr. Caiozzo. (*Id.* at 283:2-18; *see also id.* at 289:22-25 ("Q: If someone walked in tomorrow and offered you a supervisor position would you take it? A: Not with that management.").) Accordingly, EML is entitled to summary judgment on this claim.

### b.  Mr. Mayers

Mr. Mayers likewise argues that EML discriminated against him by failing to promote him. It is not entirely clear from the record which position Mr. Mayers argues EML failed to promote him to, as Mr. Mayers mentions other employees promoted to positions such as foreman, manager, and general manager. Regardless, Mr. Mayers fails to establish a prima facie case of discrimination because he provides no evidence regarding the qualification criteria for the positions he sought and no evidence, beyond his own testimony, that he was qualified for any of those positions. Accordingly, EML is entitled to summary judgment on this claim.

### D.  Retaliation

Plaintiffs also assert claims for retaliation under Title VII, § 1981, NYSHRL, and NYCHRL. Like disparate treatment discrimination claims, claims for retaliation are analyzed under the *McDonnell*

*Douglas* burden-shifting framework. *See, e.g.*, *Edwards v. Jericho Union Free Sch. Dist.*, 55 F. Supp. 3d 458, 467-70 (E.D.N.Y. 2014); *Moccio v. Cornell Univ.*, 889 F. Supp. 2d 539, 592 (S.D.N.Y. 2012). To establish a prima facie case of retaliation under Title VII, § 1981, and NYSHRL, each Plaintiff must prove: (1) that he engaged in protected activity, (2) that his employer was aware of this activity, and (3) that his employer took adverse action against him as a result of the activity. *See, e.g.*, *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 216 (2d Cir. 2001); *Whyte v. Nassau Health Care Corp.*, 969 F. Supp. 2d 248, 259 (E.D.N.Y. 2013). "A causal connection in retaliation claims can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment . . . or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Natofsky v. City of New York*, 921 F.3d 337, 353 (2d Cir. 2019). The standard under the NYCHRL is similar, except that a plaintiff need only establish that the employer took action "reasonably likely to deter a person from engaging in protected activity." *Rozenfeld v. Dep't of Design & Const.*, 875 F. Supp. 2d 189, 208 (E.D.N.Y. 2012).

### 1.   Mr. Belvin

Mr. Belvin claims that EML retaliated against him after he filed his EEOC complaint on May 21, 2015 by subjecting him to a series of frivolous disciplinary actions. By filing a complaint with the EEOC, Mr. Belvin was engaged in a protected activity, and EML does not dispute it was aware of the complaint. (*See* Def. 56.1 ¶¶ 56-65; Mundo Tr. (Dkt. 44-3) at ECF p. 2, 33:9-34:12.) Accordingly, the only question is whether EML engaged in an adverse employment action as a result of Mr. Belvin filing the EEOC complaint.

Mr. Belvin has adduced sufficient evidence from which a reasonable juror could conclude that EML took adverse action against him as a result of his EEOC complaint. First, the record reflects

33

evidence that EML exhibited direct retaliatory animus against Mr. Belvin for filing his EEOC complaint. Mr. Belvin testified that, at some point after filing his complaint, Mr. Mundo, EML's general counsel, told him that his "stack of write ups" would "go away" if Mr. Belvin agreed to drop the EEOC complaint. (Belvin Tr. at 246:14-247:14.) If proven, this would establish a direct causal relationship between the write-ups and Mr. Belvin's protected activity in filing the EEOC complaint, especially given that Mr. Belvin amassed numerous "write-ups" for infractions after filing (and not withdrawing) his EEOC complaint. The alleged comments by Mr. Mundo suggest that Mr. Belvin's disciplinary record was at least partially responsive to his EEOC complaint.

