UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
………………………………………………………………x

MICHAEL BELVIN,
MICHAEL MAYERS,

                                                    Civil Action No. 17-CV-06303
                              Plaintiff(s),

        -against-

ELECTCHESTER MANAGEMENT, LLC

                              Defendants.
……………………………………………………………x

_____

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTIONS IN LIMINE TO PRECLUDE TESTIMONY OF NON-PARTY WITNESS, EVIDENCE ALLEGED TO BE TIME BARRED, AND EVIDENCE ANTICIPATED TO BE BASED ON GOLDEN RULE/RETILE THEORY

_____

_____

ALBERT VAN-LARE
THE LAW OFFICES OF ALBERT VAN-LARE
125 Maiden Lane, Suite 510
New York, New York 10038
(212) 608-1400
Vanlareesq@aol.com
Attorney for Plaintiffs

**PRELIMINARY STATEMENT**

The Defendant has filed four separate motions seeking court rulings on each of the motions. The motions include, among others, the followings: a. a motion seeking to preclude the testimony of a nonparty employee regarding discriminatory acts against such employees: b. a motion seeking to preclude evidence that is allegedly time-barred: c. a motion that seeks a court order to prevent Plaintiffs from presenting any evidence based on the Golden Rule or Reptile Theory, and lastly a motion that seeks an order precluding Plaintiff from introducing any evidence of insurance liability of settlement discussions among the parties. The Plaintiffs will address each point below.

**ARGUMENT**

**POINT I**

<u>**THE COURT SHOULD NOT PRECLUDE THE TESTIMONIES OF NON-PARTY WITNESSESSES IDENTIFIED AS DAVID HEWLETT AND JEROME JENKINS**</u>

The Defendant in its moving papers argued that the testimonies of non-party witnesses should be precluded in this matter. The Defendant relied heavily on a set of cases from districts courts. This reliance however is misplaced. The Defendant argument cites to , *EEOC v. Bloomberg L.P., 778 F. Supp. 2d 458, 468 (S.D.N.Y. 2011) ("There is a manifest difference between claims of individual discrimination and claims of a pattern or practice of 7 272747945v.4 discrimination."); Rao v. Rodriguez, 2017 U.S. Dist. LEXIS 58996 (E.D.N.Y. 2017) (granting defendants' motion in limine to preclude evidence related to substantive evidence of a non-party discrimination complaint); Levitant v. City of New York Human Res. Admin., 2011 U.S. Dist. LEXIS 20742 (E.D.N.Y. 2011) (precluding testimony of non-party witnesses because they did not have direct knowledge relevant to the plaintiff's discrimination allegations); Oliver v. New York State Police, 2022 U.S. Dist.*

*LEXIS 57588 (N.D.N.Y. 2022) (granting motion in limine to exclude evidence related to non-party complaints and personnel documents related to such complaints because they were irrelevant to the remaining triable issues); Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 160 (2d Cir. 1999) (hearsay statements by witnesses without personal knowledge "did not constitute competent evidence"); Kargo, Inc. v. Pegaso PCS, S.A., No. 05-cv  10528 (CSH)(DFE), 2008 U.S. Dist. LEXIS 81888, at \*36 (S.D.N.Y. Oct. 14, 2008) (evidence deemed inadmissible hearsay because declarant had "no personal knowledge of the events described").*  These cases however are truly clear that a witness may be precluded if his testimony is not based on personal knowledge, or the testimony is not related to the case at bar. The two witnesses that Defendant seeks to preclude were Plaintiffs former co-workers who witnessed the discrimination complaints that Plaintiffs made and in the case of Hewlett he filed his own EEOC complaint and Plaintiffs will testify that he was pressured by Mr. Mundo, Defendant's attorney, to withdraw his EEOC complaint just as Plaintiff Belvin was. See Belvin deposition page 246.

Additionally, Mayers testified that Hewlett was present when discriminatory comments and acts were committed and that he and Hewlett suffered the same fate including disproportionate assignment of work (Mayers deposition at pages 45,49,51,57, 69 71, 72, 75, 86,177, 288,) retaliation (Mayers deposition page 174) and race-based decisions by the employer (Mayers deposition Page 209). Exhibit A

Mayers also testified that Jerome Jenkins also experienced firsthand the same harassing and discriminatory conduct he experienced, and that Black employees were subjected to retaliatory termination. See Mayers deposition pages 168,170,246,249, and 250.

Belvin also testified that Jerome Jenkins has knowledge of the discriminatory experience and retaliation Belvin experienced. See Belvin deposition at 181, 186, 274,275, and 304. Exhibit B. David Hewlett was constantly subjected to write ups and retaliated against with write ups for talking to Belvin. See Belvin's deposition transcript at pages, 130, 133, 156, 157, and 230. Jenkins and Hewlett are two witnesses fully ware of the experience of Plaintiffs and can provide insightful testimonies helpful to the court.

