# Trial Transcript Day 1

BELVIN - DIRECT - VAN-LARE                93

A      Electchester Management.

Q      How long have you been employed by Electchester Management?

A      Twenty-four years, three months.

Q      In what capacity are you employed?

A      I am a porter of Third Housing.

Q      Can you describe, briefly for the jury what your responsibilities are as a porter?

A      Cleaning and maintaining the building.

Q      Anything else?

A      That's about it.

Q      How old are you?

A      Sixty-years old -- 61, I'm sorry, just made 61.

Q      Did you work anywhere else before you came to Electchester?

A      Yes.

Q      Can you tell the jury where that was?

A      Queens Hospital Center, Flushing, New York.

Q      And while employed at Electchester, did you make any kind of complaint?

A      Numerous complaints.

Q      When you said numerous, what do you mean?

A      When I first got there, I -- I was subject to things that I had never been -- that I had been subject to before but not in a -- not in a workplace, things such as racist remarks,

joking racist remarks, just horrible things overall in regards to race.

Q    When you said horrible things overall, you need to tell me, specifically, what you are referring to.

A    Well, when I first --

MS. MOORE:  Objection.

THE COURT:  I'm sorry, if there's an objection, don't answer until I rule on the objection.

THE WITNESS:  Okay.

THE COURT:  The objection is overruled.  You may answer.

A    When I first got to Electchester, the general manager Dr. for my interview.  The general manager referred to the guy that brought me for the job as a nigga.  I was very uncomfortable with the word but I needed the job, so I didn't say anything.

Q    Okay.  I'm going to show you some of the exhibits that have been entered into the record into this proceeding, okay?

THE COURT:  You have to identify the exhibit for the court reporter.

MR. VAN-LARE:  I will.

Q    Plaintiff exhibit 1, do you see an image -- do you see something on your screen, sir?

A    Yes, I do.

Q    Okay.  What do you see?

A    A monkey.

Q    Okay.  Do you know what that -- strike that.  Have you seen this picture before?

A    Yes, I have.

Q    Do you know who took this picture?

A    I took the picture.

Q    Okay.  So you've seen this image before?

A    Yes.

Q    Can you describe what the actual image looks like, tell us what it is made of?

A    That is a stuffed animal, which is a monkey, with a rope tied to the neck hanging from inside of my locker.

        MS. MOORE:  Objection.

        THE COURT:  Overruled.  You can finish your answer.

A    It's a monkey tied to my locker with a rope around the neck.

Q    And do you remember, and try as much as you can, approximately when this particular monkey was hung over your locker?

A    That monkey was hanging over my locker sometime in October of 2012.  I remember because we were doing leaves the day that I came back from lunch, of 2012.

Q    Do you know who in particular hung this monkey up?

A    I have no idea who hung it there but whoever hung it there had keys to enter this room because it's a locked door.

BELVIN - DIRECT - VAN-LARE                    98

and I said I heard him, I heard what he said.

          MS. MOORE:  Objection.

          THE COURT:  Overruled.

Q    You said there was a problem between Mr. Martinez and Mr. Prezioso?

A    Yes.

Q    What is the problem?

A    They were harassing -- harassing him.

          MS. MOORE:  Objection.

          THE COURT:  Sustained.

Q    How did the monkey hanging on your locker make you feel?

A    I was very, very angry.  I -- that was the straw that broke the camel's back for me.  And I -- if I'm not going to do anything now, when am I going to do something.  So I was very upset.  I took it home to my wife later that day and I told her it's getting --

          MS. MOORE:  Objection.

          THE COURT:  Sustained.  Just -- I have a question. When was this photograph taken?

          THE WITNESS:  October of 2012.

          THE COURT:  Well, you had a camera or what did you use to take it?

          THE WITNESS:  A cellphone.

          THE COURT:  You used a cellphone?

          THE WITNESS:  Yes.

BELVIN - DIRECT - VAN-LARE                    99

THE COURT:  Did you take it proximate to the time you actually found it there?

THE WITNESS:  I believe I took it when I saw it there, yes.

THE COURT:  So you took it right away?

THE WITNESS:  Yes.

THE COURT:  Go ahead.  Next question.

MR. VAN-LARE:  Okay.

Q    Now, you were explaining how it made you feel, were you finished with that answer?  Without talking about your wife --

A    I was upset about the monkey hanging from the locker.

THE COURT:  All right, next question.

Q    I'm going to direct your attention to another document that was entered into the records today and that is plaintiff exhibit 3.  It should be in front of your screen.  Can you see it?

A    Yes.  I'm seeing it on the screen now, yes.

Q    Do you know who took this particular picture, plaintiff exhibit 3?

A    I took the picture.

Q    Okay.  When did you take it?

A    I took the picture in 2010, I believe.

(Continued on the following page.)

LEEANN N. MUSOLF, RPR, CCR
Official Court Reporter

Belvin - direct - Van-Lare          101

A    I talked to Juan about it once or twice.  I told Juan we need to talk to Tom about it and we spoke to him about it a couple of times.

Q    Did you ever hear from Mr. Prezioso?

A    Never.

Q    He never said anything about this image to you?

A    Nothing.

Q    What does this image represent to you?

          MS. MOORE:  Objection.

          THE COURT:  Overruled.

          You may answer.

A    That thing was, if I may say so, that thing was, there's part of it missing.  There was a thing attached to that image on the wall with a white Barbie doll sitting on it --

          MS. MOORE:  Objection.

A    -- periodically .

          THE COURT:  Overruled.

A    There is a white --

          THE COURT:  When did you see that?

