# Trial Transcript Day 2

Q    And did you read the document?

A    Yes, I did.

Q    Are you familiar with the contents of the document?

A    Yes.

MR. VAN-LERE:  Your Honor, at this point, I ask that the document be admitted into evidence.

MS. MOORE:  No objections.

THE COURT:  All right.

Plaintiff's Exhibit No. 37 is received in received.

(Plaintiff Exhibit 37, was received in evidence.)

Q    Mr. Mayers, when you received this document, what did you do?

A    Sat back in my chair and was, like, stunned for a minute, like, just sit back and think, like, tears came to my eyes.

Q    Why did tears come to your eyes?

A    Because I no longer had employment, I no longer knew how I was going to get treatment, I didn't know how I was going to pay my rent.

Q    Who is it about the document that brought tears to your eyes?

A    They told me I no longer had a job.

Q    And how did you feel about that?

MS. MOORE:  Objection.

THE COURT:  You may answer.

A    Like -- like the world was coming to an end.

Q    Did you talk to anyone which referenced what to do regarding this document?

A    Not at first, but after I came out of my shell, yeah.  I started talking to a few people and I received a reminder, someone told me about vacation time.  And then I remembered that when I went out, I went out on vacation time and I went out on my own sick days.  So when I looked at the date, I realized that I was released too early.

Q    And what, if anything, did you do after that realization?

A    I got in touch with Dr. Pinkal Desai and I let her know that I needed to get back to work, otherwise I wouldn't have employment, and am I well enough to be released and she said yes.

Q    Okay.  And did you, eventually, go back to work and resume your regular responsibilities?

A    Yes, I did.

Q    Did anyone in management address this issue with you directly?

A    Not at all.

Q    Do you know if your company has a policy on bonus?

A    I don't know if it's a policy, but I know annually around Christmastime, we do receive bonuses.

Q    Okay.  And do you know who awards these bonus to the workers?

A    Management.

Case 1:17-cv-06303-NGG-MMH    Document 116-3    Filed 12/02/22    Page 4 of 31 PageID #: 3129

Q    Okay.  And do you know whose money this is?

A    I believe the cooperators of the housings, they get together and they -- they put money in some type of an envelope for us and it's divided.

Q    Okay.  And do you know who collects the envelope?

A    I believe they have a -- I'm not sure exactly -- I'm not sure exactly who does it but I just know we've been getting it for, like, 18 years.  It's a committee.  They have a committee that do this.  I apologize.  They have a committee.

Q    Okay.  In the years that you worked there, did you get a bonus every year?

A    Every year.

Q    Was there a time you never got bonus?

A    Yes.

Q    When was that?

A    The year of July -- I mean, the July of 2014 when I went out with cancer.

Q    Okay.  And do you remember when you actually went out?

A    Yes, it was, like, July 4th, of 2014.

Q    So from January one until July when you went out, did you work?

A    Yes, I did.

Q    Okay.  And then when you went out, did you work for the rest of the year?

A    No, I did not.

A    I'm not sure.  When they hand someone else their bonus and when I received my bonus, I don't see what that person gets and I don't -- and they don't see what I get.

Q    Okay.

MR. VAN-LERE:  I have no other questions at this time, Your Honor.

THE COURT:  Did you not receive any part of your bonus in 2014?

THE WITNESS:  Not -- none of it.

THE COURT:  Even though you worked the first half of the year?

THE WITNESS:  Yes, I received nothing.

THE COURT:  I see.  All right.

MR. VAN-LERE:  Thank you, Your Honor.

THE COURT:  All right.

Cross examination.

THE JURY:  The screen didn't come up for this exhibit, it was just admitted into evidence.

THE COURT:  Exhibit 37?

THE JURY:  Thirty-seven.

THE COURT:  All right.  Let me put it up.  I'm sorry about that.

Sir, could you put that back in so they pick up 37.

Here we go.  Okay.  All right, thank you.

Cross examination.  Ms. Moore?

Case 1:17-cv-06303-NGG-MMH   Document 116-3   Filed 12/02/22   Page 6 of 31 PageID #: 3131

complaint, you had been out of work on leave for about ten months?

A    I believe so.