EML fails to rebut Mr. Belvin's claim that Mr. Mundo told him the disciplinary actions would stop if he agreed to drop his EEOC complaint. Rather than providing a non-retaliatory explanation for such comments, EML merely offers a blanket denial that Mr. Belvin's deposition testimony is enough to create a genuine issue of fact. (Def. 56.1 ¶ 56; Def. Reply ¶ 56.) As already discussed, EML's contention that deposition testimony is not enough to create a fact issue to overcome summary judgment is meritless here where Mr. Belvin's testimony cannot be characterized as "contradictory or incomplete" on this issue. *Rivera*, 743 F.3d at 20. Rather, Mr. Belvin's testimony that Mr. Mundo told him to drop the complaint in exchange for a clean disciplinary record is consistent with Mr. Belvin's amended EEOC complaint, which he filed in July of 2015 to include a claim of retaliation.

In addition to this direct evidence of a retaliatory nexus, Mr. Belvin also adduces indirect evidence that EML subjected him to retaliation in the form of frivolous disciplinary actions shortly after he filed his EEOC complaint in May 2015. For example, EML suspended Mr. Belvin for three days on July 13, 2015 for throwing a bag of garbage and giving Mr. Caiozzo and Mr. Prezioso "an aggressive look and using an aggressive tone . . . ." (Def. 56.1

¶ 58.) Mr. Belvin requested arbitration of the suspension and the arbitrator ruled in his favor, finding the conduct did not warrant a suspension. (Def. 56.1 ¶ 59; Feb. 13, 2017 Arbitration Opinion & Award (Dkt. 44-3) at ECF p. 1,512.) A month later, EML suspended Mr. Belvin for a day for alerting a superior over the radio to the presence of asbestos in his work area, even though, in April 2016, Mr. Belvin had received a written warning for *failing* to notify management of the presence of asbestos. (Def. 56.1 ¶ 19; Aug. 16, 2016 Suspension Letter (Dkt. 44-3) at ECF p. 1,451; Apr. 7, 2016 Written Warning (Dkt. 44-3) at ECF p. 1,449.) Mr. Belvin also contested this suspension, and it was converted to a final warning letter. (Def. 56.1 ¶ 19; Aug. 26, 2016 Stipulation of Settlement (Dkt. 44-3) at ECF p. 1,453.) The close proximity in time between Mr. Belvin's EEOC complaint and these suspensions further support an inference of retaliation. Accordingly, Mr. Belvin has succeeded in establishing a prima facie case.

EML argues that the disciplinary actions taken against Mr. Belvin do not constitute adverse actions causally connected to his EEOC complaint because he had been subject to a "series of disciplinary issues throughout his employment tenure." (Def. 56.1 ¶ 13.) However, EML only points to one instance of discipline that occurred before Mr. Belvin filed his EEOC complaint — a written warning EML issued on February 26, 2015 "for wearing a non-EML-issued jacket and wearing a cell-phone earpiece while working." (Def. 56.1 ¶ 14.) The vast majority of disciplinary actions EML cites occurred after Mr. Belvin filed his EEOC complaint. (Def. 56.1 ¶¶ 15-20, 22-26.) EML has therefore failed to rebut Mr. Belvin's prima facie case of retaliation. Accordingly, because a genuine issue of fact exists as to whether Defendant retaliated against Mr. Belvin, summary judgment is inappropriate on Mr. Belvin's retaliation claims under Title VII, § 1981, NYSHRL, and NYCHRL.

2. Mr. Mayers

Mr. Mayers argues that EML retaliated against him: (1) through a campaign of retaliation in response to various grievances he filed between 2013 and 2017 and (2) by firing him two months after he filed his EEOC complaint.