The Defendant was also aware of these two witnesses and chose to question Plaintiffs extensively about the witnesses at deposition but exercised the option not to depose them. There

is nothing prejudicial to the defendant about the testimonies that will come from theses witnesses. The court should allow them to testify

## POINT II
## BILL GAMBRELL'S RACIST STATEMENTS CAN BE IMPUTED ON ELECTCHESTER BECAUSE ELECTCHESTER IS THE SUCCESSOR IN INTEREST TO THE FIVE SEPARATE HOUSING CORPORATIONS THAT WERE UNIFIED AS ONE ENTITY INTO ELECTCHESTER MANAGEMENT CORPORATION IN 2007 AND THE ALLEGATIONS ARE NOT TIME BARRED BECAUSE THIS IS A HOSTILE WORK ENVIRONMENT CASE.

Bill Gambrell's racist statements can be imputed against Defendant Electchester because Electchester is the corporation that inherited all of the previous five housing coops that existed prior to the incorporation of defendant. See defendant Rule 56.1 statement paragraphs 1 thru 11. Doc. 44.2.  It is the successor in interest to the original company. The plaintiffs and other employees maintained their job seniorities, pension vesting, and union rights. The staff were all absorbed wholesome. The defendant argument is unpersuasive and same management personnel including Vito Mundo, vice president and general counsel, continued their jobs.

 According to Rule 403 of the Federal Rules of Evidence, "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed Rules Evid rule 403. There is no basis to exclude Gambrell's statement here because management was aware, and complaints were made. Defendant cannot avoid liability by simply invoking the establishment of a new corporation on paper.

According to Nat'l R.R. Passenger Corp. v. Morgan, "[a] hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.' 42 U.S.C. § 2000e–5(e)(1). The timely filing provision only requires that a Title VII plaintiff file a charge within a certain number of days after the unlawful practice happened. It does not matter, for purposes of the statute, that some of the component acts of the hostile work

environment fall outside the statutory time period." Nat'l R.R. Passenger Corp. v. Morgan, 536
U.S. 101, 117 (2002)

The Plaintiff's statements regarding Gambrell would not mislead the jury because Gambrell was
employed by the predecessor company to ELM. Due to ELM being established to centralize
management across the five Housing Companies, ELM assumed liability for actions performed
by workers of the other Housing Companies. Since ELM assumed liability, Gambrell's conduct
is imputed to ELM.

The Plaintiff's statements regarding Gambrell cannot be time barred because while the racist
statements did fall outside of the statutory time period, it was one of many acts that constituted
Plaintiff's hostile work environment claim and it is undisputed that other acts fall within the
statutory period. The court should therefore allow the racist statement made by Gambrell to be
brought to the attention of the jury in this case.

## POINT III
### THE COURT DOES NOT NEED TO EXCLUDE THE REPTILE THEORY

Excluding the reptile theory argument is baseless because it is not prejudicial to inform the Jury
that employment discrimination laws are designed to protect them and the public.

The legislative history of NY EXEC § 296, for example, like Title VII, implies that employment
discrimination laws were implemented in order to protect workers from bigotry and unfairness
that may occur in the workplace because a number of amendments over time have included more
people from marginalized groups such as victims of domestic violence. N.Y. Exec. Law § 296
(McKinney). It is not prejudicial to convey to the jury that the laws that the Defendant was
breaking are designed to protect the working population including jurors who may or may not be
workers. The argument is not derived from improper motive that appeals to the emotions of jury
members rather such arguments ask jurors to uphold the intent of the law.

The point of punitive damages, for example, is that they convey society's beliefs as related to the
claim(s) made by the Plaintiff. In this case they are discrimination and retaliation. By excluding

the ability for the Plaintiff to send "a message about society's or the community's beliefs, especially as related to discrimination and retaliation, through a jury verdict", the Defendant seeks to eliminate Plaintiffs' right to discuss punitive damages in court. This in turn hampers the Plaintiffs' ability to obtain punitive damages which plaintiff can rightfully include in Plaintiff's communication to the jury. The court should therefore deny Defendant's motion to exclude the reptile theory

## POINT IV

## PLAINTIFFS WILL NOT INTRODUCE EVIDENCE OF INSURANCE OR SETTLEMENT DISCUSSIONS IN JURY'S PRESENCE

Plaintiffs will not present any evidence of insurance or settlement discussions to the jury.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motions in their entirety.

Dated: August 26, 2022

Respectfully submitted,

Albert Van-Lare

The Law Offices of Albert Van-Lare

125 Maiden Lane

Suite 510

New York, NY 10038

(212) 608-1400

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the WITHIN PLAINTIFF'S MEMORANDUM OF LAW on DEFENDANT VIA EMAIL on August 26, 2022, to:

**WILSON, ELSER, MOSKOWITZ, EDELMAN, & DICKER LLP**

Marielle A. Moore

150 East 42nd Street

New York, New York 10017

Tel.: (212) 490-3000

Fax: (212) 490-3038

Marielle.Moore@wilsonelser.com

*Attorney for the Defendants*

The Law Offices of Albert Van-Lare

Attorneys for Plaintiffs'

Albert Van-Lare

125 Maiden Lane, Suite 510

New York, New York 10038

vanlareesq@aol.com

# CERTIFIED TRANSCRIPT

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
Docket No. 17-cv-06303 (NGG)(PK)
- - - - - - - - - - - - - - - - - - x
MICHAEL BELVIN and MICHAEL MAYERS,

                    Plaintiffs,

        - against -

ELECTCHESTER MANAGEMENT, LLC,

                    Defendant.