          THE WITNESS:   That was -- as soon as they put it up.  That thing went up in 2002, I believe.

Q    Which thing went up in 2002?

A    The man hanging from the wall, and it had a Barbie doll attached to it in 2002.

Q    My question to you is why did you take the picture?

*Michele Lucchese, Official Court Reporter*

Belvin - direct - Van-Lare                102

A     Because it was a lot of games, a lot of guys, they act like children there, in my opinion, and they did stupid --

          MS. MOORE:  Objection.

          THE COURT:  Overruled.  You may finish.

A     A lot of guys did a lot of childish things there and I can't say who exactly hung -- nailed that thing to the wall, but one morning I came in to work.  My wife dropped me off at work and there was a couple of maintenance guys there outside of building one and we switched seats because she was driving while I was eating.  She was actually eating while I was driving.  And she got out and we exchanged seats and I came in to go to work, whatever.  And they noticed her giving me a kiss.  And like two or three days later that thing was on the wall and I knew what it meant, but I didn't say anything because it was never directed towards me, like Mike, this is for you.  So I didn't say anything about it.  But it stayed there for at least about a week -- two weeks before the Barbie doll was missing.  The Barbie doll was down on the floor, next to that sewer pipe.  It laid there for awhile.  I would come over there whenever the shop door was opened to exit there to go back to the floor that I worked.

Q     You said you know what this means, the picture, right? Can you tell the jury what you believe it means?

          MS. MOORE:  Objection.

          THE COURT:  Overruled.

*Michele Lucchese, Official Court Reporter*

Belvin - direct - Van-Lare            106

                    (In open court.)

                    THE COURT:  Let me know when you are ready.

                    MR. VAN-LARE:  I'm ready.

                    THE COURT:  No, no.  I don't mean you; I mean the court reporter.

                    The objection is overruled, and Exhibit No. 2 --

                    MR. VAN-LARE:  Plaintiff.

                    THE COURT:  -- is shown to the jury.  All right. You can ask your questions.

                    (Plaintiff's Exhibit 2, was received in evidence.)

Q    Mr. Belvin, have you seen this picture before?

A    Yes, I have.

                    THE COURT:  Would you sit up straight and into the microphone.  This isn't your living room.  This is a courtroom.

                    THE WITNESS:  Okay.

                    THE COURT:  Go ahead.

Q    Do you know who took this picture?

A    I took the picture.

Q    And approximately when did you take the picture?

A    I believe I took that picture 2013.

Q    And do you -- where was this image when you took the picture?

A    That was the A side of building 12, third -- Second Housing.

Belvin - direct - Van-Lare                    107

Q     Where in particular?

A     On the work cabinet where we keep cleaning solutions.

Q     And why did you take this picture?

A     For one, it scared me when I put the lights on.  And I couldn't believe it was there, someone put it there again, another monkey picture, another monkey.  This is a plastic monkey.  I couldn't believe it was there, so I took a picture so if I needed it, I would be able to show it, that it actually happened.

Q     Did you complain to anyone in the general authority regarding the presence of this picture?

A     That was 2013, I believe I complained to Juan and Tom about it.

Q     Did any one of them respond back to you?

A     No.

        THE COURT:  How did you complain?  What did you do to complain?  In what form did your complaint take?

        THE WITNESS:  Well, I said to him here it is again.

        MS. MOORE:  Objection.

        THE COURT:  I'm sorry.  You said to him on the phone?  You called him up?

        THE WITNESS:  No, I spoke to Mr. Martinez in person.

        THE COURT:  So you complained to Mr. Martinez in person?

        THE WITNESS:  In person, yes.

*Michele Lucchese, Official Court Reporter*

Belvin - direct - Van-Lare                    108

THE COURT:  Who else did you complain?

THE WITNESS:  To Tom Prezioso.

THE COURT:  Was that in person as well?

THE WITNESS:  Yes.

THE COURT:  So you advised them of what had happened?

THE WITNESS:  Yes.

THE COURT:  Next question.

Q   You said you didn't get any response; correct?

A   No.

THE COURT:   I don't want to hear the response.  I want to just have you ask another question.

Q   After you complained to them, was anything done by management?

A   No.

Q   And this particular image, what does it represent to you?

MS. MOORE:  Objection.

THE COURT:  You may answer.

A   Another case of someone doing something stupid on the job as far as being racist.

Q   Did there come a time when you spoke to anyone in management about these pictures floating around?

MS. MOORE:  Objection.

THE COURT:  You mean other than what he already testified to?

*Michele Lucchese, Official Court Reporter*

Belvin - direct - Van-Lare          109

MR. VAN-LARE:  Yes, Your Honor.

THE COURT:  You may answer.

A    The EEOC.

Q    Now, when did you go to the EEOC?

A    2015 of March.

Q    Okay.  When you filed the EEOC complaint in March of 2015 --

MS. MOORE:  Objection.

THE COURT:  Is there more to the question before I rule on the objection to a question you haven't finished?

If you are going to object to a question, counsel, wait until the question is asked.  Give me an opportunity to at least hear the question and then you may object, but don't interfere in counsel asking the question.  We'll be here for two weeks if we keep doing this.

What's the question?

Q    When you went to the EEOC in March of 2015, did you file a complaint?

A    Yes, I did.

Q    Do you know if there was any investigation by the EEOC?

A    Yes, there was.

Q    And did you receive any response from the EEOC?

A    I received a right-to-sue letter from them.

Q    Mr. Belvin, I'm going to direct your attention now to a document here for identification, and that will be Plaintiff's

*Michele Lucchese, Official Court Reporter*

Belvin - direct - Van-Lare                112

Q    Please, can you just explain what happened without saying what somebody said.