Q    So you went out on leave in July of 2014, correct?

A    Yes.

Q    Was that July 4th, 2014?

A    Yes.  July 3rd, 2014 was my last day of work.

Q    And you returned to work in August of 2015, is that correct?

A    I believe so.  I'm not sure.

Q    And it has been just about seven years since you filed that EEOC complaint, correct?

          MR. VAN-LERE:  Objection, Your Honor.

          THE COURT:  Overruled.

          You may answer, if you know.

A    I'm not sure.

Q    Isn't it true that the Equal Employment Opportunity Commission, or the EEOC as we have been referring to it repeatedly, isn't it true that they did not find that Electchester discriminated against you?

          MR. VAN-LERE:  Objection, Your Honor.

          THE COURT:  You may answer.

A    That's not the case.

Q    Is it your testimony that the EEOC -- that it is not true that the EEOC did not find that Electchester discriminated

MAYERS - CROSS - MOORE                  254

letter on the screen arrived early?

A    What do you mean by "early?"

Q    That it arrived before it was supposed to?

A    I believe I was terminated a little too early, yes.

Q    Because you used your vacation and your sick time when you first went out on leave, right?

A    Yes.

Q    When you first received this letter, didn't you testify that you didn't even remember that you had used your vacation or your sick time?

A    Yes, that's the truth.

Q    After you received this letter, you went to the doctor, correct?

A    After I had a conversation with somebody and they mentioned vacation time, is when I went to the doctor.

Q    That was Dr. Desai, correct?

A    Dr. Pinkal Desai, yes.

Q    And you went to go see Dr. Desai a few days after you got this letter?

A    Yes, between Dr. Desai and the union, yes.

Q    And you went to the doctor to get a medical clearance to return to work, correct?

A    That's what I remember, yes.

Q    And you got that medical clearance after you received the letter from Electchester Management, this letter?

Case 1:17-cv-06303-NGG-MMH    Document 116-3    Filed 12/02/22    Page 8 of 31 PageID #: 3133

A     Yes.

Q     Not before you received this letter?

A     Not before.

Q     So whether you had received this letter or not, you would not have been able to return to work without that medical clearance, right?

A     That's a fact.

Q     So you needed that medical clearance to come back to work, correct?

A     Yes.

Q     You went to your union, Local 32B-J, the same day you went to the doctor to get the medical clearance, right?

A     Yes.

Q     And the union sent you to Michael India?

A     Well, Michael India is the representative.

Q     Michael India, is he the grievance representative for 32B-J?

A     Yes, at that site.

Q     And you got a call from Michael India within a day of going to the union, didn't you?

A     Yes.

Q     And Michael India said to you he was going to call Vito Mundo, correct?

A     After he told me no Mikey, they got you, you're fired, I'm going to see what I can do for you.  That's what he said

first.

Q     But he did tell you he was going to call Vito, correct?

A     After I told him I went out on my vacation time and my sick time, he said hold on, then he's flailing some papers. Then he said, hold on, I'm gotta call Vito.

Q     And you understood that he was referring to Vito Mundo, the general counsel of Electchester Management, correct?

A     Yes.

             (Continued on the following page.)

Case 1:17-cv-06303-NGG-MMH   Document 116-3   Filed 12/02/22   Page 10 of 31 PageID #: 3135

BY MS. MOORE (Continuing):

Q    And then Mr. India called you right back that same day, correct?

A    Yes, he did.

Q    And he said, "Go back to work on Monday," correct?

A    That's what he told me.

Q    Do you have any reason to believe that Mr. India did not talk to Mr. Mundo?

A    I don't have a clue, I'm just going by what he says.

Q    So, is it your understanding that Mr. India did, in fact, speak to Mr. Mundo?

A    I believe he did.

Q    And that's why you were allowed to go back to work, correct?

A    I guess that's correct.

Q    And it was less than a week between when you received this letter and when you went back to work, correct?

A    I'm not sure.

Q    Was it more than two weeks?

A    I'm not sure about the timeline at all.

Q    Between the time you first spoke to the union and when Mr. India told you go back to work on Monday, how much time was that, a couple days?

A    I'm really not sure of the timeline.