a. *Grievances*

Regarding the first claim, Mr. Mayers has failed to adduce evidence of retaliation based on his grievances sufficient to withstand summary judgment. Mr. Mayers asserts that in response to a grievance he filed in 2013 alleging discrimination and harassment, he was not provided sufficient help in putting up Christmas decorations. (Mayers Tr. at 176:20-178:16.) He also asserts that sometime in 2014 he was suspended for using inappropriate language with Mr. Belvin at a staff meeting. (*Id.* at 179:3-181:21.) He contested this suspension, leading him to file another grievance; EML then reinstated the lost day of pay. (*Id.*) Even if Mr. Mayers were able to establish that filing these grievances constituted protected activity in satisfaction of the first prong of the prima facie case of retaliation, he has failed to show he suffered an adverse employment action as a result of either grievance. After his first grievance, Mr. Mayers alleges his work became more difficult, but the only example he points to is the issue with the Christmas decorations—a problem he shared with all the porters in his housing unit, even though he was the only one to file a grievance. (*Id.* at 176:22-178:8.) He also admits the problem was rectified after he complained about the lack of assistance. His second grievance was filed in response to being suspended for using inappropriate language at work, and he admits he did not experience any retaliation as a result of this grievance before he went out on sick leave. (*Id.* at 183:4-8.) Therefore, Mr. Mayers has failed to establish a prima facie case of retaliation based on the grievances.

### b. Termination

Mr. Mayers also claims EML retaliated against him by terminating him two months after he filed an EEOC complaint, even though he was subsequently reinstated. Mr. Mayers began his leave of absence on July 4, 2014. (Def. 56.1 ¶ 96.) While still out on sick leave, Mr. Mayers filed his EEOC complaint on May 18, 2015. Two months later, on July 24, 2015, EML sent him a letter of termination, citing the CBA policy that requires EML to hold a union employee's position open for at least 12 months. (Def. 56.1 ¶ 96; Termination Letter (Dkt. 44-3) at ECF p. 1,530.) Because, by EML's calculation, Mr. Mayers had been out on leave for over 12 months at that point, EML believed it was within its rights to terminate his employment. (Termination Letter (Dkt. 44-3) at ECF p. 1,530.) However, EML reinstated Mr. Mayers after he was able to show EML had miscalculated the duration of his absence; because he had used vacation time for part of his leave, he had not been out for 12 months when EML sent the termination letter. Confronted with its mistake, EML reinstated Mr. Mayers on August 17, 2015.[5] (Def. 56.1 ¶ 97.)

Mr. Mayers has succeeded in establishing a prima facie case of retaliation based on his EEOC complaint and subsequent termination, notwithstanding EML's reinstatement of Mr. Mayers after he pointed out its mistake. The Second Circuit has held "that the notice of termination itself constitutes an adverse employment action, even when the employer later rescinds the termination."

---

[5] Once he returned to work, Mr. Mayers apparently applied for disability benefits. Mr. Mayers recounted a conversation with Mr. Wiley in which Mr. Wiley arguably discouraged Mr. Mayers from applying for disability benefits, though Mr. Mayers stated in his deposition testimony that he was confused by the comment and believed that Mr. Wiley did not know what he was talking about. Although Plaintiff's 56.1 cites this as evidence of possible retaliatory motive in response to the EEOC complaint (Pl. 56.1 ¶ 169; Pl. Mem. at ECF p. 17), such an allegation is clearly a misconstruction of Mr. Mayers's testimony. Therefore, the court disregards this allegation.

*Shultz v. Congregation Shearith Isr. of N.Y.*, 867 F.3d 298, 305–06 (2d Cir. 2017). Therefore, the only issue to determine for purposes of the prima facie case is whether there is a retaliatory nexus between the protected activity and the termination. Here, Mr. Mayers filed his initial EEOC complaint on May 18, 2015, and he was terminated about two months later, on July 24. Such close temporal proximity is sufficient to show a retaliatory nexus. *See Gorman-Bakos v. Cornell Co-op Extension of Schenectady*, 252 F.3d 545, 555 (finding a time lapse of four months would be "sufficient to support an allegation of a causal connection strong enough to survive a summary judgment motion"). Based on these facts Mr. Mayers has established a prima facie case of retaliation.