- - - - - - - - - - - - - - - - - - x

                    March 7, 2019
                    10:19 a.m.


        DEPOSITION of MICHAEL MAYERS, a Plaintiff herein,
taken by the Defendant, held at the offices of Wilson
Elser Moskowitz Edelman & Dicker, LLP, 150 East 42nd
Street, New York, New York, before Sara K. Killian, a
Professional Court Reporter and Notary Public of the State
of New York.

Page 45

1                        M. Mayers

2       A.        We was told to strip floors by

3   yourselves, just the black individuals.  Michael

4   Belvin, David Hewlitt and myself.

5       Q.        Okay.

6       A.        Can I get the paperwork that you got

7   because I had to rearrange how things was written

8   on my paperwork based on how things are here, so I

9   can answer them a lot -- if it's possible.  It's

10  the same paperwork --

11      Q.        You mean the --

12      A.        I got it highlighted, yes.  Same

13  page, 42.

14              MS. MAYO:  I'm going to go make

15          copies of this and we'll mark it into

16          evidence.

17                  (Time noted: 11:11 a.m.)

18                  (Recess taken.)

19                  (Time noted: 11:20 a.m.)

20              MS. MAYO:  Can we have this marked as

21          Exhibit G?

22                  (Whereupon, Exhibit G was marked for

23          identification.)

24              MS. MAYO:  Can I have the last

25          question and answer read back?

Page 49

M. Mayers

1

2      A.      Yes.  It was necessary to strip

3   floors.

4      Q.      All right.

5              So when did this happen, paragraph

6   42, the floor stripping that you just mentioned?

7      A.      It would be around 2013 when he

8   transferred me.

9      Q.      That's when you were transferred to

10   Buildings 1 and 6?

11      A.      First Housing, yes.

12      Q.      From Building 9 in Second Housing?

13      A.      Yes.

14      Q.      Do you have any sense of when it was

15   around 2013?  Spring?  Fall?  Summer?

16      A.      Around April.

17      Q.      Talk to me a little bit about what

18   happened.  Explain to me what happened.

19      A.      We was told -- I was told -- David

20   Hewlitt and I was told to come clean the buildings

21   every day by Ed Wiley, claiming that Tom Prezioso

22   told him that David Hewlitt and I weren't cleaning

23   our buildings.

24              We happened to be the only black

25   males over there and we were also transferred and

```
 1                    M. Mayers
 2       Q.       Okay.
 3                What building was Mr. Hewlitt
 4   assigned to?
 5       A.       Three and five.
 6       Q.       When did Mr. Prezioso tell you to
 7   clean your building?
 8       A.       Every day.  Every day.  He didn't
 9   tell me directly.  He sent Ed Wiley to tell me.
10       Q.       What did Mr. Wiley said to you?
11       A.       Every morning, when we met in the
12   locker room, we would sit at the table and he was
13   like "Tom is pointing out you two guys about not
14   cleaning your buildings.  You have to clean your
15   buildings."
16                I asked "What does he mean by clean
17   buildings?  Rectify what's wrong and I'll
18   straighten it out."
19                I never received an answer.
20       Q.       Mr. Wiley said Tom is pointing out
21   you guys?
22       A.       Yes.
23       Q.       Who else was present when he said
24   this?
25       A.       Me, David Hewlitt, George Restrepo,
```

Page 57

1              M. Mayers

2        Q.        Okay.

3              Did you have -- do you know if

4    Mr. Hewlitt had a similar experience with respect

5    to Ed walking him into the building?

6        A.        No.   But Ed had Richie Bonnette walk

7    through Dave's building to see what was wrong with

8    the building and Richie asked me to walk with him.

9    We both walked up to Dave's building, Building 5.

10       Q.        So the answer is no, you don't know

11   whether Mr. Prezioso did the same thing to David

12   Hewlitt in terms of sitting outside and having Ed

13   walk through the building?

14       A.        I don't know that.

15       Q.        You don't know that?  You don't know

16   whether that happened or didn't happen?

17       A.        I don't know.

18       Q.        What you do know, though, is that at

19   some point you walked through the building with Ed

20   and -- through Dave's building with Ed and Richie?

21       A.        With Richie Bonnette alone.

22       Q.        You walked through Dave's building

23   with Richie Bonnette alone?

24       A.        Yes.

25       Q.        When was that?

1                    M. Mayers

2    the vacation time of Building 2.  Building 2,

3    which means I had to take care of Buildings 1 and

4    6 and 2 --

5         Q.      When the person on Building 2 was on

6    vacation?

7         A.      Yes.

8         Q.      Okay.

9         A.      Now, the person on Building 2 takes

10   care of Building 7 on his vacation.