A    Okay.  I was calling the radio two times simultaneously and I had my hand truck with me that day when I was on my break and the radio was fixed to it and the hand truck was about three or four feet from me and as I'm walking over to answer it, Mr. Caiozzo and Mr. Capasso was walking across the street came and they said that someone's been calling you on the radio.  And I said she just called me two times --

MS. MOORE:  Objection.

A    -- I'm walking over to answer.

THE COURT:  All right.  Overruled.  The objection is overruled.

Go ahead.

A    So they said no, you're -- you didn't answer the radio, you're on your phone.  You got a wire set in your ear and I told them I'm on my break, I'm answering the radio now, and they said no, you should answer the radio immediately.  I said I'm answering the radio.  She called me like right afterward and --

MS. MOORE:  Objection.

A    -- I answered.

MR. VAN-LARE:  May I, Your Honor?

THE COURT:  Overruled.  Go ahead.

Q    Did you, in fact, have an earphone on?

*Michele Lucchese, Official Court Reporter*

Belvin - direct - Van-Lare                    113

A     Yes, I did.

Q     While you were at work?

A     Yes, I did.

Q     Are you allowed do that?

A     On your break, yes.

Q     And you were on break?

A     I was on break.

          MR. VAN-LARE:  Your Honor, I will move on to Plaintiff's Exhibit 17.

          THE COURT:  All right.  So put it up.

Q    Mr. Belvin, can you -- up in front of your screen is a document marked for identification, Plaintiff Exhibit 17, one, seven.

A     Yes, I see it.

Q     Okay.  Did you see that memo before?

A     Yes.

Q     Approximately when did you first see the memo?

A     That -- March 5, 2015.

Q     And it was addressed to you; correct?

A     Yes.

          MR. VAN-LARE:  Your Honor, at this point I would like this document entered into the record as Exhibit 17.

          MS. MOORE:  The Defendant has no objections.

          THE COURT:  All right.  Plaintiff's Exhibit 17 is received in evidence and published to the jury.

                *Michele Lucchese, Official Court Reporter*

Belvin - direct - Van-Lare                114

(Plaintiff's Exhibit 17, was received in evidence.)

THE COURT:  All right.  Next question.

Q    Mr. Belvin, your employer in this memo, Exhibit 17, accused you of not wearing the proper outer jacket that was issued to you.  Is that true?

MS. MOORE:  Objection.

A    Yes.

THE COURT:  Overruled.

Next.

Q    Why didn't you comply with your employer's requirement for uniform?

A    It was a -- that was a hoodie that I was wearing that particular day and I had cut my hair to Telly Savalas look in 2009 and they don't issue a hoodie to wear there, but over the years, under Mr. Grambell and Mr. Tom Prezioso, when he first came over there, it was okay to wear the hoodie and put the work jacket over it.  That's what I had on.

MR. VAN-LARE:  I'm going to -- Your Honor, I would like to go to another exhibit and that will be Plaintiff's Exhibit 16 for identification.

May I put it up, Your Honor?

THE COURT:  Yes, you may.

Q    Do you see Plaintiff's Exhibit 16 in front you?

A    Yes, I do.

Q    Have you seen this particular memo before?

*Michele Lucchese, Official Court Reporter*

Belvin - direct - Van-Lare                116

THE COURT:  Sure.

THE WITNESS:  There is five housings:  First, second, third, fourth, and fifth.  I worked at the time -- I started at Second Housing, and that's where I was before they transferred me.

THE COURT:  To?

THE WITNESS:  Third Housing.

THE COURT:  Are these all under the umbrella of Electchester Management?

THE WITNESS:  Yes, the same hand, like fingers.

THE COURT:  All right.

Q    Mr. Belvin, your employer here also accused you of videotaping employees.

MS. MOORE:  Objection.

Overruled.  You may answer.

THE WITNESS:  Yes.

THE COURT:  Is that a question?

MR. VAN-LARE:  Yes, it was a question.

THE COURT:  What is the question?

Q    You were accused by your employer of videotaping coworkers; is that true?

A    Yes, I was doing that.

Q    Why did you do that?

A    Because management had -- management told me that if you can't do the job, we have to let you go.

*Michele Lucchese, Official Court Reporter*

Belvin - direct - Van-Lare                    118

Q    Please go ahead.

          THE COURT:  I think he explained.  Next question.

Q    After you did this videotape, did anyone in management approach you to punish you or it was just that warning?

A    It was just a warning.

Q    And by the way, the memo is dated July 7, 2015.  Do you see that date?

A    Yes, I do.

Q    That was after you filed your EEOC complaint; correct?

A    Yes, it was.

          MS. MOORE:  Objection.

          THE COURT:  Overruled.

          MR. VAN-LARE:  Your Honor, I will proceed to another document as Plaintiff's Exhibit 18 for identification.

Q    Mr. Belvin, you should see a document in front of you.

A    Yes, I do.

Q    Have you seen this particular memo before?

A    Yes, I have.

Q    Where did you see it?

A    It is given to me.

Q    Okay.  By who?

A    By --

          THE COURT:  Wait.  All right.  You received this memo.  You're offering it in evidence.

          MR. VAN-LARE:  I'm going to -- I just wanted him

*Michele Lucchese, Official Court Reporter*

BELVIN - DIRECT - VAN-LARE                128

counter that is there and it's asbestos, an asbestos piece

that has to be removed by an abatement company every time that

someone wants to renew their kitchen.  And she had put down --

brought down pieces that was -- was asbestos and I noticed

this piece sitting there with the rest of the stuff, so I

reported it on the radio, told my supervisor.