Q    Was it more than a week?

MAYERS - CROSS - MOORE                                    258

A    I don't believe -- I believe it was probably a week.  I'm not sure.

Q    Between when you received this letter on the screen, Plaintiffs' Exhibit 37, and when you learned you could return to work, you never talked to any of the managers over at Electchester Management, correct?

A    Not one of them came and approached me to say welcome back or nothing.

     No, I didn't.

Q    I'm talking about between when you received this letter and returned to work.

A    The only thing I spoke to the managers about was pertaining to work.  I didn't speak to them about nothing else.

Q    You did not speak to them about returning to work between when you received this letter and when you went back to work?

A    No.  Only when I had to get treatment did I have to go talk to the managers.

Q    Thank you.

     You never called anyone from Electchester Management between when you received this letter and when Mike India told you to go back to work, right?

A    No, I didn't.

Q    And you did go back to work, didn't you?

A    Yes, I did.

Q    In August 2015?

A    I believe that's about right.

Q    And you didn't lose any pay, right?

A    I didn't lose any pay.

Q    And you had the same assignment when you came back, right?

A    Yes.

Q    And you had the same duties when you came back, right?

A    Yes.

Q    Isn't it true that nobody at Electchester Management said anything to you to indicate that your termination was due to your disability?

A    No.

I spoke to Ed Wiley and he stated something like, "You know, if you're not feeling well, Mike, you shouldn't come back to work."

MS. MOORE:  Your Honor, I'd like to show the witness his deposition transcript.

THE COURT:  Go ahead.  And just identify it for the record as to the date and the page and the line, if you will.

MS. MOORE:  Yes, your Honor.

The date of the deposition was March 7, 2019.  It was the first of two depositions of Mr. Mayers in this matter. And I'm going to refer to Page 95, and I will tell you the line number.

MAYERS - CROSS - MOORE                    260

Pardon me, but, after all that, I think I'm actually not going to ask the witness about Page 95.

I would like to talk about Page 165.

Q    The portion I would like you to review begins on Page 164, Mr. Mayers, on Line 25.

Do you see Line 25 where it says:

"Question, Did anybody say anything that..."

And continuing on to 165 to Line 4?

THE COURT:  Could you focus in on the portion that you would like the witness to review?

MS. MOORE:  Right.

THE COURT:  I'm wondering if I could bridge the two pages.

Q    Do you see where it says:

"Question, Did anybody say anything that indicated to you that the termination was about your disability.

"Answer, No."

A    Okay.

Q    Does that refresh your recollection as to whether anybody at Electchester indicated that your termination was due to your disability?

A    Yes.

Q    Mr. Mayers, you're claiming you didn't receive a bonus in 2014 because of your disability, correct?

A    Yes.

*Linda A. Marino, Official Court Reporter*

Case 1:17-cv-06303-NGG-MMH    Document 116-3    Filed 12/02/22    Page 14 of 31 PageID #: 3139

Q    You didn't complain to anyone at Electchester Management that you didn't get a bonus, did you?

A    No, I didn't.

Q    And you went out on disability leave in July of 2014, correct?

A    Yes.

Q    So, you weren't working at Electchester in December 2014, correct?

A    No, I wasn't.

Q    And you returned to work in August 2015, right?

A    Right.

Q    So, you were working at Electchester in December 2015, correct?

A    Yes.

Q    And you received a bonus in December 2015, right?

A    Yes.

Q    Mr. Mayers, you were upset when you learned in 2014 that you had cancer, correct?

A    Yes.  I was crushed.

Q    In 2019, were you diagnosed with emphysema?

A    Yes.

Q    Was that also upsetting?

A    Yes.

Q    I'd like to show you a document that was previously marked for identification as Plaintiffs' Exhibit 8 and was

Five.

Q    And was Electchester Management -- why was Electchester Management, LLC, formed?

A    It was formed in 2006 because the housing companies were in despair.  And it took a group of men who had talent to bring them together to form a company that would purchase things collectively instead of each housing company doing it individually and to maintain it and bring it back up to where it is today, where it's liveable.

Q    How many housing companies make up Electchester, the Electchester Housing Co-op?