However, EML has met its burden to rebut Mr. Mayers's prima facie case. As explained above, EML inadvertently terminated Mr. Mayers due to a miscalculation of the duration of his absence; upon realizing the error, EML reinstated Mr. Mayers immediately. Mr. Mayers fails to adduce evidence to suggest that this reason is actually pretext for a discriminatory motive. Instead, he provides only anecdotal, hearsay testimony about other employees who were not terminated after being out on leave for over a year. (Mayers Tr. at 171:7-18.) Accordingly, EML is entitled to summary judgment on Mr. Mayers's retaliation claim under federal and state law. EML is likewise entitled to summary judgment on Mr. Mayers's NYCHRL claim for the same reason; despite the lower burden for establishing retaliation under the NYCHRL, Mr. Mayers's has not produced evidence to suggest the EML's mistaken termination, followed by his immediate reinstatement, "reasonably could be construed as likely to deter a person from engaging in protected activity." *Rozenfeld*, 875 F. Supp. 2d at 208.

E.   **Disability Discrimination & Retaliation**[6]

Mr. Mayers asserts claims of discrimination and retaliation under the ADA and NYCHRL. The ADA prohibits discrimination "against a qualified individual on the basis of disability in regard to . . . discharge of employees, employee compensation . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Discrimination under the ADA includes "not making reasonable accommodations to the known physical . . . limitations of an otherwise qualified individual with a disability who is an . . . employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A).

Claims under the ADA are analyzed under the burden-shifting framework of *McDonnell Douglas*. *See Davis*, 804 F.3d at 235; *Kho*, 344 F. Supp. 3d at 721. A plaintiff establishes a prima facie claim of discrimination under the ADA if: "(1) the employer is subject to the ADA; (2) the plaintiff is disabled within the meaning of the ADA or perceived to be so by her employer; (3) she was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; (4) she suffered an adverse employment action; and (5) the adverse action was imposed because of her disability." *Davis v. N.Y.C. Dep't of Educ.*,

---

[6] The court notes that Mr. Mayers also attempted to bring a claim for age discrimination, however he never asserts this claim under the Age Discrimination in Employment Act. Notwithstanding this deficiency in the pleadings, he also fails to allege facts that would support such a claim. Although he asserts Mr. Wiley referred to his age on a few occasions implying he should exercise his right to retire, he does not actually allege that he suffered an adverse employment action in connection with these comments. (Pl. 56.1 ¶¶ 151-53.) Therefore, even if Mr. Mayers had properly brought a claim for age discrimination, he would have failed to establish a prima facie case.

804 F.3d 231, 235 (2d Cir. 2015). Similarly for a failure to accommodate claim, the plaintiff must show: "(1) she has a disability; (2) the defendant had notice of the disability; (3) she could perform the essential functions of the job with reasonable accommodation; and (4) the defendant refused to make such accommodations." *Kho v. N.Y. & Presbyterian Hosp.*, 344 F. Supp. 3d 705, 721 (S.D.N.Y. 2018). The elements for establishing a prima facie case of retaliation under the ADA are the same as under Title VII. *See Weixel v. Board of Educ.*, 287 F.3d 138, 148 (2d Cir. 2002). Further, "seeking reasonable accommodation . . . constitutes protected activity under" the ADA. *Id.* at 149.

The NYCHRL also prohibits employers from discriminating on the basis of "actual or perceived . . . disability." N.Y.C. Admin. Code § 8-107(1)(a). The elements of a prima facie case of discrimination under NYCHRL are coextensive with the ADA. *Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010). Like the ADA, under NYCHRL an employer is required to "make reasonable accommodation to enable a person with a disability to satisfy the essential requisites of a job . . . provided that the disability is known or should have been known by the employer." *Lazzari v. N.Y.C. Dep't of Parks & Recreation*, 751 F. App'x 100, 102 (2d Cir. 2018). However, unlike the ADA, the "NYCHRL places the burden on the employer to demonstrate lack of a safe and reasonable accommodation and to show undue hardship." *Id.* Still, "[w]here the record shows that a defendant has engaged in an interactive process with an employee concerning a requested accommodation, summary judgment may—under appropriate circumstances—be granted." *Elmessaoudi v. Mark 2 Rest. LLC*, No. 14-cv-4560 (PGG), 2016 WL 4992582, at *8 (S.D.N.Y. Sept. 15, 2016). Such interactive processes "may involve meeting with the employee who requests an accommodation, requesting information about the condition and what limitations the employee has, asking the employee what he or she specifically wants, showing some sign of having considered the employee's request, and