11        Q.      Okay.

12        A.      Upon that individual getting back

13   from vacation, they called me and David Hewlitt to

14   do Building 7 and that's not our assigned vacation

15   buildings.

16        Q.      Who is the person from Building 7?

17        A.      Building 7 was George Restrepo.  He

18   went on vacation after Rodrigo got back.

19        Q.      Okay.

20                Who covered your building when you

21   went on vacation -- or your buildings, Buildings 1

22   and 6 -- when you were on the vacation?

23        A.      Buildings 1 and 6 would be -- I

24   believe it was George Restrepo would take care of

25   Buildings 1 and 6.  Yes.  Seven took care of

Page 71

1                    M. Mayers

2              When did that happen?

3        A.        That happened -- I'm only going to

4    give you the year.  That happened in 2014.  No,

5    I'm sorry.  I'm sorry.  That was like 2013.

6        Q.        Were you given any reason why you

7    were covering two buildings at that time?  This

8    wasn't at the same time, was it?  They were not on

9    vacation at the same time?

10       A.        No.  When Rodrigo got back from

11   vacation, he was supposed to handle Building 7.

12   They got on the radio and told me and David

13   Hewlitt -- Joe Copeaaso got on the radio and told

14   me and David Hewlitt to cover Building 7.

15       Q.        For how many days did that happen?

16       A.        That was for, like, a month because

17   George had a month vacation.  That was, like, a

18   month.

19       Q.        Why was Mr. Restrepo out?

20       A.        Vacation.

21       Q.        And you were just told to cover this?

22   You weren't given any reason?

23       A.        No explanation.

24       Q.        Do you know if anybody else had ever

25   been asked to cover two buildings or two -- not at

Page 72

1                    M. Mayers

2    the same time, but in this manner?

3         A.        Well, we used to actually get paid

4    for covering another building over in Second

5    Housing.  When I got here, right, they -- the

6    people who covered other buildings was assigned to

7    those buildings when that person went on vacation.

8             When I covered Building 2, that was

9    understandable, but when Building 2 got back, I

10   was not supposed to -- Building 2 was supposed to

11   cover Building 7, but they made two of the black

12   individuals cover it -- David Hewlitt and

13   myself -- cover Building 7.

14        Q.        Okay.

15             I think, though, my question was had

16   this ever -- to your knowledge, has this ever

17   happened before?

18        A.        It's never happened to no one ever.

19        Q.        Okay.

20             Do you know if any of the other black

21   porters in the other housing units ever had to do

22   the same thing, cover two buildings in one year,

23   two vacation buildings?

24        A.        You know, I really don't know because

25   I'm not familiar with other housings because --

1                          M. Mayers

2        Q.        When were you told that you had to

3    strip the floors using the method that you talked

4    about?  When were you told that you had to do that

5    alone?

6        A.        2013 in a meeting.

7        Q.        Meeting with who?

8        A.        Anthony Caiozzo, Tom Prezioso, Joe

9    Copeaaso, Miner Lee, Richie Bonnette, Carl Lizon,

10   Claude, Rodrigo, George Restrepo, David Hewlitt

11   was up in the building making an attempt to strip

12   the floors by himself at that time, making an

13   attempt.

14            At that same time while we was

15   downstairs in this meeting, David Hewlitt was

16   trying to strip the floors by himself.

17       Q.        You were told in this meeting what?

18       A.        That we -- that virtually, these

19   floors is terrible, we need to strip the floors.

20   We was told to strip the floors by ourselves.

21       Q.        So in this meeting with Anthony, Joe,

22   Tom, Miner Lee, Richie, Carl, Claude, Rodrigo and

23   George Restrepo, you guys were told to strip the

24   floors alone?

25       A.        Yes.

Page 86

1                    M. Mayers

2        A.      Yes.  So it became isolated to me

3    because I'm the only one that spoke up and said

4    anything.

5        Q.      Okay.

6                When was this meeting?

7        A.      2013.  I believe it was 2013, 2014.

8    I'm not sure.  It was one of those.

9        Q.      After this, did you talk to the

10   Hispanic guys about why they were stripping in a

11   crew?

12       A.      I don't have any authority to tell

13   anybody what to do.  No I didn't.

14       Q.      Did you ask them why they were

15   stripping in a crew?

16       A.      No.

17       Q.      Did they tell you that they were

18   given the okay to strip in a crew?

19       A.      No.  I never asked.

20       Q.      While you were working at Buildings 1

21   and 6, did you ask anybody to help you strip after

22   this meeting?

23       A.      No.  I wouldn't do that.

24       Q.      Do you know if David Hewlitt asked

25   anybody to help him strip after this meeting?

1                    M. Mayers

2    us, they fire us.

3         Q.      Okay.

4         A.      They've been trying to get rid of us

5    since this management stepped in in Electchester.

6    They've been trying to get rid of us.

7         Q.      When you say "us," who you do you

8    mean?