MS. MOORE:  Objection.

THE COURT:  Overruled.

Q    Were you given any other punishment other than the

warning that was issued in this case?

A    I was suspended.

Q    For how long, sir?

A    One day.

Q    Thank you.

MR. VAN-LERE:  Your Honor, at this point, I would

like to move to the next exhibit, which would be exhibit 22

for identification.

MS. MOORE:  Objection.

THE COURT:  Do you have a question about the exhibit

for your client?

MR. VAN-LERE:  Yes.

Q    Do you recognize this document, sir?

A    That's the one-day suspension I was given.

Q    I'm talking about exhibit 22.

THE COURT:  Twenty-two is a new exhibit.  Are you

familiar with this exhibit?

THE WITNESS:  This is the suspension I was given.

Q    When did you receive this document?

A    A day before -- I got it on -- I believe I got it on the 25th.

Q    And who gave it to you?

A    Mr. Caiozzo.

Q    Okay.  And did you get it on or about the -- okay, did you get it on or about August 26, 2016?

A    Yes.

Q    Okay.

MR. VAN-LERE:  Your Honor, I would like this document to be admitted into the record as plaintiff exhibit 22.

THE COURT:  The objection is overruled and the exhibit 22 is published to the jury.

(Plaintiffs' Exhibit 22, was received in evidence.)

THE COURT:  Go ahead.

Q    Mr. Belvin, does this document accurately reflect how the case ended?

A    Yes, it does.

Q    Thank you.

MR. VAN-LERE:  Your Honor, I would like to move to the next --

THE COURT:  I'm sorry, let the jury look at the

LEEANN N. MUSOLF, RPR, CCR
Official Court Reporter

A    Mr. Bonnette is the shop steward at Electchester housing and Mr. Bonnette was picked by management to be the shop steward and I've been in the union for years and I've never known is shop steward to be picked by management so I never think he was someone I needed to talk to about problems I was having on the job concerning management.

MS. MOORE:  Objection.

THE COURT:  Overruled.  So he was picked shop steward for what union?

THE WITNESS:  32BJ, I'm sorry.

THE COURT:  And he was selected by the management of Electchester?

THE WITNESS:  Yes, he was.

THE COURT:  Is your testimony?

THE WITNESS:  Yes, it is.

THE COURT:  Go ahead, next question.

Q    Is that the only issue that resulted in this problem?

A    There was numerous issues between me and Mr. Bonnette.

Q    Can you please tell us.

A    Mr. Bonnette wanted me not to speak about things that was taking place on the job because he didn't want to confront management.  And I had a huge problem with that because, I mean, he's there to be the liaison between the workers and management and he didn't want to do his job and I told him so --

25 is received in evidence and published to the jury.

(Plaintiffs' Exhibit 25, was received in evidence.)

THE COURT: Okay. Questions.

Q    Mr. Belvin, did you, in fact, take an unauthorized leave as is alleged here?

A    According to the contract, yes I did.

Q    Why did you do that?

A    The contract book states that if you take five days off, on the sixth day, if you take a day off, you have to take another day right after whether you're sick or not and --

MS. MOORE: Objection.

THE COURT: Continue.

A    And at the time, previously the other management never enforced that rule, which I never knew about anyway because I never read that part of the contract, and when I did it, the management told me -- they gave me a written warning after I did it.

Q    And did you ever repeat that behavior again?

A    I believe I did.

Q    You did it again?

A    Yes, I did.

Q    Under what circumstance?

A    I -- my wife was sick one morning and I had to stay home and I took a day off and it was unauthorized day.

Q    Okay. Were you brought up on charges?

this warning letter to you?

THE COURT:  So you're not asking that it be introduced in evidence?

MR. VAN-LERE:  Your Honor, I would like the document that has been marked for identification as exhibit 27 put in evidence as plaintiffs' exhibit 27.

THE COURT:  Is there an objection?

MS. MOORE:  No objection.

THE COURT:  All right.  Plaintiffs' exhibit 27 is received in evidence and published to the jury.  Let the jury review it first.

(Plaintiffs' Exhibit 27, was received in evidence.)

THE COURT:  All right.

Q    Mr. Belvin, what is -- sorry, what was your regular working hours during the month of May 2017?

A    Seven to four.

Q    And do you have rules regarding when you have to vacate the premise after you finish your assignment?

A    Yes, we do.

Q    What is the rule?

A    Seven to four.

Q    Okay.  And --

A    Seven to four are my working hours.

Q    And when you got this memo --

THE COURT:  I'm sorry, there was no answer to your

last question.

Are there rules about what time you must leave the premise of the housing project at the end of your duty day?

THE WITNESS:  Yes, there is.

THE COURT:  And what is that?

THE WITNESS:  I clock in at 7:00 in the morning, I clock out at 4:00 in the evening.

THE COURT:  And you leave the premise at --

THE WITNESS:  Leave the premise.

THE COURT:  And that's in the rules?

THE WITNESS:  That's in the rules.

THE COURT:  Go ahead.  Next question.

Q    Mr. Belvin, did you, in fact, stay beyond 4:00 p.m.?

A    Yes, I did.

Q    Why did you stay beyond 4:00 p.m.?

A    That was a weekend that I worked.  We work a weekend every 70 to 80 days, and you work by yourself in all the buildings -- in all 12 buildings, and there was -- I wasn't finished.  And I had only been over there a year and there was things that was unfamiliar to me because we do things totally different when I was in Second Housing, and I was trying to complete the job where I wouldn't leave anything where some older person or someone would trip and fall over some debris that was in the basements.