A    There are five housing companies; 1, 2, 3, 4, and 5.

Q    And how many buildings are there in each housing company?

A    Housing Company No. 1 has seven buildings with 381 occupants -- families, not occupants.

Housing No. 2 has 688 units, and they have 12 buildings.

Housing No. 3 has also 12 buildings with 788 families.

Housing No. 4 has five buildings with 360 units. There are two tall towers, 23-story high-rises.  Each building has 94 in each, so that's 182 -- 92 in each, I'm sorry, 184 collectively.  92 units in each building.

Q    Who are the people, generally speaking, who live in the Electchester Housing Co-op?

DIRECT EXAMINATION (Continued)

BY MS. MOORE:

Q    And the maintenance position, I'm sorry.  Never mind.

Who at Electchester Management should employees complain to about discrimination or harassment?

A    They can come to myself or Nicole Rollins or any manager, or Vito Mundo.

Q    Who's Nicole Rollins?

A    Nicole Rollins was, at that time, the head office manager up in the Joint Industry Board Building where all the administrative work is performed.  It's Suite 307, and she was also the supervisor for the accounts payable.

Q    Is she still working for Electchester Management?

A    No, she left us in January.

Q    So is there somebody who replaced her?

A    This person who replaced her in that position, Shelley Ramkhelawan.

Q    How do Electchester Management employees know where to direct their discrimination or harassment complaints?

A    When they are hired they are given a booklet and in that booklet gives them their rules and regulations, the explanation of what their job assignment is, both maintenance and porters.  And in the back it has harassment, sexual harassment, EEOC, discrimination, all the paragraphs that would explain what it entails for that charge, and when the

Case 1:17-cv-06303-NGG-MMH   Document 116-3   Filed 12/02/22   Page 17 of 31 PageID #: 3142

managers give it to them they ask them to read it and please come back with questions.

Q   What happens when Electchester Management receives a discrimination or harassment complaint?

A   Personally, I've never received one in that title that I should be accepting and I don't believe Nicole did or Shelley did either.  They came through the mail in the form of an EEOC, and the ones that I'm aware of, and they go straight to Cindy Huang, who is HR who divides them up to Mr. Mundo, who is the head of the company, and to the managers.

Q   Other than complaints via the EEOC or the Equal Employment Opportunity Commission, what if a worker just has a complaint that somebody is harassing or discriminating against you?

A   They go straight to the manager.

Q   What happens when they go straight to the manager, what does Electchester Management do?

A   They investigate, they get all the details and then they'll call up Mr. Mundo and usually it goes a step further. They call the union, the shop steward comes in and they see if they can settle it and, if not, they go to grievance, if it can't get settled there, it would go to arbitration.

Q   And if discipline is necessary, would Electchester Management discipline employees involved in these complaints?

A   Yes.

PREZIOSO - DIRECT - MS. MOORE                    296

divisions, their multiple 30,000 employees.

And Executive Safety & Health came down and designed a safety program, they designed all the cultural things that we needed and with that they began giving classes, which were just given last week.  They are given every year except for the two COVID years.

And what they do is, they cover asbestos awareness, confined space, because some buildings have a crawl space underneath.  They cover respirator, how to fit a respirator on, and they do -- we have medical exams that you can use the respirator.  HAZMAT.  The chemicals we use.  It's a full green property.  No matter what we use it's green products.

Sexual harassment.  Before sexual harassment became a class online they used to cover that, and works -- I believe the last thing is workplace violence.

Q    Do they also cover anti-discrimination and anti-harassment?

A    Yes.

Q    And do they provide cultural and racial sensitivity training to Electchester Management employees?

A    Yes.

Q    These trainings are annual?

A    Yes.  Generally in September because people go on vacation from May to September 15th.  This year it was a little behind, so we just finished them last week.

telling Mr. Mayers it was a mistake to file a complaint?

A    No.

Q    To your knowledge, did Mr. Mayers ever complain that anyone at Electchester Management told him that it was a mistake to file a complaint?

A    I don't have a knowledge of that, no.

Q    Did you ever tell anybody that Mr. Mayers wasn't getting a bonus in 2014?

A    I wasn't aware of that.  I have nothing to do with bonuses.