offering and discussing available alternatives when the request is too burdensome." *Id.* After establishing a prima facie case of discrimination under NYCHRL, "the defendant then has the opportunity to offer legitimate reasons for its actions. If the defendant satisfies that burden, summary judgment is appropriate if no reasonable jury could conclude either that the defendant's reasons were pretextual, or that the defendant's stated reasons were not its sole basis for taking action, and that its conduct was based at least in part on discrimination." *Reed v. Nike, Inc.*, No. 17-cv-7575, 2019 WL 2327519, at *1 (S.D.N.Y. May 31, 2019).

### 1. Discrimination

Mr. Mayers asserts EML discriminated against him by terminating him while on sick leave, failing to accommodate his cancer treatment upon his return to work, and denying him his bonus in 2014 while he was out on leave. EML does not dispute that it is subject to the terms of the ADA, that Mr. Mayers is disabled due to his cancer diagnosis, or that he was qualified to perform the functions of his job as a porter. Therefore, the analysis of his prima facie case of disability discrimination turns on the final elements, *i.e.*, whether he suffered an adverse employment action and, if so, whether the adverse action was due to his disability.

#### a. Termination

Mr. Mayers has adduced evidence sufficient to overcome summary judgment on his termination claim. As already stated, temporary termination may constitute an adverse employment action in the Second Circuit. *Shultz*, 867 F.3d at 305-06. Therefore, the only issue to address regarding this claim is whether EML terminated him because of his disability. Mr. Mayers does not assert that anyone at EML told him he was being fired because of his disability. However, EML admits that it terminated him in accordance with the CBA because of his absence, which was a direct result of his cancer treatment. In *McMillan v. City of New York*, 711 F.3d 120 (2d Cir. 2013), the Second Circuit found

the *McDonnell Douglas* framework to be of little use where "the parties agree that the employer complains of conduct that is the direct result of the employee's disability" because "there is no need to evaluate whether the employer's adverse employment action made in response to that conduct is pretextual." *Id.* at 129. In that case, the court concluded the plaintiff "need only demonstrate that, with reasonable accommodations, he could have performed the essential functions of his job." *Id.* Mr. Mayers has established that he was able to perform the essential functions of his job with accommodations, which is why EML agreed to reinstate him once they received word from his doctors he was cleared to return to work. Although the short period of time between Mr. Mayers's termination and reinstatement may serve to limit damages, this has no bearing on the prima facie case. Further, because under *McMillan* there is no need to assess whether EML's proffered reasons for termination were pretextual, the court does not proceed with the burden-shifting analysis on this claim. Accordingly, summary judgment is denied regarding this aspect of his disability discrimination claim, under both the ADA and the NYCHRL.

### b. *Failure to accommodate*

Mr. Mayers has failed to adduce evidence sufficient to allow a reasonable juror to conclude EML failed to accommodate his disability. Mr. Mayers has met the first three elements of a failure to accommodate claim—*i.e.*, he has a disability, EML knew about the disability, and the parties agreed he was able to perform the essential functions of the job with reasonable accommodation. Therefore the only issue to resolve is whether EML refused to accommodate him. Upon returning to work, Mr. Mayers requested a schedule change that would allow him to work weekends so he could continue to attend cancer treatments periodically during the week. Mr. Mayers himself admits that his request for a schedule change was honored and he was accordingly able to attend his cancer treatments during the week. Rather than alleging EML

denied his request outright, Mr. Mayers asserts that the manner in which EML engaged in the interactive process was unsatisfactory because in order to accommodate his requested schedule, EML shared information about Mr. Mayers's diagnosis with other employees who would have to change their schedules as part of the accommodation.