9         A.      The blacks.

10        Q.      All the blacks?

11        A.      If they could get away with it, yes.

12        Q.      Who else have they tried to fire?

13   What other black porter have they tried to fire?

14        A.      What other black porter have they

15   tried to fire?  They won't outright fire you.

16   They write you up.  They set up a pattern and have

17   a paper trail based on getting rid of you.

18              Now, most of the black porters either

19   get written up or get terminated.

20        Q.      Okay.

21              Who's been written up?

22        A.      Michael Belvin, Jerome Jenkins,

23   myself.

24        Q.      Anybody else?

25        A.      Bobby.

Page 168

1              M. Mayers

2      Q.      Would you necessarily witness all the

3  write ups?

4      A.      No, not really.  No.  Not unless I'm

5  told about them.  No, I wouldn't witness them all.

6      Q.      How do you know that Mr. Jenkins was

7  written up?

8      A.      Because he's terminated and he's a

9  friend of mine.  I associate with him.

10     Q.      Okay.

11             What was Mr. Jenkin's terminated for?

12     A.      I believe it was -- I believe it was

13  not following a directive.  I'm not sure, but I

14  believe it was not following a directive.  Yeah.

15     Q.      Do you know what directive he was

16  given that he didn't follow?

17     A.      No, I don't.

18     Q.      And Bobby, how do you know that he

19  was written up?

20     A.      How do I know he was written up?

21  Because he has more write ups than anybody in the

22  whole five housings.  He even beats out

23  Mr. Belvin.

24     Q.      It's your position that all of the

25  write ups that he received are unjustified?

1                    M. Mayers

2    up?

3        A.      No.

4        Q.      You haven't witnessed Mr. Jenkins

5    being written up or Bobby being written up?

6        A.      No.

7        Q.      Or Anthony Edwards being written up?

8        A.      No.

9        Q.      Okay.

10               What was Mr. Edwards written up for?

11       A.      I am not sure, but I just know he got

12   written up.

13       Q.      Okay.

14               To your knowledge, have any white

15   porters ever been written up?

16       A.      I'm sure, yeah.  I'm sure Tommy

17   Crane -- I believe he's gotten written up.  I

18   believe he's gotten written up.  There's another

19   white porter that got written up.  Chris.  He was

20   suspended.

21       Q.      How do you know this?

22       A.      Because Ed Wiley told me.  He said

23   "Yeah, I had to suspend the kid because he was

24   sleeping."

25       Q.      Okay.

Page 174

1                    M. Mayers

2              You said that when you file a

3    grievance, your workload gets harder and the

4    example that you gave me was stripping floors.

5         A.       Yes.   Once I filed a grievance, all

6    the sudden, the blacks -- the blacks -- because

7    David Hewlitt filed, Michael Belvin filed and I

8    myself filed.

9              All the sudden, they're telling those

10   three individuals who have been here for decades

11   plus that never ever stripped floors by

12   themselves, to strip floors by themselves.

13        Q.       Was this in a separate meeting other

14   than the meeting you identified earlier?

15        A.       No, same situation.   They approach

16   each and every individual separately.   Anthony

17   Caiozzo approached Michael Belvin separately to

18   tell him to strip floors by himself.   These

19   weren't all meetings.   My situation was in a

20   meeting.

21        Q.       Okay.

22              In that same meeting, everybody was

23   told the same thing?

24        A.       In my meeting, the meeting I was in,

25   yes.

1                    M. Mayers

2    stuff.   It's a big thing and it's a lot of work.

3                    It seemed like, to me, that we got

4    less help, we got a lot less help.  We had a

5    really rough time after I filed this grievance.

6    We had a really rough time because they didn't

7    supply us with enough help to do this.  Now, they

8    do.  Now, they give us help from other housings.

9                    By then, they were just allowing

10   First Housing to do it.  I mean, the other guys

11   didn't say nothing.  We all felt the same way, but

12   no one else said nothing about we need help.

13        Q.      So this is when you were in First

14   Housing?

15        A.      Yes, First Housing.

16        Q.      Okay.

17                 Who had to put up this Christmas

18   stuff?

19        A.      Miner, Rodrigo, myself, George

20   Restrepo and I'm not sure if David Hewlitt was

21   there.  If it's between 2012 or 2013 -- I'm not

22   sure which one -- I'm not sure if it was David

23   Hewlitt or Alvaro.  Alvaro and Dave would switch

24   with each other.  I'm not sure which one it was

25   exactly, whether it was Alvaro or David Hewlitt.

Page 239

                              M. Mayers

1

2    anything --

3         A.        I see Kelvin all the time.  I talk to

4    Bob's cousin all the time.  I talk to him all the

5    time.  Tony is doing okay for himself.  I'm in

6    touch with them all the time.  Yes.  They've never

7    received a call back.  No.  Never.

8         Q.        Did any of them tell you they had

9    spoken to anybody at Electchester Management, LLC?

10        A.        Not at all.

11        Q.        Okay.

12                  You also said that black people are

13   fired.

14                  Can you identify to me who has been

15   fired?

16        A.        William Washington.  You have the

17   list of names over there.  His cousin, Washington.