So I tried to finish and I couldn't finish so I

Belvin- direct - Van-Lare                  141

Q    Mr. Belvin, you should see an exhibit in front of you.
It's marked Exhibit 28 for identification.

A    The screen is blank.

         It's up now.

         THE COURT:  Okay.  Go ahead.

Q    Take a moment to look at that particular document.

A    Yes, I recall getting the paper.

Q    You have seen this document before; is that correct?

A    Yes, I have.

Q    Where did you see it?

A    It was given to me by I believe Mr. Ed Wiley, the
manager.

         THE COURT:  When was that?

         THE WITNESS:  That was 2014.

         THE COURT:  Go ahead.

Q    So it was given to you on or about December 19, 2014; is
that correct?

A    That's correct.

Q    Okay.

         MR. VAN-LARE:  Now, Your Honor I'd like this
document admitted into evidence as Plaintiff Exhibit 28.

         THE COURT:  Anything?

         MS. MOORE:  No, Your Honor.

         THE COURT:  All right.  Exhibit 28, Plaintiff's
Exhibit 28 is received in evidence.  Publish for the jury.

*Michele Lucchese, Official Court Reporter*

Belvin- direct - Van-Lare                142

(Plaintiff's Exhibit 28, was received in evidence.)

(Exhibit published.)

THE COURT:  All right.

Q    Did your manager at that time, Ed Wiley, discuss the content of this memo with you before he gave it to you?

A    Yes, I believe so.

Q    What was the substance of that discussion?

A    He said that we should refrain from having dealings like that with one another.

Q    What happened?

A    Mr. -- I'm going to call him Danny because that's what I know him as, and it's hard to pronounce his name, Mr. Saliche, said to me -- spoke very nasty to me one morning around six o'clock in the morning.  I didn't -- I'm not supposed to actually work until 7:00 in the morning, and he was playing with me, but he said words to me that I did not care for.

MS. MOORE:  Objection.

THE COURT:  Overruled.

Q    What was the statement he made to you?

A    He walked into the compactor room and called me what's up, my nigga?

MS. MOORE:  Objection.

THE COURT:  Overruled.

Q    Do you speak Spanish?

A    I don't, no, not at all.

*Michele Lucchese, Official Court Reporter*

Belvin- direct - Van-Lare                    143

Q    Do you have an understanding of any level of Spanish?

A    Yes.

Q    I'm going to direct your attention to paragraph 3 in this memo.  After speaking Michael, he brought to light that for years he has been called Moreno, or Moreno, Spanish for black, by a lot of workers.  At that time I reminded Martires of the severity of the issue and how we only had a safety class on violence in the workplace in the beginning of the year, in parenthesis, Executive Safety and Health Consultants, Inc. taught the class.

      Were you called Moreno?

A    That morning he said -- he called me nigga, but I had been called Moreno at times by a lot of the Latino workers there.

      MS. MOORE:  Objection.

Q    Did Mr. --

      THE COURT:  I'm sorry.  I'm going strike the answer. You can ask the question again.

      Limit yourself to the question asked, please.  Go ahead.

Q    Have you been called Moreno?

A    Yes.

Q    And may I draw your attention, sir, to the very last -- actually, strike that.  I just have another question for you before that.

*Michele Lucchese, Official Court Reporter*

Did Mr. Martires make any allegation against you that was revealed to you?

A     Yes.  He said we had worked together.

Q     Okay.  I'm going to direct your attention now to the last paragraph, and this is from Ed Wiley, and in that paragraph, I directing your attention to the very last sentence, the one before the last, it starts from the third line from the bottom.

I also let them know I was putting this letter together.  I'm putting it in their files.  It was made clear to both men that this is not going to be tolerated.

Did Mr. Mr.  Wiley tell you why he had to put something in your file after you complained about how you've been treated?

MS. MOORE:  Objection.

THE COURT:  Overruled.  You may answer.

A     It really didn't.  It really did not.

MR. VAN-LARE:  Your Honor, I do not have additional questions on this exhibit.  I'd like to move on to the next exhibit, Your Honor.

THE COURT:  All right.

MR. VAN-LARE:  And that will be 29, Your Honor.

Q     There is a document in front of you.  It should say 29 at the top.  Do you see it?

A     Yes, I do.

Belvin- direct - Van-Lare                    151

your client's attention to some part of it that would be the subject of the questioning here.  The jury will have the entire document in the jury room when it deliberates, so we can move things along a little faster.

MR. VAN-LARE:  Thank you, Your Honor.

Q    Mr. Belvin, I'm going to direct your attention to page 680, bottom right, it's the first page of the exhibit.  Do you see that page?

A    Yes, I do.

Q    And please, I want you to go to the second paragraph. No.  I'm sorry.  The first paragraph on the bottom.  It starts with Mr. Belvin essentially.  Do you see that paragraph?

A    Yes, I do.

Q    Mr. Belvin essentially confirmed his contemporaneous written statement of December 24th that Mr. Bourgade referred to him as boy, which Mr. Belvin interpreted as a racial slur that deeply offended him.

Mr. Belvin added that the incident occurred when, after hearing a loud voice, he came upon Mr. Bourgade and Mr. Goldberg moving his stove into the stove room of building 11, to which Mr. Belvin was assigned.

Mr. Belvin, did Mr. Bourgade, in fact, call you boy?

A    Yes, he did.

MS. MOORE:  Objection.

THE COURT:  Overruled.

Belvin- direct - Van-Lare                                    152

Q    Why do you find that offensive?