Q    Was Mr. Mayers on Electchester Management's payroll in December of 2014?

A    No.

Q    Was Mr. Mayers not on the payroll because he was on disability leave?

A    Yes.

Q    When Mr. Mayers was diagnosed with cancer, did someone collect donations for him from his coworkers?

A    His shop steward, Richard Bonnette.

Q    Did you give Mr. Bonnette a contribution for Mr. Mayers?

A    Absolutely.

Q    How much did you donate to Mr. Mayers?

A    $100.  I have sympathy, I have cancer also, so it's -- it's a brotherhood.

Q    I'd like to show you a document that's been admitted into

I go through -- any write-ups or anything like that, Tommy, you know, he's made aware of.

THE COURT:  You were asking a different question.

Go ahead.

MS. MOORE:  I was just going to clarify.

Q   When you were walking, you were with the contractor and Joe Capasso?

A   Yes, yeah.

Q   And did you write this disciplinary notice?

A   Yes.

Q   Was Mr. Belvin also wearing headphones?

A   He absolutely was.

Q   Is wearing a cell phone earpiece or headphones during work hours a violation of Electchester's rules of conduct?

A   Yes, it is.

Q   Are Electchester Management's employees required to respond to radio calls during their breaks?

A   Yes, they are.

Q   And that's during the two breaks in addition to the lunch break?

A   Correct.

The lunch, break they can shut them off, do whatever they need to do.  We have people that are in standby.

Q   Did you issue this disciplinary action to Mr. Belvin because of his race?

Q    What is this document?

A    Its another one of our co-workers and he wasn't wearing --

Q    Just what is the document?

A    Oh, it's a write-up, it's a write-up.

MS. MOORE:  Your Honor, I'd like to offer this document into evidence that's been previously marked as Defendant's Exhibit D.  I'd like to offer it into evidence as Defendant's Exhibit D.

MR. VAN-LARE:  No objection, your Honor.

THE COURT:  All right.  Defendant's Exhibit D is received in evidence and published to the jury.

(Defendant Exhibit D, was received in evidence and published to the jury.)

Q    Who was this a written warning to?

A    David Bourgade.

Q    Why did you give Mr. Bourgade this written warning?

A    Because he wasn't wearing the proper attire, the uniform.

Q    Is David Bourgade a porter?

A    Yes.

Q    Is David Bourgade black?

A    No, he's not.

Q    Is David Bourgade white?

A    Yes, he is.

Q    I'd now like to show you a document that has been marked

CAIOZZO - DIRECT - MOORE                    379

for identification purposes as Defendant's Exhibit E.

Are you familiar with this document?

A    Yes.

Q    Did you draft this document?

A    Yes, I did.

Q    Did you draft it on or around the date across the top, March 10, 2015?

A    Yes, I did.

Q    And what is this document?

A    It's a warning letter.

Once again, he wasn't wearing --

Q    One moment, one moment.

It's a warning letter?

A    Yes.

MS. MOORE:  Your Honor, I'd like to move to admit this document into evidence as Defendant's Exhibit E.

MR. VAN-LARE:  No objection, your Honor.

THE COURT:  All right.  Defendant's Exhibit E is received in evidence and published to the jury.

(Defendant Exhibit E, was received in evidence and published to the jury.)

Q    Who is Luis Herrera?

A    He's a porter on site.

Q    Why did you give Mr. Herrera this written warning?

A    Again, he was not wearing his proper uniform that we

CAIOZZO - DIRECT - MOORE                    380

purchased.

THE COURT:  When did he receive that uniform, was it immediately prior to this date?

THE WITNESS:  I'm sorry?

THE COURT:  When did he receive this uniform to wear?

THE WITNESS:  In around -- well, we change the uniforms every four years.  So, 2008 I implemented all the uniforms.  So, if this is a newer one, yeah, they probably changed them, like, twice between 2008 and 2015.

THE COURT:  But this was not a new practice to require uniforms to be worn; is that right?

At that time, in 2015, it was not a new practice to provide uniforms.

THE WITNESS:  No.  I had the uniforms for quite some time.

THE COURT:  I see.  Thank you.

Go ahead.