That allegation is insufficient to maintain a failure to accommodate claim. Indeed, the ADA states that a "'reasonable accommodation' may include . . . job restructuring" or "part-time or modified work schedules." 42 U.S.C. § 12111(9). In order to accommodate Mr. Mayers's requested modified schedule, EML had to switch his schedule with other porters' existing schedules. (Sept. 10, 2015 Accomm. Req. Memo (Dkt. 46-1) at ECF p. 5.) Accordingly, Mr. Mayers has failed to establish a prima facie case of failure to accommodate under the ADA. Mr. Mayers's claim also fails under the NYCHRL; even with the burden on EML to show undue hardship in denying an accommodation request, *Lazzari*, 751 F. App'x at 102, EML's burden is easily satisfied given these facts, especially considering it did honor his accommodation request. EML is accordingly entitled to summary judgment on the failure to accommodate claim under the ADA and NYCHRL.

### c. *Denial of bonus*

Mr. Mayers has adduced sufficient evidence from which a juror could reasonably conclude EML discriminated against him by withholding his bonus in 2014. Denial of a bonus is an adverse employment action. *See, e.g.*, *Terry*, 336 F.3d at 138. Therefore, the only issue to address is whether EML denied Mr. Mayers the bonus because of his disability. Mr. Mayers asserts he was denied his bonus while out on sick leave in December 2014.[7] During his

---

[7] The court notes that in his deposition testimony, Mr. Mayers claims he was denied his bonus as an act of retaliation for filing his EEOC complaint.

deposition, he clarified that the bonus porters generally receive is essentially a tip contributed by the tenants in the building. (Mayers Tr. at 191:17-192:3.) EML collects these tips and distributes them to the porters during the holidays. Because Mr. Mayers was on leave in December 2014, Mr. Belvin went to retrieve Mr. Mayers's bonus for him. However, when Mr. Belvin asked Mr. Wiley about Mr. Mayers's bonus, Mr. Wiley reportedly responded that management had told him that Mr. Mayers would not be getting a bonus that year.[8] (*Id*. at 193:9-13.) While Mr. Mayers does not claim that anyone from management told him he was being denied a bonus because of his disability, a reasonable juror could, given the circumstances, infer that management did not want to give him his share of the Christmas tips because he was absent for part of the year—an absence caused by his disability. *See, e.g.*, *McMillan*, 711 F.3d at 129 (finding the plaintiff "was tardy because of his disability and that he was disciplined because of his tardiness. In other words, McMillan was disciplined because of his disability"). Mr. Mayers accordingly succeeds in stating a prima facie case of disability discrimination on this basis, which EML fails to rebut. While EML notes that Mr. Mayers received a prorated bonus in 2015, it does not deny that it failed to award Mr. Mayers a 2014 bonus. Accordingly, Mr. Mayers's claim for disability discrimination based on the denial of his 2014 Christmas bonus may proceed to trial under both the ADA and NYCHRL.

---

However, he was denied the bonus in December 2014, several months before he filed the EEOC complaint in 2015. In an effort to construe the facts in the light most favorable to Mr. Mayers, the court will therefore assess this allegation as part of his disability discrimination claim.

[8] The record is admittedly confusing on this point; at various points Mr. Mayers states he was denied a bonus in 2015, but during his deposition he clarified that he was denied the bonus while he was out on sick leave in 2014.

### 2.   Retaliation

Mr. Mayers has failed to adduce evidence from which a reasonable fact finder could conclude that EML retaliated against him in violation of the ADA or NYCHRL. While the record is not entirely clear, the court construes Mr. Mayers as arguing that EML retaliated against him as a result of his request for a reasonable accommodation. (Pl. Mem. at 13-14.) In support of this claim, he points to two documents in the record: a cease-and-desist letter from his union to EML, and a letter written by Mr. Mayers himself alleging harassment and retaliation. (Feb. 27, 2018 32BJ Cease & Desist Letter ("32BJ Letter") (Dkt. 46-1) at 13; Dec. 21, 2017 Mayers Letter (Dkt. 46-1) at 14.) The 32BJ letter fails to describe with any level of specificity what exactly this harassment entailed, and Mr. Mayers does not offer an explanation (let alone evidence) on how this vague claim of harassment is tied to disability retaliation. The letter Mr. Mayers wrote describes the written complaints of his co-workers, and asserts EML solicited such written complaints in retaliation for his filing a grievance and the EEOC complaint, but again fails to establish any connection to his disability status or accommodation request. As a result, Mr. Mayers has failed to allege any facts on which to base such a retaliation claim under either the ADA or NYCHRL, and summary judgment is therefore granted in favor of EML.