18   His brother Anthony Washington.  Jerome Jenkins.

19   This guy named Ricky and this other light skinned

20   guy named Keith.  All black.

21        Q.        Where did Keith work?

22        A.        He worked in Third Housing.

23        Q.        When was he left go?

24        A.        I don't know.  I just know he was

25   fired.

Page 246

M. Mayers

1

2    we were ever friends.  We just was associates.  We

3    dealt with each other.  That's it.  I don't think

4    we were ever friends.

5         Q.      Why would Mr. Bonnette say something

6    like that to Mr. Belvin when they were not

7    friends?

8         A.      Because at the time, we did speak.

9    We all spoke at the time.  These are one of the

10   reasons why we no longer speak.  Just one of them.

11        Q.      Mr. Jenkins, why was he left go?

12        A.      Jerome Jenkins?  I believe it's

13   because he didn't follow a directive.

14        Q.      Where did he work?

15        A.      He worked in Fourth Housing.

16        Q.      Okay.

17                You don't know what directive that

18   was?

19        A.      No, I don't.  I wasn't there.

20        Q.      Did Mr. Jenkins say to you that he

21   thought his termination was discriminatory?

22        A.      Yes.  He went to arbitration.  Yes.

23        Q.      What was the basis for his belief

24   that his termination was discriminatory?

25        A.      His skin color.

Page 249

1                         M. Mayers

2    fired.

3         Q.        And William Washington, the same

4    thing?  Do you know when he got fired?

5         A.        No, I don't.

6         Q.        Was it before you filed your EEOC

7    charge?

8         A.        Yes.  Yes, he was gone before the

9    EEOC charge.

10        Q.        And Anthony Washington, do you

11   remember when he got fired?

12        A.        Yes, he was -- I don't remember when,

13   but he was gone before I filed my EEOC charge.  I

14   don't remember when.

15        Q.        So in the last four years, can you

16   identify a black person who's been terminated by

17   Electchester Management, LLC?

18        A.        Jerome Jenkins.

19        Q.        Anybody else?

20                  I'm sorry.  I thought you said

21   Mr. Jenkins was let go six years ago.

22        A.        No, I did not tell you -- that was

23   Anthony Washington.  About six or seven years ago.

24   That was Anthony Washington.  That's not Jerome

25   Jenkins.

Page 209

1              M. Mayers

2              So he said "Fine.  This is how this

3    works.  No one calls Mike, but you get no

4    overtime" and this is what he told me.

5         Q.      Okay.

6              Do you think that Ed took you out of

7    the overtime pool because of your race?

8         A.      Basically, yeah.  Everything they

9    done was based on race.  So yeah.

10        Q.      What's the basis of your belief that

11   that had anything to do with your race?

12        A.      Because of the fact that I'm the only

13   black individual over there at the time before

14   David Hewlitt got there.  For me to be the only

15   one who don't receive overtime kind of speaks for

16   itself.

17        Q.      Do you know if any of the other

18   porters had an argument with Ed Wiley?

19        A.      No.  They don't argue.  It's only

20   black people that argue.

21        Q.      So you can't identify any non-black

22   porter who engaged in similar activities with Ed

23   Wiley?

24        A.      No.  Not that I know of.  I can't say

25   it didn't happen.  Him and Richie didn't get along

Page 250

1              M. Mayers

2      Q.        Okay.

3              So anybody other than Jerome Jenkins?

4      A.        That I remember?  That I remember?

5   No.  It was one guy who I don't know his name.  He

6   worked in Building 10 and 12.  I believe Ed Wiley

7   fired him.  I believe Ed Wiley fired him.  He

8   worked in Building 10 and 12.  I don't know his

9   name.  I don't know anything about why he got

10  fired or anything.  I just know he worked here for

11  like two weeks and he was gone.

12     Q.        In the same four-year period of time,

13  has nobody else -- has anybody else been fired

14  from Electchester Management, LLC?

15     A.        No.

16     Q.        Just Jerome Jenkins and this guy

17  from --

18     A.        We're talking about black

19  individuals, correct?

20     Q.        Anybody.

21     A.        I believe there's a guy named Jose

22  got fired and -- I don't know.  There's some Third

23  Housing guys who got fired.  I don't know their

24  names.

25     Q.        How many guys from Third Housing?

Page 357

1

2                    CERTIFICATION

3          I, SARA K. KILLIAN, a Court

4    Reporter and Notary Public of the State

5    of New York, do hereby certify that

6    MICHAEL MAYERS, the witness whose

7    examination under oath is hereinbefore set

8    forth, was duly sworn, and that such deposition

9    is a true record of the testimony given

10   by such witness.

11         I FURTHER CERTIFY that I am not

12   related to any of the parties to this

13   action by blood or marriage, and that

14   I am in no way interested in the

15   outcome of this matter.

16              IN WITNESS WHEREOF, I have hereunto

17   set my hand this 11th day of March, 2019.