A    Boy means to a black man as the "N" word and Mr. David Bourgade is young enough to be my son.  So him referring to me as boy, it was totally out of line and unnecessary.

Q    Do you know the final outcome of this investigation?

A    I believe they gave him a one-day suspension.

Q    Thank you.

        MR. VAN-LARE:  Your Honor, I will have no further questions on this particular exhibit.

        I'd like to proceed to the next one.

        THE COURT:  Can we have a sidebar for a minute, please.

        (Continued on the next page.)

        (Sidebar conference.)

*Michele Lucchese, Official Court Reporter*

Belvin- direct - Van-Lare                157

where the kids play and throw their paraphernalia in there, like pumpkin seeds on the ground.  I picked up a whole bunch of stuff, put it in the bag, and I proceeded to walk it to the same area where I threw the other garbage at.  And this bag weighed probably about six or seven pounds because it had some soda cans that I swept up from the ground, and I saw Mr. Prezioso and Mr. Caiozzo walking down Jewel Avenue, and I had tried to avoid them since I filed the EEOC case.

So I tossed the bag probably about 30 feet from the garbage and proceeded to walk back toward my building, and they yelled at me from about 60 feet away, and I had to turn and look to see why were they yelling at me, and finally they got closer to me and they told me don't throw that bag of garbage like that, in an aggressive way.  And Mr. Caiozzo yelled something else, said something else to me hard, but I didn't hear what he said.  And I told Tom, I said Tom I've thrown this bag of garbage for almost 10 or 14 years, or whatever.  And, in fact, you've at times told me when you're standing there smoking your cigar strike, like a bowling ball and --

MS. MOORE:  Objection.

A    -- I walked away from them.  I looked in amazement because I couldn't figure out what they were talking about, I guess that's what they felt I did.

I went to lunch.  I came back from lunch and they

*Michele Lucchese, Official Court Reporter*

Belvin- direct - Van-Lare                158

told me to give them the keys and to exit the premises and I did just that.

Q    And at the top where it says subject, it says disciplinary action, three-day suspension, 7/14, 7/15, and 7/16.

Is this the same three-day suspension that you testified before?

A    Yes.

Q    So is this the same case that you went to the arbitrator that you testified to before?

A    Yes.

Q    And this is the case that the arbitrator gave you your three days back?

A    Yes, he did.

MR. VAN-LARE:  Thank you.  I have no further questions for Mr. Belvin on this particular exhibit, Your Honor.

I'd like to proceed at this point, Your Honor, to the next exhibit I have, which would be Exhibit 13.

THE COURT:  I'm sorry, exhibit?

MR. VAN-LARE:  One-three.

THE COURT:  13.  All right.

MS. MOORE:  Objection.

THE COURT:  I'm sorry?  Did you say something?

MS. MOORE:  Objection to number 13.

Belvin - Direct - Van-Lare                    163

A     It's an EEOC form.

Q     And is this the form that you signed?

A     Yes, it is.

Q     Is there -- and if you look at this on -- I just direct you to the part that says -- it's the fourth box from the bottom.  It says:  The particulars are.

      Do you see that area?

A     Yes.

Q     It says:  This charge is an amendment to the EEOC case I filed in May 2015 -- and the number is given to the case -- alleging discrimination based on race.  After filing the EEOC case, respondent threatened me to drop my charge and issued disciplinary action against me.

      Mr. Belvin, who threaten you to drop your charge?

      MS. MOORE:  Objection.

      THE COURT:  Overruled.

A     Mr. Vito Mundo.

Q     Who is Mr. Vito Mundo?

A     He is the president of HR.

Q     And --

      THE COURT:  Where?

      THE WITNESS:  At Electchester housing.

Q     Apart from being the president of HR, did he have any other responsibility at Electchester management?

A     I'd assume so.  He's the head guy there.

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

Belvin - Direct - Van-Lare                164

THE COURT:  I'm going to strike that answer:  I assume so.

Q    My question to you, sir, is:  Apart from being the head of HRA, did he hold any other position at Electchester?

A    I believe he's also lead counsel.

MS. MOORE:  Objection.

Q    I'm sorry?

A    I believe he's lead counsel for them.  Not lead counsel -- I'm sorry -- general counsel for them.

Q    If you remember, when did Mr. Mundo threaten you to withdraw your case?

A    I believe it was a few months after I filed.

Q    Can you explain to the jury the circumstances that led to that?  How did that come to happen?

MS. MOORE:  Objection.

THE COURT:  Sustained on that.

Q    Did Mr. Veto Mundo speak to you directly?

A    Yes, he did.

Q    What did he say to you?

A    He had made mention to me about the case in regards to another matter that I had up the hill and said that -- that all your write-ups could go away if you just drop your EEOC case.  It could make things better for you.

Q    And did you give any response after that statement was made?

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

Q    Who did?

A    Mr. Prezioso.

Q    And you submitted --

THE COURT:  Can we get a time frame there as to when this was said?

MR. VAN-LARE:  Yeah.  He said this in May -- on May 12th, 2015, but he's saying that since he started working for Electchester in September of 1999 up through 2015, his performance has always been satisfactory.

MS. SHEA:  Objection.

MR. VAN-LARE:  That's what he said here, but I can reask my last --

THE COURT:  I think you should ask him the question, not make --

MR. VAN-LARE:  Yes.

THE COURT:   -- the statement.

MR. VAN-LARE:  Okay.

Q    Mr. Belvin, when did Mr. Prezioso tell you that your performance is good?

A    In 2015.

Q    Did he ever repeat that after 2015?

A    No.