Q    Is Mr. Herrera black?

A    No he's not.

Q    Is Mr. Herrera Latino or Hispanic?

A    Yes, he is.

Q    I'd like to show you a document that has been admitted into evidence and was previously marked for identification as Plaintiffs' Exhibit 31.

A    Yes, it is.

Q    Did you write this document?

A    Yes.

Q    Did you write this document on or about the date across the top, March 11th, 2014?

A    Yes.

        MS. MOORE:  Your Honor, I'd like to offer what's previously been marked as Defendant's Exhibit S into evidence?

        MR. VAN-LARE:  Plaintiffs have no objection, your Honor.

        THE COURT:  Very well.  Defendant's Exhibit S is received in evidence and published to the jury.

        (Defense Exhibit S, was received in evidence.)

        (Exhibit published.)

Q    Who is Joe McCormick?

A    He was a porter.

Q    Why did you write Mr. McCormick this written warning?

A    Because he was here after hours.

        THE COURT:  On the property --

        THE WITNESS:  Oh, yes.

        THE COURT:  -- after hours?

        THE WITNESS:  Correct, he was -- you know, he wasn't supposed to be working and he was working after hours, or he was in his uniform I should say.

Q    Is Mr. McCormick white?

CAIOZZO - DIRECT - MS. MOORE                394

A     Yes.

Q     I'd like to show you a document that was previously marked for identification purposes as Defendant's Exhibit T.

      Are you familiar with this document?

A     Yes, I am.

Q     Did you write this document?

A     Yes, I did.

Q     Did you draft this document on or around the date across the top, February 16th, 2018?

A     Yes, I did.

Q     What is this document?

A     Ruffino came in --

      THE COURT:  No, sorry.

Q     What is --

      THE COURT:  In the nature of what is this document.

      THE WITNESS:  Oh, it's a warning letter.

      MS. MOORE:  Your Honor, I'd like to move to admit what's previously been marked for identification as Defendant's Exhibit T into evidence.

      MR. VAN-LARE:  Plaintiffs have no objection, your Honor.

      THE COURT:  All right.  Defense Exhibit T is received in evidence and published to the jury.

      (Defense Exhibit T, was received in evidence.)

      (Exhibit published.)

Q    Who is Ruffino Quintana?

A    He's a porter.

Q    Why did you give Mr. Quintana this warning letter?

A    Mr. Quintana would come in like 4 a.m. to start his job at 7 a.m.  I don't know, he was just -- he would just come in very, very early all the time, you know.

Q    So he was not on the property during his regular -- or he was on the property outside of his regular schedule?

A    Yes.  He would go right to his building.

Q    Is Mr. Quintana black?

A    No.

Q    Is Mr. Quintana Hispanic or Latino?

A    Yes.

        THE COURT:  Would he go to work immediately after arriving, in other words, go to his duties --

        THE WITNESS:  Yeah.

        THE COURT:  -- commence his duties at four in the morning?

        THE WITNESS:  Yes, he would.

        THE COURT:  And why was that a problem?

        THE WITNESS:  Well, I would get a phone call from miss wife one time and she was, like, I don't understand why he has to start so early.  And I called him and I said, listen, Ruffino, you can't have, you know, your spouse call me asking me why you're here so early.  You don't have to come in

collect donations for him from his co-workers?

A    Yes.

Q    Did you contribute a donation to Mr. Mayers?

A    Of course I did, yes.

Q    How much did you donate to Mr. Mayers?

A    Twenty dollars.

          MS. MOORE:  Sorry, I'm having trouble pulling up the next document.  If you wouldn't mind bearing with me.

          I'd like to show you a document that was admitted into evidence that was previously marked for identification as Plaintiffs' Exhibit 37.

Q    Are you familiar with this document?

A    Yes.

Q    Do you know if other employees of Electchester Management have received a letter letting them know their position could no longer be held open after 12 months?

A    Yes.

Q    Which employees received a letter like this?

A    Well, honestly --

          MR. VAN-LARE:  Objection, your Honor.  I'm not sure this is -- oh, withdrawn.

          THE COURT:  Would you like to repeat the question?

          MS. MOORE:  Sure.