### F.   Emotional Distress Damages

EML finally moves to prevent Mr. Belvin from seeking garden variety emotional distress damages stemming from his discrimination claims. When counsel for EML asked Mr. Belvin during his deposition whether he was seeking emotional distress damages, he responded in the negative. (Def. 56.1 ¶ 66.) However, he subsequently clarified in an affidavit that he had been under the mistaken impression that he could only seek emotional distress damages with the support of an expert medical witness.

(Belvin Aff. ¶ 7.) Because Mr. Belvin is only seeking garden vari-ety emotional distress damages, meaning that "the evidence of mental suffering is generally limited to the testimony of the plain-tiff, who describes his or her injury in vague or conclusory terms, without relating either the severity or consequences of the in-jury," *Thorsen v. Cnty. of Nassau*, 722 F. Supp. 2d 277, 292 (E.D.N.Y. 2010), he argues he should be permitted to seek such damages notwithstanding his deposition testimony.

EML's argument that a plaintiff is generally not permitted to change his deposition testimony via declaration after the fact is well taken. Nonetheless the circumstances here are meaningfully distinct from a case in which *factual* allegations made during a deposition are contravened by a subsequent affidavit. *See, e.g., Brown v. Henderson*, 257 F.3d 246, 256 (2d Cir. 2001) (affirming summary judgment where the plaintiff attempted to "rescue her claim with a last-minute conversion to the position that, instead of what she had consistently said before, she faced adverse con-ditions because she is a woman"). Here, Mr. Belvin is seeking garden variety emotional distress damages, which means he will be limited to his own assertions about how the alleged discrimi-nation affected him. *See Abel v. Town Sports Int'l, LLC*, No. 09-cv-10388 (DF), 2012 WL 6720919, at *16 (S.D.N.Y. Dec. 18, 2012) ("In cases involving garden-variety emotional distress, damages awards are based primarily on the plaintiffs' description of men-tal anguish in somewhat general terms, there is little or no evidence of medical treatment, and there is little detail of the du-ration, severity, or consequences of the condition."). To prove such damages, he will rely on the same facts he alleges in support of his discrimination claims. Therefore, the court does not find (and EML does not claim that) allowing his claim for emotional distress damages would prejudice EML. Accordingly, because Mr. Belvin will be limited to relying on the same facts alleged in sup-port of his discrimination claim, he is permitted to seek garden

variety emotional distress damages notwithstanding his disclaimer of such damages in his deposition testimony. However, Mr. Belvin should be aware that he will be limited at trial to testifying to his own description of his emotional distress, and will not be permitted to "offer evidence regarding any mental or emotional disorders, severe emotional distress, or anything beyond the so-called 'garden variety' emotional distress that might result from discrimination." *MacCluskey v. Univ. of Conn. Health Ctr.*, No. 13-cv-01408 (MPS), 2014 WL 7404565, at *2 (D. Conn. Oct. 20, 2014).

## IV. CONCLUSION

For the foregoing reasons, Defendant's (Dkt. 44) motion for summary judgment is granted in part and denied in part. The parties are directed to contact the chambers of Magistrate Judge Peggy Kuo to discuss next steps in this case.


SO ORDERED.


Dated:    Brooklyn, New York
          December 10, 2020

                                        /s/ Nicholas G. Garaufis
                                        NICHOLAS G. GARAUFIS
                                        United States District Judge