18

19

20   _____

21             SARA K. KILLIAN

22   Notary Public of the State of New York

23

24

25

# CERTIFIED TRANSCRIPT

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

Docket No. 17-cv-06303 (NGG)(PK)

- - - - - - - - - - - - - - - - - - x

MICHAEL BELVIN and MICHAEL MAYERS,

                    Plaintiffs,

        - against -

ELECTCHESTER MANAGEMENT, LLC,

                    Defendant.

- - - - - - - - - - - - - - - - - - x

                    March 6, 2019
                    10:37 a.m.

        DEPOSITION of MICHAEL BELVIN, a Plaintiff herein,
taken by the Defendant, held at the offices of Wilson
Elser Moskowitz Edelman & Dicker, LLP, 150 East 42nd
Street, New York, New York, before Sara K. Killian, a
Professional Court Reporter and Notary Public of the State
of New York.



Page 130

1                     M. Belvin

2       A.       No.

3       Q.       Did any of them ever say to you that

4    Mr. Caiozzo referred to them in any sort of

5    derogatory manner as a result of them being black?

6       A.       Not that I recall.

7       Q.       Paragraph 22 --

8       A.       Yes?

9       Q.       Can you identify who these other

10   African American employees are who were constantly

11   issued write ups?

12      A.       Mr. Mayers.

13      Q.       Anyone else?

14      A.       Myself.

15      Q.       Yes, other than you.

16      A.       I believe David Hewlitt, Bobby -- I

17   don't know Bobby's last name.  Anthony Edwards.

18      Q.       Anyone else?

19      A.       I believe Milton.  I can't remember

20   Milton's last name.

21      Q.       Anyone else?

22      A.       That's about it.

23      Q.       Okay.

24               So what write up were you issued that

25   other people were not issued for doing the same

```
1                    M. Belvin
2       Q.      Were there other people present?
3       A.      No, just them two and me.
4       Q.      Did they know you were there?
5       A.      I don't think they did.
6       Q.      So you were not actually part of this
7   discussion?
8       A.      No.
9       Q.      You were eavesdropping?
10      A.      No.  I was coming out of the office
11  and I stopped to -- it was cold out, so I stopped
12  to put my -- button up my jacket and I could hear
13  the conversation.
14              I will say I didn't make any noise.
15      Q.      How long did you stand there?
16      A.      Took me probably about a minute or
17  two to tie up my clothes or whatever and then I
18  had to walk around the corner and it's in the
19  basement and you could hear the echoes of
20  everything as I'm walking away.
21      Q.      Richie Bonnette, Dave Hewlitt --
22  Richie is, again, black, right?
23      A.      Yes.
24      Q.      And Dave?
25      A.      Black.
```

Page 160

1                          M. Belvin

2    he got written up.

3          Q.       In the times you went across the

4    street, you did not get written up for going

5    across the street to get snacks?

6          A.       I stopped.

7          Q.       When?

8          A.       Tom became general manager, I think,

9    in 2009, I believe.  After the looks and some of

10   the things that he would say at times or whatever,

11   I didn't think he was a person that would give you

12   anything, so I just stopped doing it.  I try to

13   read people, how I see them act or whatever and I

14   don't think I'm going to put myself in that

15   predicament so he could write me up, so I never do

16   it.

17         Q.       He never said anything to you?

18         A.       He never said anything to me, no.

19         Q.       So when did this happen with

20   Mr. Hewlitt?

21         A.       He was working in Fourth Housing at

22   the time and I think it had to have been 2009.

23         Q.       Since 2009, have you seen -- to your

24   knowledge, have any other black employees been

25   written up for going across the street?

Page 181

1                          M. Belvin

2         A.         Anthony Edwards and Bobby and we had

3    Jerome Jenkins.

4         Q.         So other than -- what is the basis

5    for your belief that you were transferred to

6    Fourth Housing in retaliation for having filed the

7    EEOC complaint and for having complained to Richie

8    in 2013?

9         A.         The workload is different, much more.

10   I mean, it's an insurmountable amount of work as

11   opposed to what I had in Second Housing.

12              The roaches, I pretty much -- the

13   people in the building will tell you now that if

14   they take -- as a matter of fact, they had spoken

15   to Anthony -- "If you move him out of this

16   building, we're going to file a complaint up the

17   hill against you because the building is clean now

18   and we don't have the amount of roaches that we

19   had before.  He's wonderful here."

20              I don't even really want to leave the

21   building because I got to know the people in the

22   building like I did in Building 11 and I got a

23   good rapport with most of them and I'm fine.  I

24   just don't like the idea that I have so much work

25   on a Saturday and Sunday and they're not even

Page 186

1                    M. Belvin

2        A.        Yes, there is.

3        Q.        There is?

4        A.        Yes.

5        Q.        Or there are.

6        A.        Yes, there is other black porters.

7        Q.        Who are they?

8        A.        Mr. Mayers works in First Housing,

9    the only black porter.

10       Q.        He works in First Housing, you said?

11       A.        Yes.  I'll do them in numbers.

12                 Second Housing is Richie, Jerome,

13   Dave.  That's it.

14       Q.        Third?

15       A.        Third is me, Keith and Ray Coleman.

16                 Fourth Housing is Anthony Edwards,

17   Bobby and they used to have Jerome Jenkins.  He's

18   not there.  I can't count him.  Just two.