Q    And, Mr. Belvin, this statement that we are looking at -- I'm referring specifically to this exhibit -- did you submit it to the EEOC?

Belvin - Direct - Van-Lare                168

A       Yes, I did.

Q       Thank you.

        We spoke earlier about a monkey that was put up that you took pictures of.

        Do you remember that?

A       Yes, I do.

        MS. SHEA:  Objection.

        THE COURT:  Please don't object to something like that.  It's a predicate to a question.  It's already in evidence, and I don't want to have to answer every objection to every question.  It serves no purpose.

Q       Actually, I will --

        THE COURT:  I'm not done.

        MR. VAN-LARE:  I'm sorry.

        THE COURT:  It's in evidence.  He's recapping evidence as a predicate to the next question.  Please.  Let him ask his question and if the question is a problem, then you object.  He didn't even ask the question.  How do you object to a statement that's already in evidence before a jury?  I don't know.

        Ask your question.

        MR. VAN-LARE:  Your Honor, I'm going to just leave that area and just move on to the last area I have, Your Honor.

        THE COURT:  You don't have a question after all

                    *Denise Parisi, RPR, CRR*
                    *Official Court Reporter*

Belvin - Direct - Van-Lare                169

this?

MR. VAN-LARE:  I do, but --

THE COURT:  Well, ask your question.  I didn't say don't ask your question.  I said wait until the question is asked to object if you have an objection.

So what's your question?

Q    Mr. Belvin, we spoke about monkeys this morning.

Do you know if there was a public figure that was depicted as a monkey?

A    Yes, I do.

Q    And which figure is that?  Which public figure?

A    The figure of the monkey hanging from my work locker.

Q    Now I'm asking, do you know of a public figure in the United States that was a person who is a public figure that was depicted as a monkey?

A    That would be the President Barack Obama.

MS. MOORE:  Objection to the question.

THE COURT:  Overruled.

Q    Why did you say that would be President Obama?

A    I saw it there a couple times.

Q    Do you recall around what time you saw it?

A    This was probably 2013, 2014.

Q    Okay.

Mr. Belvin, with the experience you've gone through, how do you feel about waking up and going to work?

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

Belvin - Direct - Van-Lare                170

A    It's -- it's -- it was very difficult.  It still is difficult to this day to go there because -- I mean, after putting in 24 years there and enduring some of the stuff that I had endured there, I -- I'm close to retirement, and I contemplated just walking away from the rest of my retirement because you can only take so much there, and I got no help from management, no help from the union.  And, basically, the EEOC, they told me that if management would come after me or retaliate against me, that I should show them a card that they gave me.  I showed them the card and management just attacked me from then on, like the card didn't mean anything to them, so there was nobody to help me.

Q    When you said "them," who is the person that you showed the card to?

A    Management.

Q    Who?  Who, in particular?

A    Anthony Caiozzo, Tom Prezioso.

Q    And when you showed them the card, did you say something when you showed it to them?

MS. MOORE:  Objection.

A    I said -- I said this is from the EEOC, and they told me that if there was a problem to show you this, and it didn't mean anything to them.

THE COURT:  What did this card -- what was the purpose of this card?

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

it.

MS. SHEA:  Oh.

Q    Is it your testimony that this memo was the result of your complaint?

A    I can't read it.

Yes.

Q    Okay, I'm going to zoom out a little bit just so that it's a little easier to read.

I'm sorry, your answer was yes?

A    Yes.  You actually made it smaller.

Q    Yes, I zoomed out to make it easier to read?

A    Okay, it's harder to read.

Q    My apologies then.  I will re-zoom.

A    That's good.

Q    So, it's your testimony that this was not in response to Mr. Saliche's complaint against you, correct?

A    This is confusing because there was two -- two incidents and I don't remember -- I don't really remember some of this but yes, some -- this happened.

Q    And you did tell Mr. Saliche you don't want to hear it, correct?

A    Yes.

Q    Didn't you complain he called you Moreno after he complained about you?

A    He called me Moreno every time he saw Moreno, or the N

Belvin - recross- Shea                          192

word.

Q    Mr. Belvin, didn't you testify at your deposition that Mr. Martinez had also called you Moreno?

A    Yes, he did.

Q    And that you did not complain to Electchester about that time?

A    I complained to him.

Q    Mr. Belvin, did you testify earlier that you complained to the EEOC about the photos that have been introduced into evidence today?

A    Some of them, yes.

        MS. SHEA:  Your Honor, I would like to pull up the document that's been previously introduced into evidence as Exhibit 14, please.

        THE COURT:  Please, go ahead.

Q    Is that easy to read?  Should I zoom in or out?

A    Yes, it's good.

Q    Can you point to me where you complained about animals in this document?

A    I didn't.

        MS. SHEA:  I would now like to pull up Plaintiff's Exhibit 13, which is the amended EEOC complaint.

Q    Can you please point to me where you complain about animals in this complaint?

A    I didn't.

*LEEANN N. MUSOLF, RPR, CCR*
*Official Court Reporter*

Belvin - recross- Shea                              194

Q    And Mr. Mayers?

A    I believe so.

Q    And Mr. Jenkins?

A    I believe so.

Q    I'm going to scroll to the second page.  Did you call out to Mr. Bonnette that you would resolve your dispute across the street?

A    No.

Q    Did you tell him that you should talk by your car?

A    No.

Q    Did you raise your voice?

A    Yes.

          MS. SHEA:  We can take this off the screen now. Apologies.  I have one more follow-up on Exhibit 28.  I don't believe we need the document back up but that was -- unless, Your Honor, you disagree.

          THE COURT:  Go ahead.