Q    Which other employees received a letter like this?

A    Well, at the same time that Mr. Mayers got it, it was

CAIOZZO - DIRECT - MS. MOORE                    403

Dominick Sarapachiello, I apologize if I'm not saying his name correctly. Also prior to this we had William Washington, we had Mr. Perez, I forgot his first name. We had Sal Miller. Vito Lanziersa, Anthony Yaccarino. There might have been one or two also before Mr. Mayers.

Q     Thank you.

A     And I apologize, Mr. Dellosantos.

Q     Thank you.

      I'm going to show you or I'd like to show you what's previously been marked for identification and admitted into evidence as Plaintiffs' Exhibit 1.

      Have you ever seen this photograph?

A     Yes.

Q     When was the first time you saw this photograph?

A     It was right before the deposition that we got pulled into, that's the first time I ever saw this.

Q     When you say the deposition we got pulled into, do you mean your deposition in this lawsuit?

A     Yes, I do.

Q     Was that sometime in 2019?

A     Yes.

Q     Did you ever see this photograph at any time before your deposition in this lawsuit in 2019?

A     Never.

Q     Have you ever seen the monkey depicted in this photo at

(Continuing.)

THE COURT:  What was the finding, was there asbestos?

THE WITNESS:  It was in the adhesive, the glue.

THE COURT:  In the glue.

THE WITNESS:  Yes.

BY MS. SHEA:

Q    In the glue, not the tile itself?

A    Right, that's what I said, the glue.

Q    And you said Mr. Bonnette called you?

A    Yes.

Q    Could you please explain to us what this paragraph number two is describing?

A    Because I said Mike was going a little crazy, like, excited like a riot, screaming, "Cooperators, there's asbestos.  It's danger, it's danger, it's asbestos," and he didn't notify -- I mean, the foreman was there.  The foreman got reprimanded for not reporting it to me right away. Richie, the shop steward, came and he's the one who reported it to me.

Q    Is it part of Electchester's rules and policies for someone who discovers asbestos to notify management directly?

A    Yes, if there's a problem, yes.

Q    And are all employees aware of this rule or policy?

A    Yes, because we have safety meetings.

long name -- but they approached me and they told me that Mike was in there taking pictures.

Q    And is this against Electchester's rules and policies.

A    Yes, it is.

Q    And can you please explain the contents of paragraph number five?

A    Because at the same time, I was informed that Mike also took a piece of the tile that he was complaining about.

Q    And I apologize, I should have said this earlier, is this your signature at the bottom?

A    Yes.

Q    So, you wrote this document?

A    Yes.

Q    Thank you.

A    At the same time, the two maintenance men that actually ripped up the floor, they got a written warning also.  And the foreman at the time, Juan Lopez, he got demoted and he went to a porter's position.

Q    And were all of these disciplinary actions a result of mishandling this same situation?

A    Yes.

Q    And the two maintenance men and Juan --

A    Juan Lopez was the foreman at the time.

Q    And is Juan black?

A    No, he's Hispanic.

CAPASSO - DIRECT - SHEA                              447

Q    I think I am done with this exhibit.

          MS. SHEA:  Your Honor, I would now like to show the witness and the jury the exhibit that's previously been introduced into evidence known as Defendant's GG.

          (Exhibit published to the jury.)

          MS. SHEA:  Actually, I withdraw.  I don't need to ask this question.

Q    To your recollection, was Mr. Belvin ever written up for violating Electchester's radio etiquette policy?

A    I know he got written up for using -- for when we tried to get his attention on the radio and he had his earplugs in.

Q    And is having earplugs in against Electchester policy?

A    Yes.

Q    Mr. Capasso, did you ever learn that Mr. Mayers had been diagnosed with cancer?

A    I learned, yes.

Q    And how did you come to learn this?

A    Because they were taking a donation for Mike.

Q    And did you contribute to this donation?

A    Yes, I did.

Q    Do you recall how much?

A    I think it was, like, $20.

Q    When Mr. Mayers came back from his medical leave, were you involved in a discussion regarding his -- withdrawn.

          Mr. Capasso, have you ever met Mr. Belvin's son?

*Linda A. Marino, Official Court Reporter*