19       Q.        Okay.

20                 And Fifth?

21       A.        No black porters.

22       Q.        How many houses in Fifth Housing?

23   How many buildings in Fifth Housings?

24       A.        Two huge ones.

25       Q.        So are there only two porters in

1                        M. Belvin

2    up the hill.

3          Q.      Did he only say this to the black

4    porters?

5          A.      Mr. Mayers told me he said it to him.

6    He said it to David Hewlitt.

7          Q.      Did he say this to any of the

8    Hispanic or white porters?

9          A.      I wouldn't know.

10         Q.      Did you go to your Union with a

11   complaint about Ed Wiley?

12         A.      I believe I filed -- I filed so many

13   grievances.  I could have.

14         Q.      I want to talk to you about this hand

15   truck issue.

16         A.      Oh, Jesus.

17         Q.      Do you have any photographs of this

18   hand truck?

19         A.      I do, but I don't have them with me.

20         Q.      Do you have photographs of other

21   people using a hand truck similar to yours?

22         A.      I do, but I don't have it with me.

23              MR. VAN-LARE:  I don't have them.  If

24       you have it, make them available to me.

25              THE WITNESS:  Okay.  I will.  I know

1                    M. Belvin

2    abrasive with me.

3              Everything I did, if I walked -- like

4    the hat incident.  I got a wool hat on my

5    head that has -- it's not a cap, a baseball cap

6    where you put it on and it has to be one way, but

7    this is a wool hat that you put on your head and

8    you don't look, oh, let me make sure the name is

9    here or whatever when I put it on.  It's freezing

10   outside.

11             And they complained about little

12   things like that.  They complained about me being

13   late for the meeting.  They complained about

14   everything with me.  I mean, I had no write ups

15   until I went to the EEOC and then every time you

16   talk to Vito Mundo "Now, Mike, you got a stack of

17   write ups in there.  We could make them go away if

18   you drop your EEOC case."

19        Q.    Vito said that to you?

20        A.    Yes.

21        Q.    When did he say that to you?

22        A.    In 2015, early -- I filed in March.

23   They started with the harassment and they -- I

24   think this had to have been sometime in late --

25   the middle part of the 2015.

Page 274

1                    M. Belvin

2    Mr. Bonnette regarding Electchester Management's

3    hiring practices?

4         A.    Like I said, it was so many times

5    that I just -- a lot of them, I don't remember

6    because some of them was like a minute or two,

7    "Have they hired any blacks over in Fourth

8    Housing?  Have they hired any blacks in Fourth

9    Housing?  Did they hire in Fifth Housing?" and he

10   would say "No.  I'm working on it, I'm working on

11   it.  I'm working on it."

12             So a lot of those conversations was

13   like that.

14        Q.    Okay.

15             So the next time you talked to him

16   about this, what happened to you that you believe

17   was retaliatory?

18        A.    It wasn't to me.  It was one of my

19   co-workers which was black.  He was involved in a

20   conversation.

21        Q.    Who was this and what happened to

22   them?

23        A.    Jerome Jenkins.

24        Q.    What happened to Mr. Jenkins?

25        A.    Repeatedly written up and fired.

Page 304

1                          M. Belvin

2      employees of Defendant all have knowledge or

3      information relevant to the subject matter of this

4      action."

5                     Right?

6          A.       Mm-hmm.

7          Q.       I need you to be more specific than

8      that and identify who these other employees of

9      Defendant who have knowledge are.

10         A.       Have knowledge of what took place?

11     Ed Wiley.

12         Q.       You already identify Ed Wiley here.

13     It says other employees.  You identify Joe

14     Copeaaso, Ed Wiley, Anthony Caiozzo, Richie

15     Bonnette, Tom Prezioso, Vito Mundo.  Then you say

16     and other employees of Defendant.

17                  Who are those other employees other

18     than the people you identify in this paragraph?

19         A.       I would say Jerome Jenkins.

20         Q.       Anyone else?

21         A.       Anthony Washington.

22         Q.       Anyone else?

23         A.       Mike Mayers.

24         Q.       Anyone else?

25         A.       That's about it that I could think

Page 336

1

2                          CERTIFICATION

3            I, SARA K. KILLIAN, a Court

4      Reporter and Notary Public of the State

5      of New York, do hereby certify that

6      MICHAEL BELVIN, the witness whose

7      examination under oath is hereinbefore set

8      forth, was duly sworn, and that such deposition

9      is a true record of the testimony given

10     by such witness.

11           I FURTHER CERTIFY that I am not

12     related to any of the parties to this

13     action by blood or marriage, and that

14     I am in no way interested in the

15     outcome of this matter.

16                IN WITNESS WHEREOF, I have hereunto

17     set my hand this 11th day of March, 2019.

18

19     

20     _____

21                SARA K. KILLIAN

22     Notary Public of the State of New York

23

24

25