Q    That was the document about Mr. Danny Saliche saying Moreno that we just spoke about.  Do you remember that?

A    Yes.

Q    Is it your testimony that you did not call Mr. Saliche any racially derogatory terms?

A    No, I did not.

          MS. SHEA:  Your Honor, I would like to put up the document that's been previously introduced into evidence as

Belvin - recross- Shea                      196

Q    And this is regarding the garbage throwing incident we discussed, correct?

A    Correct.

Q    Actually, I apologize, I'm going to withdraw this question.

        MS. SHEA:  I think I'm almost done, Your Honor, I'm just going to review all of my notes real quick.

        THE COURT:  That's fine.  Regarding the garbage throwing incident, Mr. Belvin, you previously testified that this matter did go to arbitration; is that correct?

A    Yes, it did.

Q    And it's your testimony that the arbitrator gave you your three days back, correct?

A    Yes, he did.

Q    Isn't it also true that the arbitrator noted your attitude and reduced the suspension to a warning?

A    Perhaps, yes.

Q    So, in fact, you were disciplined for the garbage throwing incident?

A    Yes, I was.

Q    Did you previously testify at your deposition -- actually, I apologize, I'm going to withdraw that.

        You previously testified earlier today that the bag you tossed had garbage from the park, correct?

A    Correct.

*LEEANN N. MUSOLF, RPR, CCR*
*Official Court Reporter*

Belvin - redirect - Van-Lare                              212

                    (In open court.)

                    THE COURT:  All right.  Continue.

BY MR. VAN-LARE:

Q    Mr. Mayers, what kind of complaint did you file with the

EEOC?

A    It was based on discrimination and disability and age.

Q    What is the nature of your disability?

A    I have leukemia, cancer.

Q    When were you diagnosed?

A    July of 2014.

Q    And did you inform your employer that you had diagnosis?

A    Yes, I did.

Q    And who in particular did you inform?

A    Joe Capasso.

Q    And when you informed Mr. Capasso, did you tell him

anything else?

A    I only told him the doctor found something in my blood.

Q    And that was it?

A    That was it.

Q    Okay.  Did you ever go for treatment?

A    Yes, I did.

Q    Okay.  And how soon after you told him did you go for

treatment?

A    I believe I -- I believe it was July -- I'm not sure

exactly, but I think it was July 15th I entered to start

                    *Michele Lucchese, Official Court Reporter*

Belvin - redirect - Van-Lare                213

getting my cycles of chemotherapy.

Q    And was that something that you did continuously or it was broken down?

A    I had to stay in the hospital for the first month of getting chemo and after that they have call aftercare.  I had to come into the hospital for five days every -- I think it was six weeks, I had to come into the hospital for five days.

Q    Were you able to work during this time?

A    No, I couldn't work because I would be taking five days almost like every month and I couldn't work.

Q    Did you tell your employer that that was the situation, you could not work for that period?

A    Yes, they understood.

Q    And what did your employer do?

A    At the time they allowed it, I guess.  They allowed it.

Q    Okay.  And how much time did you ask for?

A    Well, it was about a year the doctor told me.  The doctor told me it would be close to a year before I would be able to go back to work and get aftercare.

Q    Were you out close to that time?

A    I was out close to that time, yes.

Q    Precisely for how long were you out?

A    I think it was about close to 11 months.

Q    And were you in a position to return back to work after 11 months?

*Michele Lucchese, Official Court Reporter*

Belvin - redirect - Van-Lare                                    215

A      Vito Mondo .

Q      And you know who Mr. Vito Mondo is?

A      The general counsel.

            THE COURT:  Of?

            THE WITNESS:  Of Electchester Housing.

Q      What did he say in his letter of termination?

A      I'm sorry that you've been out over 12 months and it states that we only have to hold your job for you for 12 months and that if there's any employment later down the line, we'll see if we can reinstate you.

Q      When you received that letter, how did you feel?

A      For a second, suicidal.

            I had no more healthcare.  I had no way to pay my rent.  It was like one of the scariest things of my life because my children weren't ready for me to go.  I have a little cat that depends on me.  I was crushed.

Q      What, if anything, did you do?

A      I was talking to someone on the phone and they reminded me -- they mentioned that I went out on -- they had mentioned -- was it vacation time?  They mentioned vacation time to me, and a light bulb be went off in my head because when I first went out, I went out on vacation.  I went out on my own personal time.  I never used my sick days.  I had all of my sick days and I had vacation time.  And when I did the math, I realized I wasn't out a full year.  I was released a

Belvin - redirect - Van-Lare                    216

little too early.

Q    So when you found out that that was the situation, what was your next step?

A    I went and got my paperwork from the doctor, then I went to the union, and I had to tell the union that I wasn't out a year and that I was terminated falsely.

Q    And what did the union do?

A    At first, the union told me no, Mike, they got you, you're fired, you're fired.  That's the first thing they said to me.

Q    And then what followed next?

A    I told them, as I went out, when I went out, I said I have all my check stubs stating that I went out on -- I went out on my own time.  So I still had five weeks.  I had five weeks.  I went out five weeks on my own time.

So Mike looked at the paperwork and he said okay, Mikey, I got to call you back.  He said I have to call Vito. I guess he called Vito.  I don't know whether he did.  I know he called me back and he said Mikey, go back to work Monday.

Q    Did you, in fact, go back to work on the Monday?

A    Yes, I did.

Q    Okay.

MR. VAN-LARE:  Your Honor, I would like to put some exhibit up.

Q    Mr. Mayers --

*Michele Lucchese, Official Court Reporter*