233

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------x
                                        17-CV-6303(NGG)
BELVIN ET AL.,
                                        United States Courthouse
          Plaintiffs,                   Brooklyn, New York

          - versus -                    November 8, 2022
                                        9:30 a.m.
ELECTCHESTER MANAGEMENT,
LLC,

          Defendant.
------------------------------x

              TRANSCRIPT OF CIVIL CAUSE FOR TRIAL
          BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
             UNITED STATES SENIOR DISTRICT JUDGE
                        BEFORE A JURY

APPEARANCES
Attorney for Plaintiffs:

                              LAW OFFICES OF ALBERT VAN-LARE
                              125 Maiden Lane, Suite 510
                              New York, New York 10038
                              BY:  ALBERT VAN-LARE, ESQ.


Attorney for Defendant:
                              WILSON ELSER MOSKOWITZ
                              EDELMAN & DICKER LLP
                              150 East 42nd Street
                              New York, New York 10017-5639
                              BY:  MARIELLE ALECIA MOORE, ESQ.
                                   CORRINE SHEA, ESQ.


Court Reporter:          LEEANN N. MUSOLF, RPR, CCR
                         Phone:  718-613-2374
                         Fax:    718-613-2267
                         Email:  lmusolf.edny@gmail.com

Proceedings recorded by mechanical stenography.  Transcript
produced by Computer-aided Transcription.

*LEEANN N. MUSOLF, RPR, CCR*
*Official Court Reporter*

PROCEEDINGS                                    234

THE COURTROOM DEPUTY:  Case on trial.  Beginning with the plaintiffs, please state your appearance for the record.

MR. VAN-LERE:  Alvin Van-Lare for the plaintiffs.

Good morning, Your Honor.

THE COURT:  Good morning.

MR. MAYERS:  Michael Mayers.

MR. BELVIN:  Michael Belvin.

Good morning.

THE COURT:  Good morning.

Mr. Mayers, are you feeling better?

MR. MAYERS:  Yes.

THE COURT:  All right.

MS. MOORE:  Good morning.

Marielle Moore for the defendant Electchester Management, LLC.

MS. SHEA:  Good morning.

Corrine Shea for the defendant.

MR. PREZIOSO:  Good morning.

Thomas Prezioso.

THE COURT:  Good morning, everyone.  Please be seated.

Before we bring in the jury, we just have one issue to deal with.  We had a discussion at the end of the day yesterday regarding what claims are in and what claims are not

PROCEEDINGS                                    235

in at this point of the litigation.  In the Court's memorandum

and order granting in part and denying in part defendant's

motion for summary judgment, docket number 52, the Court

granted summary judgment with respect to plaintiff Michael

Mayers's claims for failure to accommodate and retaliation

pursuant to the Americans with Disabilities Act, see page 43

for failure to accommodate and 45 for retaliation, of the

memorandum and order.

Specifically, the Court considered Mr. Mayers's

claim that, quote, EML retaliated against him as a result of

his request for a reasonable accommodation, end quote, and

dismissed that claim.  Further, the joint pretrial order

submitted by the parties and so ordered by the Court on

October 18, 2022, docket number 89, stated that the claim for

retaliation pursuant to the ADA was not among the claims for

trial.

Accordingly, Mr. Mayers's testimony regarding

Electchester's response to his request for an accommodation is

irrelevant to the claims at issue in the trial.  The jury will

be instructed to disregard this testimony.

Anything else?

MR. VAN-LERE:  Yes, Your Honor.

Just to be clear, Your Honor did grant Mr. Mayers's

claim for disability discrimination under the ADA and New York

City Human Rights Law premised on his termination and denial

PROCEEDINGS                                    236

of bonus.

THE COURT:  I'm sorry, on what?

MR. VAN-LERE:  You granted his claim for disability discrimination based on his termination and denial of bonus. I'm reading from your --

THE COURT:  Denial of his bonus?

MR. VAN-LERE:  Correct, Your Honor.

THE COURT:  I'm not understanding this, at all.

MR. VAN-LERE:  I am reading from your decision of --

THE COURT:  No, tell me --

MR. VAN-LERE:  Document 19, Your Honor, it's page 2 of 18.

MS. MOORE:  If it helps, Your Honor, we're not contesting that the termination and the denial of bonus are -- have survived as a disability discrimination claim under the ADA and the Human Rights Law.  The only part of that that we're contesting is, as you just stated, the part that was dismissed, the reasonable accommodation law.

THE COURT:  Right.  So you can pursue the issue of the denial of the bonus, in other words.

MS. MOORE:  Right.

THE COURT:  All right?  You can do that.  So it's only the ADA claim, that I've already discussed.  All that's been dismissed is Mr. Mayers's claim that the defendant retaliated against him as a result of his request for a

PROCEEDINGS                                    237

reasonable accommodation, and the Court dismissed that claim under the ADA.

MR. VAN-LERE:  Thank you, Your Honor.

THE COURT:  That's it.  Everything else -- the rest of it is fair game.

MR. VAN-LERE:  Thank you.

THE COURT:  Anything else from the defense at this point?

MS. MOORE:  Yes, Your Honor.

There was some testimony yesterday by Mr. Mayers that he was micromanaged by Thomas Prezioso about cleaning his buildings, and I believe that claim was also dismissed on page 29 of your order, as part of his race discrimination disparate treatment claim.  And my understanding is that the only surviving disparate treatment claim for Mr. Mayers and Mr. Belvin is based on their hostile work environment allegations.

THE COURT:  I'll look at it.

MS. MOORE:  Thank you.

MR. VAN-LERE:  If I may quickly, Your Honor, these acts who constitute evidential hostile work environment, they are not completely separate.  They may not go towards claim that has been dismissed, I said that, but if there are acts that constitute hostile work environment, he has a right to bring it up.

PROCEEDINGS                                         238

THE COURT:  I said I'd look at it.

MR. VAN-LERE:  Thank you.

THE COURT:  Bring in the jury.

The witness should retake the witness stand, please.

(Jury enters the courtroom.)

THE COURT:  Please be seated, everyone.

Good morning, members of the jury.  At this time, we'll continue with the direct testimony of Mr. Mayers.

Mr. Mayers, I remind you, you are still under oath. You may proceed, sir.

MR. VAN-LERE:  Thank you, Your Honor.

(Witness retakes the witness stand.)

(Continued on next page.)

*LEEANN N. MUSOLF, RPR, CCR*
*Official Court Reporter*

MAYERS - DIRECT - VAN-LARE          239

**MICHAEL MAYERS**, called as a witness, having been previously

first duly sworn/affirmed, was examined and testified as

follows:

DIRECT EXAMINATION (Continued)

Q    Good morning, Mr. Mayers.

A    Good morning.

Q    How are you?

A    I'm all right.

Q    I'm going to direct your attention right now to a

document I'm going to enter for identification and that would

be Plaintiff's Exhibit 11.  Is there something on your screen?

A    No.

        MR. VAN-LERE:  It's hooked up, Your Honor.

        THE COURT:  All right.

Q    Mr. Mayers, do you see any document in front of you, sir?

A    Yes, I do.

Q    Okay.  That has been marked for identification as

Plaintiff's 11.  Please take a moment, look at that document,

let me know when you are done.

        MS. MOORE:  Objection.  This document is hearsay.

        THE COURT:  Objection to what?  I'm sorry.

        MS. MOORE:  The document, it's hearsay.

        THE COURT:  Don't tell me what it is.  Excuse me.

He hasn't offered it.  You can't object until he offers the

document, okay?

*LEEANN N. MUSOLF, RPR, CCR*
*Official Court Reporter*

Case 1:17-cv-06303-NGG-MMH    Document 117-3    Filed 12/03/22    Page 8 of 239 PageID #: 3470

MS. MOORE:  Understand.

THE COURT:  You don't do this until he's offered the document.  He hasn't offered the document.  You have to wait until he's offered the document, please.

MS. MOORE:  Yes, Your Honor.

A     I read it.

Q     Okay.  Did you see this document before?

A     Yes.

Q     And you know the person who wrote this document?

A     Yes, it was Mike India of Local 32B-J.

Q     Was this document ever given to you?

A     It was mailed to me.

Q     Did you receive it in the mail?

A     Yes, I did.

Q     Okay.  Below the right last name, Michael India, there's an individual who was copied.  Do you see that?

A     Yes.

Q     Who was that?

THE COURT:  I'm sorry, I'm not understanding you.

Q     Below the name of the --

THE COURT:  Don't identify anything in the document before the document is admitted into evidence.  Please.

Q     Mr. Belvin, did you receive this document on or about the date on it, which is February 27, 2018?

A     I believe so.

Case 1:17-cv-06303-NGG-MMH    Document 117-3    Filed 12/03/22    Page 9 of 239 PageID #: 3471

Q    Okay.

        MR. VAN-LERE:  Your Honor, at this point, I'm offering this document to be admitted at an exhibit as Plaintiff's 11.

        MS. MOORE:  Objection, Your Honor.

        THE COURT:  Sustained.

        Next.

        MR. VAN-LERE:  I will go to Plaintiff's Exhibit 12 for identification, Your Honor.

        THE COURT:  All right.

Q    Mr. Belvin, do you see -- sorry, Mr. Mayers, do you see Plaintiff's 12 for identification in front of you?

A    Yes, I do.

Q    Please take a moment to look at Plaintiff's 12 for identification.

A    Okay, I read it.

Q    Do you know what that document is?

A    Yes, it is.

Q    Who wrote the document?

A    I believe -- oh, I wrote this document myself.

Q    Okay.  And when did you write it?

A    Around December 19th or something like that.

Q    And to whom was it directed?

A    To basically anybody in Electchester Management.

Q    To whom was it given?

MAYERS - DIRECT - VAN-LARE                   242

A     I believe it was sent up to their general counsel.

Q     Okay.

            MR. VAN-LERE:  At this time, Your Honor, I ask that
the document marked for identification at Plaintiff's 12 be
admitted into evidence.

            MS. MOORE:   Objection.

            THE COURT:  Sustained.

            MR. VAN-LERE:  At this point, Your Honor, I will
move to Plaintiff's 37 for identification, three seven.

Q     Please take a moment to look at Plaintiff's 37 for
identification.

A     Okay.

Q     Have you seen Plaintiff's 37 for identification before?

A     Yes.

Q     When did you see it?

A     I received it in the mail.

Q     Who sent it to you?

A     Vito Mundo.

Q     Okay.  And about what time did he send you this document?

A     I don't know when he sent it, but I received it in the
mail about when I got home, like, 3:30 -- I mean, yeah, about
3:30, 4:00 that day.

Q     Okay.  And to whom was the document directed -- to whom
was it addressed?

A     To Mr. Mayers, me.

Q    And did you read the document?

A    Yes, I did.

Q    Are you familiar with the contents of the document?

A    Yes.

MR. VAN-LERE:  Your Honor, at this point, I ask that the document be admitted into evidence.

MS. MOORE:  No objections.

THE COURT:  All right.

Plaintiff's Exhibit No. 37 is received in received.

(Plaintiff Exhibit 37, was received in evidence.)

Q    Mr. Mayers, when you received this document, what did you do?

A    Sat back in my chair and was, like, stunned for a minute, like, just sit back and think, like, tears came to my eyes.

Q    Why did tears come to your eyes?

A    Because I no longer had employment, I no longer knew how I was going to get treatment, I didn't know how I was going to pay my rent.

Q    Who is it about the document that brought tears to your eyes?

A    They told me I no longer had a job.

Q    And how did you feel about that?

MS. MOORE:  Objection.

THE COURT:  You may answer.

A    Like -- like the world was coming to an end.

Q    Did you talk to anyone which referenced what to do regarding this document?

A    Not at first, but after I came out of my shell, yeah.  I started talking to a few people and I received a reminder, someone told me about vacation time.  And then I remembered that when I went out, I went out on vacation time and I went out on my own sick days.  So when I looked at the date, I realized that I was released too early.

Q    And what, if anything, did you do after that realization?

A    I got in touch with Dr. Pinkal Desai and I let her know that I needed to get back to work, otherwise I wouldn't have employment, and am I well enough to be released and she said yes.

Q    Okay.  And did you, eventually, go back to work and resume your regular responsibilities?

A    Yes, I did.

Q    Did anyone in management address this issue with you directly?

A    Not at all.

Q    Do you know if your company has a policy on bonus?

A    I don't know if it's a policy, but I know annually around Christmastime, we do receive bonuses.

Q    Okay.  And do you know who awards these bonus to the workers?

A    Management.

Q    Okay.  And do you know whose money this is?

A    I believe the cooperators of the housings, they get together and they -- they put money in some type of an envelope for us and it's divided.

Q    Okay.  And do you know who collects the envelope?

A    I believe they have a -- I'm not sure exactly -- I'm not sure exactly who does it but I just know we've been getting it for, like, 18 years.  It's a committee.  They have a committee that do this.  I apologize.  They have a committee.

Q    Okay.  In the years that you worked there, did you get a bonus every year?

A    Every year.

Q    Was there a time you never got bonus?

A    Yes.

Q    When was that?

A    The year of July -- I mean, the July of 2014 when I went out with cancer.

Q    Okay.  And do you remember when you actually went out?

A    Yes, it was, like, July 4th, of 2014.

Q    So from January one until July when you went out, did you work?

A    Yes, I did.

Q    Okay.  And then when you went out, did you work for the rest of the year?

A    No, I did not.

MAYERS - DIRECT - VAN-LARE                    246

Q    Okay.  Do you know if there's a practice for payment of bonus to people who work parts of the year and didn't complete a full year?

A    I don't know.

Q    And did you, eventually, get paid this bonus?

A    I never received it.

Q    Okay.  Now, you came back the following year, and that would be 2015, is that correct?

A    Yes.

Q    Okay.  When did you return in 2015?

A    I believe it was, like -- I believe it was June.  I'm not sure, though.  You can't quote me on it, but I believe it was June of 2015.  June or July of 2015.

Q    But it is correct to say you did not work for the entire year of 2015?

A    Yes.

Q    Okay.  Did you get bonus in 2015?

A    When I got back, I received a bonus, yes.

Q    Okay.  Do you know if the company has a way of deciding half bonus or full bonus?  Is it in any category?  Do you know how this is done?

A    I have no idea.

Q    Okay.  Are the employees aware of the amount of bonus that each person gets or is it private business for each individual?

A    I'm not sure.  When they hand someone else their bonus and when I received my bonus, I don't see what that person gets and I don't -- and they don't see what I get.

Q    Okay.

MR. VAN-LERE:  I have no other questions at this time, Your Honor.

THE COURT:  Did you not receive any part of your bonus in 2014?

THE WITNESS:  Not -- none of it.

THE COURT:  Even though you worked the first half of the year?

THE WITNESS:  Yes, I received nothing.

THE COURT:  I see.  All right.

MR. VAN-LERE:  Thank you, Your Honor.

THE COURT:  All right.

Cross examination.

THE JURY:  The screen didn't come up for this exhibit, it was just admitted into evidence.

THE COURT:  Exhibit 37?

THE JURY:  Thirty-seven.

THE COURT:  All right.  Let me put it up.  I'm sorry about that.

Sir, could you put that back in so they pick up 37.

Here we go.  Okay.  All right, thank you.

Cross examination.  Ms. Moore?

MS. MOORE:  Yes, Your Honor, I do have some cross examination for this witness if I may.

THE COURT:  Sure.  Please go ahead.

MS. MOORE:  I'm sorry, Your Honor, just a brief question about the mechanics of the thing.  Do you control who sees the screen?

THE COURT:  I do.

MS. MOORE:  Okay, great.  That's a load off.

THE COURT:  Let's put it this way, I do my best.

MS. MOORE:  As we all try.

THE COURT:  All right.

MS. MOORE:  I'm sorry, I'm having some trouble gathering my notes.

THE COURT:  Take your time.

MS. MOORE:  Thank you.

CROSS-EXAMINATION

Q    Good morning, Mr. Mayers.

A    Good morning, counsel.

Q    You began working at the Electchester co-op in about 2004, correct?

A    Yes.

Q    And you've worked for my client, Electchester Management, LLC, since about 2007, is that right?

A    Yes.

Q    You still work for Electchester Management?

A    Yes, I do.

Q    That means you've been working for Electchester Management for about 18 years, is that right?

A    And 4th months, yes.

Q    Do you also live in an apartment at the Electchester co-op?

A    Yes, I do.

Q    And did you have to -- you had to apply for an apartment there, correct?

A    Yes, I did.

Q    You filed a complaint with the EEOC in May of 2015, is that correct?

A    Yes.

Q    And that was after you had been working for Electchester Management for about seven years?

A    Nine years.

Q    That was nine years?  You and Mr. Belvin filed EEOC complaints against Electchester Management within a few days of each other, right?

A    I believe a month of each other because I was out sick.

Q    You believe it was -- was it -- you believe it was within one month of Mr. Belvin's complaint?

A    I believe so because I was out sick so I really don't know when he filed.

Q    Thank you.  And at the time you filed your EEOC

MAYERS - CROSS - MOORE                    250

complaint, you had been out of work on leave for about ten months?

A    I believe so.

Q    So you went out on leave in July of 2014, correct?

A    Yes.

Q    Was that July 4th, 2014?

A    Yes.  July 3rd, 2014 was my last day of work.

Q    And you returned to work in August of 2015, is that correct?

A    I believe so.  I'm not sure.

Q    And it has been just about seven years since you filed that EEOC complaint, correct?

        MR. VAN-LERE:  Objection, Your Honor.

        THE COURT:  Overruled.

        You may answer, if you know.

A    I'm not sure.

Q    Isn't it true that the Equal Employment Opportunity Commission, or the EEOC as we have been referring to it repeatedly, isn't it true that they did not find that Electchester discriminated against you?

        MR. VAN-LERE:  Objection, Your Honor.

        THE COURT:  You may answer.

A    That's not the case.

Q    Is it your testimony that the EEOC -- that it is not true that the EEOC did not find that Electchester discriminated

MAYERS - CROSS - MOORE                251

against you?

THE WITNESS: Can I explain, Your Honor?

THE COURT: You may answer the question.

A    No, that's not what the paperwork says.

Q    Are you saying that the EEOC did find that Electchester discriminated against you?

A    No, I'm not saying that neither.

Q    Aren't you here suing Electchester because the EEOC did not find that Electchester discriminated against you?

A    They -- they gave me a right to sue letter. In the letter, it says that they're not saying that your client is innocent, they're just saying that they're not going to investigate it, so -- so we had to go and get a -- obtain our own lawyer.

Q    But the letter did not say that Electchester discriminated against you, correct?

A    It did not say that.

MS. MOORE: Pardon me, Your Honor, but I've got a folder here that's supposed to contain deposition transcripts that mysteriously no longer seems to contain deposition transcripts. Do you mind if I confer with my colleague Ms. Shea just to make sure I have the right USB?

THE COURT: Sure, that's fine.

MS. MOORE: Thank you so much.

(Brief pause.)

MAYERS - CROSS - MOORE                    252

MS. MOORE:  Thank you, everyone.  I appreciate your patience very much.

Q    Mr. Mayers, thank you for your patience.  I'd like to show you a document that's been admitted into evidence and that was previously marked for identification as Plaintiff's Exhibit 37, and I will show that to you as soon as my computer stops loading.

(Pause in proceedings.)

MS. MOORE:  Any minute now.

MS. SHEA:  Your Honor, may I help her with the technology?

THE COURT:  Of course.

MS. SHEA:  Thank you.

(Pause in proceedings.)

MS. SHEA:  Thank you, Your Honor.

MS. MOORE:  All right.  Thank you.  Sorry, again.

Q    Without furtherer adieu, I'd like to show you a document that's previously been admitted into evidence and has been previously marked as Exhibit 37.  Can you see that on your screen, Mr. Mayers?

A    It's tiny, but yes.

Q    Okay.  Let me zoom that in for you.  Is that better?

A    Much better, thank you.

Q    Did you get this letter around July 24, 2015?

A    I believe so.

LEEANN N. MUSOLF, RPR, CCR
Official Court Reporter

MAYERS - CROSS - MOORE                    253

Q    And you definitely got this letter after July 4th, 2015, correct?

A    I believe so.

Q    Was the first person that you called after you got this letter Mr. Belvin?

A    No.

Q    Do you remember testifying at your deposition that the first person you spoke to after you got this letter was Mr. Belvin?

A    I don't remember that.  I believe I called my niece first, but if I did, that was a mistake on my part.

Q    You do remember your deposition, correct, in this matter?

A    Somewhat.

Q    Was that deposition in about March 2019?

A    I'm truly not sure.

Q    Do you know if it was in 2019?

A    I do believe that.

Q    And you remember you were under oath at that deposition, correct?

A    Yes, I do.

Q    And you swore to tell the truth?

A    Yes, I did.

Q    And your attorney was present at that time, right?

A    Yes, he was.

Q    Thank you.  Is it your testimony, Mr. Mayers, that this

*LEEANN N. MUSOLF, RPR, CCR*
*Official Court Reporter*

MAYERS - CROSS - MOORE                          254

letter on the screen arrived early?

A     What do you mean by "early?"

Q     That it arrived before it was supposed to?

A     I believe I was terminated a little too early, yes.

Q     Because you used your vacation and your sick time when you first went out on leave, right?

A     Yes.

Q     When you first received this letter, didn't you testify that you didn't even remember that you had used your vacation or your sick time?

A     Yes, that's the truth.

Q     After you received this letter, you went to the doctor, correct?

A     After I had a conversation with somebody and they mentioned vacation time, is when I went to the doctor.

Q     That was Dr. Desai, correct?

A     Dr. Pinkal Desai, yes.

Q     And you went to go see Dr. Desai a few days after you got this letter?

A     Yes, between Dr. Desai and the union, yes.

Q     And you went to the doctor to get a medical clearance to return to work, correct?

A     That's what I remember, yes.

Q     And you got that medical clearance after you received the letter from Electchester Management, this letter?

MAYERS - CROSS - MOORE                255

A    Yes.

Q    Not before you received this letter?

A    Not before.

Q    So whether you had received this letter or not, you would not have been able to return to work without that medical clearance, right?

A    That's a fact.

Q    So you needed that medical clearance to come back to work, correct?

A    Yes.

Q    You went to your union, Local 32B-J, the same day you went to the doctor to get the medical clearance, right?

A    Yes.

Q    And the union sent you to Michael India?

A    Well, Michael India is the representative.

Q    Michael India, is he the grievance representative for 32B-J?

A    Yes, at that site.

Q    And you got a call from Michael India within a day of going to the union, didn't you?

A    Yes.

Q    And Michael India said to you he was going to call Vito Mundo, correct?

A    After he told me no Mikey, they got you, you're fired, I'm going to see what I can do for you.  That's what he said

MAYERS - CROSS - MOORE                    256

first.

Q    But he did tell you he was going to call Vito, correct?

A    After I told him I went out on my vacation time and my sick time, he said hold on, then he's flailing some papers. Then he said, hold on, I'm gotta call Vito.

Q    And you understood that he was referring to Vito Mundo, the general counsel of Electchester Management, correct?

A    Yes.

            (Continued on the following page.)

MAYERS - CROSS - MOORE                  257

 BY MS. MOORE (Continuing):

Q     And then Mr. India called you right back that same day, correct?

A     Yes, he did.

Q     And he said, "Go back to work on Monday," correct?

A     That's what he told me.

Q     Do you have any reason to believe that Mr. India did not talk to Mr. Mundo?

A     I don't have a clue, I'm just going by what he says.

Q     So, is it your understanding that Mr. India did, in fact, speak to Mr. Mundo?

A     I believe he did.

Q     And that's why you were allowed to go back to work, correct?

A     I guess that's correct.

Q     And it was less than a week between when you received this letter and when you went back to work, correct?

A     I'm not sure.

Q     Was it more than two weeks?

A     I'm not sure about the timeline at all.

Q     Between the time you first spoke to the union and when Mr. India told you go back to work on Monday, how much time was that, a couple days?

A     I'm really not sure of the timeline.

Q     Was it more than a week?

MAYERS - CROSS - MOORE                    258

A    I don't believe -- I believe it was probably a week.  I'm not sure.

Q    Between when you received this letter on the screen, Plaintiffs' Exhibit 37, and when you learned you could return to work, you never talked to any of the managers over at Electchester Management, correct?

A    Not one of them came and approached me to say welcome back or nothing.

         No, I didn't.

Q    I'm talking about between when you received this letter and returned to work.

A    The only thing I spoke to the managers about was pertaining to work.  I didn't speak to them about nothing else.

Q    You did not speak to them about returning to work between when you received this letter and when you went back to work?

A    No.  Only when I had to get treatment did I have to go talk to the managers.

Q    Thank you.

         You never called anyone from Electchester Management between when you received this letter and when Mike India told you to go back to work, right?

A    No, I didn't.

Q    And you did go back to work, didn't you?

A    Yes, I did.

Q    In August 2015?

A    I believe that's about right.

Q    And you didn't lose any pay, right?

A    I didn't lose any pay.

Q    And you had the same assignment when you came back, right?

A    Yes.

Q    And you had the same duties when you came back, right?

A    Yes.

Q    Isn't it true that nobody at Electchester Management said anything to you to indicate that your termination was due to your disability?

A    No.

I spoke to Ed Wiley and he stated something like, "You know, if you're not feeling well, Mike, you shouldn't come back to work."

MS. MOORE:  Your Honor, I'd like to show the witness his deposition transcript.

THE COURT:  Go ahead.  And just identify it for the record as to the date and the page and the line, if you will.

MS. MOORE:  Yes, your Honor.

The date of the deposition was March 7, 2019.  It was the first of two depositions of Mr. Mayers in this matter. And I'm going to refer to Page 95, and I will tell you the line number.

Pardon me, but, after all that, I think I'm actually not going to ask the witness about Page 95.

I would like to talk about Page 165.

Q   The portion I would like you to review begins on Page 164, Mr. Mayers, on Line 25.

Do you see Line 25 where it says:

"Question, Did anybody say anything that..."

And continuing on to 165 to Line 4?

THE COURT:  Could you focus in on the portion that you would like the witness to review?

MS. MOORE:  Right.

THE COURT:  I'm wondering if I could bridge the two pages.

Q   Do you see where it says:

"Question, Did anybody say anything that indicated to you that the termination was about your disability.

"Answer, No."

A   Okay.

Q   Does that refresh your recollection as to whether anybody at Electchester indicated that your termination was due to your disability?

A   Yes.

Q   Mr. Mayers, you're claiming you didn't receive a bonus in 2014 because of your disability, correct?

A   Yes.

MAYERS - CROSS - MOORE                    261

Q    You didn't complain to anyone at Electchester Management that you didn't get a bonus, did you?

A    No, I didn't.

Q    And you went out on disability leave in July of 2014, correct?

A    Yes.

Q    So, you weren't working at Electchester in December 2014, correct?

A    No, I wasn't.

Q    And you returned to work in August 2015, right?

A    Right.

Q    So, you were working at Electchester in December 2015, correct?

A    Yes.

Q    And you received a bonus in December 2015, right?

A    Yes.

Q    Mr. Mayers, you were upset when you learned in 2014 that you had cancer, correct?

A    Yes.  I was crushed.

Q    In 2019, were you diagnosed with emphysema?

A    Yes.

Q    Was that also upsetting?

A    Yes.

Q    I'd like to show you a document that was previously marked for identification as Plaintiffs' Exhibit 8 and was

*Linda A. Marino, Official Court Reporter*

MAYERS - CROSS - MOORE                    262

admitted into evidence.

(Exhibit published to the jury.)

Q    Can you see that document on your screen, Mr. Mayers?

A    If it could be a little bigger, I could see it a little better.

Q    Of course.

A    Thank you.

Q    Is that better?

A    Yes.

Q    I like to zoom out first to show you the entire document before I focus on the part that I want to talk about.

A    Okay.

Q    This is your EEOC complaint, correct?

A    Yes.

Q    You didn't include anything about monkeys or stuffed animals in your EEOC complaint that's in front of you right now, did you?

A    No, I didn't.

Q    You didn't include anything about a picture of President Obama in your EEOC complaint that's in front of you right now, did you?

A    No, I didn't.

Q    And you didn't include anything about not getting a bonus in your EEOC complaint, did you?

A    No, I didn't.

Q    And you amended your EEOC complaint in August of 2015, correct?

A    Yes.

Q    I'd like to show you a document that was previously marked for identification as Plaintiffs' Exhibit 9 and has been admitted into evidence.

            (Exhibit published to the jury.)

Q    Even after you amended your EEOC complaint, you didn't include anything about monkeys or stuffed animals, right?

A    No, I didn't.

Q    And even after you amended your EEOC complaint, you didn't include anything about a picture of President Obama in that complaint, right?

A    No, I didn't.

Q    And even after you amended your EEOC complaint, you didn't include anything about not getting a bonus, correct?

A    No, I didn't.

Q    Isn't it true, Mr. Mayers, that Tom Prezioso, the general manager of Electchester, never said anything to you about your race?

A    No.

Q    Is it your testimony that that's not true?

A    No, he's never spoken to me about race directly.

Q    Isn't it true that manager Anthony Caiozzo never said anything to you about your race?

MAYERS - CROSS - MOORE                                264

A    He never said nothing to me directly in.

Q    And isn't it true that manager Joe Capasso has never said anything about your race?

A    Never said nothing to me directly.

Q    And Mr. Ed Wiley, he never said anything to you about your race either, correct?

A    Never.

Q    And Mr. Mundo, Electchester's general counsel, he never said anything to you about your race either, right?

A    No.

Q    Mr. Mayers, nobody at Electchester Management has ever called you the N word, have they?

A    Not to my knowledge.

Q    And when I say "the N word," do you understand that I'm referring to a racial slur that's used against African-American or black people?

A    Yes.

Q    Have you ever called anyone at Electchester Management the N word?

A    I've used the word but I never called nobody the word.

Q    You didn't call the shop steward Richard Bonnette the N word?

A    No.

Q    You didn't tell the shop steward something to the effect of, "Do your job, N word"?

A    No.

Q    Mr. Mayers, you were suspended for one day in April or May of 2014, correct?

A    Yes.

Q    You were suspended for cursing at a safety meeting?

A    That's what -- yeah, that's what I was suspended for, yeah.

Q    You were suspended for saying, quote, "Why you sucking them off?" and "Motherf'er"?

A    That's not true.

     I did say, "Why you sucking them off?"  That was it. I never said nothing else.

Q    You complained to the union about that suspension, correct, 32BJ?

A    Yes.

Q    And the union -- you ended up getting paid for that one day that you were suspended, right?

A    After I got back from cancer, yes.

Q    Mr. Mayers, were you suspended -- pardon me, let me rephrase the question.

     Mr. Mayers, you were suspended in November 2017 for shouting the N word at a foreman, Enis Zedjalovic, correct?

A    Yes.

Q    You shouted, "What am I, your N word slave?" at the foreman?

MAYERS - CROSS - MOORE                266

A     It's something I shouldn't have said, but, yes, I did say it.

Q     And you were suspended for two days for that, correct?

A     Yes, I was.

Q     You complained to the union about that suspension too, didn't you?

A     Yes, I did.

Q     And the union didn't want to challenge that suspension, did they?

A     No, they didn't.

Q     Mr. Mayers, you were suspended in May of 2019 for calling your shop steward an F'ing coward and telling him to get the F out of here, correct?

A     Yes, I was.

Q     You were also suspended in November '19 for slapping your co worker on the butt and saying, "You're my favorite white boy," correct?

A     No, I didn't -- we do play like that, but I didn't say nothing about him being no white boy.  That wasn't said.

Q     So, it's your testimony that you slapped him on the butt but you didn't say, "You're my favorite white boy"?

A     No.  He slapped me on the butt and I slapped him.  We been playing like that for, like, 20 years, Gio and I.  We just joking around.

Q     You refer to one of your co-workers, a fellow porter

MAYERS - CROSS - MOORE                      267

named Luis Jaramillo, as "Fat Luis," don't you?

A    I guess, yeah.  That's how we describe them 'cause there were two Luises.  There's one Slim Luis and one -- and we all call him Fat Luis, yes.

Q    And you referred to Mr. Jaramillo as a sumo wrestler, didn't you?

A    We used to joke around like that, yes.

Q    And you would ask him how hungry he is when he goes to lunch?

A    Yeah, I used to do that, "Are you hungry?"  It was just jokingly.  All jokes.

Q    And Luis Jaramillo speaks English with an accent, correct?

A    Yes.

Q    He speaks Spanish, correct?

A    Yes, he does.

Q    You made fun of him for that at work too, didn't you?

A    Never.

Q    It's your testimony that you never made fun of Mr. Jaramillo for speaking Spanish?

A    Never.

Q    Or for his accent?

A    Never.

Q    Is Aldo Torres a porter who works at Electchester Management with you?

*Linda A. Marino, Official Court Reporter*

MAYERS - CROSS - MOORE                    268

A    Yes, he works with me.

Q    You sometimes make fun of Mr. Torres' height at work, don't you?

A    Yeah, he calls me fat and I call him short, yes.  We joke around, yes.

Q    Did you tell Mr. Torres he was a, quote, "little toy you can fit on your keychain"?

A    I don't remember ever saying that, but it sounds like me.

Q    Mr. Torres speaks English with an accent, correct?

A    Yes.

Q    He speaks Spanish, correct?

A    Yes, he does.

Q    And you have made fun of his accent or his English at work, haven't you?

A    I corrected his English.  I've never made fun of him.

     When he says a word wrong, I correct him.  I never made fun of him.

Q    Your testimony is that you've never made fun of Mr. Torres' English or his accent.

A    Right.  I made fun of his height but never his English or his accent.  That never happened.

Q    Do you recall an incident in January 2017 in which Mr. Belvin shouted and cursed at the shop steward Richard Bonnette?

A    I remember Richard Bonnette yelling at Michael and

MAYERS - CROSS - MOORE          269

Michael returned verbal fire.  Mr. Bonnette initiated that argument.

Q    You witnessed Mr. Belvin telling Mr. Bonnette to, quote, "Take it across the street," correct?

A    That never happened.

Q    You told Electchester Management that's what you witnessed, didn't you?

A    No.

Electchester wrote what they wanted to write.  I did not tell them that.

Q    I'd like to show you a document that's been admitted into evidence that was previously marked as Plaintiffs' Exhibit 23.

(Exhibit published to the jury.)

Q    Do you recognize this document, Mr. Mayers?

And I will zoom in for you.

A    Yeah, 'cause I can't see it.

Q    Right.  Can you see it now?

A    Yes, I can.

Q    I'd like you -- to direct you to the first paragraph on Page 2.  It's now at the top of the page and I'm going to zoom again to make sure you can see it.

Do you see where it says, "Indeed, Mr. Mayers also corroborated Mr. Bonnette's allegation that the shouting match resulted in Mr. Belvin essentially calling out Mr. Bonnette to go and resolve their dispute, 'across the street.'"

MAYERS - CROSS - MOORE                    270

          Do you see that?

A    I've never seen this paper before and that's not how it went.

Q    Is it your testimony that you did not tell Electchester Management that Mr. Belvin told Mr. Bonnette to take it across the street?

A    No, that never happened.

Q    I'd like to direct you to the next paragraph on that page.

          Do you see the second paragraph on that page?

          Let me make it bigger.

          Can you see that?

A    Yes.

Q    Do you see where it says, "Second, Mr. Mayers clearly stated that he heard Mr. Belvin shout something first, to which Mr. Bonnette responded, 'Shut up.'  And then Mr. Mayers, with only Mr. Belvin in his sight, rushed back towards him to intervene and deescalate the conflict by stating, 'Mike, what are you doing, man?'"

          Do you see that?

A    I see that.

          Can I tell you how it happened?

Q    My question is did it happen this way as is written down?

A    Not at all.  Not at all.

          Can I explain?

Case 1:17-cv-06303-NGG-MMH   Document 117-3   Filed 12/03/22   Page 39 of 239
PageID #: 3501

Q    Your testimony is that --

THE COURT:  Next question, all right?

If you have another question, go ahead.

MS. MOORE:  I don't have any more questions about Exhibit 23 or what's been previously marked as Exhibit 23. And if you'll give me one moment to double-check my notes at the table, I may be done with Mr. Mayers' questioning.

THE COURT:  Please, go ahead.

(Pause in proceedings.)

MS. MOORE:  Your Honor, I have no further questions for Mr. Mayers.

THE COURT:  Thank you.

Redirect?

MR. VAN-LARE:  Yes, your Honor.

REDIRECT EXAMINATION

BY MR. VAN-LARE:

Q    Mr. Mayers.

A    Yes.

Q    Counsel asked you, actually, the last question, and you were trying to respond to the question by saying, "Can I explain?  That's not how it happened."

A    Yes.

Q    Would you please explain how it happened?

A    Jerome and Mike was headed to the pizza shop for lunch. Jerome and Mike and Richard Bonnette was working with me.  As

*Linda A. Marino, Official Court Reporter*

MAYERS - REDIRECT - VAN-LARE          272

Jerome and Richie stopped to talk, Mike kept walking.  So, Mike yelled to Jerome, "Come on, Jerome, let's go."

And Richie responded, "Shut up."

Mike walks back around the garage and says, "Who said that?"

And that's where the situation escalated.  That's how that took place.

Q    Counsel also asked you about the notice that you got from the EEOC.

Do you remember that question?

A    Yes, I do.

Q    Did you receive any notice from the EEOC saying that your employer has no liability?

A    I believe so.

Q    I'm saying did you get a notice from the EEOC that cleared your employer of any wrongdoing?

MS. MOORE:  Objection.

A    No, no, not at all.

Q    Counsel also asked you if you contacted anyone at management after you got the letter from Mr. Mundo and before you went to Mr. India; do you remember that question?

A    Yes.

Q    You did not call anyone in Electchester before you went to Mr. India of the union, correct?

A    Yes, because that was the union's job to deal with them.

That's not my job to deal with them.

Q    So, that's why you went to the union, correct?

A    Yes.

Q    Counsel also asked you if anyone at Electchester told you that your termination was due to disability and you responded to that question; do you remember that?

A    Yes.

Q    Are you aware of any employer in all the places you have worked who would tell an employee, "We are firing you because you are disabled"?

A    No.

Q    And she also asked you if Mr. Capasso ever said anything about your race to you; do you remember that question?

A    Yes.

Q    You did not anywhere in your complaint accuse the managers or Mr. Capasso of using direct racist remark against you, did you?

A    No.

        I was told twice by Mr. Capasso to climb a tree. One time was on the radio for everybody to hear it.  And the other time it was Anthony Caiozzo and Capasso, myself, and Juan Martinez.  We were standing there, I was doing my grounds, and there was a hanging limb.  And I was like, "That's gonna fall on somebody."

        And Joey retorted, "Climb up there and get it,

PROCEEDINGS                                274

Mike."

I think that was offensive.

MR. VAN-LARE:  I do not have further questions for Mr. Mayers?

THE COURT:  Anything else?

Thank you.

MS. MOORE:  No, your Honor.

THE COURT:  Thank you.

Very well.  The witness is excused.

You may stand down, sir.

THE WITNESS:  Thank you.

THE COURT:  You're welcome.

(Witness excused.)

MR. VAN-LARE:  At this point, the Plaintiff wishes to inform the Court that we have no further witnesses to call.

THE COURT:  Very well.  Thank you very much.

MR. VAN-LARE:  Thank you, your Honor.

THE COURT:  At this time, we'll take a five-minute break.

All rise for the jury.

(Jury exits.)

THE COURT:  Please be seated, everyone.

At this time is there a motion from the defense?

MS. MOORE:  Yes, your Honor.  We'd like to move for a directed verdict.

*Linda A. Marino, Official Court Reporter*

THE COURT:  Tell me why.

MS. MOORE:  Sure.  We don't believe that Plaintiffs have met their burden on their hostile work environment claim under Title VII, Section 1981, or the New York State Human Rights Law, nor under the New York City Human Rights Law.

Specifically, the conduct that's alleged by the Plaintiffs, I don't believe they have proven its actually occurred.  The Plaintiffs have not shown -- proven by a preponderance of the evidence that they were subject -- or no reasonable jury could find that they were subject to this conduct that they've alleged because of their race.

Mr. Belvin testified plainly that he assumed a figurine of what was he described as a black man was put there because of his wife.  That was an assumption.

Mr. Belvin claims he was called a "moreno," but the gentleman who called him that was written up.  He claims he was called "boy" once, but that gentleman was also written up.

And Mr. Martinez testified that he didn't see anything offensive and that -- and he did not, importantly, testify that Plaintiffs complained to him about anything other than one stuffed monkey on a walker many years ago.

It's also clear that no jury could find that the Plaintiffs subjectively considered their work environment to be hostile or that any of these things were sufficiently severe and pervasive to alter the terms and conditions of

PROCEEDINGS                                    276

their employment by creating and abusive working environment

or that they were treated less well than other employees in a

way that was more than trivial and substantial or petty.

Regarding their disparate treatment claims as it's

related to hostile work environment, much of what I said

applies to that also.  But importantly, they have not proven

or cannot -- a reasonable jury could not find that they

suffered an adverse employment action, either one, with

regards to their race or that the circumstances of any adverse

employment action or anything gives rise to an inference of

discrimination.

And I don't -- finally, no reasonable jury could

find that Mr. Mayers suffered an adverse employment action

because of his disability.  There has been no evidence in that

regard or that he was treated less well than nondisabled

employees.

THE COURT:  Thank you.

MR. VAN-LARE:  Your Honor, the Plaintiffs actually

met their burden in this regard.

Number one, the environment does constitute hostile

work environment.  We have evidence regarding the monkey that

was on display that was meant to indicate that these guys are

like monkey.  And in particular, that is not in contest so

far.

There is no single action by management to confront

or do something about this horrible situation for years.  Your Honor, you saw they have evidence that was presented regarding work safety issues and what you shouldn't do.  They had regular work safety meetings.  Nobody even had the responsibility within the complex of the organization to talk to people about EEO violations.  And these guys continued to experience this.

The former assistant manager/foreman, Mr. Martinez, who testified yesterday, said he saw this image, they called his attention to it, and he went to the general manager Mr. Prezioso to tell him, and Mr. Prezioso's reaction was something like, "Oh, leave me alone.  I don't want to be part of that," and he did absolutely nothing about it.  No one else did anything about it.

Mr. Mayers has testified that in 2015, when he actually worked for half the year, he got a bonus.  In 2014, he worked half the year, he didn't get a bonus.  Obviously, he was not treated the same way.  And the only difference is he was out the first year for his disability for which they refused to pay him.  And Mr. Belvin actually attempted to help him.  Nothing was done on that.

Then his termination.  Your Honor, this is a company that has existed for years and should have proper personnel record.  They went ahead and simply fired this guy.  And from testimony, the letter was actually written by the general

PROCEEDINGS                    278

counsel of the company, who should know better in terms of what the rules and regulations should be.

If this man did not find out from people talking to him about vacation time, he would have been out on the street. And he also testified regarding how he felt given the fact he was recovering and about to go through a process of treatment. He felt very bad emotionally and he really felt bad about himself.

He testified very credibly as to how that influenced him.  He did get his job back and it began his recovery, but that was a very serious problem that he had in terms of the effect on his emotional mind.

So, I believe we have met our burden and you should deny their motion.

THE COURT:  Anything else?

MS. MOORE:  Yes.

I'd just like to add that Mr. Mayers hasn't proven or even testified at all about anyone else who was given a bonus who was out at the end of the year -- of any year.

And Mr. Mayers also didn't testify that he saw any monkeys, heard any racial slurs, was called any racial slurs, or witnessed really anything that could constitute a hostile work environment.

I just wanted to add that.

THE COURT:  Thank you.  Motion is denied and we're

*Linda A. Marino, Official Court Reporter*

PROCEEDINGS                    279

going to proceed with the defense case.

Who are your witnesses for today on the defense case?

MS. MOORE:  Your Honor, we're going to have Mr. Thomas Prezioso testifying today and also Mr. Anthony Caiozzo.

THE COURT:  All right.  About how long will direct be for Mr. Prezioso?

MS. MOORE:  One to two hours, I would say, but I can't be certain.

THE COURT:  Okay.  And then the other witness, Mr. Caiozzo, how long will his direct be?

MS. MOORE:  About the same, your Honor.

THE COURT:  Okay.  And we're not going to get through all of that today, I take it.

MS. MOORE:  Maybe.  It depends, I think, on what questions Mr. Van-Lare has for the witnesses as well.

THE COURT:  Right.

MS. MOORE:  We could, if we spoke to them now, arrange to have our third witness waiting on deck, Mr. Capasso, if you'd like us to do that.

THE COURT:  I'd like to go to 5:30.  I'm going to leave that up to you to figure out.

MS. MOORE:  Okay.

THE COURT:  We're going to break for five more

*Linda A. Marino, Official Court Reporter*

PROCEEDINGS                    280

minutes, so you can chat with Plaintiffs' counsel on that just

to see what he believes he'll need to do on cross.

MS. MOORE:  Understood.

Your Honor, we were planning and had previously

advised our medical expert and the general counsel -- now

former retired general counsel for Electchester to come in on

Thursday.

THE COURT:  For Wednesday, I want to have a full

day, so you're going to need to figure out what works.  You'll

probably have a better idea of this once we're underway this

afternoon; in other words, what it takes to finish the two

witnesses that you already have scheduled for today.

MS. MOORE:  Understood.

THE COURT:  Because I'd like to -- I don't know if

we're going to be able to get to jury charge until Thursday,

but that would mean we would have to have a charge conference

on Wednesday.

MS. MOORE:  Okay.

THE COURT:  But let's take it one step at a time.  I

think you ought to have enough witnesses onboard so we can go

to 5:30 each day.

MS. MOORE:  Understood.

THE COURT:  The jury was willing to stay Wednesday

and Thursday for an extra period of time.  But I don't know

how that would work and we should consult with each other

*Linda A. Marino, Official Court Reporter*

PROCEEDINGS                              281

along the way.

          MS. MOORE:  Absolutely.

          THE COURT:  Okay.

          MR. VAN-LARE:  Your Honor, just quickly.

          I understand that you have four witnesses you are

calling now; Mr. Prezioso, Mr. Caiozzo, Mr. Mundo, and the

expert; is that all?

          MS. MOORE:  Mr. Bonnette.

          MR. VAN-LARE:  So, you have five.

          MS. MOORE:  Five, yes.

          MR. VAN-LARE:  Thank you.

          THE COURT:  Let's take five minutes.

          MR. VAN-LARE:  Thank you, your Honor.

          (Recess taken.)

          THE COURT:  Please be seated, everyone.

          Call the jury.

          (Jury enters.)

          THE COURT:  Please be seated, everyone.

          At this time, the defense will present its case.

You may call your first witness.

          MS. MOORE:  The defense calls Thomas Prezioso.

          THE COURTROOM DEPUTY:  Sir, please raise your right

hand.

          Do you solemnly swear the testimony you shall give

to the Court will be the truth, the whole truth, and nothing

                    *Linda A. Marino, Official Court Reporter*

PREZIOSO - DIRECT - MOORE                    282

but the truth?

THE WITNESS:  I do.

THE COURTROOM DEPUTY:  Please have a seat and please state and spell your full name for the record.

THE WITNESS:  Thomas Prezioso, T-H-O-M-A-S P-R-E-Z-I-O-S-O, Prezioso.

THE COURT:  You may inquire.

**THOMAS PREZIOSO**, called as a witness, having been first duly sworn/affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. MOORE:

Q    Good morning, Mr. Prezioso.

A    Good morning, everyone.

Q    Could you please introduce yourself?

A    My name is Thomas Prezioso.  I'm the general manager of Electchester Management, LLC.

Q    What does Electchester Management, LLC, do?

And if you could, please speak closely and clearly so that the jury can hear and the court reporter can pick up your testimony.

A    Certainly.

We maintain a property that consists of 38 buildings, Housings 1 through 5, in Fresh Meadows, New York.

Q    What's the name of that property?

A    Electchester Housing Companies One, Two, Three, Four, and

*Linda A. Marino, Official Court Reporter*

PREZIOSO - DIRECT - MOORE                  283

Five.

Q     And was Electchester Management -- why was Electchester Management, LLC, formed?

A     It was formed in 2006 because the housing companies were in despair.  And it took a group of men who had talent to bring them together to form a company that would purchase things collectively instead of each housing company doing it individually and to maintain it and bring it back up to where it is today, where it's liveable.

Q     How many housing companies make up Electchester, the Electchester Housing Co-op?

A     There are five housing companies; 1, 2, 3, 4, and 5.

Q     And how many buildings are there in each housing company?

A     Housing Company No. 1 has seven buildings with 381 occupants -- families, not occupants.

Housing No. 2 has 688 units, and they have 12 buildings.

Housing No. 3 has also 12 buildings with 788 families.

Housing No. 4 has five buildings with 360 units. There are two tall towers, 23-story high-rises.  Each building has 94 in each, so that's 182 -- 92 in each, I'm sorry, 184 collectively.  92 units in each building.

Q     Who are the people, generally speaking, who live in the Electchester Housing Co-op?

*Linda A. Marino, Official Court Reporter*

PREZIOSO - DIRECT - MOORE                    284

A     If you knew Flushing, New York as a melting pot, that's Electchester.  There are some original cooperators still when the first housing opened up in 1949, God bless them 'cause they're near a hundred.  And there's every type.

We have politicians, we have cabdrivers, we have jewelers, we have electricians; mostly electricians, maybe 65/35.  But all walks of life, every ethnicity, every religion.

Q     Who is currently the manager of each housing company.

A     First and Second Housing Companies is Joseph Capasso and Third, Fourth, and Fifth is Anthony Caiozzo.

Q     And have Joe Capasso and Anthony Caiozzo held those same positions since you became the general manager?

A     Say that again because I'm a little confused.

Q     When did you become the general manager?

I'll ask another question.

A     I became the general manager January of 2008.

Q     Since you became the general manager, have Mr. Capasso and Mr. Caiozzo been in their same positions?

A     No.

Q     Who managed the housing companies, each housing company, when you first started?

A     When I first started, Bob Martin was in First Housing; I had Second, Fourth, and Fifth; and John Liacona was in Third.

Q     Do you know someone named Ed Wiley?

*Linda A. Marino, Official Court Reporter*

A    Yes, I do.

Q    Did Ed Wiley work for Electchester Management, LLC?

A    For roughly three years, yes.

Q    During those three years he worked there, when was he -- what was his job assignment?

A    He was the manager of First and Second Housing, I believe.

Q    Do you know when he started working for Electchester Management?

A    The very end of 2012 or the beginning of 2013.

Q    And until when was he a manager at Electchester Management?

A    The fall of 2015.  I don't know the exact month.

Q    Are Electchester Management's employees union members?

A    Yes.

Q    Are the porters -- actually, before I ask you that...

        What are your duties as a general manage?

A    My main duty is a liaison between the cooperators and management, between the contractors, insurance companies.  All the different entities come through me to go to get decisions made from Vito Mundo.

Q    Do all of the managers report directly to you?

A    Yes, they do.

Q    Are you on the property, Electchester's property, daily?

A    From 6 a.m. to 4 or 5 p.m., yes.

PREZIOSO - DIRECT - MOORE                286

Q    Do you have an office on the property?

A    Yes.

Q    And during the day, do you leave your office and walk around the property?

A    Most of the day.

I go in my office in the morning to look at what happened overnight.  We have a building link system where cooperators can put tickets in.  And I look to see what was left behind by the maintenance men the night before and what might have been put in overnight.  I walk the property, the exterior, to make sure nothing happened overnight so it makes the foreman's job and the manager's job easier.

I start early because we went to split shift with COVID, mainly.  And I'm the easiest person -- I live there -- to get on the site.  I'm the early bird.

Q    Do you walk around the property throughout the day?

A    All day.  I'm very rarely -- I start my day in my office and I end my day.  But if not, I'm outside.

Q    About how many people did does Electchester Management employ?

A    Eighty.

Q    And what job titles do those various employees have?

A    You have myself, you have two managers, you have 37 porters, you have 27 maintenance men, and administrative upward of 20, consisting of a chief financial officer,

PREZIOSO - DIRECT - MOORE                287

accounts payable and receivable supervisors and then clerks underneath.

We have two offices out in the field; one down south on Jewel Avenue on the southeast corner of the property for First and Second housing, and then we have one in the center of the property. The property is shaped like a Y. So, right in the dead center is Third, Fourth, and Fifth Housing office.

In each office, you have three women -- one office has three women and one has two women and a man that handle daily complaints from the cooperators.

Q    You mentioned porters.

What are the porters' duties?

A    They have duties that are daily, weekly, monthly.

They clean windows. When they come in in the morning, they go out on the property and look for large items that might have been broken, like a bottle. People come home at night, you don't want them to see it out there when they leave in the morning. So, they go around the property and make sure it's safe for the cooperators to go to work.

They go inside, they do the overnight garbage, they go through the building mopping, wiping down glass. There are bulk days. Each day they have to bring the garbage out to the big compactors that are out in the parking fields.

So, they have a full day.

Q    Does Electchester Management have a diverse workforce?

*Linda A. Marino, Official Court Reporter*

A     Yes.

Q     Since you became the general manager, do you know what percentage of Electchester Management's workforce is nonwhite?

A     It's always averaged between 55 to 65.

Q     And since you became the general manager, do you know what percentage of Electchester Management's workforce is black or African-American?

A     We've kept between 23 and 25 percent African-American.

Q     Are Electchester -- I believe I already asked you if the employees are union members.

        Are the porters union members?

A     Yes, they are part of 32BJ.

Q     Were you ever a member of a union?

A     I am currently a member of Local Union No. 3, IBEW.

Q     How long have you been a member of the Local No. 3?

A     Forty-two years.

Q     Do you like being a member of a union?

A     I'm very proud to be part of a union.

Q     Do you believe that unions are good for workers?

A     Yes, absolutely.  That will give me dignity when I retire.

Q     And do you believe that unions are good even if they make decisions you don't agree with?

A     Yes, absolutely.

Q     And does that happen sometimes, where the employees union

PREZIOSO - DIRECT - MOORE                    289

makes a decision you don't agree with?

A    Yes.

Q    And what do you usually do when the union makes a decision you don't agree with?

A    I don't recall.  I don't recall.

Q    Ultimately, do you respect the union's decision?

A    I do.

Q    Do you know the Plaintiff Michael Belvin?

A    Yes, I do.

Q    How do you know Mr. Belvin?

A    From work.

Q    And how long has Mr. Belvin been working for Electchester Management?

A    Since it began.  I believe it began in September of 2007.

Q    And did Mr. Belvin work at the Electchester Housing Co-op before Electchester Management came in?

A    Yes.

Q    What is Mr. Belvin's job title?

A    Porter.

Q    And has Mr. Belvin been a porter the entire time he's been employed with Electchester Management?

A    Yes.

Q    Does Mr. Belvin still work for Electchester Management?

A    Yes.

Q    How do you know -- do you know the Plaintiff Michael

Mayers?

A    Yes, I do.

Q    How do you know Mr. Mayers?

A    From employment, from being an employee of Electchester Management.

Q    How long has Mr. Mayers been working for Electchester Management?

A    The same time, since September 2007.

Q    And he also -- did he also work at the co-op before Electchester Management came in?

A    That's correct.

Q    What's Mr. Mayers' job title?

A    Porter.

Q    And has he been a porter the entire time he's been employed with Electchester Management?

A    Yes.

Q    And does Mr. Mayers still work for Electchester Management?

A    Yes.

Q    Does Mr. Mayers live in the Electchester co-op?

A    Yes, he does.

Q    Did he apply for an apartment there?

A    Yes, he did.

Q    Did you assist him with obtaining an apartment in the Electchester co-op?

PREZIOSO - DIRECT - MOORE                    291

A     Absolutely.

Q     How did you assist him with obtaining an apartment there?

A     The Electchester Management had a rule that they wouldn't hire anybody that lived on the property and workers couldn't get an apartment.

      That being said, the rental office came to me and said that one of my employees is looking for an apartment.  I asked who it was and I told them, "I will sponsor him."

      And they said, you know, it's not kosher -- I'll use that as a term -- and I said, "That's quite all right."

Q     When you say it's "not kosher," you mean it was against the rules?

A     It was against the rules.

      And they were looking at me.  But they came to me, "Just knowing Michael Mayers," I said, "I'll put my name on that piece of paper."

Q     And you did that?

A     And I never heard nothing from it.

Q     And to your knowledge, Mr. Mayers still lives at the Electchester Housing Co-op?

A     Yes, I sponsored Mr. Mayers.

Q     Did you ever offer Mr. Mayers a maintenance position?

A     Yes.

Q     Is a maintenance position a promotion from porter?

A     Yes.

PREZIOSO - DIRECT - MOORE                292

Q    Do you know when you offered Mr. Mayers that position?

A    When I first began, all the people used to meet at the shop at lunchtime, and it became a way that it got to me that Michael wanted to get promoted.

        So, I asked him about it and I offered it to him, but he never accepted it.

Q    He didn't accept the position?

A    No.

        (Continued on the following page.)

PREZIOSO - DIRECT - MS. MOORE                293

DIRECT EXAMINATION (Continued)

BY MS. MOORE:

Q    And the maintenance position, I'm sorry.  Never mind.

Who at Electchester Management should employees complain to about discrimination or harassment?

A    They can come to myself or Nicole Rollins or any manager, or Vito Mundo.

Q    Who's Nicole Rollins?

A    Nicole Rollins was, at that time, the head office manager up in the Joint Industry Board Building where all the administrative work is performed.  It's Suite 307, and she was also the supervisor for the accounts payable.

Q    Is she still working for Electchester Management?

A    No, she left us in January.

Q    So is there somebody who replaced her?

A    This person who replaced her in that position, Shelley Ramkhelawan.

Q    How do Electchester Management employees know where to direct their discrimination or harassment complaints?

A    When they are hired they are given a booklet and in that booklet gives them their rules and regulations, the explanation of what their job assignment is, both maintenance and porters.  And in the back it has harassment, sexual harassment, EEOC, discrimination, all the paragraphs that would explain what it entails for that charge, and when the

managers give it to them they ask them to read it and please come back with questions.

Q     What happens when Electchester Management receives a discrimination or harassment complaint?

A     Personally, I've never received one in that title that I should be accepting and I don't believe Nicole did or Shelley did either.  They came through the mail in the form of an EEOC, and the ones that I'm aware of, and they go straight to Cindy Huang, who is HR who divides them up to Mr. Mundo, who is the head of the company, and to the managers.

Q     Other than complaints via the EEOC or the Equal Employment Opportunity Commission, what if a worker just has a complaint that somebody is harassing or discriminating against you?

A     They go straight to the manager.

Q     What happens when they go straight to the manager, what does Electchester Management do?

A     They investigate, they get all the details and then they'll call up Mr. Mundo and usually it goes a step further. They call the union, the shop steward comes in and they see if they can settle it and, if not, they go to grievance, if it can't get settled there, it would go to arbitration.

Q     And if discipline is necessary, would Electchester Management discipline employees involved in these complaints?

A     Yes.

Q    Not who made the complaints, but who are the subject of complaints?

A    Ask that question again.

Q    If somebody was the subject of a discrimination complaint, you know, or had been complained about, would Electchester Management discipline them?

A    No.

Q    Electchester Management would not discipline people who had complaints about discrimination against them?

A    Oh, yes, yes, I'm sorry I didn't understand the question, that's why I asked twice.  I apologize.

Q    What does the investigation usually involve?

A    Finding out the details of both parties.  Finding out the circumstance of what happened and then bringing it to Mr. Mundo, who would get involved with it and call in their union and their shop steward and to see where it would lead.

Q    Do you find out the details or does Electchester find out the details by interviewing the employees?

A    Yes.

Q    What is Executive Health and Safety?

A    That is a contractor that we took on board in 2007.  In 2006, OSHA came down and looked over the property and didn't like what they saw, so they gave us some recommendations.  Us, being a brand new company, we called in experts.  These experts were used by local union number 3 for all their

divisions, their multiple 30,000 employees.

And Executive Safety & Health came down and designed a safety program, they designed all the cultural things that we needed and with that they began giving classes, which were just given last week. They are given every year except for the two COVID years.

And what they do is, they cover asbestos awareness, confined space, because some buildings have a crawl space underneath. They cover respirator, how to fit a respirator on, and they do -- we have medical exams that you can use the respirator. HAZMAT. The chemicals we use. It's a full green property. No matter what we use it's green products.

Sexual harassment. Before sexual harassment became a class online they used to cover that, and works -- I believe the last thing is workplace violence.

Q    Do they also cover anti-discrimination and anti-harassment?

A    Yes.

Q    And do they provide cultural and racial sensitivity training to Electchester Management employees?

A    Yes.

Q    These trainings are annual?

A    Yes. Generally in September because people go on vacation from May to September 15th. This year it was a little behind, so we just finished them last week.

PREZIOSO - DIRECT - MS. MOORE                    297

Q     Are these trainings mandatory for all of Electchester's

employees?

A     All the people out in the field.

Q     And are they mandatory for all of the managers?

A     Yes.

Q     Have you attended these trainings, training sessions

presented by Executive Health and Safety?

A     Except for three years, yes.  This year being one, I

wasn't in town and because of this, and then the two COVID

years.

Q     Does Electchester Management keep track of attendance at

these trainings?

A     Yes.

Q     How long -- actually never mind.  I'd like to show you a

document that was previously marked for identification as

Defendant's Exhibit GG.

            MS. MOORE:  May I show the witness?

            THE COURT:  Go ahead.

Q     I'm going to show you what's previously been marked for

identification as Defendant's Exhibit GG.  I'm just going to

give you an overview of all nine pages, then I'll ask you some

questions about the document generally.

            Are you familiar with this document?

A     Yes, that's the document that a new employee would

receive and sign off on and if they had any questions they

PREZIOSO - DIRECT - MS. MOORE                    298

would come back and we would help them understand it.

Q    Who created the version -- who created this document?

A    When Anthony Caiozzo came over in 2008 he was running multiple buildings in Manhattan, although they were commercial, he ran many buildings and a huge staff.  And he came over with some work-related rules and regulations and we modified them to residential.  It took many years to construct and this is the final being in October of 2015.

Q    So you were involved in some way in the creation of this document?

A    By case history on the property it was maneuvered, and added and subtracted and modified by what happened on the property, yes.

Q    So this document has been revised over the years?

A    Yes.  Multiple times.

        MS. MOORE:  Your Honor, I'd like to move to admit this document into evidence.  I'm not sure how you'd like to handle the numbering.  We could call it Exhibit GG or Defendant's Exhibit GG?

        THE COURT:  Defendant's GG.

        Any objection?

        MR. VAN-LARE:  No, your Honor.

        THE COURT:  All right.  Defendant's Exhibit GG is received in evidence.  Publish to the jury.

        (Defense Exhibit GG, was received in evidence.)

(Exhibit published.)

MS. MOORE:  Would you like me to allow the jury some time to review it?

THE COURT:  Well, if there's something in particular about a nine-page document that you would like the jury to -- that you would like to question the witness about, why don't we do it that way.

MS. MOORE:  Sure, that's fine.  I can do that.

Q    Earlier you mentioned a book that was distributed to all Electchester Management employees.  Is this the book you were referring to?

A    It is the pamphlet, yes.

Q    When were these rules finally all pulled together and put into one document?

A    This is the final version, the date you see on top, October 28, 2015.  I don't think it's been revised since then. This is the final.

Q    But were these rules that are in this document in force before 2015?

A    Yes, but not in this version.

Q    Does this document -- I'm going to direct you to page three, the bottom of page 3 and also page 4.  Does this document accurately set out Electchester's rules of conduct for Electchester Management's employees?

A    Yes.

PREZIOSO - DIRECT - MS. MOORE          300

Q     I'm going to direct you to page 6 and page 7.  Does this document accurately set out Electchester Management's policy against discrimination?

A     Yes.

Q     Does this document accurately set out Electchester Management LLC's policy against retaliation?

A     Yes.

Q     Are harassment and discrimination prohibited by Electchester Management?

A     Absolutely.

Q     Does the policy in front of you specifically prohibit making jokes about an individual's race?

A     Yes.

Q     Does the policy specifically prohibit the use of racial slurs in the workplace?

A     Yes.

Q     And does the policy specifically prohibit displaying racially derogatory material?

A     Yes.

Q     And does the policy specifically prohibit retaliating against anyone who complains about harassment or discrimination?

A     Yes.

Q     Does this document set out Electchester Management's procedures for complaints of discrimination?

A    Yes.

Q    And does it set out Electchester Management's procedures for complaints of harassment?

A    Yes.

Q    And retaliation?

A    Yes.

Q    So I want to direct you again to the rules of general conduct.  After Electchester Management distributed these rules in writing, was there generally an increase in the number of disciplinary writeups for its employees in general?

A    I don't know that.  I don't recall it.

Q    Are there certain rules, generally speaking, that are commonly violated?

A    Yes.

Q    Can you tell us which rules are commonly violated at Electchester?

A    One, eight, 16, 21, 29.

Q    What is Electchester Management's disciplinary policy?

A    We follow the CBA of 32BJ.  They are usually verbal warnings and they start to become written warnings.  You try to keep it to a minimum.  If they go up, there's suspensions and eventually terminations, but that's all under the 32BJ Collective Bargaining Agreement.  It's not under Electchester at all.

Q    Are disciplinary issues all documented in writing?

A    They should be by the managers, yes.

Q    And when are they usually documented?

A    When the event happens.

Q    Who, ultimately, is responsible for documenting a disciplinary issue?

A    The manager.

Q    Do you mean the manager involved in the issue?

A    The manager involved in the issue and he will take it to Vito Mundo, who would clean it up, you know, make it legalese. They'd call in the union, the shop steward and they would try to get it resolved.  Because they are a union, we're a union. We try to blend.  We try to keep everybody employed.  We're not out to hurt anybody.

THE COURT:  I'm sorry, Mr. Mundo, what is his title?

THE WITNESS:  He is the general counsel for the Joint Industry Board of the electrical industry and he also is the general counsel for Electchester.  He's currently retired. He retired on November 1st.

THE COURT:  Oh, I see.

THE WITNESS:  So now it's Matthew Kelly.

THE COURT:  And so when you say general counsel, is he in effect the chief executive or is he --

THE WITNESS:  No.  There's Dr. Finkel would be the president of Electchester Management, but Vito -- we go to Vito for everything.  Vito answers our questions, Vito tries

PREZIOSO - DIRECT - MS. MOORE                303

to right us.

THE COURT:  All right.  So in other words, he's given the responsibility by the union, by Local 3, how does this -- I don't think we have an understanding of where -- who you report to and where that person is in the overall ownership of the property.

Who owns the property --

THE WITNESS:  Local --

THE COURT:  -- Electchester.

THE WITNESS:  Local union number 3 owns the property since the late '40s.

THE COURT:  All right.  And the president of that union is?

THE WITNESS:  The president of the union is Thomas Cleary.

THE COURT:  And so the union has a managing board?

THE WITNESS:  The union constructed Electchester Management to run the housing companies for them.  Each housing company has a board of 13 individuals.  So me, Mr. Caiozzo and Mr. Capasso deal with five individual housing boards, one for each housing company, one through number five. We answer to Mr. Vito Mundo.  He is our boss.

THE COURT:  I see.  And then he answers to --

THE WITNESS:  Dr. Finkel.

THE COURT:  Dr. Finkel.  And he answers to?

PREZIOSO - DIRECT - MS. MOORE          304

THE WITNESS:  I never got an answer to that one.  I don't know.

THE COURT:  Well, I'm just, for the jury it's important to know who is ultimately responsible for the management of Electchester.

THE WITNESS:  Dr. Gerald Finkel.

THE COURT:  Okay, fine, thank you.

Now, you are a member of Local 3.

THE WITNESS:  Yes.  I started my career in 1980 as an elevator helper, an elevator apprentice/helper, mechanic foreman.  My company went out of business, they went to a different union in 2002.  So I didn't want go to the Local 1, which is the other elevator union company.  New York is unique, because they have two union elevators, generally in the state they only have one.

So I went and did street lighting and traffic signals for Petrocelli Electric.  While doing that, I was asked to come aboard here because they knew that my dad ran housing projects for 30 years.  I grew up in a housing project, I lived half of my life in a housing project, so I think they assumed that it was always at my kitchen table.

I went to trade school for all boilers and air conditioners.  I worked for Phoenix House Drug Rehabilitation Program, where I learned construction and structural, then I came aboard here.

PREZIOSO - DIRECT - MS. MOORE                305

I went to NYU for two years to learn New York law, realty law --

THE COURT: You have a certificate from NYU in real estate?

THE WITNESS: Yes.

THE COURT: All right. Thank you. You were not an electrician.

THE WITNESS: No, I wasn't.

THE COURT: All right.

And that union basically represents electricians.

THE WITNESS: The majority, but they have many divisions.

THE COURT: I see. All right. Thank you very much. Continue.

BY MS. MOORE:

Q    Does Electchester Management keep copies of disciplinary documents or notices?

A    Yes, the managers have folders on them.

Q    During your employment as the general manager of Electchester Management, did you ever learn that Mr. Belvin had complained that someone had hung a stuffed monkey on his locker?

A    Yes.

Q    When did you learn or -- do you remember when you learned about Mr. Belvin's complaint?

A    No, not really.  I don't remember the date.

Q    Who did you learn about Mr. Belvin's complaint from?

A    Manager Ed Wiley.

Q    Did you ever speak to Juan Martinez about this complaint?

A    No.

Q    When you heard that Mr. Belvin had complained about this, how did you feel?

A    Horrible.

Q    Did you ever say to anyone about this complaint that you don't want to hear it?

A    No.

Q    What did you -- did you instruct Mr. Wiley to do anything about this complaint?

A    Yes, I asked him to go look for the stuffed animal, the alleged stuffed animal.  He called me back on the phone and said he didn't see it.  I said, well then you have another assignment, you must go and interview everybody that uses that locker and get to the bottom of this.  He concurrently came back to me and said not one person has admitted seeing it nor had they seen it.  So I relayed that message to my manager, Vito Mundo, who said, go about your business, go back because we're hiring a lot of companies, it will show up, something will come of this.  And I went back to my assignment, but I didn't see the pictures until 2018 when the suit was filed.

Q    Okay.  Is it your understanding that Mr. Wiley did in

PREZIOSO - DIRECT - MS. MOORE                    307

fact search for the stuffed monkey that Mr. Belvin complained

about?

A     Yes.

Q     And to your knowledge, Mr. Wiley did not find a stuffed

monkey, correct?

A     Correct.

Q     Did Mr. Wiley find a stuffed monkey anywhere on the

Electchester property after you told him to go look?

A     No.

Q     Then to your understanding did Mr. Wiley interview

employees when you instructed him to?

A     Yes.

Q     Which employees do you understand that Mr. Wiley

interviewed?

A     Among -- I understand First and Second Housing used that

locker room at that time.

Q     Do you believe he interviewed employees from First and

Second Housing?

A     Yes.

Q     And was Mr. Wiley able to identify anyone with knowledge

or information about a stuffed monkey on Mr. Belvin's locker?

A     Unfortunately, no.

Q     To your knowledge, did Mr. Belvin lodge any other

complaints about monkeys or stuffed animals in the workplace?

A     No.

PREZIOSO - DIRECT - MS. MOORE                308

Q    Has any other employee complained about stuffed monkeys or stuffed animals in the workplace?

A    No.

Q    Do you ever play Solitaire on your computer at work?

A    Absolutely not.

Q    Do you ever play cards on your computer at work, period?

A    Absolutely not.

Q    If someone came to your -- to the door of your office and used their foot to keep it propped open, would you notice that?

A    From my office, no.  There's a huge conference room in between my office, which is a cubby hole in the back, and the front door.

Q    So is it your testimony that you wouldn't notice somebody doing that?

A    No.

Q    How big is your office?

A    My office is roughly eight by eight, 10 by 10.

Q    And can your computer screen be seen from the front door of your office -- or from the door of your office?

A    No, I have an L-shaped desk so I face the door.

Q    To your knowledge, did Mr. Belvin ever complain to anyone at Electchester Management about a depiction of President Obama?

A    No.

PREZIOSO - DIRECT - MS. MOORE                309

Q    Did you ever see a depiction of President Obama anywhere on the Electchester property?

A    No.

Q    To your knowledge, did Mr. Belvin ever complain that any employee of Electchester Management called him the N word?

A    No.

Q    Did you ever tell Mr. Belvin that he should drop his discrimination complaint with the Equal Employment Opportunity Commission?

A    No.

Q    Are you aware of anyone at Electchester Management telling Mr. Belvin that he should drop his discrimination complaint with the EEOC?

A    No.

Q    To your knowledge, did Mr. Belvin ever complain that someone at Electchester Management told him to drop his discrimination complaint with the EEOC?

A    No.

Q    To your knowledge, prior to filing this lawsuit, did Mr. Belvin ever complain to Electchester Management that he was receiving disciplinary writeups because he filed a complaint with the EEOC?

A    No.

        MS. MOORE:  I'd like to show you a document that's been admitted into evidence and was previously marked for

PREZIOSO - DIRECT - MS. MOORE                310

identification as Plaintiffs' Exhibit 31.

Your Honor, if I may show the witness?

THE COURT:  Yes, it's in evidence.

Q    Mr. Prezioso, can you see this document?

A    Yes.

Q    Are you familiar with this document?

A    Yes.

Q    Do you recall the incident described in this document?

A    Yes.

Q    Did Mr. Belvin throw a trash bag?

A    Yes.

Q    How far did Mr. Belvin throw the bag?

A    About 20 feet.

Q    Did he throw the bag overhand?

A    No, underhand.

Q    He threw the bag underhand?

A    Like a bowling ball.

Q    Is it common for Electchester employees to throw bags of garbage 15 to 20 feet?

A    No.

Q    Is that something that Electchester's employees are allowed or encouraged to do?

A    No.

Q    Did Mr. Belvin throw that trash bag across your path?

A    I was about five to six feet on a 45-degree angle, we

PREZIOSO - DIRECT - MS. MOORE                    311

were heading to my office, so it was within five or six feet
of Mr. Caiozzo.

Q    And within five or six feet -- was it within five or
six feet of where you and Mr. Caiozzo were walking?

A    Yes.

Q    Did the garbage bag come close to hitting anything?

A    It hit the garbage bags that were piled up along the
curb, but if it was errant, it probably would have went
through the car window right behind it.

Q    Did you ask Mr. Belvin not to throw trash bags in that
manner?

A    I asked him, please not to do it because it's not safe.

Q    How did Mr. Belvin respond?

A    He puffed out his chest, stared us down and said, why is
that?

Q    And Mr. Belvin received a three-day suspension from
Electchester Management for that, correct?

A    That is correct.

Q    Did this suspension have anything to do with Mr. Belvin's
race?

A    Not at all.

Q    Did the suspension have anything to do with Mr. Belvin's
complaint to the Equal Employment Opportunity Commission?

A    Absolutely not.  It's all about safety.

Q    Did Mr. Belvin file a grievance with his union over this

three-day suspension?

A     I believe he did.

Q     And did the arbitrator reverse Electchester Management's decision to suspend Mr. Belvin?

A     Absolutely.

Q     Did the arbitrator reduce the penalty from a suspension to a warning?

A     A written warning that stayed in his folder, correct.

Q     Did you agree with the arbitrator's decision to reduce the penalty from a suspension?

A     I was okay with it.

Q     Did the arbitrator agree that Mr. Belvin had an attitude when he threw the bag of garbage?

A     I believe that's why he gave him the written warning.

Q     Did you agree with the arbitrator's determination that Mr. Belvin at the time had a clean disciplinary record?

A     I don't believe he did.

Q     Did Electchester Management pay Mr. Belvin back for the three days that he was suspended?

A     Absolutely.

Q     Did you ever see Mr. Belvin throwing a garbage bag and tell him strike?

A     No.

Q     If an employee of Electchester Management suspects his work site contains asbestos, what should that employee do?

PREZIOSO - DIRECT - MS. MOORE          313

A    Get in touch with management immediately and cordon off the area.  Nobody should be in that work area.

Q    And how are Electchester Management employees informed of how to handle potential asbestos?

A    They're trained by Executive Safety & Health once a year.

Q    Is there also a reference to asbestos procedures in the general rules of conduct we discussed earlier?

A    I don't recall.

Q    Do the general rules of conduct require employees to follow OSHA safety guidelines?

A    Yes.

          MS. MOORE:  I'd like to show you a document that's been admitted into evidence and was previously marked for identification as Plaintiffs' Exhibit 20.

Q    Are you familiar with this document, Mr. Prezioso?

A    Yes.

Q    What is this document?

A    It's a written warning administered to Michael Belvin in 2016.

Q    Do you recall an incident in which Mr. Belvin broke off a piece of a floor tile he believed contained asbestos and put it in his pocket?

A    Yes.

Q    Where did Mr. Belvin find that piece of floor tile?

A    In Apartment 2E in building number 11 in the Second

PREZIOSO - DIRECT - MS. MOORE                314

Housing Company.

Q    By removing a piece of a floor that he believed contained asbestos, was Mr. Belvin complying with OSHA guidelines?

A    No.

Q    Did Mr. Belvin alert management to the possible presence of asbestos over the radio?

A    I don't recall in this instance if he did that.

Q    Do you know if there was asbestos present?

A    Yes.

Q    Was there asbestos present?

A    Yes.

Q    Did this written warning have anything to do with Mr. Belvin's race?

A    Absolutely not.

Q    Did this written warning about the asbestos have anything to do with the complaint Mr. Belvin filed with the EEOC approximately one year before this?

A    No.

Q    How did Electchester Management discover there was, in fact, asbestos present?

A    When this happened we closed off the apartment, we called in a company Gallant who actually came down that night and began to work on the apartment.

Mr. Val Holt's company, Executive Safety & Health did the air monitoring.  You must have two separate entities,

one to remove the asbestos, one to do the air monitoring.

When that -- we thought that it left the apartment with Mr. Belvin, so we had to do the air elevator shaft, the top of elevator, all the foyers, all the way out to the street, we had to do air monitoring, and Gallant came in and removed the asbestos.  So it was like a three-day procedure.

Q    After this, after this three-day procedure, did Executive Health and Safety give a presentation about asbestos at Electchester Management's work site?

A    Yes, we called them back at a 15,000-dollar cost on March 24th, 2016 to give an extra class.

Q    Did Mr. Belvin attend this meeting?

A    Yes.

Q    How did Mr. Belvin behave during the meeting?

A    He was boisterous and didn't raise his hand when the class was going on.

Q    Didn't raise his hand, do you mean before he was speaking?

A    Correct.

Q    How did you learn that Mr. Belvin was disruptive during this meeting?

A    At the end of the meeting we usually meet with the instructor, collect the attendance sheets so we know how to pay it out.  Because most of the class is made up of all five housing companies, and we break up the bill per housing

PREZIOSO - DIRECT - MS. MOORE                    316

company so we need to know -- it's color coded -- who attended the class. And Val Holt said there was the gentleman in the back, you know who I'm talking about, he was very disturbing. I said, what do you mean by disturbing? He didn't raise his hand, he just interrupted the class.

THE COURT: This piece of asbestos, was it inside -- it was inside in a vacant apartment?

THE WITNESS: Yes. A gentleman was told to go into the kitchen -- the kitchen is very old so they generally have the old nine-inch tiles and at the end of cupboard or the counter that has the sink, years ago they used to put in an asbestos sheet, because the stove was right next to the counter and otherwise it would become flammable. So we always brought a company in to remove the counter piece and we used to float the floor in the kitchen, because you're allowed to contain it. As long as it's not broken up, you're allowed to contain it.

THE COURT: So you don't necessarily remove it, you contain it.

THE WITNESS: On the floor, correct. The panel that's on the end of the counter is removed by a professional company.

THE COURT: I see.

THE WITNESS: So this gentleman that was working on the floor, took it upon himself to scrape up the tiles.

PREZIOSO - DIRECT - MS. MOORE                    317

Anthony Giadullo, one of our employees.

THE COURT:  Who actually -- I'm sorry.  Mr. Belvin didn't break up the tiles?

THE WITNESS:  No.  He broke a piece off of it after it was broken up.  It was in the middle of the foyer.

THE COURT:  So the error, if any, about how the asbestos was to be handled, it was created -- the problem was created by someone else.

THE WITNESS:  Correct.

THE COURT:  And then, according to you, Mr. Belvin then took a piece of one of the asbestos and put it in his pocket, is that what you're saying?

THE WITNESS:  That was the -- yes.

THE COURT:  That's what you had testified to.

THE WITNESS:  Yes.

THE COURT:  All right.  Let's move on.

MS. MOORE:  I'd like to show you a document that was admitted into evidence and that was previously marked for identification as Plaintiffs' Exhibit 16.

Q    Can you see that document, Mr. Prezioso?

A    Yes, I can.

Q    Are you familiar with this document?

A    Yes, I am.

Q    What is this document?

A    This is a written warning given to Michael Belvin in

PREZIOSO - DIRECT - MS. MOORE                    318

2015.

Q    Do the general rules of conduct that we discussed earlier prohibit taking photos or videos on Electchester Management's property?

A    Yes.

Q    Did this warning have anything to do with Mr. Belvin's race?

A    No.

Q    Did this warning have anything to do with the complaint Mr. Belvin filed with the Equal Employment Opportunity Commission?

A    No.

                (Continued on the next page.)

PREZIOSO - DIRECT - MOORE                    319

BY MS. MOORE: (Continuing.)

Q    To your knowledge, did Mr. Mayers ever lodge any complaints about monkeys or stuffed annals in the workplace?

A    No.

Q    To your knowledge, did Mr. Mayers ever complain that another employee of Electchester Management called him the N-word?

A    No.

Q    Did you become aware of a time when Mr. Mayers used the N-word?

A    Yes.

Q    When did Mr. Mayers use the N-word?

A    I believe there was a job in First Housing Company, they were remodeling the conference room for the First Housing board.  Michael was doing the floors in his building, building number four in First Housing, and he overheard and that job was beginning, the renovation of the conference room and he took -- and left the building with the worker he was working with, Anthony Yaccarino, and he walked over to observe what these men were doing.

        And the foreman and him had words at the punch-out clock that certain people were getting overtime and he wasn't part of it.  And with that, it led to, what I am a, you know, slave, N-word.

Q    And Mr. Mayers said that to?

A    To Mr. Zedjalovic, Zedjalovic.

Q    To your knowledge, did Mr. Mayers ever lodge any complaints with Electchester Management about a depiction of President Obama?

A    No.

Q    Did you ever learn that Mr. Mayers had been diagnosed with cancer?

A    Yes.

Q    Approximately, when did you learn that he had been diagnosed with cancer?

A    Somewhere before he went out.  So that would be the summer of '14.  I don't know if it was June or July.  I had heard coworkers talking that he had something wrong with his blood.

Q    At that time, what was the process for requesting a medical leave of absence?

A    To speak to HR to fill out paperwork, Cindy Wong.

Q    How long does Electchester Management hold open a position for anyone who is on an extended leave of absence?

A    According to 32BJ's collective bargaining agreement, up to one year.

Q    Did you ever tell Mr. Mayers it was a mistake to file a disability discrimination complaint?

A    No.

Q    Are you aware of anyone at Electchester Management

telling Mr. Mayers it was a mistake to file a complaint?

A    No.

Q    To your knowledge, did Mr. Mayers ever complain that anyone at Electchester Management told him that it was a mistake to file a complaint?

A    I don't have a knowledge of that, no.

Q    Did you ever tell anybody that Mr. Mayers wasn't getting a bonus in 2014?

A    I wasn't aware of that.  I have nothing to do with bonuses.

Q    Was Mr. Mayers on Electchester Management's payroll in December of 2014?

A    No.

Q    Was Mr. Mayers not on the payroll because he was on disability leave?

A    Yes.

Q    When Mr. Mayers was diagnosed with cancer, did someone collect donations for him from his coworkers?

A    His shop steward, Richard Bonnette.

Q    Did you give Mr. Bonnette a contribution for Mr. Mayers?

A    Absolutely.

Q    How much did you donate to Mr. Mayers?

A    $100.  I have sympathy, I have cancer also, so it's -- it's a brotherhood.

Q    I'd like to show you a document that's been admitted into

PREZIOSO - DIRECT - MOORE                    322

evidence, and that was previously marked for identification as Plaintiff's Exhibit 1.  Have you ever seen this photograph?

A    In March of 2019 when I was handed the Court orderers, we went for a deposition in Mr. Van-Lare's office and he was the first person who showed me this.

Q    So that was the first time you ever saw this photograph?

A    Yes.

Q    Have you ever seen the stuffed monkey in this photo anywhere on the Electchester property?

A    No.

Q    I'd like to show you another document that's been admitted into evidence that was previously marked for identification as Plaintiff's Exhibit 2 -- nevermind. Actually, yes, sorry, I lost my train of thought.

        Have you ever seen this photograph?

A    Only at that same office in Manhattan at Mr. Van-Lare's office.  I have never seen it on the property.

Q    Okay And that was in 2019, when you first saw this photo?

A    March, I believe it's March of 2019.

Q    Have you ever seen this monkey depicted in this photo anywhere at the Electchester co-op?

A    No.

Q    Did Mr. Belvin ever complain to you about a plastic monkey being placed on a work cabinet in Second Housing?

A    No.

PREZIOSO - DIRECT - MOORE                    323

Q    All right.  I'd like to show you a document that's been admitted into evidence that was previously marked for identification purposes Plaintiff's Exhibit 3.  Have you ever seen this photograph?

A    At Mr. Van-Lare's office at the same time, March of 2019.

Q    Have you ever seen the figure depicted in this photo at the Electchester co-op?

A    No.

Q    From the photo, do you recognize what the figure depicted in this photo is?

A    Yes.

Q    What is it?

A    It's a wrestling figurine.  When my daughter was born, she loved this wrestler.  Jimmy Superfly Snuka.  If you look underneath it, there are kneepads.  He's muscle bound.  That is Jimmy Superfly Snuka.  I would know it like it's yesterday.

Q    Is Jimmy Superfly Snuka Black or African American?

A    He comes from Fiji.

Q    So he's not black?

A    No.  I don't know what you call somebody from Fiji, the island of Fiji.

Q    Did Mr. Belvin ever complain to you about a figurine of a Black or African American man nailed to the wall in the shop with a Barbie doll hanging off of it?

A    No.

*LEEANN N. MUSOLF, RPR, CCR*
*Official Court Reporter*

PREZIOSO - CROSS - VAN-LARE                    324

MS. MOORE:  Your Honor, if you would just give me one minute to consult with my colleague, I may be finished with this witness.

THE COURT:  Sure.

If anyone on the jury just wants to stand up to stretch, you can do that, too.

(Pause in proceedings.)

MS. MOORE:  Your Honor, I have no more questions for Mr. Prezioso at this time.

THE COURT:  Very well.  Thank you.  All right.

Cross examination.

MR. VAN-LERE:  Thank you, Your Honor.

CROSS-EXAMINATION

Q    Good afternoon, Mr. Prezioso.

A    Good afternoon, Mr. Van-Lare.

Q    How are you?

A    Very well.

Q    Okay.  Counsel showed you Exhibit GG.  Do you remember that?

A    Yes.

Q    And that is your employer's policy, is that correct?

A    Yes.

Q    That policy was adopted in 2015, is that correct?

A    The final revised version, yes.

Q    What did you use before 2015?

*LEEANN N. MUSOLF, RPR, CCR*
*Official Court Reporter*

PREZIOSO - CROSS - VAN-LARE                325

A    We used that policy, but it wasn't written, it was -- it was just scratched up policy.

Q    So you didn't have a policy, is that correct?

A    Written policy?

Q    Correct.

A    We had a policy, but it wasn't signed off on by the workers.

Q    What do you mean when you say it wasn't signed off on by the workers?

A    We -- we explained to the workers, at safety meetings, what is expected of them.

Q    But you did not actually give them a written policy that it can keep?

A    That is -- that is correct.

Q    Okay.  So you have these safety meetings how often?

A    Once a month.  They were for quite a few years.

Q    Okay.  And this policy was adopted in the fall of 2015, is that correct?

A    I believe it was October.

Q    October of 2015, okay.  Do you -- are you aware from your testimony that Mr. Belvin and Mr. Mayers filed a complaint with the EEOC, correct?

A    Yes.

Q    And that complaint was filed in March and May of 2015, correct?

PREZIOSO - CROSS - VAN-LARE                326

A      I don't know the month.

Q      Okay.  Well, if it was filed in May or March of 2015, you would have adopted your policy after the filed complaint with the EEOC, correct?

A      Correct.

Q      You said Electchester was formed in 2006?

A      2007.

Q      2007, okay.  When you described Electchester as a company formed in 2007 -- 2007, that is the cooperation as a company, correct?

A      Yes.

Q      That -- the building existed before 2007, correct?

A      The what?  I didn't understand what you said.

Q      Okay.  What is Electchester Management, LLC, that was formed in 2007?  What is that?

A      This is a company that maintains the properties.

Q      Okay.  And that company is the employer for yourself and the plaintiffs in this case, correct?

A      From September 2007, yes.

Q      Okay.  Now, prior to September 2007, who maintained the properties at Electchester?

            MS. MOORE:  Objection.

            THE COURT:  I'm sorry?

            MS. MOORE:  Objection.

            THE COURT:  Overruled.

*LEEANN N. MUSOLF, RPR, CCR*
*Official Court Reporter*

You may answer.

A   The same employees that performed the duties in 2007.

Q   Okay.  And I believe you testified at one point that this building had been in existence since the 1940s, correct?

A   Each housing was built at a different time.  Housing number one was in the 40s, yes, housing number two and three were in the early 50s, housing number four was in the mid-50s and housing number five was in 1966.

Q   When Electchester was formed in 2007, the employees that were -- that became Electchester employees, did they work in the same job that it did before the formation of Electchester?

A   Unless they got promoted, yes.

Q   So the managers that you have, Mr. Caiozzo, Mr. Capasso, and yourself, you were present within that premise working as employees prior to the creation of Electchester Management, correct?

        MS. MOORE:  Objection.

        THE COURT:  Well, I'll allow the witness to answer. The answer was no?

        THE WITNESS:  The answer is no.

        THE COURT:  Okay, go on.

Q   Now, when Electchester Management came into existence, Mr. Belvin was employed, right?

A   Correct.

Q   He was working prior to the creation of that corporation,

he was working there, correct?

A    Correct.

Q    So did Mr. Mayers, correct?

A    Correct.

Q    Do you know if there was a reduction their salary as a result of the creation of the new LLC?

A    No.

Q    Do you know if there was a reduction in the terms of their employment, like their benefits, did that change because a new cooperation was formed?

A    No, that's collective bargaining.  It wouldn't matter what company is involved, that's through the union, the --

Q    So the workers just continued their work everyday like they did before the creation of the LLC, correct?

A    Yes.

Q    You testified you know Mr. Ed Wiley, correct?

A    Yes.

Q    You knew him as an employee for Electchester, correct?

A    Correct.

Q    Is he still employed by Electchester?

A    Say that again.

Q    Is he still employed by Electchester?

A    No, he is not.

Q    Do you know why he left Electchester?

A    He was terminated.

PREZIOSO - CROSS - VAN-LARE                    329

Q    Do you know why he was terminated?

A    He wasn't qualified to be a manager.

Q    Who hired him?

A    Vito Mundo and Dr. Gerald Finkel.

Q    Were you consulted before he was hired?

A    No.

Q    Okay.  Why do you say he wasn't qualified?  He had a job, according to your testimony, for about three years.

          THE COURT:  I'm sorry, was the question, was he -- was the witness consulted before he was hired or fired?

          MR. VAN-LERE:  Hired, H-I-R-E-D.

          THE COURT:  All right.  Go ahead.

          THE WITNESS:  I answered that.

          THE COURT:  And the answer is yes?

          THE WITNESS:  I wasn't consulted.

          THE COURT:  You weren't consulted.

          THE WITNESS:  I wasn't consulted before he was hired.  The answer was no.

          THE COURT:  Were you the manager when he was hired?

          THE WITNESS:  I was the general manager when he was hired.

          THE COURT:  You were?

          THE WITNESS:  I was the general manager.

          THE COURT:  And he was hired to do what?

          THE WITNESS:  Manage First and Second Housing

*LEEANN N. MUSOLF, RPR, CCR*
*Official Court Reporter*

Companies.

THE COURT:  Is that where these plaintiffs were employed?

THE WITNESS:  At that time, I believe they were.

THE COURT:  I see.

THE WITNESS:  They were in Second Housing at that time.

Q    And all the managers, including Mr. Ed Wiley at that time, reported directly to you, correct?

A    Correct.

Q    Now, you gave an estimate as to how many of the residents are nonwhite; do you remember that?

A    Residents or employees?

Q    Oh, employees.  I stand corrected.

THE COURT:  Is there a question?

MR. VAN-LERE:  Yes.

Q    You gave an estimate as to how many employees were nonwhite, correct?

A    Correct.

Q    How did you get your figures?

A    We do payroll every week, we know who the employees are, it's just simple math.

Q    You did that on your own by assuming the race of the employees, is that correct?

A    Yes.

Q      You didn't give out a survey that is kind of anonymous to ask people to identify themself, correct?

A      Correct.

Q      You just did it based on your opinion of some individuals in management, correct?

A      That and conversation, that and conversation.  We know who people are.

Q      In conversation with who?

A      The employees.

Q      Oh.  You asked the employees in conversation, what is your race?

A      No, it comes up in conversation, I'm from the Dominican Republic, I'm from Staten Island.

Q      Okay.  The Dominican Republic and Staten Island are not identification of race, correct?

            MS. MOORE:  Objection.

A      That's correct.

            THE COURT:  I'm sorry?

            MS. MOORE:  I didn't think he was finished, Your Honor.

            THE COURT:  Sustained.  I'm sustaining the objection.  The jury will disregard the question and the answer.

Q      Now, what kind of discussion about race did you have with an employee that convinced you as to what their races might

be?

A    I didn't have a discussion with them.

Q    You just said there were discussions.

A    Between people you -- you understand when people talk, oh, I'm going back home.  Most of our Spanish employees go back home for their vacations.  Oh, where do you come from?  Oh, I'm in Cuba, oh, I'm in Honduras.  That's how you learn things.

Q    And how does that information get channeled to management so it's reflected in some form of statistics?

A    When they hand in their vacation forms, sometimes they say, I'm going back home.  Oh, really, where do you go?  I'm going back home to Honduras.  It's in friendly conversation with the -- between the manager and the person who is going on vacation.

Q    So if someone says, I'm going back home to Honduras for vacation, for example, you then make a note of that particular statement so you can use it to compile your statistics; is that how it works?

         MS. MOORE:  Objection.

         THE COURT:  Sustained.

Q    Mr. Prezioso, who is in charge of compiling these statistics?

A    I just did it off the top of my head to see.

Q    So it was something that you just conjure from your own

head, right?

MS. MOORE:  Objection.

THE COURT:  Sustained.

Q    Sir, you just said you just took it off the top of your head, correct?

A    I thought it up and I did it, yes.

Q    Okay.  Did anyone assist you in doing that?

A    No.

Q    Okay.  Did you actually write -- have this in writing somewhere?

A    At one time I probably did, yeah.

Q    And what happened to it now?

A    I don't know where it is now.  I do the math and I -- I know.

THE COURT:  Are you required to keep statistics of the ethnicity and the race of your employees?

THE WITNESS:  No, not at all.

Q    So it was just something that you did on your own and you had it in a journal that you have now thrown away, correct?

MS. MOORE:  Objection.

THE COURT:  Sustained.

Q    You were asked what is it that you would do when a union makes a decision that you don't agree with.  Do you remember that question?

A    I don't know if I remember the answer, though, but go

ahead.

Q    There was no answer.  So I want to give you the opportunity to respond, if you have an answer.

A    I don't believe I do.

Q    You were also asked as to who in your company is responsible for EEO and harassment matters; do you remember that?

A    Yes.

Q    And you identified Mr. Mundo, correct?

A    At that time.  He answers all of the EEOC -- any of the complaints.  He fills out the paperwork and sends it back to the agency, yes.

Q    And you also said the managers can also be approached if an employee has issues like that, correct?

A    Yes.

Q    And, yourself, Mr. Tom Prezioso, you are -- you are also designated as a person that could be approached if there are allegations of discrimination or harassment?

A    Correct.

Q    Correct?

A    Correct.

Q    Did you, Mr. Prezioso, ever receive any complaint of harassment from an employee in that capacity prior to 2015?

A    I don't recall.

Q    You never received one, in fact; isn't that true?

MS. MOORE:  Objection.

A    I don't recall.

THE COURT:  Overruled, by the way.  Go ahead.

Q    Mr. Prezioso, did you receive complaint that was filed by Mr. Mayers with the EEOC?

A    I believe I received it, yes.

Q    It came to your attention at some point, isn't that true?

A    Yes.

Q    And Mr. Belvin's complaint, as well, came to your attention at some point; isn't that true, Mr. Prezioso?

A    Yes.

Q    Did you read it?

A    I don't recall -- I must have read it but I don't recall, today, when.  It's many years ago.

Q    You must have read it but you don't remember the substance of the complaint, is that correct?

A    That is correct.

Q    Did you think it was a serious complaint?

A    I don't recall what it says right now, but I would take any EEOC complaint serious.

Q    Other than the complaint that Mr. Belvin and Mr. Mayers, did you receive complaints from other employees since 2015?

A    I believe one other one, Jermone Jenkins.

Q    And that's it, isn't that true?  That is all that you ever --

A    I --

Q    Excuse me, sir.

A    I'm sorry.

Q    That is all that you ever received, isn't that true?

A    I believe it is.

Q    Do you know why that is so?

A    No.

Q    Isn't it true that it is so because you had no policy for informing employees as to where to go?

A    I don't know that to be true.

Q    You remember being deposed in my office, as you responded in a question to counsel not long ago, correct?

A    Correct.

Q    And you remember responding to the question as to who should be consulted if there are complaints of harassment?  Do you remember me posing that question to you?

A    Yes, but I don't remember my answer.

Q    Okay.  Do you remember that your answer was you are not the individual designated to receive complaints?

A    Could you repeat that?  I didn't understand what you said.

Q    Sure, I will repeat it, Mr. Prezioso.

Mr. Prezioso, do you remember responding that you are not the individual designated to receive complaints relating to EEO matters?

A    Correct.  I did say that.

Q    Why are you changing your story today, that you are one of those responsible for receiving complaints?

            MS. MOORE:  Objection.

            THE COURT:  You may answer.

A    Because I -- it's correct, I should -- I am the responsible party.  I read it and it passed my memory that day, but I am the responsible party.

Q    At that time when you were deposed, two, three years ago, you didn't remember?

A    That is correct.

Q    Your memory three years later is better than it was three years ago, correct?

A    No, because of this case, I read it, I read it.  So it reminded me, hey, buddy, you're the guy.

Q    What did you read that reminded you?

A    The instructions are that all of the EEOC complaints should come to myself and the co-logs**

Q    So if you, general manager, Mr. Prezioso, did not know that prior to reading it, do you think your employees will know?

A    No.

Q    You were told by Mr. Wiley that a complaint has been made, that a monkey was hung up somewhere in the premise, correct?

PREZIOSO - CROSS - VAN-LARE                    338

A    Correct.

Q    And you actually testify in your deposition that you told Mr. Wiley to go down and investigate the monkey complaint, right?

A    Correct.

Q    Mr. Wiley got back to you, didn't he?

A    Yes.

Q    What did he tell you?

A    He didn't find anybody that knew about the monkey, nor did he find the monkey.

Q    And what did you do?

A    I told Mr. Mundo.

Q    And you left it at that, correct?

A    My -- my superior left it at that.  I followed direction.

Q    No, I'm saying you.  I'm not talking about your superior, we can get to your superior later.  When Mr. Wiley got back to you and said I didn't see a monkey, you didn't do anything beyond talking to Mr. Mundo, correct?

A    That's correct.  I spoke to Mr. Mundo.

Q    And you left it at that?

A    That is correct.

Q    Did you speak to any of your managers to say, hey, we've got a terrible situation here.  Let's talk about what to do. Did you?

A    I don't recall doing that.

*LEEANN N. MUSOLF, RPR, CCR*
*Official Court Reporter*

PREZIOSO - CROSS - VAN-LARE                339

Q    You did not, that's a fact; isn't it true?

A    I don't recall that.

Q    By the way, did you subsequently go back to Mr. Wiley, Ed Wiley, to tell him to disclose to you if there have been new information or additional investigation that he did?  Did you ever have a discussion with Mr. Wiley about this?

A    I don't recall.

Q    Mr. Wiley was fired because he mishandled this situation; isn't that true?

A    This situation, no.

         MS. MOORE:  Objection.

Q    I'm sorry?

A    You asked me if Mr. Wiley got terminated over this situation?

Q    Yeah, I am.

A    No, he did not.

Q    Thank you.

         THE COURT:  The objection is overruled.  Okay.

         Anything else?

         MR. VAN-LERE:  Yes, sir.

         THE COURT:  Go ahead.

Q    Was he a competent manager?

A    No.

Q    Did you give him an evaluation?

A    No.

Q    For three years, you did not evaluate him?

A    There was not an evaluation form, it was -- I discussed his work habits with Vito Mundo.

Q    So you did not have an official evaluation process that is documented for your managers?

A    That is correct.

Q    You are the general manager, why didn't you initiate that?

A    Excuse me?

Q    I'll repeat it.  Mr. Prezioso, you are the general manager --

A    Correct.

Q    -- and all managers report to you.

A    Correct.

Q    Can you tell this jury why you did not have an official evaluation process for your managers?

A    That would be a question for Vito Mundo.  I was the liaison.  I'm not a decision-maker.  I follow direction.

Q    Okay.

A    Mr. Vito Mundo can answer that question.

Q    Okay.  So Mr. Vito Mundo runs everything and you simply follow his direction; is that my understanding?

A    That's the way it is, yes.

Q    But Mr. Mundo left, according to your testimony, doesn't work for Electchester anymore, correct?

A    He just left November 1st, yes.

Q    Was --

A    Of this year, just now, last week.

Q    Yeah, I got you.

A    Okay.

Q    Was he physically in the office until the last day of October?

A    I don't know that.

Q    Okay.  Have you been given additional responsibilities now that he left for you to actually become an effective GM?

A    No, Matthew Kelly has replaced Vito Mundo and the company is structured still the same.

Q    Do you, as a GM, have a problem with that structure?

A    No.

Q    Does that structure affect your ability to perform your own job, Mr. Prezioso?

A    No.

Q    Executive Safety is a company you identify as a corporation that comes in and helps to train your staff in different areas, correct?

A    Yes.

Q    How long does this training last, Mr. Prezioso?

A    In years.

Q    Tell me, last year, 2021, how long did your training last?

PREZIOSO - CROSS - VAN-LARE                342

A    We didn't have it the last two years because of Covid, sir.  Do you mean the individual class?  I don't know what question you're --

Q    Oh, sure, we'll specify it.  Well, let me ask you about -- thank you for telling me that.  What kind of classes do they run?

A    I explained it earlier, but I'll explain it again.  They cover asbestos awareness, confined space, sexual harassment, HAZMAT, which is all the chemicals they use, I stated that they have chemicals, everything we use on the property is green, they take a physical, they learn -- they have a respirator fitting, and workplace violence.  If I left one out, I apologize.

Q    Now, did they run any of these classes consecutively or everything is done, concurrently, at the same time?  What is the structure of the classes?

A    The classes are given yearly.  If you're a new member or a new employee, it's an eight-hour class, and if you're a current employee, they get a four-hour refresher course in the same categories I just brought up.

Q    Okay.  So the four-hour class for a current employee will cover all the categories that you just explained?

A    Yes.

Q    Thank you, sir.

A    It's a refresher course, it's not a starter course.

Q    Now, you also testified that Mr. Caiozzo, who is another manager, came with up with the rules you adopted in 2015, is that correct?

A    Yes.

Q    Do you remember that testimony?

A    Yes.

Q    From what company did Mr. Caiozzo come?

A    I don't recall.

Q    Where did he bring the rules from?

A    From the company he was working at.

Q    And you don't know the name of the company?

A    No, I do not.

Q    Do you know the role of -- the rules that he brought, did they have a specific designation?

A    I don't know -- I don't understand your question.

Q    Okay.  When he brought those rules?

A    Yes.

Q    Are they documented somewhere that says, employee manual on EEO, employee manual on health and safety.  What was the designation?

A    I don't remember because that was back in 2008.

Q    Mr. Prezioso, did you and Mr. Caiozzo sit down together to review these rules?

A    Me, Mr. Caiozzo, I don't recall who was the manager in 2008, the third manager, Vito Mundo.

Q    What does Mr. Caiozzo do for the company?

A    He is the manager of Housings 3, 4, and 5.

Q    Did he work in HR or labor relations in his previous work before coming to you?

A    I don't know that.

Q    You interviewed him, correct, for his job?

A    Absolutely not.

Q    Who did?

A    I don't know.

Q    And he reports to you?

A    Yes.

Q    And that is the procedure in Electchester?

A    That is the procedure from the people above me, yes.

Q    When did you find out that you have a new employee and his name is Mr. Caiozzo?

A    March 28, 2008.

Q    Was that on his first day at work?

A    Yes.

Q    And you were not involved in his interview process?

A    No.

Q    Did he replace Mr. Wiley?

A    No, they worked together.

Q    Okay.  Do you think your administrative structure is disfunctional?

A    I don't think that, no.

PREZIOSO - CROSS - VAN-LARE                    345

Q    And you believe, as an administrator, a general manager, that what you just described to me, with the hiring of Mr. Ed Wiley and the hiring of Mr. Caiozzo, is not an administratively disfunctional process?

A    I don't know the process.  It's done by the people above me, so I don't have an opinion on that.  I don't know the interview process.  I'm given an employee to work with.  So I can't answer that question.

Q    Mr. Prezioso, you've said it repeatedly now, the people above me.  Who are these individuals that are above you making these decisions?

A    Vito Mundo and Dr. Gerald Finkel, which I testified to already.

Q    Okay.  Those two, correct?

A    Correct.

Q    But the president doesn't instruct you directly, it's Mr. Vito Mundo that gives you direct instructions, correct?

A    Correct.

Q    You testified that Mr. Belvin was disruptive; do you remember that testimony?

A    I didn't hear what you said, sir.

Q    Okay.  You testified that Mr. Belvin was disruptive?

A    In an OSHA class, correct.

Q    Were you in the class?

A    No.

Q    Did you ever attend a class with him?

A    I think one year I did, I happened to be in his class, but not this particular class.

Q    Was he disruptive in the class you attended?

A    I don't believe so.

Q    Do you believe Mr. Belvin is a good employee?

A    I believe he does his job very well.

Q    Okay.  Do you have rules for class attendance during training that requires employees to raise up their hand before they can say something?

A    That's up to the instructor.  I wouldn't have those rules.  The instructor is the one who complained to me.  I don't run the class, sir.

Q    Okay.  Are you aware of any instructor that requires employees to raise up their hand before speaking?

A    I went through 12 years of school and I had to raise my hand for 12 years, so yes.

Q    Yes to what?

A    To have an organized class, you should raise your hand.

Q    I'm not saying what you should or should not do.  I'm asking and I will restate my question.

A    Please.

Q    Are you aware of any of your instructors that have a standing instruction that employees must raise up their hand before speaking?  That's all.

PREZIOSO - CROSS - VAN-LARE                 347

A     I don't know that.

Q     Thank you, Mr. Prezioso.

A     You're welcome.

Q     If an employee just says something at a training, in your opinion as a general manager who is in charge of a lot of employees, is that something that is necessarily disruptive?

            MS. MOORE:  Objection.

            THE COURT:  You may answer.

A     I don't know the circumstance.  I wouldn't give an opinion on it.

Q     Thank you, Mr. Prezioso.

            Mr. Prezioso, you testified that the union rules that governs employees in your workplace requires you to keep the job open for one year.  After that, the employee doesn't return from a disability, they are fired, correct?

A     I don't.  The CBA, there's a collective bargaining agreement between our union and any corporation that signs up, and they're -- that's the rules.  We have to follow their union book.  It's not me.  And it's in there.

Q     That's what I just asked you.  I just recapped your testimony that you testified that the union rules require that the employees who are absent due to disability for a year or more can be fired; that's all I'm asking you.  Do you remember that testimony?

A     Yes.

                    LEEANN N. MUSOLF, RPR, CCR
                        Official Court Reporter

Q    Okay, thank you.  In Mr. Belvin's case -- sorry in Mr. Mayers's case, do you remember, as you sit here today, how long he was actually out due to disability?

A    A little less than a year.

Q    And you know he was fired by a letter written by Mr. Mundo, right?

A    Correct.

Q    How did you find out, by the way, that Mr. Mayers has been fired?

A    I don't recall if it was sent in an email or it was sent down through interoffice mail.  I don't know how I received it.

Q    And what did you do when you found out that Mr. Mayers has been given a letter of termination?

A    I spoke to Mr. Mundo and I said he's not out a full year yet, and I believe he said he was sending out another one for Dominick Sarapachiello, both parties were out close to the same time.  And he sent it out in error.  He sent it out in the mail to Mr. Mayers too early.

        He says, what do you mean?  Because he looked at a calendar.  And I knew that Mr. Mayers -- because before you send out the letter, you see if people have vacation time left, sick time left, you know.  I don't use a calendar on the wall, you use a working calendar.  So he says, oh boy, I messed up.  And that was the discussion.

Q    That is such a simple procedure you just described, look before you leap, right?  Before you terminate someone, look up at the calendar and see what the leave status is, right?

A    Absolutely.

MS. MOORE:  Objection.

THE COURT:  I'll allow it.

Q    Do you know why you are aware of the fact that Mr. Mayers has been out for less than a year and Mr. Mundo did not know this.  Do you know why?

A    No.

Q    Do you think that if Mr. Mundo allows you to do your job, that probably could have been avoided?

A    I don't know.  I don't have an opinion on that.

Q    By the way, did Mr. Mundo discuss or consult with you before sending out a letter of termination?

A    Not with me, no.

Q    And Mr. Mundo is a lawyer, right?

A    Yes.

Q    He's also the general counsel, the head honcho of the attorneys in this particular company, correct?

A    I don't know if he's the head of the attorneys, but he is an attorney for the Joint Industry Board, correct.

Q    He is the general counsel, is he not?

A    Yes.

Q    And you did testify that you understand and you feel for

what Mr. Mayers went through with the cancer treatment; do you remember that testimony?

A    Absolutely.

Q    And you also said you, yourself, have experienced the disease?

A    Absolutely.

Q    Mr. Prezioso, did you ever receive a letter of termination from Vito Mundo?

A    I was never out for an extended period of time, so the answer is no.

MR. VAN-LERE:  I have no further questions for Mr. Prezioso.

Thank you, sir.

THE WITNESS:  Thank you.

THE COURT:  Redirect?

MS. MOORE:  Yes, Your Honor.

REDIRECT EXAMINATION

Q    Hello, again, Mr. Prezioso.

A    Good morning -- good afternoon, I apologize.

Q    During the time that Ed Wiley worked for Electchester Management, did Mr. Wiley receive training regarding the company's policy against discrimination and harassment?

A    Yes.

Q    During Mr. Wiley's employment, did any employee ever complain to you that he was racist?

A    No.

Q    Did you ever see Mr. Wiley being racist?

A    No.

Q    During Mr. Wiley's employment, did any other employee ever complain to you that Mr. Wiley harassed them?

A    No.

Q    Did you ever see Mr. Wiley harassing anyone?

A    No.

Q    During Mr. Wiley's employment with Electchester Management, did any other employee ever complain to you that Mr. Wiley discriminated against them?

A    No.

Q    Did you ever see Mr. Wiley discriminating against anyone?

A    No.

Q    During Mr. Wiley's employment, did any other employee ever complain to you that Mr. Wiley treated Black or African American employees differently based on their race?

A    No.

Q    Did you ever see Mr. Wiley treating Black or African American employees differently based on their race?

A    No.

Q    And Mr. Wiley was not terminated because of anything involved in this lawsuit, is that correct?

A    Not that I'm aware of, no.

Q    Why was Mr. Wiley let go from Electchester Management?

A    He didn't have the talent to be a manager.  He didn't have leadership skills.

THE COURT:  Were you involved in making the evaluation of Mr. Wiley in connection with his possible termination?

THE WITNESS:  I expressed my feeling, but to no avail.

THE COURT:  Okay, thank you.

THE WITNESS:  You're welcome, sir.

Q    Mr. Prezioso, you are responsible for the daily operation of Electchester Management, is that correct?

A    Correct.

Q    And for a large -- or for important personnel decisions, you defer to Mr. Vito Mundo and now Mr. Matthew Kelly, now the general counsel, is that correct?

A    That's correct.

MS. MOORE:  I have no further questions, Your Honor.

THE COURT:  Anything else from plaintiffs?

MR. VAN-LERE:  Just one question.  If I may just pull up my deposition, Your Honor.

RECROSS-EXAMINATION

Q    Mr. Prezioso.

A    Yes, sir.

Q    I want to take you back to the deposition you had in my office.

PREZIOSO - RECROSS - VAN-LARE                353

A     Yes.

Q     Do you remember responding that you don't know if
Mr. Wiley has information regarding who is in charge of equal
employment opportunity complaints?

A     I don't remember that answer, sir.

Q     Okay.

          MR. VAN-LERE:  Your Honor, I would like to show the
witness, direct his attention to a copy of his deposition.

          THE COURT:  All right.  This is the first
deposition?

          MR. VAN-LERE:  No, he only had one, Your Honor.

          THE COURT:  No, when was the deposition?

          MR. VAN-LERE:  I believe it was -- one second, Your
Honor.  March 13, 2019.

          THE COURT:  Okay.  At what page?

          MR. VAN-LERE:  I believe it's page 54, five four.

          THE COURT:  Fifty-four, all right.  Why don't you
direct him to a line.

          MR. VAN-LERE:  I will, Your Honor.

Q     I will direct your attention, sir, to page 54, line nine.
Are you there?

A     I'm looking at it, sir.

Q     Okay.

          Question:  Do you know if the company actually has
someone designated to be EEO office for the responsibility of

*LEEANN N. MUSOLF, RPR, CCR*
*Official Court Reporter*

PREZIOSO - REDIRECT - MOORE          354

receiving EEOC complaints.  Answer:  Vito Mundo would be that person.  He is the counsel.  Everything filters up to Mr. Mundo.

Is Mr. Wiley aware of --

THE COURT:  Question.

Q    Question:  Is Mr. Wiley aware of this?  Answer:  I don't know.

Question:  Did you have an opportunity to discuss with Mr. Wiley any kind of complaint regarding racial discrimination?  Answer:  No.

You and Mr. Wiley never actually engaged in any discussion regarding race discrimination that may have been brought up, correct?

A    Correct.

MR. VAN-LERE:  I don't have any other questions for the witness, Your Honor.

THE COURT:  All right.

Anything else from defense?

MS. MOORE:  Just one question.

THE COURT:  Of course.

MS. MOORE:  Thank you.

THE COURT:  You can do it from there if it's just one question.

REDIRECT EXAMINATION

MS. MOORE:  Mr. Prezioso, you did discuss

Mr. Belvin's complaint about a monkey on his locker with Mr. Wiley, correct?

THE WITNESS:  Yes.

MS. MOORE:  That is all, Your Honor.  Thank you.

THE COURT:  Anything else?

MR. VAN-LERE:  I have no other questions, Your Honor.

THE COURT:  All right.  The witness is excused.

You may stand down, sir.

THE WITNESS:  Thank you, sir.

(The witness steps down.)

THE COURT:  All right.  We're going to break for lunch until 2:00.

All rise for the jury.

(Jury exits the courtroom.)

THE COURT:  I thought I would mention, before we -- now that we've been talking about Local 3 and Electchester, that I actually personally have friends who live in Electchester, a retired member of Local 3, Eddy Thompson and his wife Terry Thompson, who have been dear friends for many, many years from my days when Terry was the district manager for Congressman Ackerman when he was a state senator.

So I just point that out.  They have no relationship with this case, I assume, and I have never discussed this case with them, and I only thought of it as I was sitting here

PROCEEDINGS                                356

today and I was hearing the testimony of the witness.

MR. VAN-LERE:  If I can be heard on that, Your Honor?

THE COURT:  What's that?

MR. VAN-LERE:  If I can be heard on that?

THE COURT:  Yes, of course.

MR. VAN-LERE:  Plaintiff has no problem with that, at all.

THE COURT:  Okay.  Just, sitting here, it's very important for me to make it clear, you know, if there is a relationship with someone.  I mean, how many households are there in Electchester, I would assume I might even know other people but I'm not doing a survey.

So as someone who grew up in Queens and has spent most of his adult life in Queens, I'm going to know people in Queens.  All right?

MR. VAN-LERE:  Thank you, Your Honor.

THE COURT:  Do you have any problems with that?

MS. MOORE:  No, Your Honor.  Understood.

THE COURT:  Okay.  Thanks very much.  We'll see you at 2:00.

MR. VAN-LERE:  Thank you, Your Honor.

(Lunch recess.)

*LEEANN N. MUSOLF, RPR, CCR*
*Official Court Reporter*

PROCEEDINGS                                    357

AFTERNOON SESSION

2 o'clock p.m.

THE COURT:  The jury is ready.  Let's call in the jury.

Is your next witness here?

MS. MOORE:  Yes, he's here.

THE COURT:  Good.

About how long for his witness?

MS. MOORE:  About the same as Mr. Prezioso, your Honor.

THE COURT:  And on cross, about the same idea?

MR. VAN-LARE:  Yes, about the same.

THE COURT:  We should get to the next witness.

MS. MOORE:  We have him scheduled to come at 3 p.m., your Honor.

THE COURT:  Thank you.

(Jury enters.)

THE COURT:  Please be seated, everyone.

The defense may call its next witness.

MS. MOORE:  May I go to get the witness in the hallway?

THE COURT:  Surely.

(Pause in proceedings.)

MS. MOORE:  The Defendant calls Anthony Caiozzo.

THE COURTROOM DEPUTY:  Sir, please raise your right

CAIOZZO - DIRECT - MOORE 358

hand.

Do you solemnly swear the testimony you shall give to the Court will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: I do.

THE COURTROOM DEPUTY: Please have a seat.

And please state and spell your full name for the record.

THE WITNESS: It's Anthony Caiozzo.

THE COURTROOM DEPUTY: Please spell your full name.

THE WITNESS: A-N-T-H-O-N-Y C-A-I-O-Z-Z-O.

THE COURT: You may inquire.

**ANTHONY CAIOZZO**, called as a witness, having been first duly sworn/affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. MOORE:

Q    Good afternoon, Mr. Caiozzo.

Could you please introduce yourself to the jury?

A    My name is Anthony Caiozzo and I'm 54 years old and I have five children.

Q    Where do you currently work?

A    Electchester Management.

Q    What is your job title?

A    I'm a manager.

THE COURT: Could you pull the microphone a little

*Linda A. Marino, Official Court Reporter*

CAIOZZO - DIRECT - MOORE                  359

closer to you?

THE WITNESS:  Yeah, okay.

THE COURT:  Thank you very much.

Go ahead.

A    I'm a manager.

Q    How long have you been working for Electchester
Management?

A    Since 2008, March.

Q    Do you know when Electchester Management was formed?

A    Several years before that.

Q    Electchester Management, LLC, was formed several years
before?

A    Yeah, like 2006, something like that.

Q    And you started in around 2008 or '09?

A    Yes, 2008.

Q    Where did you work before Electchester Management?

A    HelmsleySpear, 301 Madison.

Q    And what is HelmsleySpear?

A    It's a real estate firm that owns properties throughout
Manhattan.

Q    And were you a supervisor at HelmsleySpear?

A    Yes.

Q    Who did you supervise at HelmsleySpear?

A    Mostly the electrical department and the maintenance
department.

CAIOZZO - DIRECT - MOORE                    360

Q     What was your job title when you first began working for Electchester Management?

A     I was a foreman.

Q     And between when you were a foreman and a manager, did you have any other positions at Electchester Management?

A     At Electchester Management?

Q     Yes.

A     No, but when I started at Electchester Management I went in as an assistant manager.

Q     Thank you for clarifying.

A     Okay.

Q     And between when you came in as assistant manager and when you became a manager, did you have any other positions?

A     No.

Q     What are your duties as a manager?

A     Well, I go around and I check out the properties, which is, like, the structural end of the buildings; I check the cleanliness of the buildings; I read the blueprints; I meet with the contractors; I discuss capital improvement projects; I, you know, sit in on meetings having to do with contracts with the union.

Q     Are you involved in worker disciplinary issues?

A     Yes.

Q     Can you please explain how you're involved in worker disciplinary issues?

CAIOZZO - DIRECT - MOORE                   361

A     Well, what happens is, like, the foreman or there will be a, you know, a situation where the employee will come to me and he'll be like, "You know, this is what's going on," and I'm like, "Okay, let's get your shop steward here.  Let's discuss it."

      And basically, I'm involved in that respect.  And if I see that, you know, there's no resolve, then, you know, progressive discipline kicks in.

Q     What's your approach to worker discipline?

A     Well, I give everybody plenty of chances to just, like, you know, make sure that they understand, "Hey, listen we're here to do a job.  Everybody has bosses.  I have bosses -- " my boss is right there -- "and basically, you know, there's dos and don'ts."

      And basically, that's my motto.  It's very, very simple.

Q     Were you ever a member of a union?

A     Yes.

Q     Are you currently a member of a union?

A     Yes, I am.

Q     What union are you a member of?

A     Local 3.

Q     How many -- for how long have you been a member of Local 3?

A     Since 1987.

*Linda A. Marino, Official Court Reporter*

Q    Do you like being a member of a union?

A    Absolutely.

Q    Do you believe that unions are good for workers?

A    I absolutely do.

THE COURT:  In your current capacity, you're not in that capacity as a union member, are you?

THE WITNESS:  I absolutely am.

THE COURT:  So, even though you have a managerial position, it's covered by a union contract?

THE WITNESS:  Yes.

THE COURT:  I see.

All right, go ahead.

Q    Do you know the Plaintiff Michael Belvin?

A    Yes, I do.

Q    How do you know him?

A    He works for Electchester Management.

Q    When did you first meet Michael Belvin?

A    Well, when I started in 2008, I went around to the various properties and I was introducing myself.  And I came across Mr. Belvin and I walked over and I says, "Hi.  My name is Anthony Caiozzo.  I'm the new manager of the block."

I put my hand out and he just looked at me and just stared at me and just walked away.  I was, like, okay.

Q    Do you know the Plaintiff Michael Mayers?

A    Yes, I do.

CAIOZZO - DIRECT - MOORE                    363

Q     When did you first meet Mr. Mayers?

A     Well, we didn't, like, formally introduce each other,
but, like, he's always -- he was always walking around the
property and, you know, walking with Mike and, you know, they
were always together.

      But I really, like, you know, I only -- I spoke to
him when, like, we bumped into each other, "Hi.  I'm Anthony."
And he was very cordial with me.

Q     When you first began working at Electchester Management,
did you attempt to make any changes to Electchester's daily
operations?

A     Yes.

Q     What kind of changes did you make?

A     Well, I noticed that there was a need to install
bathrooms because there was, like, no bathrooms.

      Out of 38 structures, there might have been eight
bathrooms at the most.  And it was really sad because we did
have bathrooms and they were all plywooded up throughout all
of Electchester.  So, I said, "I'm not having this.  And we
are going to take down the plywood and we're going to get
these bathrooms in operation."

      They all consisted of inside the laundry rooms.  So,
we took them all off and we implemented about an additional 30
bathrooms.

Q     When you refer to bathrooms, are these bathrooms for

CAIOZZO - DIRECT - MOORE                    364

employee use?

A    Yes, employee and if, you know, a cooperator is doing laundry, absolutely open it up, let the person use it.

Q    Did you also enforce higher cleanliness standards at Electchester?

A    Absolutely, I did.

I started with everybody -- there was going to be -- I actually installed additional locker rooms.  There was -- everybody was just eating their lunch wherever they wanted; inside the compactor rooms.  So, we initiated one, two, three, four -- four additional locker rooms with working bathrooms.  Two of them have showers that we just installed.

And yeah, and, you know, we actually -- when I first got there, everybody was wearing whatever they wanted to wear.  It was very odd that, you know, it was supposed to be one uniform from this company Red's, and we would just purchase them -- not me, but they would just purchase them.  And I says, "We can't have this.  We have to have a uniform company that comes in once a week and replaces the 33 uniforms."

It's eleven shirts long sleeves, eleven short sleeves, and eleven long pants.  Additionally to that, winter jackets.  All uniform -- everything looks exactly the same.  Winter jackets, overall bibs, and a springtime jacket.

Q    Mr. Caiozzo, we will talk about the uniforms in just a bit.

*Linda A. Marino, Official Court Reporter*

CAIOZZO - DIRECT - MOORE                    365

But when you came into Electchester, did you enforce higher cleaning standards in the buildings for the residents?

A    Oh, I absolutely did.

The place -- basically, the floors weren't done properly.  The floors were all done with wax.  And listen, the workers are working.  They're my co- and we were working all together.

And you're supposed to strip the wax off and then you're supposed to clean it, and then if you wanted to use wax you reuse wax.  But I didn't want to use wax anymore because wax would actually -- would infuse all the -- you know, if you didn't clean it correctly, you would just put wax on top of, you know, dirt and it was just very, very -- it did not look good.

Q    Did you also enforce higher standards of conduct and behavior among the employees?

A    Oh, absolutely.

It just -- everybody was always horsing around.  And it was like, you know, over the radio, people would use, like, an FM radio and play songs.  So, it just -- that, you know, I introduced radio etiquettecy (sic).  People would just, you know, do whatever they wanted as far as not having any direction.

Do I blame them at the time?  Probably not.

But you know what?  I came from a place where, like

*Linda A. Marino, Official Court Reporter*

CAIOZZO - DIRECT - MOORE                    366

I said, we had dos and don'ts.

Q    Was there an increase in disciplinary write-ups after you came into Electchester Management?

A    Unfortunately and fortunately, the answer to that is yes.

Q    When you first began working for Electchester, did all of the porters receive breaks in addition to their lunch hour?

A    No, they did not.

Q    Did you change that when you came in?

A    I absolutely did.

I noticed that there was just two or three, you know, employees that had the breaks that were, according to them, from previous contracts.  So, I went to my bosses, and I said, "I know this is a big thing to ask for, but it's just not fair.  I want to implement breaks for everyone.  Breaks in place."

And basically, what that meant was everybody is going to get two 15-minute breaks wherever they were.  You know, pull out your water bottle or take a break, but your radio must be maintained, you know, because if there's an emergency, we can't have 64 employees, you know, everybody on break.

Q    And just so we're clear, these breaks are additional to the one-hour lunch break?

A    Yes.  I introduced the two 15-minute breaks; one in the morning, and one in the afternoon.

I also hired an additional six porters so that we could have backup to the buildings, so, like, if somebody was out on Monday and Tuesday, we would have floaters, they were called.

So, of course, my bosses are like, "Okay," but this is what we needed to do, you know.

Q    I'd like to show you a document that's been admitted into evidence that was previously marked for identification as Defendant's Exhibit GG.

(Exhibit published to the jury.)

A    Okay.

Q    I'm not sure -- there we go.

Do you see this document on your screen?

A    Yes, I do.  Thank you.

Q    Do you recognize this document?

A    Yes, I do.

Q    Who created this document?

A    Well, Jerry Fillippatos, he was one of the attorneys also for the LLC.

And, basically, when I first got there, I had a set of dos and don'ts.  And he took it and crafted it into this.

Q    So, over the years, your set of dos and don'ts, did they become this document?

A    Yes, they did.

Q    And was this document on your screen distributed to all

CAIOZZO - DIRECT - MOORE                    368

of Electchester Management's employees?

A    Yes.

Q    Do you know when it was distributed?

A    Around October 28, 2015.

Q    I want to direct you to the last page.

        Did you witness Mr. Belvin signing this document?

A    I was in my office, yes.

Q    Do you know why Mr. Belvin indicated he was signing this document under duress?

A    I have no idea.

        I just basically told him, "Mike, I'm just giving you a set of papers.  You can take them and just walk out with them or I just need you to, you know, look at them, and, if you want to, but just take them with you."

Q    Did you ever meet Mr. Belvin's family?

A    Yes, I did.

Q    Who in Mr. Belvin's family did you meet?

A    His son.

Q    When did you meet Mr. Belvin's son?

A    A dear friend of mine, Patty Brooks, she lives in Electchester.  And her family member died, and she asked if it was okay for her to have a memorial in one of the rec rooms. I was, like, absolutely.  I know her whole family.

        And she did.  And I went there too that night, and I was in there helping out a little bit here and there.  And

*Linda A. Marino, Official Court Reporter*

CAIOZZO - DIRECT - MOORE                369

Mr. Belvin, Mr. Mayers, and Michael's son were coming in and, you know, I saw them and they saw me.  And Michael walked over with Mr. Mayers and he introduced his son to me, and I says, "I know your dad for a long time," and, you know, chitchat and that was the end.

Q    I'd like to show you a document that's been admitted into evidence that was previously marked for identification as Plaintiffs' Exhibit 28.

          (Exhibit published to the jury.)

Q    Are you familiar with this document?

A    Yes.

Q    Would you like some more time to review it or...

A    If you could, just scroll up a little bit on it.

Q    Is that okay?

A    Yes.

Q    I can make it bigger.

A    Please.  I apologize, my glasses are outside.

Q    Mr. Caiozzo, do you need your glasses to see the screen?

A    If that would be okay, I would like to go get them.

          THE WITNESS:  They're underneath the bench.

          THE COURT:  Bring them in.

          THE WITNESS:  Thank you.

          (Pause in proceedings.)

          THE WITNESS:  Thank you.

Q    Please let me know when you're ready, Mr. Caiozzo.

*Linda A. Marino, Official Court Reporter*

CAIOZZO - DIRECT - MOORE                    370

THE COURT:  Is that the whole document?

MS. MOORE:  Yes, your Honor.

A    Yes, I'm ready.

Q    Are you familiar with this document?

A    Yes.

Q    At the end of 2014, did Mr. Belvin complain that he'd been referred to using the Spanish word "moreno"?

A    Yes.

Q    Who did he complain was referring to him in this manner?

A    Danny, Martires.

Q    Did Electchester Management investigate his complaint?

A    Absolutely.

Q    Were you involved in that investigation?

A    I was in the -- I was in the actual -- sorry.

I was in the room with them, yes.

Q    What did you learn at this meeting?

A    Well, I learned that Michael just took the back-and-forth with Danny that they were having the whole time and basically -- you know, they were just -- they were horsing around, and, basically, I didn't understand why, you know, Mike would -- all of a sudden, he wasn't in a good mood.  And they know not to be fooling around, so we took action.

Q    To your knowledge, before December 2014, did Mr. Belvin complain to anyone in Electchester Management that he was being referred to with the Spanish word "moreno"?

*Linda A. Marino, Official Court Reporter*

CAIOZZO - DIRECT - MOORE                    371

A    No, absolutely not.

Q    I'd like to show you a document that has been admitted
into evidence and was previously marked for identification as
Plaintiffs' Exhibit 29.

          THE COURT:  Could I just ask a question about the
exhibit that's up there now, 28?

          Do you know who prepared that memorandum?

          THE WITNESS:  I do not know, I do not know.

          THE COURT:  All right.

          Go ahead, counsel.

Q    I'd like to show you a document that's been admitted into
evidence and was previously marked for identification as
Plaintiffs' Exhibit 29.

          (Exhibit published to the jury.)

Q    Are you familiar with this document?

A    Yes.

Q    Would you like some time to review it?

A    Well, I see what I wrote on the bottom there.  I was
there.

Q    When you say you were there, what were you there for?

A    Jerry Fillippatos was questioning Michael about, you
know, again, with the racial remarks towards Mr. Saliche,
Martires Saliche.  And it was in reference to, you know,
calling some really bad Latino names.

Q    Did Mr. Belvin refer to Mr. Saliche, also known as Danny,

*Linda A. Marino, Official Court Reporter*

using a racial slur?

A      Yes, he did.

Q      Was it a racial slur used against Hispanic or Latino people?

A      Yes.

Q      Is that why Mr. Belvin received this memorandum in his personnel file?

A      Yes.

Q      And is that your handwriting at the bottom?

A      Yes.

Q      Did Mr. Belvin refuse to sign this?

A      Yes, he did.

            THE COURT:  Who prepared this document?

            THE WITNESS:  It was Jerry Fillippatos.

            THE COURT:  An attorney?

            THE WITNESS:  Yes, it was at a local -- I apologize.

            The LLC's attorney, Jerry Fillippatos.

            THE COURT:  I see.  And it was given to you to give to Mr. Belvin or was Mr. Fillippatos also present?

            THE WITNESS:  No, Mr. Fillippatos was present along with the shop steward.

            THE COURT:  And you.

            THE WITNESS:  And myself, yes.

            THE COURT:  And the shop steward was from 32BJ.

            THE WITNESS:  Yes, Richie Bonnette.

CAIOZZO - DIRECT - MOORE            373

THE COURT:  You were not present at the time that this exchange of comments was made, you were just present when the document was presented to Mr. Belvin?

THE WITNESS:  Correct, yes.

THE COURT:  All right.  Next question.

Q    Did you ever tell Mr. Belvin that filing a discrimination complaint with the EEOC was a mistake?

A    I would never say something like that.

Q    Are you aware of anyone telling Mr. Belvin that filing a discrimination complaint with the EEOC was a mistake?

A    No.

Q    To your knowledge, did Mr. Belvin ever complain that someone at Electchester Management told him filing a discrimination complaint with the EEOC was a mistake?

A    No.

Q    To your knowledge, prior to filing this lawsuit, did Mr. Belvin ever complain to Electchester Management that he was receiving disciplinary write-ups because he filed a complaint with the EEOC?

A    No.

Q    I'd like to show you a document that's been admitted into evidence and was previously marked for identification purposes as Plaintiffs' Exhibit 15.

(Exhibit published to the jury.)

Q    Are you familiar with this document?

Linda A. Marino, Official Court Reporter

CAIOZZO - DIRECT - MOORE                    374

A    Yes.

Q    What is this document?

A    It's basically a letter to Mr. Belvin that says, "They were calling you on the radio --"  I'll just give you the whole story.

We were walking around with a contractor and we were on 161st Street and Mr. Belvin was across the street.  And I heard over the radio, "Michael come in.  Building 11, come in.  Michael, come in."  And he was not answering.  And.

I was there, and I says, "Joe, can you just tell him to please just answer the radio?  They're looking for him."

So, Joe walked over and we were walking that direction also with the contractor, and Joe says, "Mike, they're calling you on the radio."

And Mike says, "I'm on break."

And Joe says, "I understand, but they're looking for you.  It could be an emergency."  Something to that effect.

And Mike just kept saying, "Well, I'm on break."

And Mike goes from zero to 60, and I was just, like, "Let's just walk away," in front of the contractor.  I was a little bit mortified.

So, we just walked away, and, basically, he got this letter for that.

Q    When you say "we," do you mean you and Joe Capasso?

A    Well, Tommy and I.

*Linda A. Marino, Official Court Reporter*

I go through -- any write-ups or anything like that, Tommy, you know, he's made aware of.

THE COURT: You were asking a different question.

Go ahead.

MS. MOORE: I was just going to clarify.

Q    When you were walking, you were with the contractor and Joe Capasso?

A    Yes, yeah.

Q    And did you write this disciplinary notice?

A    Yes.

Q    Was Mr. Belvin also wearing headphones?

A    He absolutely was.

Q    Is wearing a cell phone earpiece or headphones during work hours a violation of Electchester's rules of conduct?

A    Yes, it is.

Q    Are Electchester Management's employees required to respond to radio calls during their breaks?

A    Yes, they are.

Q    And that's during the two breaks in addition to the lunch break?

A    Correct.

The lunch, break they can shut them off, do whatever they need to do. We have people that are in standby.

Q    Did you issue this disciplinary action to Mr. Belvin because of his race?

*Linda A. Marino, Official Court Reporter*

CAIOZZO - DIRECT - MOORE                     376

A    No, I did not.

Q    Did you issue this disciplinary action to Mr. Belvin

because he filed a complaint with the EEOC?

A    No, I did not.

Q    You touched on this a little bit earlier, but does

Electchester Management provide uniforms for its porters?

A    Yes, we do.

Q    What items does Electchester Management provide?

A    Eleven long-sleeve shirts, eleven short-sleeve shirts,

eleven pairs of pants, one winter jacket, one overall -- it's

actually, you know, a zip-up, like, one of those kind of like

your hands get in -- anyway, also a springtime jacket.

Q    I'd like to show you a document that's been admitted into

evidence that was previously marked for identification as

Plaintiffs' 17.

            (Exhibit published to the jury.)

A    Okay.

Q    Are you familiar with this document?

A    Yes.

Q    Do you recall the events described in this document?

A    Yes.

Q    Do you recall what Mr. Belvin was wearing?

A    He was wearing some sort of a hoodie and it wasn't, you

know, a jacket that we give out to the employees.

Q    Did Mr. Belvin tell you his coat was stolen?

CAIOZZO - DIRECT - MOORE                    377

A    Yes, he did.

Q    How was it proven wrong that his coat was stolen, as it says in this memo?

A    Well, I just called the company and they just delivered the coat.  And basically I actually told Michael, "We're just gonna go to the cameras and see, you know, the delivery of the jackets."

     And he -- right away, he just says, "Oh, no, no, no, no.  I found it.  It was not stolen.  I misspoke."  Something to that nature.

Q    I'm going to show you a document that has been marked for identification purposes as Defendant's Exhibit D.

     THE COURT:  That's D?

     MS. MOORE:  D, as in dog.

     May I show the witness, your Honor?

     THE COURT:  Do you have it up?

     THE WITNESS:  Yes, it's there.

     THE COURT:  It's there.

Q    Are you familiar with this document?

A    Yes.

Q    Did you write this document?

A    Yes, I did.

Q    Did you write this document on or around the date across the top, March 10, 2015?

A    Yes, I did.

*Linda A. Marino, Official Court Reporter*

CAIOZZO - DIRECT - MOORE                    378

Q    What is this document?

A    Its another one of our co-workers and he wasn't

wearing --

Q    Just what is the document?

A    Oh, it's a write-up, it's a write-up.

          MS. MOORE:  Your Honor, I'd like to offer this

document into evidence that's been previously marked as

Defendant's Exhibit D.  I'd like to offer it into evidence as

Defendant's Exhibit D.

          MR. VAN-LARE:  No objection, your Honor.

          THE COURT:  All right.  Defendant's Exhibit D is

received in evidence and published to the jury.

          (Defendant Exhibit D, was received in evidence and

published to the jury.)

Q    Who was this a written warning to?

A    David Bourgade.

Q    Why did you give Mr. Bourgade this written warning?

A    Because he wasn't wearing the proper attire, the uniform.

Q    Is David Bourgade a porter?

A    Yes.

Q    Is David Bourgade black?

A    No, he's not.

Q    Is David Bourgade white?

A    Yes, he is.

Q    I'd now like to show you a document that has been marked

CAIOZZO - DIRECT - MOORE                    379

for identification purposes as Defendant's Exhibit E.

Are you familiar with this document?

A    Yes.

Q    Did you draft this document?

A    Yes, I did.

Q    Did you draft it on or around the date across the top, March 10, 2015?

A    Yes, I did.

Q    And what is this document?

A    It's a warning letter.

Once again, he wasn't wearing --

Q    One moment, one moment.

It's a warning letter?

A    Yes.

MS. MOORE:  Your Honor, I'd like to move to admit this document into evidence as Defendant's Exhibit E.

MR. VAN-LARE:  No objection, your Honor.

THE COURT:  All right.  Defendant's Exhibit E is received in evidence and published to the jury.

(Defendant Exhibit E, was received in evidence and published to the jury.)

Q    Who is Luis Herrera?

A    He's a porter on site.

Q    Why did you give Mr. Herrera this written warning?

A    Again, he was not wearing his proper uniform that we

*Linda A. Marino, Official Court Reporter*

CAIOZZO - DIRECT - MOORE                 380

purchased.

THE COURT:  When did he receive that uniform, was it immediately prior to this date?

THE WITNESS:  I'm sorry?

THE COURT:  When did he receive this uniform to wear?

THE WITNESS:  In around -- well, we change the uniforms every four years.  So, 2008 I implemented all the uniforms.  So, if this is a newer one, yeah, they probably changed them, like, twice between 2008 and 2015.

THE COURT:  But this was not a new practice to require uniforms to be worn; is that right?

At that time, in 2015, it was not a new practice to provide uniforms.

THE WITNESS:  No.  I had the uniforms for quite some time.

THE COURT:  I see.  Thank you.

Go ahead.

Q    Is Mr. Herrera black?

A    No he's not.

Q    Is Mr. Herrera Latino or Hispanic?

A    Yes, he is.

Q    I'd like to show you a document that has been admitted into evidence and was previously marked for identification as Plaintiffs' Exhibit 31.

*Linda A. Marino, Official Court Reporter*

(Exhibit published to the jury.)

Q    Do you recognize this document?

A    Yes, I do.

Q    What is this document?

A    It's a three-day suspension letter.

Q    Who was this a three-day suspension letter to?

A    Mr. Belvin.

Q    Did you write this three-day suspension letter?

A    Yes, I did.

Q    Do you recall the incident described in this document in which Mr. Bill threw a bag of garbage?

A    Yes.

Q    How far did Mr. Belvin throw the garbage bag?

A    Within 15 to 20 feet.

THE COURT:  Of?

Where did he throw it?

THE WITNESS:  So, me and Tom Prezioso were walking down the block and, you know, we saw Mike coming on the left of us, and he stopped.  So, Tommy and I kept walking, and then next thing I know is, obviously, there's -- well, you guys don't know, but there's a whole bunch of garbage here, all stacked up, ready to be taken away, because at that time we had the garbage out in the street.  Now we got -- I implemented these big, you know, pickup containers from the sanitation department.

CAIOZZO - DIRECT - MOORE                382

But at that time, there was -- all the garbage was there. And Tommy and I were just walking, talking, and all of a sudden, within six feet in front of us, there's a bag that comes flying I would say at this high -- you know, at my height, and it just lands right there.

And I was mortified, and Tommy looks at him and Tommy actually says, "Mike, please don't throw the bag. You know, it's a safety issue. It's not safe."

And Mike stood there, pumping his chest, and said, "Why is that?"

And I told Tommy, "Let's just get out of here, please."

And that's what happened. I mean, who does that?

Q    Did this three-day suspension have anything to do with Mr. Belvin's race?

A    No, it did not.

Q    Did this three-day suspension have anything to do with Mr. Belvin's complaint to the EEOC?

A    No, it did not.

Q    Did Mr. Belvin file a grievance with his union over this three-day suspension?

A    Yes, he did.

Q    Did Electchester Management pay Mr. Belvin back for the three days he was suspended?

A    Yes, we did.

CAIOZZO - DIRECT - MOORE                383

Q    To Electchester Management's porters carry radios?

A    Yes, they do.

Q    What is the purpose of the radios?

A    The radio is -- it serves different purposes, obviously, but that's just to communicate with each other; that if there's an emergency, we can all communicate.  Then the foreman gets on and he'll say something like, "Okay, maintain radio silence."

Or if there's an issue at the home, you know, and we would actually call and say, "Listen, please call your house right away."  And that's happened before.

But that's really, you know, the purpose of that.  Or, you know, "Can you come pick me up?"  Or you reach out and ask for help in a reference to -- like, if you need help with there's a lot of garbage or somebody just emptied out their whole apartment, you know, on a weekend or something like that, you reach out to the guy on duty on the radio, you know?

Q    Are Electchester Management's employees taught about proper radio use?

A    Yes.

Q    How are they taught about proper radio use?

A    Well, we would have a meeting every other month or once every three months and we would discuss, you know, certain things that would happen, and it would be, like, clarifying that.

CAIOZZO - DIRECT - MOORE                    384

"Hey, listen, guys, I don't want the radio -- I don't want people talking on the radio you refer to yourselves as your first names.  If you want to say 'Building 10, Joseph, come in,' I don't have a problem with that part.  But we do have a problem with anything else saying it over the radio. We, as co-workers, we don't want to talk like that."

Q    When is proper radio use communicated to Electchester Management's porters?

A    I don't -- what?  I'm sorry.

Q    When does Electchester tell its employees about proper radio use?

A    Like I said, we have, like, a safety meeting.  We have a safety meeting every, like, three months, somewhere every other month, and we speak about it.  You know, we speak about stuff going on, I introduce new employees, I ask them to stand up, say his name or her name, and you know...

Q    Are safety meetings mandatory for all employees?

A    Yes, to show up, yes.

Q    I'd like to show you a document that has previously been admitted into evidence and was marked for identification as Plaintiffs' Exhibit 21.

          (Exhibit published to the jury.)

A    Yup.

Q    Are you familiar with this document?

A    Yes, I am.

Q    Do you recall the incident in this disciplinary action?

A    Yes, I do.

Q    What was the nature of Mr. Belvin's safety alert?

A    He just started, you know, yelling over there, "Enis, I need you.  You got to come over here.  There's asbestos wallpaper all over the place," something to that effect, and he kept saying it and saying it.

     Basically, we walked over there, Enis and I walked over there, and I was like, "Mike, you can't talk like that over the radio."

     "Oh, you're trying to poison my family.  I gotta take this stuff home with me.  This is all over my clothes."

Q    Mr. Belvin said that to you?

A    Absolutely.

     And I said, "Enis, do not don't say anything.  All right, Mike, where is it?

     "It's right there."

     I'm looking at it, and I was like -- so, I took the whole garbage bag, I didn't even touch it, took the whole garbage bag, I'm looking at it, and it looks like a tabletop vinyl like you would use in your house, like, you know, the plastic.

     But I took the whole bag, I called up the place right away, they came down, they took the sample --

Q    What place did you call?

CAIOZZO - DIRECT - MOORE                386

I'm sorry to interrupt.

A      I apologize.  I called a lab company that specializes in, you know, testing.  We have a lab company that does all our testing.

And, so, Orvis came down -- Orville, I apologize, Orville came down and he took it, he goes, "You know, there's no glue on this.  It's nothing."

It literally looked like a table like you buy at Woolworth or something like that -- I'm giving away my age, I apologize -- but Woolworth, and, basically, that's what it was.

And, you know, I got it tested.  I notified everybody that there was nothing -- you know, there was no asbestos, period.

And, you know, we had a meeting with his union over this, so...

THE COURT:  Well --

THE WITNESS:  I apologize.

THE COURT:  That's all right.  Just wait for another question.

That's Exhibit 21 on there?

MS. MOORE:  Right.

Q      I'd like to show you a document that has previously been marked for identification as Defendant's Exhibit G.

Actually, I'm not going to show you that document.

*Linda A. Marino, Official Court Reporter*

CAIOZZO - DIRECT - MOORE        387

THE COURT:  You're saying withdrawn.

MS. MOORE:  Withdrawn.

THE COURT:  That's fine.  I'll know what it means.

MS. MOORE:  Actually, I have a few more questions about Exhibit 21, Plaintiffs' Exhibit 21, that's been admitted into evidence.

THE COURT:  Go ahead.

(Exhibit published to the jury.)

THE COURT:  It's in front of the jury.

Q    Was Mr. Belvin suspended over this disciplinary action?

A    Yes.

Q    Did this one-day suspension have anything to do with Mr. Belvin's complaint to the EEOC more than one year prior?

A    No, it did not.

Q    Did Electchester Management negotiate with 32BJ to overturn the suspension?

A    Yes.

Q    Did Electchester Management pay Mr. Belvin back for the day?

A    Yes, we did.

THE COURT:  Could you get a little bit closer?

THE WITNESS:  I apologize.

THE COURT:  Sit forward.

THE WITNESS:  Yes, we did.

Q    I'd like to show you what's previously been marked for

*Linda A. Marino, Official Court Reporter*

identification as Exhibit I, Defendant's Exhibit I.

A    Okay.

Q    Are you familiar with this document?

A    Yes.

Q    Did you draft this document?

A    Yes, I did.

Q    Did you draft it around the date across the top, December 29, 2016?

A    Yes.

Q    What is this document?

A    This document basically tells him, Mike --

Q    What is the document?

A    Oh, I'm sorry.

It's a sensitivity class write-up, information letter.

Q    Is this a letter to Mr. Belvin?

A    Yes.

MS. MOORE:  Your Honor, I'd like to move to admit this letter into evidence as Defendant's Exhibit I.

MR. VAN-LARE:  No objection, your Honor.

THE COURT:  All right.  Defendant's Exhibit I is received in evidence and published to the jury.

(Defendant Exhibit I, was received in evidence and published to the jury.)

(Continued on the following page.)

*Linda A. Marino, Official Court Reporter*

CAIOZZO - DIRECT - MS. MOORE          389

DIRECT EXAMINATION (Continued)

BY MS. MOORE:

Q    Do you recall the incident described in this document in which Mr. Belvin was late to an OSHA sensitivity class?

A    Yes.

Q    Did Mr. Belvin tell you why he was late to the class?

A    Yes.  He said he thought his class started at 1 o'clock.

Q    Are these OSHA sensitivity classes taught by an outside contractor?

A    Yes.

Q    Who is the outside contractor?

A    Executive Health & Safety.  I think I said it correctly.

Q    Does Electchester Management pay for these classes?

A    Yes, we do.

Q    Does Electchester pay per person for these classes?

A    Yes, we do.

Q    How does Electchester Management inform its employees of the dates and times of these classes?

A    About two or three days before the class actually is, you know, given, we post it and we put everybody's name and we put the two classes.  There will be a 9 o'clock and a 1 o'clock or, you know, Tuesday or Wednesday 9 o'clock or, you know, and basically everybody's name is there and when they come in in the morning -- and it's posted for like three days.  When you come in the morning and you're typing in your name to clock

in, you know, you know, you read it, and we also make plenty of announcements on the radio because, you know, we don't want to do makeup classes because it actually costs us.  There's a minimum charge for the company to come down, you know.  If he's gotta come down for one person he's going to charge us, you know, the minimum amount plus the one person fee and, you know, basically that's the way.  So it's posted three days before.

Q    Do you believe -- or did you believe Mr. Belvin when he said he thought the class was at 1 o'clock?

A    I did not believe him.

Q    Did this notice have anything to do with Mr. Belvin's race?

A    No.

Q    Did this writeup have anything to do with Mr. Belvin's EEOC complaint that he filed more than one year prior?

A    No, it did not.

MS. MOORE:  I'd like to show you what's been admitted into evidence and previously marked for identification as Plaintiffs' Exhibit 27, which I just showed you.

Please just give me one moment to figure out what's in my notes.

THE COURT:  Yes, of course.

MS. MOORE:  Thank you.

Q    I would like to show you what's previously been marked as Plaintiffs' Exhibit 27, which is already been admitted into evidence.

Are you familiar with this document?

A    Yes.

Q    Did you write this letter to Mr. Belvin?

A    Yes.

Q    Did you write it to him at around the date across the top?

A    Yes.

Q    Why did you write Mr. Belvin a warning letter for staying on the property after his shift ended?

A    Well, there's several reasons why I would write something like this.  First of all, two hours and 45 minutes after your shift is done, you know, anything can happen to you.  How are we supposed to know where you're at?  And basically you can't stay on the job site after your time.

If you have a workload that's going on, then that's means you need to contact your foreman and say, listen, I have a whole bunch of garbage here and I need help with it.  Is there anybody around.  And if the foreman doesn't answer or the foreman can't, you know, receive your call, you call up the guy on duty, which is Mr. Alvarez, and basically -- but you don't call him two and a half hours after -- two hours and 45 minutes after your time because, you know, he was like

wondering why you were here, you know.

And Mike abruptly just hung up on the phone him when he actually asked him, you know, so I was very confused myself.

Q    Do Electchester Management employees need permission in advance to work overtime?

A    Yes.

Q    And who are they supposed to request permission in advance from?

A    The foreman.

Q    Did this warning letter have anything to do with Mr. Belvin's race?

A    No, it did not.

Q    Did this warning letter have anything to do with Mr. Belvin's EEOC complaint that he filed more than two years prior?

A    No.

Q    I'd like to show you a document that was previously marked for identification purposes as Defendant's Exhibit S.

A    Yup, I see it.

Q    Are you familiar with this document?

A    Yes, I am.

Q    What is this document?

A    This is a warning.  Once again, this employee --

Q    Mr. Caiozzo, is this document a warning letter?

A    Yes, it is.

Q    Did you write this document?

A    Yes.

Q    Did you write this document on or about the date across the top, March 11th, 2014?

A    Yes.

MS. MOORE:  Your Honor, I'd like to offer what's previously been marked as Defendant's Exhibit S into evidence?

MR. VAN-LARE:  Plaintiffs have no objection, your Honor.

THE COURT:  Very well.  Defendant's Exhibit S is received in evidence and published to the jury.

(Defense Exhibit S, was received in evidence.)

(Exhibit published.)

Q    Who is Joe McCormick?

A    He was a porter.

Q    Why did you write Mr. McCormick this written warning?

A    Because he was here after hours.

THE COURT:  On the property --

THE WITNESS:  Oh, yes.

THE COURT:  -- after hours?

THE WITNESS:  Correct, he was -- you know, he wasn't supposed to be working and he was working after hours, or he was in his uniform I should say.

Q    Is Mr. McCormick white?

A     Yes.

Q     I'd like to show you a document that was previously marked for identification purposes as Defendant's Exhibit T.

Are you familiar with this document?

A     Yes, I am.

Q     Did you write this document?

A     Yes, I did.

Q     Did you draft this document on or around the date across the top, February 16th, 2018?

A     Yes, I did.

Q     What is this document?

A     Ruffino came in --

THE COURT:  No, sorry.

Q     What is --

THE COURT:  In the nature of what is this document.

THE WITNESS:  Oh, it's a warning letter.

MS. MOORE:  Your Honor, I'd like to move to admit what's previously been marked for identification as Defendant's Exhibit T into evidence.

MR. VAN-LARE:  Plaintiffs have no objection, your Honor.

THE COURT:  All right.  Defense Exhibit T is received in evidence and published to the jury.

(Defense Exhibit T, was received in evidence.)

(Exhibit published.)

CAIOZZO - DIRECT - MS. MOORE                    395

Q    Who is Ruffino Quintana?

A    He's a porter.

Q    Why did you give Mr. Quintana this warning letter?

A    Mr. Quintana would come in like 4 a.m. to start his job at 7 a.m.  I don't know, he was just -- he would just come in very, very early all the time, you know.

Q    So he was not on the property during his regular -- or he was on the property outside of his regular schedule?

A    Yes.  He would go right to his building.

Q    Is Mr. Quintana black?

A    No.

Q    Is Mr. Quintana Hispanic or Latino?

A    Yes.

            THE COURT:  Would he go to work immediately after arriving, in other words, go to his duties --

            THE WITNESS:  Yeah.

            THE COURT:  -- commence his duties at four in the morning?

            THE WITNESS:  Yes, he would.

            THE COURT:  And why was that a problem?

            THE WITNESS:  Well, I would get a phone call from miss wife one time and she was, like, I don't understand why he has to start so early.  And I called him and I said, listen, Ruffino, you can't have, you know, your spouse call me asking me why you're here so early.  You don't have to come in

that early.  I don't understand why would you come in that early.  Oh, you know, Anthony, I just want to get my building clean, and I understand, but you can't be there, it's a safety issue.  It's, God forbid, he slips and he falls and he's up on the roof and something happens -- these are 23-story buildings, he can get lost anywhere in the staircase.

THE COURT:  Was he assigned to one the 23-story buildings?

THE WITNESS:  Yes, he was.

THE COURT:  Which one, is that five?

THE WITNESS:  Yes, it's Fifth Housing, yes, correct, Fifth Housing.

MS. MOORE:  I have no more questions about Defendant's Exhibit T.

Q    To your knowledge, Mr. Caiozzo, did Mr. Mayers ever lodge any complaints about monkeys or stuffed animals in the workplace?

A    Not that I know of.

Q    To your knowledge, did Mr. Mayers ever complain that another employee of Electchester Management called him the N word?

A    Not that I know of.

Q    Did you become aware of a time when Mr. Mayers used the N word?

A    Yes.

CAIOZZO - DIRECT - MS. MOORE                    397

Q    When did Mr. Mayers use the N word?

A    Well, I can't recall the exact time, but he was actually discussing overtime inside, inside the shop and one of our co-workers, Enis, at the time who was -- he was a foreman and Michael Mayers was standing over him, and, you know, he said some really bad stuff, and he used the N word and he also sometime around that week he actually did the same thing to another employee in the locker room, his name is Aldo, I can't remember his last name, I apologize, but, you know, and he admits to these things, it's no secret to him.

Q    To your knowledge, did Mr. Mayers ever lodge any complaints about a depiction of President Obama?

A    No, not to my knowledge.

Q    At the safety meetings does someone take minutes?

A    Yes.

Q    Who takes the minutes?

A    It's usually one of either Emily Garcia or Jennifer or, you know, or one of the office staff.

Q    Are minutes taken for every safety meeting?

A    Yes.

Q    And do they record those minutes during the meeting?

A    Like on a tape recorder?

Q    Or write them down?

A    They write them down.

Q    During the meeting?

A     Yes.

Q     Are the minutes distributed shortly after the meeting?

A     Only if I request them.  You know, they just go into a file.

Q     But copies are kept of the meeting minutes?

A     Yes.

Q     I'd like to show you what's previously been marked for identification as Defendant's Exhibit Y.  I'm just going to scroll through so you can see the entirety of the document.

A     Yeah.  Uh-huh.

Q     Do you recognize this document?

A     Yes, I do.

Q     What is this document?

A     It's part of the minutes to a safety meeting, one of the safety meetings.

Q     Did that safety meeting occur on April 30th, 2014?

A     Yes.

Q     And were these minutes recorded and distributed -- or recorded and maintained the same way you just explained?

A     Yes.

        MS. MOORE:  Your Honor, I'd like to move to admit Defendant's Exhibit Y into evidence.

        MR. VAN-LARE:  No objection.

        THE COURT:  All right.  Defendant's Exhibit Y is received in evidence and published to the jury.

(Defense Exhibit Y, was received in evidence.)

(Exhibit published.)

THE COURT:  How often were these safety meetings held, on average?

THE WITNESS:  On average, every three months somewhere around there, every two months.

THE COURT:  And the entire staff would be required to attend these meetings?

THE WITNESS:  Yes.  Yes.  I mean, we would have people coming in and out.  The foremans would be listening over the radio making sure that there was no emergencies or anything to that nature.  If there was, obviously we would have to take a break and take care of it.

THE COURT:  And would each one of the units have a separate meeting or would these be global meetings for the entire staff of Electchester?

THE WITNESS:  We would actually -- that's a good question.  We would actually have half.  We would have Third, Fourth and Fifth have a meeting in Fourth Housing's rec room, then we would have First and Second in building eight in Second Housing.

THE COURT:  I see.

Q    Do you recall this meeting?

A    Yes, I do.

Q    Do these minutes accurately reflect what was discussed

CAIOZZO - DIRECT - MS. MOORE                    400

during this meeting?

A    Unfortunately, yes.

Q    Did you hear Mr. Mayers cursing during this meeting?

A    Yes.

Q    What did you hear Mr. Mayers saying?

A    Exactly what it said right there.  I don't even want to say it, but...

Q    Are you referring to where it says, Don't suck them off, MF?

A    Yeah.

Q    Is cursing against general rules of conduct for Electchester Management employees?

A    Absolutely.  It should be everywhere.

Q    Was Mr. Mayers disciplined for cursing at this meeting?

A    Yes, he was.

Q    What discipline did he receive for cursing at this meeting?

A    He got a, I think it was a one-day suspension.

Q    Did this one-day suspension have anything to do with Mr. Mayers' race?

A    No.

Q    Did Electchester Management negotiate with Mr. Mayers' union to reverse the suspension?

A    Yup, yes.

Q    And did Electchester pay Mr. Mayers back for the day he

was suspended?

A     Yes.

            MS. MOORE:  I have no more questions about this exhibit.

Q     Did you ever tell Mr. Mayers that filing a disability complaint is not the way to go at work?

A     Never.

Q     Did you ever tell Mr. Mayers it was a mistake to file a disability complaint?

A     I would never do that.

Q     Are you aware of anyone at Electchester Management telling Mr. Mayers it was a mistake to file a disability complaint?

A     No.

Q     To your knowledge, did Mr. Mayers ever complain that anyone at Electchester Management told him it was a mistake to file a disability complaint?

A     No.

Q     Did you ever tell Ed Wiley that Mr. Mayers wasn't getting a bonus in 2014?

A     No, I would never do that.

Q     Did you ever tell anyone at Electchester Management that Mr. Mayers wasn't getting a bonus in 2014?

A     No.

Q     When Mr. Mayers went out on disability leave, did someone

CAIOZZO - DIRECT - MS. MOORE                402

collect donations for him from his co-workers?

A    Yes.

Q    Did you contribute a donation to Mr. Mayers?

A    Of course I did, yes.

Q    How much did you donate to Mr. Mayers?

A    Twenty dollars.

MS. MOORE:  Sorry, I'm having trouble pulling up the next document.  If you wouldn't mind bearing with me.

I'd like to show you a document that was admitted into evidence that was previously marked for identification as Plaintiffs' Exhibit 37.

Q    Are you familiar with this document?

A    Yes.

Q    Do you know if other employees of Electchester Management have received a letter letting them know their position could no longer be held open after 12 months?

A    Yes.

Q    Which employees received a letter like this?

A    Well, honestly --

MR. VAN-LARE:  Objection, your Honor.  I'm not sure this is -- oh, withdrawn.

THE COURT:  Would you like to repeat the question?

MS. MOORE:  Sure.

Q    Which other employees received a letter like this?

A    Well, at the same time that Mr. Mayers got it, it was

CAIOZZO - DIRECT - MS. MOORE          403

Dominick Sarapachiello, I apologize if I'm not saying his name

correctly.  Also prior to this we had William Washington, we

had Mr. Perez, I forgot his first name.  We had Sal Miller.

Vito Lanziersa, Anthony Yaccarino.  There might have been one

or two also before Mr. Mayers.

Q    Thank you.

A    And I apologize, Mr. Dellosantos.

Q    Thank you.

I'm going to show you or I'd like to show you what's

previously been marked for identification and admitted into

evidence as Plaintiffs' Exhibit 1.

Have you ever seen this photograph?

A    Yes.

Q    When was the first time you saw this photograph?

A    It was right before the deposition that we got pulled

into, that's the first time I ever saw this.

Q    When you say the deposition we got pulled into, do you

mean your deposition in this lawsuit?

A    Yes, I do.

Q    Was that sometime in 2019?

A    Yes.

Q    Did you ever see this photograph at any time before your

deposition in this lawsuit in 2019?

A    Never.

Q    Have you ever seen the monkey depicted in this photo at

CAIOZZO - DIRECT - MS. MOORE                404

the Electchester Co-op?

A    No.

Q    I'd like to show you what's been previously identified as Plaintiffs' Exhibit 2, and which has also been admitted into evidence.

Have you ever seen this photograph?

A    Yes.

Q    When was the first time you saw this photograph?

A    Again, during -- right before the deposition.  Some -- like a week before I was shown this photograph.

Q    Did you ever see this photograph at any time before your deposition in this lawsuit in 2019?

A    No.

Q    Have you ever seen the monkey depicted in this photo at the Electchester Co-op?

A    Never.

Q    I'd like to show you what's previously been admitted into evidence and which was marked for identification as Plaintiffs' Exhibit 3.

Have you ever seen this photograph?

A    No.  Only, like I said, right before the deposition, like a week or so before.

Q    Have you ever seen the figure depicted in this photo at the Electchester Co-op?

A    No, I have never seen that.

CAIOZZO - DIRECT - MS. MOORE          405

MS. MOORE:  I have no more questions about that exhibit.

Q    Do you know someone named Jerome Jenkins?

A    Yes.

Q    Who is Jerome Jenkins?

A    He was a porter.

Q    Did you hire Mr. Jenkins?

A    Yes, I did.

Q    Did you ever tell Mr. Jenkins to remove any black or Muslim newspapers from his work space?

A    Never.

MS. MOORE:  Your Honor, if I could consult briefly with my colleague, I may not have any more questions.

THE COURT:  Please.

Q    When you saw the photos just before your deposition in 2019, who showed you those photos?

A    Actually it was -- I'm going to tell you her name, Mayo.

Q    Was it a lawyer?

A    Yes, it was.

Q    Was it one of Electchester's lawyers?

A    No, it was not.

Q    You referenced some people who got -- actually, withdrawn.

MS. MOORE:  I have no more questions.

THE COURT:  Very well.

CAIOZZO - CROSS - MR. VAN-LARE          406

MR. VAN-LARE:  May I, your Honor?

THE COURT:  Cross-examination.

MR. VAN-LARE:  Thank you.

CROSS-EXAMINATION

BY MR. VAN-LARE:

Q     Good afternoon, Mr. Caiozzo.

A     Good afternoon.

Q     How are you?

A     I'm a little nervous, but I'm okay.

Q     Relax.

A     Thank you.

Q     You and I have met before, correct?

A     Yes, we have.

Q     Counsel asked you questions about unions, do you remember that?

A     Go ahead.

Q     And you responded that you were a member of the union, right?

A     Yes, I am.

Q     And that unions are good for employees?

A     Absolutely, correct.

Q     You are a manager at Electchester, correct?

A     I what?

Q     You are a manager?

A     Yes, I am.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

Q    At Electchester?

A    Yes, I am.  Sorry.

Q    And you are not a manager that engages in fairness when it comes to hiring employees, are you?

A    Fairness?

Q    Yes.

A    Oh, absolutely.

Q    Do you know an individual named Tommy DiFilippi?

A    Yes, I did.

Q    Where does he work?

A    He works in Third Housing.

Q    That's part of Electchester?

A    Correct.

Q    Are you related him?

A    Yes, I am.

Q    Was he hired through a union hiring form?

A    We don't have one.  32BJ does not have one.

Q    Who introduced him to Electchester for employment purposes?

A    That would be myself.

Q    Who interviewed him?

A    What's that?

Q    Who interviewed him?

A    Oh, I did and, you know, my colleagues.

Q    You interviewed him, isn't that true?

CAIOZZO - CROSS - MR. VAN-LARE          408

A     That is true.

Q     You brought him to Electchester; isn't that true?

A     That is true.

Q     And you offered him the job; isn't that true?

A     He qualified for the job.

Q     That's not my question, sir.  You offered him the job; isn't that true?

          MS. MOORE:  Objection.  Relevance.

          THE COURT:  Sustained.

Q     At the end of your interview with him, was he offered an opportunity to work for Electchester?

A     Yes, he was.

          MS. MOORE:  Objection.  Relevance.

          THE COURT:  Wait for the objection.

          THE WITNESS:  Oh I apologize.

          THE COURT:  Sustained.  The jury will disregard the question and the answer.  Next question.

Q     How long has he worked for Electchester?

          MS. MOORE:  Objection.

          THE COURT:  This whole line of questioning is out of bounds, it is irrelevant and I'm instructing the attorney to go to the next issue.

          MR. VAN-LARE:  Thank you, your Honor.

Q     You said there has been increase in writeups for the employees since you joined the company; is that true?

CAIOZZO - CROSS - MR. VAN-LARE                409

A     That is true.

Q     Do you know why that is so?

A     There was zero dos and don't rules and I don't even like to use the word rules, it's just common sense stuff, you know. So that's why.

Q     You said you are not aware that Mr. Belvin made a complaint involving the presence of monkey or monkeys in his workplace; is that correct?

A     That is totally correct.

Q     When did you first find out that there was an issue involving monkeys in the workplace?

          MS. MOORE:  Objection.  Mischaracterization.

          THE COURT:  I'm sorry, restate the question please.

          MR. VAN-LARE:  Thank you, your Honor.

Q     When did you first find out that there were issues involving monkeys or monkey images in the workplace?

          MS. MOORE:  Objection.

          THE COURT:  I'll allow the answer.

A     About a week before the -- I can't remember exactly, but I will tell you that I was told by one of the employees, hey, did you see what they wrote up.  And I was, like, I don't understand what you're talking about and -- it's all over the internet.  I'm, like, internet.  I don't even know what you're talking about.  And basically this -- this whole case was broadcasted over some sort of a -- you know, like, if you look

up a civil lawsuit, and basically they were going around --

and I apologize, it's Michael and Michael were going around

saying, oh, we filed the case, we filed the case, and that's

when I found out.

As far as reading it, as far as the pictures it was

the lawyer and also -- now I do remember, it was Vito, we had

a meeting before your deposition.  So, you know.

Q    I just wanted to find out --

A    Yeah, I understand.

Q    -- when you first knew?

A    Uh-huh.

Q    And it was, you said approximately when there were some

kind of public information --

A    Yes.

Q    -- being broadcast?

A    Yes, correct, and I cannot tell you for the life of me

when it was, a year before the deposition, three years before,

I cannot remember that.  You know, I don't recall that.

Q    You also said something about talking to employees about

it, did you?

A    One of the employees told me -- one of my co-workers told

me and he said, did you see what's all over the internet?  And

I said, no, I don't even know what you're talking about.  And

that's when, you know, that first draft, I'll call it, because

that's what I read off there, and I was like -- I was

CAIOZZO - CROSS - MR. VAN-LARE          411

mortified reading it.  I'm like, you know, are you kidding me.

And none of that that was in there, has ever been brought to my attention, Tom's attention, none of it.  It just came out of the nowhere.  And I was, like, very mortified.  So I can't remember exactly when it was but that's how I remember it.  Good or bad, but that's how I remember it.

Q    Who was this employee that told you, can you see what's going on the internet?

A    It was Joe Capasso.

Q    And that's how you found out?

A    Yes, we were -- I remember the day too, because I was sitting by his desk and he walked in, he sat by his desk and he said, did you see what's all over this internet?  I was like, no.  And basically that's what happened.

THE COURT:  All right, next question.

MR. VAN-LARE:  Your Honor I would like to refer the attention of the witness to transcripts of his deposition in my office.

THE COURT:  I'm sorry, is this on the subject that you just --

MR. VAN-LARE:  Yes, your Honor.

THE COURT:  -- discussed.

MR. VAN-LARE:  Yes, your Honor.

THE COURT:  Go ahead.  Simply identify the date of the deposition and the pages of the deposition that you are

referring to.

MR. VAN-LARE: The date of his deposition is March 15, 2019, and I am going to be taking him to page 61, lines 9 through 22.

THE COURT: Okay.

MR. VAN-LARE: For now, your Honor.

THE COURT: All right.

Q    Mr. Caiozzo, do you see something pop up in front of you on your screen?

A    Yes.

Q    Okay, thank you. And at this point I will like to direct your attention to page 6-1. So I will scroll up so we can see the beginning of the page. You see the top where it says 6-1, page 61?

A    Yes, I do.

Q    Thank you. And I'm going to direct your attention now to line 9.

"QUESTION: Do you know if Mr. Michael Belvin has made any complaint that he was a victim of race discrimination?

"ANSWER: Yes.

"Tell me what you know --

THE COURT: Question.

-- about complaints?"

A    Question. Yes --

CAIOZZO - CROSS - MR. VAN-LARE          413

THE COURT:  Wait.

A     -- at the time you showed me --

THE COURT:  Wait, wait.  Is that all, is that it?

MR. VAN-LARE:  No, I wasn't done, your Honor.  I did jump questions, so I'll go back.

THE COURT:  Go ahead.

BY MR. VAN-LARE:

"QUESTION:  Tell me what you know about the complaint he may have?

And there was an objection from the attorney present, Ms. Lyon.

A     Uh-huh.  Okay, so --

THE COURT:  Wait, I'm sorry.  Are you going to go on and provide the answer?

MR. VAN-LARE:  Yes, I'm trying to get -- provide the objection and get the answer, your Honor.

"ANSWER:  I know that -- I know that a while back he spoke to the agency, the EEOC.  I don't know too much about that because I wasn't down into the housing.  I know that he also made other complaints too, according to what I was told.  Some other agencies.  The National Labor Relation Board, OSHA, that's what I was told."

Do you remember this testimony?

A     I do remember that.

Q     So you are aware that Mr. Belvin did file a complaint?

CAIOZZO - CROSS - MR. VAN-LARE            414

A    At the time that we were doing the deposition and I said what I said, I just learned about all of these complaints. So I'm not sure if you're talking about like 2015, '16, '17, this was in 2019, so by that time I was very aware of actually all the stuff that I wasn't aware of at the time before the deposition, you know, sometime way before. So to answer your question, at that time, yes, I was aware of it.

Q    Do you recall Mr. Wiley coming to you to tell you he was investigating a complaint of monkey in the job place?

A    I don't recall that.

Q    You never had any discussion with Mr. Wiley, correct?

A    If I did, I don't recall him saying he found anything or anything to that nature.

        MR. VAN-LARE:  Just a moment, your Honor.

        May I please direct your attention to page 84 of the transcript, and it is going to be line 11 through 25.

Q    Sir, you see page 84 the transcript in front of you?

        THE COURT:  Line 11.

Q    Page 84, line 11, can you see that, sir?

A    Yes, I do.  Sorry.

        "QUESTION:  When you and Mr. Wiley spoke and told you he had to go look into something, what exactly did he, in what language did he tell you, as much as you remember, what did he say to you?"

        And there was an objection again from Ms. Lyon, but

CAIOZZO - CROSS - MR. VAN-LARE                415

you went and provided the answer.

A     Okay.

"ANSWER:  Okay, he said I have to go to the locker room and I have to go see if there's a stuffed -- he said there's a stuffed animal on the locker room.  That's what he said.

"QUESTION:  Okay.  Mr. Wiley's language to you was that I have to go look into a stuffed animal?

"ANSWER:  Correct.

"QUESTION:  Okay.  In the locker room?

"ANSWER:  Yeah."

Q     So you are aware that Mr. Wiley was investigating the complaint of the monkey in the locker room, correct?

A     No, no, not about a monkey.  If that's -- it says a stuffed animal.  He never mentioned to me anything about a monkey or anything like that.  So, you know, I don't know.

Q     When you and Mr. Wiley spoke, what did you think he was talking about when he said he had to go investigate a complaint about a stuffed animal?

A     Well, they're always -- sorry, people -- a lot of the porters are always picking up garbage, they are always bringing garbage everywhere.  Whose got, you know, a toy car, and like, you know, whose got other stuff in the locker rooms. So basically when he said that, I didn't think anything of it. He was going to investigate a stuffed animal.  I don't know

what that is, it could be anything.

So that's why I -- like I said, the first time I ever saw that.  At first they said it was a ceramic monkey hanging somewhere and I was, like, I was -- I'm just mortified.

Q    So did you ask him what the investigation was about?

A    I don't recall.  I don't recall.

Q    I'm going to take you, sir, to another page, I will tell you the exact page.  It is 86.  8-6.

A    Okay.

Q    I will direct your attention to line 11 on page 86.

A    Okay.

"QUESTION:  Did Mr. Wiley ever use the language monkey in talking to you on that day?"

A    No.

Q    No, I wasn't done.

A    Oh, I'm sorry.

"ANSWER:  I don't recall.  I don't recall.

"QUESTION:  If Mr. Wiley used the word "monkey" that would have struck out your memory, correct?

"ANSWER:  It was a long time ago."

Q    Mr. Caiozzo, you are not saying he didn't use the language monkey to you, your answer was you don't recall, correct?

A    If that's what I said that day, well, I don't recall.

I --

Q    I will direct your attention, sir, to page 93 --

A    Uh-huh.

Q    -- of your deposition.

A    Okay.

Q    In front of you, sir, should be page 93 reflected in your script and I want to direct your attention, sir, to line 7. We're going to go on line 7 through 21.

A    Okay.

"QUESTION:  In all of the management team meetings you guys had in 2015, 2016 and 2017, you never discussed the EEOC complaint by Mr. Belvin; is that correct?"

MS. MOORE:  Objection.  To the use of the transcript, I should clarify.

THE COURT:  I'll allow it.

Q    There was an objection then you give an answer.

"ANSWER:  I can't recall.  I mean, that's a lot of years.  I'm sure we had conversations about stuff, but I can't recall that particular one."

Q    As you sit here today, do you know if there was any discussion of this EEOC complaint at management meetings?

A    Once again, that was my answer back then and it's still my answer now.  We discuss a lot of stuff and any specific or particulars I can't recall anything like that.

Q    Sir, do you know the individuals designated to receive

CAIOZZO - CROSS - MR. VAN-LARE                    418

complaint of racial harassment or disability discrimination

when an employee has such a complaint?

A    Yes.

Q    Can you please tell the jury who these individuals are

that you know?

A    Okay.  It would be Jerry Fillippatos, and it would also

be Nicole Rollins and Mr. Tom Prezioso.

Q    Are you one of the managers designated to receive the

complaint?

A    No.

Q    Is Mr. Capasso one of the managers designated to receive

the complaint?

A    No.

Q    Where did that knowledge come from?  How -- what is the

basis of your answer that the individuals you mentioned are

the individuals so designated?

A    Well, from Jerry Fillippatos.

Q    Do you have a particular policy that states that clearly

to employees, to the best of your recollection?

A    I cannot recall.

Q    But you are definitely, to your knowledge, not one of the

individuals, correct?

A    Yeah, I'm not one of them.

Q    Have you, yourself, received training in EEOC Equal

Employment Opportunity matters?  Do you know what I mean?

CAIOZZO - CROSS - MR. VAN-LARE                   419

A     No, I have not received any training in that respect.

Q     And how long have you worked for Electchester?

A     From 2008.

Q     And since 2008, as a manager, you have not been trained
in how to handle these issues if they come up in the job
place, correct?

          MS. MOORE:  Objection.

          THE COURT:  You may answer.

A     Well, we've had sensitivity classes, and I know common
sense and I'm not going to, you know, sit there tell and you
that, you know, something's brought in front of me I'm not
going to know what to do.  Of course, I'm going to know what
to do.  If there's an issue, I'm going to bring it to my
superiors.

          (Continued on the next page.)

BY MR. VAN-LARE: (Continuing.)

Q   My only question was whether since you were hired, you have been trained, and I believe --

A   What do you define "trained?"  Let me know because I might have been trained and I just don't understand how to -- you know, maybe I'm not that smart and I really don't know.

Q   I will move on to the next question I have.

MR. VAN-LERE:  Your Honor, I would like to make the last reference to his transcript that I have, and I would like to go to page 175, line 11 through 12.

Q   Sir, you should see page 175 right in front of you.  Can you?

A   Yes, I can.

Q   So I'm just going to take line 11 and 12 --

A   Okay.

THE COURT:  I'm sorry, 11 is an answer.

MR. VAN-LERE:  Correct, Your Honor.  I just saw that.  I'm going to take line eight.

THE COURT:  Go ahead.

Q   Question:  No, my question was, is there a training done for members of the management team on equal employment opportunities?  Answer:  No, I didn't get no training.  No.

That was your response about that, right?

A   That's what it says there.

Q   Do you want to amend that response?  Is there something

you didn't know at that time that you now know?

A    No.  I asked you to explain it earlier, if there's some way that you can explain what you said as far as the, you know, the equal opportunity discrimination -- equal opportunity.  So, honestly, you know -- and when Mike Mayers was sitting right there, staring me down throughout this whole, you know, process, that takes a toll on you also, it really does.

Q    What do you mean Michael Belvin was sitting down?  Where?

A    No, Michael Mayers was sitting down in your office, in your office.  He just was like, the whole time.  (indicating.)

Q    Your testimony is that during your deposition, Mr. Mayers was -- sorry, did you say Mr. Belvin or Mr. Mayers?

A    It was Mr. Mayers.

Q    During your deposition, Mr. Mayers was staring directly in your face?

A    Oh, yes.  He was right there, right by that computer right there, and just staring me down.

Q    Did that cause you to give answers that may be incorrect?

A    No, it's just very uncomfortable.

Q    Why were you uncomfortable?

A    Because I know that he's just, you know, staring me down that whole time.  It's very uncomfortable.

Q    Do you know why he may be staring you down?

A    No.  He's right there, you could ask him.

CAIOZZO - CROSS - VAN-LARE                422

Q    It's directed to you, sir.  Do you know?  If you don't know, just tell me you don't.

A    No, I don't know.

Q    Thank you.  Is it possible he was staring at you because you told a lot of lies in your responses?

A    Absolutely not.

MS. MOORE:  Objection.

THE COURT:  Do not answer.  There's an objection.

Sustained.

Q    You testified before when counsel asked you questions on direct that Michael Mayers used a lot of racial slurs.  Do you remember that?

A    Yes, I do.

Q    Did you -- how many times did you hear Mr. Mayers use what you consider to be a racial slur?

A    I heard -- well, first of all, him acting out during the safety meeting the way he spoke, that was totally disgusting.  Second of all, he actually told Aldo, and we heard it on a recording and, you know, that -- if need be -- if -- if truth be known right now, absolutely.  And, basically, another time, we heard it again and he slapped one of our employees in the buttocks calling him his favorite white B-O-Y and, you know.  Who does that?  Come on.  Who does that?  I'm just -- I'm just saying.  You want to know -- also, the same thing happened with Enis.  Was I personally there?  No, I was not, but, you

*LEEANN N. MUSOLF, RPR, CCR*
*Official Court Reporter*

CAIOZZO - CROSS - VAN-LARE                 423

know, there's 64 employees there and I don't know why, but everybody else seems to be okay with everything.

Q   You gave us some examples now, correct?

A   Yes.

Q   You did not hear any of this with your own ears, the examples you just gave?

A   I did hear when he spoke to Aldo and he told him, I'm no N slave.

Q   I'm sorry?  You said what?

A   I'm no N slave, and he told Aldo.  In a part of where the punch-in clock is, right there.

Q   You did hear that particular expression?

A   Oh, I absolutely did.  I heard it over an audio, an audio, yes, sir.

Q   And of the examples you gave, that is the only one you heard over a radio with your own ears, correct?

A   I'm going to have to say correct.  You know what, I'm going to tell you -- I'm going to tell you one other thing.

Q   No, no question pending.

A   Oh, okay.

Q   Unless it's a direct answer to my question --

THE COURT:  That's enough.  Next question.

MR. VAN-LERE:  Thank you.

Q   When you said Mr. Belvin slapped someone in their behind?

A   I didn't say Belvin.

Q    I'm sorry, Mr. Mayers?

A    Mayers.

Q    Slapped someone in their behind and said something to the effect of my favorite white boy, right?

A    Well, you said the B word, yes.  You said the B word.  I apologize.

Q    Don't apologize, we just want the facts --

A    I use bravo.  Any time I need to say B, I use bravo because that's what they got us walking on pins and needles and eggshells.

Q    For purposes of my question here --

THE COURT:  Well, I don't want to know the purposes of question and comments from the witness.  I just want questions and answers.  So if we can return to the courtroom instead of the schoolyard here, I would really appreciate it on the part of everybody, all right?

MR. VAN-LERE:  Understood very well, Your Honor.

THE COURT:  Next question.

Q    You were shown Exhibit 27 and I would direct your attention to that exhibit in a minute.

Mr. Caiozzo, in front of you is Exhibit 27 that counsel showed you during her direct examination.  Do you remember reading that document?

A    Yes.

Q    And in your response, you suggested that Mr. Belvin was

on the premise two hours 45 minutes after the end of his

shift.  Do you remember that?

A    Yes.

Q    Can you point to my attention anywhere in this memo where

you referenced Mr. Belvin being at the job premise for two

hours and 45 minutes at the end of his shift?

A    The time sheet with when he timed out.

Q    Sir, can you direct me to where that is stated here?

A    It says it right.  The clock, the clock out.

Q    Where, sir?

A    It says, the maintenance man on duty said you need to

clock out.  And then I went to the time sheets and he did, he

clocked out at that time.

Q    Okay.

        THE COURT:  The question has to do with why did you

say two hours and 45 minutes that he was not supposed to be on

premise.  How did you reach that conclusion?

        THE WITNESS:  Oh, I apologize.  I went to the

time-out sheets and we have also video of where the actual

clock is, and I went back to that and he was there punching

out.

        THE COURT:  When did he punch out?

        THE WITNESS:  At 6:45.

        THE COURT:  When was he supposed to punch out?

        THE WITNESS:  At 4:00 p.m.

CAIOZZO - CROSS - VAN-LARE                      426

Q     You also said --

         THE COURT:  Is that his shift?  From what time to
what time was his shift?

         THE WITNESS:  His shift is from 7:00 a.m. to 4:00
p.m.

         THE COURT:  And so he was -- his punch out was at
6:45?

         THE WITNESS:  Correct.

         THE COURT:  So from 4:00 p.m. to 6:45, what was his
status?

         THE WITNESS:  He went over to the time clock and he
punched out.  He -- that's it, yes, that's exactly what
happened.  He clocked out.

         THE COURT:  He clocked out, but he should have
clocked out, according to you, what time?

         THE WITNESS:  At 4:00 p.m. and left the premise.

         THE COURT:  All right.

         Next question.

Q     You also testified that he abruptly hung the phone up on
Mr. Alvarez, I believe?

A     Right.  Mr. Alvarez told me that.

Q     Now, is there a reason why you didn't document that in
your memo written on May 11, 2017?

A     I mean, how much should I, like, put down in there.
That's exactly what happened; Mr. Alvarez told me and he says,

CAIOZZO - CROSS - VAN-LARE                    427

he hung up on me.  And I was like, all right, and this is why he got written up.  So I should actually get into details, I mean real details.

Q     All I asked you is there is reason why you didn't include that?

A     Yeah, only because how much can you possibly put down, you know, in my, like --

Q     You also testified that Ms. Quintana called you on your phone in reference to her husband.  Do you remember that?

A     Yes, I did.

Q     The spouses of people who work for Electchester, do they have your numbers?

A     What happened was Mr. Quintana didn't have a phone, so he was actually using his wife's phone.  And then when he got his own phone, his wife actually had my number on the phone and she called me.  So then later on, I told him, I said listen, Rufino, you can't have your wife calling me because I don't know where you are, you can't be here at 4:00.  I don't know what you're doing.  And that was that.  So, that's the explanation for that.

Q     Are you aware that sometimes Mr. Quintana sleeps on the job?

A     That's the news you're --

          MS. MOORE:  Objection.

A     -- telling me.  No, I'm not aware.

*LEEANN N. MUSOLF, RPR, CCR*
*Official Court Reporter*

CAIOZZO - CROSS - VAN-LARE                    428

Q    Did you ever ask him why he comes so early to work?

A    No, I didn't ask him, but I know he's working because the cooperators are always telling me, Rufino is here so early. He's, you know, he's working all the time.  And I'm like oh God, you know.  Basically, that's it.

Q    The cooperators never complained to you that him coming to work so early was an issue for them, correct?

        MS. MOORE:  Objection, relevance.

        THE COURT:  You may answer.

A    No.  They never told me, you know -- it wasn't an issue for them.  Obviously, they're getting a service, you know, and basically that's it.  And he's a nice guy.

Q    Your concern of him coming in so early, you testified, was for health and safety purposes, correct?

A    Yes, correct.

Q    But if -- when is this report time?  When is he supposed to report to work?

A    7:00 to 4:00 p.m.  7:00 a.m. to 4:00 p.m.

Q    But if he comes in at 6:00, whatever hazard or safety issue would exists, would be there at 6:00, and it would still be there at 7:00, right?

A    No --

        THE COURT:  Stop.  Let's move on to the next subject.  They have a policy and you have a position, let's just move on.

CAIOZZO - CROSS - VAN-LARE                    429

Q    Your company, Electchester Management, did they have a specific policy that says employees must report to work at their exact reporting time?

A    There's a policy in the rules that says that they can come in a little earlier and if they need to, they can, you know, if they're running ten minutes late or ten minutes behind, that's fine, but you can't come in, you know, two hours early and fall down a flight of stairs on the 23rd floor or something to that effect or, you know, something else happens, a piece of furniture falls on you.

Q    Okay.  Counsel also showed you an exhibit, I believe Exhibit 31, where Mr. Belvin was alleged to have thrown garbage in your direction.  Do you remember that?

A    I remember that.

Q    Okay.  You did not appreciate that, you actually wrote him up, correct?

A    Correct.

Q    You stated your position under oath during the arbitration; do you remember that?

A    Yes, I do remember that.

Q    And Mr. Belvin was present and he also stated his position under oath; do you remember that?

A    Yes, I do.

Q    And in spite of that, the arbitrator reversed the three-day suspension, isn't that correct?

CAIOZZO - REDIRECT - MOORE                    430

A    Correct, and he gave him a warning, he turned it into a final warning.

Q    Thank you very much, Mr. Caiozzo.  I do not have additional questions for you at this time.

A    Thank you.

THE COURT:  Any redirect?

MS. MOORE:  Yes, Your Honor, briefly.

THE COURT:  Briefly?  Go ahead.

REDIRECT EXAMINATION

Q    Mr. Caiozzo, have you attended classes at Electchester Management held by Executive Health and Safety Consultants?

A    Yes.

Q    And at those classes, did they discuss discrimination and harassment, specifically anti-discrimination and anti-harassment?

A    Yes.

MS. MOORE:  I don't have any further questions, Your Honor, for Mr. Caiozzo.

THE COURT:  All right.

Anything else from the plaintiff?

MR. VAN-LERE:  No, Your Honor.

THE COURT:  Thank you very much.  The witness is excused.

You may stand down, sir.

THE WITNESS:  Oh, thank you so much.

THE COURT:  You're welcome.

(The witness steps down.)

THE COURT:  We'll take a short five-minute break.

All rise for the jury.

(Jury exits the courtroom.)

THE COURT:  Let's take a five-minute break.  Thank you.

Before we do, who is your next witness?

MS. MOORE:  It's Joe Capasso, Your Honor.

THE COURT:  And how long?  Same thing.

MS. MOORE:  I believe so, Your Honor.

THE COURT:  So that will take us until the end of the day.

MS. MOORE:  Actually Mr. Capasso's testimony could be shorter, so it's possible depending on how many questions counsel has for him, we could finish by 5:30.

THE COURT:  We'll check with the jury as to whether they can stay until 5:30.  All right.  Thank you, everyone.

(Brief recess.)

THE COURT:  Why don't we bring the witness into the courtroom and let's get the jury.  The jurors said they can stay until 5:15.  So if we can't get it done by 5:15 with this witness, he'll have to come back tomorrow.

MS. MOORE:  Yes, Your Honor.

(Jury enters the courtroom.)

CAIOZZO - REDIRECT - MOORE                    432

THE COURT:  Please be seated.

The defense may call its next witness.

MS. SHEA:  Your Honor, we call Joe Capasso.

THE COURTROOM DEPUTY:  Please have a seat and please state and spell your full name for the record.

THE WITNESS:  My name is Joe Capasso, J-O-E, C-A-P-A-S-S-O.

THE COURT:  You may inquire.

MS. SHEA:  Thank you, Your Honor.

(Continued on next page.)

CAPASSO - DIRECT - SHEA                    433

(Witness takes the witness stand.)

**JOSEPH CAPASSO**, called as a witness, having been first duly sworn/affirmed, was examined and testified as follows:

DIRECT EXAMINATION

Q    Hello, Mr. Capasso.  Can you please introduce yourself to the jury.

A    Hi, my name is Joe Capasso.

Q    Can you please state your current employer.

A    It's Electchester Management.

Q    And what is your position at Electchester Management?

A    I'm a property manager for First and Second Housing Company.

Q    Can you tell us how you came to be employed by Electchester?

A    I started with Electchester in 2007, I started as a maintenance man.  I worked my way up to a foreman in Fourth Housing, then I was Fourth, then I went down to -- it was Third, Fourth and Fifth and then it was Second and then it was First.

Q    Thank you.  Prior to joining Electchester, can you tell us where you worked?

A    I worked for New York City HPD, Housing Preservation and Development.

Q    When did you join HPD?

A    Ninety -- I'm sorry, '87.

Q    And where did you work predominantly?

A    I worked in all five boroughs -- I mean, the four boroughs.  I wasn't really in Staten Island that much but I was all over the four boroughs.

Q    Within your position -- what was your position at HPD?

A    I started when they had the program of doing -- rehabbing apartment buildings, and I went from there for a few years, then I went to a lead abatement program, and I did that for a few years.  Then, I was on an illegal log of sees squad they called it, I did that for about -- for about a year and a half.

Then I was on the Emergency Response Unit, I did that for maybe, like, two years, and then I was code enforcement -- I was always code enforcement but this is strictly code enforcement, and then I had the title of an acting supervisor.

Q    So, as acting supervisor, is it accurate to say you had supervisory duties?

A    Yes.

Q    About how long did you have those duties?

A    Maybe around seven years.

Q    And when you joined Electchester, did you join Electchester Management, LLC or did you join one of the individual housing companies prior to Electchester's formation?

A      I believe it was LLC at the time.

Q      I'm sorry, can you confirm what year you joined Electchester?

A      It was 2007.

Q      Okay, thank you.  Were you ever a member of the local union 32B-J?

A      Yes.

Q      When were you a member of Local 32B-J?

A      When I was a foreman and a maintenance man, since I started LLC.

Q      When you joined as a maintenance man, can you tell us what your duties were?

A      I was mainly a carpenter, I did kitchens, cabinets, I took them out, rebuilt them, put them back, I did plumbing, replastering painting, little electrical doors, tiles, ceramic tiles, wood tiles -- I mean plastic tiles.

Q      Thank you.  Are you finished?  I don't want to cut you off.

A      Windows, stuff like that.  Yeah, I'm done.

Q      When you became a foreman, can you explain what your duties were as a foreman?

A      I would check the work orders that came in, then I would give out the work orders and then I would make sure the work is getting done, that we have the supplies to do it.  And that would be to check the porters, also, to make sure that the

property is clean, make sure they have their proper material

they needed, and check the buildings to make sure they were

clean, you know.  That's it.

Q    Thank you.  About when did you become a manager?

A    That was 2015.

Q    And at what point did you become -- actually, I withdraw

that question.

Are you still a part of Local 32B-J?

A    No, no, I'm local --

Q    Are you -- sorry?

A    I'm Local 3.

Q    You're part of Local 3 now?

A    Yes, since 2015.

Q    Can you explain how you came to change unions?

A    I seen the, you know, opportunity, it was brought to me

if I wanted the position.  Of course, I had to think about it,

you know.  I had to go through it over it with my family and

my wife to make sure that, you know, what I was planning on

doing, I -- when it was offered to me, I sat down and I spoke

to Anthony Caiozzo about, you know, the position and how it is

and how the benefits are, and he said it's a great union with

all the benefit packages and the retirement package.

So, like I said, I brought it home.  Actually, then

I spoke to Richie Barnnette, the stop steward for Local 32B-J,

to see how it is to leave that union and find out what I

had -- what I was invested in, you know, and I also told him that I'm thinking about doing it.

Q    Did you switch unions because your job changed?

A    Yes.

Q    So is Local 3 -- can you explain why they are different unions, just so the jury understands why we're talking about different unions?

A    Well, Local 3, it has different, I guess, variations in the union, like, they're mainly known for electrical but they do have property and they do have property managers.  Like I said, it's different -- unions are broken up.

Q    Okay, thank you.  Do you like being a member of a union?

A    Yes.

Q    Do you believe unions are good for employees?

A    Yes, I do.

Q    Has a union ever made a decision that you did not agree with?

A    Not that I'm -- no.

Q    If they did -- and by decision, I mean in a grievance or a disciplinary decision.  If they were to come to a decision that you personally did not agree, with was my question?

A    I don't under -- I mean, I wouldn't have the power to change anything.  I mean, I could voice my opinion, but I don't think I have the power to change anything.

Q    So it sounds like at the end of the day, you would

CAPASSO - DIRECT - SHEA                    438

respect their decision, is that correct?

A     If -- yes.

Q     When you began working at Electchester as a maintenance person, who was your supervisor at the time?

A     When I started with maintenance?

Q     Yes.

A     It was Juan Martinez.

Q     And can you tell us, again, what housing that was?

A     That was Second Housing.

Q     Is it accurate to say that you have worked your way up from maintenance to a manager over the past 15 plus years?

A     Yes.

          THE COURT:  What does a property manager do?

          THE WITNESS:  We -- we work with the contractors, you know, to make sure the work is getting done, we work with engineers, you know, to go out for bidding and get their contractors.

          THE COURT:  You're not a project, renovation, or putting in new windows for one of the buildings that sort of thing?

          THE WITNESS:  Yeah.  Right.  Windows, that sort of thing, boilers.

          THE COURT:  Who do you report to as a property manager?

          THE WITNESS:  I have -- at the time, it was Vito

*LEEANN N. MUSOLF, RPR, CCR*
*Official Court Reporter*

Mundo, you know, he's our lawyer.

THE COURT:  So you reported directly to the management of Local 3?

THE WITNESS:  Yes.  It would be -- sorry, my general manager, Tom Prezioso.

THE COURT:  I see, okay.  And how long have you been doing this job now, property manager?

THE WITNESS:  Since 2015.

THE COURT:  I see.  Thank you.

Go ahead.

MS. SHEA:  Thank you, Your Honor.

BY MS. SHEA:

Q    Mr. Capasso, do you know Mr. Belvin?

A    Yes, I do.

Q    Can you tell us how you know Mr. Belvin?

A    He worked for Second Housing for awhile and now he's working for Third Housing.  He's a porter.

Q    So you know him through work, is that correct?

A    Yes.

Q    And do you know Mr. Mayers?

A    Yes.

Q    Can you please explain to us how you know Mr. Mayers?

A    Mr. Mayers works for Second Housing and then he got transferred to First.  So he's in First Housing right now.

THE COURT:  Does he report to you?

THE WITNESS:  Michael?  Yes.

THE COURT:  They're both Michael so you have to tell me which Michael.

THE WITNESS:  They have a foreman, so it goes through the foreman.

THE COURT:  Through a foreman and the foreman reports to you?

THE WITNESS:  Yes, the foreman reports to me if there's anything.

THE COURT:  I see.  Thank you.

Do you see them here in this room?

THE WITNESS:  Tommy, yes.  I see Tommy Prezioso.

THE COURT:  At that table closest to you?

THE WITNESS:  Yes, on the other side, yes.

THE COURT:  Okay, thank you.

Q    During your employment with Electchester, did you ever learn that Mr. Belvin had complained that someone had hung a stuffed monkey on his locker?

A    No.  I only heard it through the court papers.

Q    To your recollection, have you ever discussed this allegation with anyone outside of deposition-type testimony?

A    No.

Q    To your knowledge, did Mr. Belvin lodge any other complaints about any other animals, dolls, or pictures?

A    Not to my knowledge, no.

Q    Mr. Capasso, do you know Ed Wiley?

A    Yes.

Q    Can you please explain how you know Ed Wiley?

A    He was the former manager of First and Second.

Q    Was he ever your supervisor or manager?

A    Yes, when I was the foreman for Second and First.

Q    About how long was he your manager?

A    I think for about a year.

Q    Can you describe your interactions with Mr. Wiley?

A    Every morning, we would go over what projects needed to be done and, you know, how the guys are set up.  Like, that nature.

Q    Have you ever heard of any complaints about Mr. Wiley regarding discrimination, harassment?

A    Not that I'm aware of, no.

        MS. SHEA:  Your Honor, I would like to show the witness Plaintiff's Exhibit 20 that has already been introduced into evidence.

Q    Mr. Capasso, can you see what's on your screen?

A    No.

        THE COURT:  There you go.

        THE WITNESS:  Oh, thank you.

        THE COURT:  Sure.

A    Yes.

Q    So you can see it on your screen now?

A    Yes.

MS. SHEA:  Your Honor, since this exhibit has already been introduced into evidence, may I have the jurors see it as well, please?

THE COURT:  Sure.  There we go.

MS. SHEA:  Thank you.

Q    Mr. Capasso, do you recognize -- first, can you see it? Should I zoom in or out?

A    No, just if you can go down a little bit.

Q    Do you recognize this document?

A    Yes.

Q    Can you identify the nature of this document?

A    Yes.  It was an incident in one of our vacant apartments, building 112E.  Apparently, there was a kitchen floor being ripped up that shouldn't have been ripped up and there was, it looks like asbestos tile at the time.

Q    Do you recall the incident that this document describes?

A    Yes.

Q    Can you please explain to us what happened?

A    That morning, I got a call from Richie Burnette, the shop steward of 32B-J, and he said that I have to come over because we got an incident going on, and then Mike Belvin was going crazy, screaming out, there's asbestos all over the place.

So then I waked over there and seen that they ripped the floor up, and then I told them that I want -- I want the

CAPASSO - DIRECT - SHEA                    443

apartment sealed.  I wanted everybody out of the apartment, I wanted the door sealed, and then I, you know, I called Executive Health and Safety to come over so he could take a piece of the tile and material that were there so we could get it monitored.

And then Gallan, that was the other company that came, and they were doing the white test samples and the air monitoring.  And a few days later, we got the results back saying that the adhesive that the tile was on contained a little asbestos.  So then we had the company come in, Fiber Control I believe it is, and they came in and they abated the rest of the floor and whatever debris we had.

(Continued on the following page.)

CAPASSO - DIRECT - SHEA                444

(Continuing.)

THE COURT:  What was the finding, was there asbestos?

THE WITNESS:  It was in the adhesive, the glue.

THE COURT:  In the glue.

THE WITNESS:  Yes.

BY MS. SHEA:

Q    In the glue, not the tile itself?

A    Right, that's what I said, the glue.

Q    And you said Mr. Bonnette called you?

A    Yes.

Q    Could you please explain to us what this paragraph number two is describing?

A    Because I said Mike was going a little crazy, like, excited like a riot, screaming, "Cooperators, there's asbestos.  It's danger, it's danger, it's asbestos," and he didn't notify -- I mean, the foreman was there.  The foreman got reprimanded for not reporting it to me right away. Richie, the shop steward, came and he's the one who reported it to me.

Q    Is it part of Electchester's rules and policies for someone who discovers asbestos to notify management directly?

A    Yes, if there's a problem, yes.

Q    And are all employees aware of this rule or policy?

A    Yes, because we have safety meetings.

*Linda A. Marino, Official Court Reporter*

CAPASSO - DIRECT - SHEA                    445

Q    And you discuss this rule in safety meetings?

A    Yes.

Q    Can you please tell us about this safety meeting in paragraph three?

A    We had -- I can't recall the whole -- yes, we had a safety meeting.  And the instructor that conducted the meeting, Val Holt his name is, at the end of the meeting, he came and he approached Tom Prezioso and myself, saying that Mike was out of control and he kept on disrupting the class with his little outbursts and all.

Q    I'm actually going to go back to paragraphs one and two. You had made a comment about cooperators.

A    Right.

Q    Is there a policy -- let me rephrase.

        Is there a reason that Electchester has a rule or policy to come directly to managers?

A    So that we would know how to handle it.

Q    Is it an issue if cooperators were to be involved in this conversation?

A    Well, we don't want a panic on our hands, you know.  I mean, of course, if it's really severe, but, you know -- yeah.

Q    Do you recall the events described in paragraph four?

A    Yeah.  Like I said, we ordered -- I ordered the apartment to be sealed and closed.  And then the foreman at the time and the maintenance guy Tony -- I forgot his last name, it's a

CAPASSO - DIRECT - SHEA                446

long name -- but they approached me and they told me that Mike was in there taking pictures.

Q    And is this against Electchester's rules and policies.

A    Yes, it is.

Q    And can you please explain the contents of paragraph number five?

A    Because at the same time, I was informed that Mike also took a piece of the tile that he was complaining about.

Q    And I apologize, I should have said this earlier, is this your signature at the bottom?

A    Yes.

Q    So, you wrote this document?

A    Yes.

Q    Thank you.

A    At the same time, the two maintenance men that actually ripped up the floor, they got a written warning also.  And the foreman at the time, Juan Lopez, he got demoted and he went to a porter's position.

Q    And were all of these disciplinary actions a result of mishandling this same situation?

A    Yes.

Q    And the two maintenance men and Juan --

A    Juan Lopez was the foreman at the time.

Q    And is Juan black?

A    No, he's Hispanic.

*Linda A. Marino, Official Court Reporter*

Q    I think I am done with this exhibit.

MS. SHEA:  Your Honor, I would now like to show the witness and the jury the exhibit that's previously been introduced into evidence known as Defendant's GG.

(Exhibit published to the jury.)

MS. SHEA:  Actually, I withdraw.  I don't need to ask this question.

Q    To your recollection, was Mr. Belvin ever written up for violating Electchester's radio etiquette policy?

A    I know he got written up for using -- for when we tried to get his attention on the radio and he had his earplugs in.

Q    And is having earplugs in against Electchester policy?

A    Yes.

Q    Mr. Capasso, did you ever learn that Mr. Mayers had been diagnosed with cancer?

A    I learned, yes.

Q    And how did you come to learn this?

A    Because they were taking a donation for Mike.

Q    And did you contribute to this donation?

A    Yes, I did.

Q    Do you recall how much?

A    I think it was, like, $20.

Q    When Mr. Mayers came back from his medical leave, were you involved in a discussion regarding his -- withdrawn.

Mr. Capasso, have you ever met Mr. Belvin's son?

*Linda A. Marino, Official Court Reporter*

CAPASSO - DIRECT - SHEA                    448

A     No.

Q     Do you know if Mr. Belvin's son had ever worked for Electchester?

A     I don't believe so.

        MS. SHEA:  I think I'm almost done.  I have one more exhibit, I think.

        THE COURT:  Sorry, I missed that.

        MS. SHEA:  I'm just looking, I think I might have one more line of questioning.

        THE COURT:  Please go ahead.

Q     Mr. Capasso, do you recall an incident between Mr. Mayers and a foreman named Enis Zedjalovic?

A     Yes.

        MS. SHEA:  Your Honor, I'd like to show the witness Defendant's proposed exhibit AA.

        THE COURT:  Go ahead.

Q     Mr. Capasso, can you see this on your screen?

A     Yes.  I only see the heading, though.

Q     Do you recognize this document?

A     Yes.  Matter of fact, it was --

Q     Wait.  I have to lay a foundation.

        Can you identify the nature of this document?

A     Yes.  Matter of fact, if you look at it, it's from five years ago today.

Q     Okay.  And is this your signature at the bottom?

CAPASSO - DIRECT - SHEA                    449

A      Yes.

Q      And was this document made about the time of the dates

contained in it?

A      Yes.

          MS. SHEA:  Your Honor, I'd like to move to admit

this into evidence.

          MR. VAN-LARE:  Plaintiff has no objection, your

Honor.

          THE COURT:  All right.  Defense Exhibit AA is

received in evidence and published to the jury.

          (Defense Exhibit AA, was received in evidence and

published to the jury.)

          MS. SHEA:  Thank you, your Honor.

Q      Mr. Capasso, can you please explain to the jury what

occurred on this date?

A      We had a project going on in First Housing.  It was

Building 5.  We were redoing the conference room.  And Enis

had a couple of porters go in there to help the maintenance

men, you know, clean up a little bit of the debris.

          So, at the end of the day, Mike came into the shop.

He started yelling at Enis, screaming at him, you know, saying

that it's not right what he's doing and he's not his N slave.

Like really aggressive in his face and everything.

Q      And you say he was yelling at Mr. Zedjalovic about what

he was doing.

*Linda A. Marino, Official Court Reporter*

CAPASSO - DIRECT - SHEA                    450

Can you please expand on that?

A    Because like I said, it was something to do with the overtime that Mike shouldn't have even been involved in.  At the time, Mike wasn't even scheduled to be in that building to know what was going on.

But then he got irate and he came into, like I said, the shop and was screaming at Enis, which was the foreman, up in his face that he's not the N slave and he ain't gonna be doing it.  So, Enis was telling him it's none of his concern because he wasn't involved in the project.

And Enis called me and he told me about the incident and then I reviewed the videotape that we have and I seen the aggressiveness from Mike towards Enis.  And Richie Bonnette was in there also, so he witnessed it, so I got the complaint from him also.

Q    And was Mr. Mayers' actions against Electchester's policies?

A    Yes, it is.

Q    Is that why he received this warning?

A    Yes.  He got suspended.

MS. SHEA:  I have no further questions at this time.

THE COURT:  Very well.  Cross-examination.

*Linda A. Marino, Official Court Reporter*

CROSS-EXAMINATION

BY MR. VAN-LARE:

Q    Good afternoon, Mr. Capasso.

A    How are you?

Q    How you doing?

A    Good afternoon.  How are you?

Q    Thank you.  I'm doing well?

A    You look younger than the last time I seen you.

Q    Thank you.

        Mr. Capasso, you just testified that you found out about Mr. Belvin's complaint in court papers; do you remember that testimony?

A    Yes.

Q    When you say "court papers," what do you mean?

A    We were -- we got a copy of the complaints from Mike Belvin and Mike Mayers.

Q    I'm sorry, you got a copy of the complaint from who?

A    Mike Mayers and Michael Belvin, you know, what they were accusing Electchester Management of.

Q    When you say "we" got it, who is the we?

A    I guess it was me, Tommy, and Anthony.  The managers.

Q    And who provided it to you?

A    I don't recall at the time.

Q    Okay.  Did you and Mr. Caiozzo discuss Mr. Belvin's case prior to you getting the lawsuit complaint?

A     No.

Q     Do you know if Mr. Caiozzo is the individual that approached you to discuss Mr. Belvin's complaint?

A     No.

Q     Are you sure?

A     Yes.

Q     Well, you don't recall who did.

A     No.

MR. VAN-LARE:  May it please the Court, I'd like to refer the witness to his deposition.

THE COURT:  Very well.

MR. VAN-LARE:  Thank you.  I will check for the date and give it in a second, your Honor.

THE COURT:  Thank you.

MR. VAN-LARE:  You're welcome.

This deposition was held on March 15, 2019.

THE WITNESS:  Right.

MR. VAN-LARE:  And Mr. Capasso was deposed only once.

Q     I'd like to refer your attention, sir, to Page 44 of your deposition.  And I will take you there in a second and I'm going to direct you to specifically look at Line 1.

Actually, it's not Line 1.  Sorry about that.

Let's just go to Line 21:

"Question, Do you know if Mr. Belvin filed a race

discrimination complaint?

"Answer, I am aware of it.

"Question, Yeah?

"Answer, I'm aware of it now, yes.

"Oh, you said --"

THE COURT:  Question?

Q    "Question, Oh, you said now?

"Answer, Yes.

"Question, You just became aware of that now?

"Answer, A couple of months ago.

"Question, Okay.  How did you get knowledge of that?

"Answer, Mr. Caiozzo.

"Question, Your fellow manager?

"Answer, Yes.

"Question, Okay.  Mr. Caiozzo informed you that
Mr. Belvin filed a race discrimination complaint, right?

"Answer, Yes."

Does that refresh your memory as to who informed you
about this complaint that Mr. Belvin filed?

A    Yes.

Q    So, Mr. Caiozzo was your fellow manager and he did start
this discussion with you.  You did not initiate this
discussion.

Correct?

A    No, but we had the lawyers.  We went --

CAPASSO - CROSS - VAN-LARE                454

Q    Don't tell me anything you may have said to the lawyer.

           THE COURT:  You had a meeting with the lawyers?

           THE WITNESS:  Yes, about this -- that we're having a

case.

           THE COURT:  Okay.

           Next question.

Q    I want to direct -- before I go to that, sir, do you know

the individuals designated in your company to receive

complaints of race discrimination or disability

discrimination?

A    It would be the general manager or our HR department.

Q    Do you know if the managers are also designated to be

people who receive those complaints?

A    If I get a complaint, yes, then I would have to forward

it.

Q    But my question is are you designated to be one of the

people that the employees --

A    Designated?  No.

Q    Thank you.

           Have you received any training in equal employment

opportunity matters?

A    We have it, the health -- executive health and safety.

We have a class there.

Q    Sorry?

A    And then the GIB, the GIB is once a year.  We have sexual

CAPASSO - CROSS - VAN-LARE                    455

harassment, a course on that.

THE COURT:  What is that?  The what?

THE WITNESS:  We call it the GIB building.

THE COURT:  The GIB building is what?

THE WITNESS:  It's our main office up the block.

THE COURT:  What does GIB stand for.

THE WITNESS:  I'm not too familiar with it.  I always call it the GIB.

THE COURT:  All right.

Q    Is it your testimony, sir, that since you've been employed, you received this training every year?

A    Yes, except for when we had COVID.

Q    Thank you, Mr. Capasso.

MR. VAN-LARE:  Your Honor, I'd like to direct the attention of the witness to his deposition Page 50.

THE COURT:  Very well.

Q    In front of you, sir, you should see on your screen Page 50; do you see that?

A    Yes.

Q    So, I will specifically direct you to Page 50, Lines 11 through 15, and I will read them to you.

At Line 11:  "Question, Have you attended a training class for equal employment opportunity in the workplace?

"Answer, I don't think so.  I don't know what that is anyway.

*Linda A. Marino, Official Court Reporter*

CAPASSO - CROSS - VAN-LARE                    456

           "Question.  Okay, no.  Have you attended any kind of
managerial training since you became a manager at
Electchester?

           "Answer, Electchester training?

           "Question, Yes.

           "Answer, As?

           "Question, Sure, I'll be glad to kind of explain it
more so you can understand me.

           "Answer, Yes, please.

           "Question, have you been to a training that has a
program which gives you classes on how to be effective as a
manager at your job?

           "Answer, No."

A     Well, there was two --

Q     Just hold on one second.  Did I read anything to you that
refreshed your memory regarding what kind of training you
received at Electchester?

A     At first, I didn't understand what you were talking
about, what kind of training.  And then you were saying about
a manager and the other training.

           THE COURT:  Is there a question?

           MR. VAN-LARE:  Yes.

Q     My question to you, sir, is you testified in your
deposition that you didn't receive training on equal
employment opportunity matters.

*Linda A. Marino, Official Court Reporter*

CAPASSO - CROSS - VAN-LARE                    457

A    At the time, I didn't know what it was.

Q    Yeah.  Is that still your answer today?

A    That?

Q    You did not receive any training on equal employment opportunity matters.

A    Like I said, we do have training.

Q    You were asked if you're aware --

        MR. VAN-LARE:  Strike that, your Honor.  I'm sorry.

Q    You were asked if you know whether Mr. Belvin's son ever worked at Electchester, and your response was no, correct?

A    Right.

Q    Do you have a relative who have worked or work for Electchester?

A    Me?

Q    Yes, sir.

        MS. SHEA:  Objection.

A    Yes, I had my son.  He's in the summer program.

Q    Thank you, sir.

        THE COURT:  What's the summer program?

        THE WITNESS:  It's Local 3.  The kids that are in college, they have them come, you know, help out a little bit to make some -- you know, to work, get experience, or whatever.

        THE COURT:  It's a Local 3 project?

        THE WITNESS:  Yes.

*Linda A. Marino, Official Court Reporter*

CROSS-EXAMINATION (Continued)

BY MR. VAN-LARE:

Q    You testified I believe, and correct me if I got it wrong, that Mr. Belvin was screaming at cooperators, was that your testimony?

A    I'm sorry, say that again.

Q    You testified that during the incident involving asbestos, in the empty apartment --

A    Right.

Q    -- Mr. Belvin was screaming at cooperators?

A    I didn't say he was screaming at cooperators.

Q    Okay.  Thank you.

A couple of employees were disciplined over the asbestos incident; is that correct?

A    Yes.

Q    But there was asbestos in that apartment; isn't that true?

A    In the adhesive, yes.

Q    And all the employee did really was to abate -- I mean was to take steps to abate it as much as possible; isn't that true?

A    That the employees?

Q    The employees?

A    They were just going to put down a floor, they weren't going to touch it.  Because we didn't know it was under there

CAPASSO - CROSS - MR. VAN-LARE          459

anyway until they started ripping it up.

Q    Is it possible that you disciplined these employees because they had the courage to speak out about the presence --

          MS. SHEA:  Objection.

Q    -- of asbestos?

          THE COURT:  Overruled.  You may answer that.

A    No.  It was the way they conducted there -- how they did it.

Q    You also testified that Mr. Mayers used racial epitaphs?

A    Yes.

Q    Did you hear that with your own ears?

A    No, I heard it from the witnesses.

Q    From who?

A    The witnesses, from the foreman and from the shop steward.

Q    So you were not present to actually hear it, correct?

A    No, not to hear, no, I just viewed it.

Q    Now you testified that Mr. Mayers said something about slave?

A    Yes.

Q    That was the word "slave" a comment that Mr. Mayers made?

A    Right.

Q    Can you tell me precisely what he said that involved the use of the word slave?

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

CAPASSO - CROSS - MR. VAN-LARE                460

A    It was the N word.

        MS. SHEA:  Objection.

Q    Okay.  It was the N word?

A    Yes.

Q    Okay.  So he used the N word --

A    Uh-huh.

Q    -- in a phrase involving the word slavery or slave?

A    Yes.  Slave, yes.

Q    Can you say exactly what he said?

A    I feel uncomfortable saying it.

        MS. SHEA:  Your Honor, object.

        THE COURT:  What's that?  I'm sorry.

        MS. SHEA:  I object to making him say it.

        MR. VAN-LARE:  If that was a statement he made I think it's important for the jury to hear exactly what he said.

        THE COURT:  I'm going to overrule the objection. You may answer the question.

A    All right.  Mike said in front of his --

        THE COURT:  Which Mike?

        THE WITNESS:  Oh, sorry.  Mike Mayers, said in front of his foreman, he's not his nigger slave.

Q    That what?

A    He's not his nigger slave.

Q    Okay.  And you considered that to be racist?

A    Yes, I do.

Q    Against who?

A    Against every -- we have rules and policies that no language like that is supposed to be permitted.

Q    So what you are saying is he used a word or phrase that is considered unprofessional and improper in the workplace?

A    Yes.

        MS. SHEA:  Objection.

Q    Thank you.

        THE COURT:  I'm going to strike the question and the answer on that.

        THE WITNESS:  Yes.  Okay.

        THE COURT:  That's a question for the jury not for you, sir.  Go ahead.

        MR. VAN-LARE:  I have no further questions, your Honor.

        THE COURT:  Anything else from defense?

        MS. SHEA:  Just one second, your Honor, please.

        THE COURT:  Sure.

        (Pause in proceedings.)

        MS. SHEA:  No, your Honor.

        THE COURT:  All right.  Very well.  The witness is excused.  You may stand down.

        THE WITNESS:  Thank you, your Honor.

        THE COURT:  You're welcome.

THE WITNESS:  Thank you.

MR. VAN-LARE:  Thank you very much.

(Whereupon, the witness was excused.)

THE COURT:  Since the witness said it to me, I will tell you what he said.  "You have a nice courtroom, I'm used to housing court."

So, okay, we're going to recess for the evening. I'm going to remind all of the jurors they are not to discuss the case with anyone.  You are not to discuss the case among yourselves.

Do not read, listen to, watch or access on the internet or anywhere any accounts of this case.  Do not research or seek outside information about any aspect of the case and attempt any investigation of the case.  Do not visit any location that's been discussed during the course of testimony.

Do not permit any other person to discuss the case in your presence, and you should not discuss with any of your fellow jurors the fact that anyone has done so, or the fact you feel it necessary to bring that to the attention of the Court.  And I remind you if anyone does discuss the case with you, you should only mention it to Mr. Reccoppa, who will then mention it to the Court.

We'll see you tomorrow morning at 9:30 where we're making every effort to move the case along smartly and so try

to be on time so we can get started at 9:30.

Thanks very much for your attention today, see you tomorrow.  All rise for the jury.

(Jury exits courtroom.)

THE COURT:  Please be seated everybody.  So now tomorrow, tell me about the witnesses.

MS. MOORE:  Tomorrow, your Honor, we have Richard Bonnette coming in.  We are attempting to work on Dr. Siegert does not -- he's traveling tomorrow.

THE COURT:  He's what?

MS. MOORE:  He's traveling tomorrow.  Dr. Siegert is likely not going to be available tomorrow.

Mr. Mundo is not available until Thursday.  As we previously informed the Court, he is traveling back from Antigua on his post retirement vacation.  So it looks like we have one witness ready for tomorrow and that's Mr. Bonnette.

THE COURT:  How long is his testimony?

MS. MOORE:  Mr. Bonnette's testimony will probably take as long as Mr. Caiozzo and Mr. Prezioso's testimony did today, one to two hours with the cross-examination of Mr. Van-Lare.

THE COURT:  So there are two witnesses for Thursday, is that what you're telling me?

MS. MOORE:  Yes, your Honor.

THE COURT:  And those two witnesses, how long will

PROCEEDINGS                                              464

they take?

MS. MOORE:  They will take --

THE COURT:  On direct.

MS. MOORE:  On direct I believe we can finish them before the lunch break.

THE COURT:  And then so that would be end of your case.

MS. MOORE:  Yes, your Honor.

THE COURT:  Do you have a rebuttal?

MR. VAN-LARE:  No, your Honor.

THE COURT:  You don't expect any.

Well, then I would expect after lunch that we would have closings and then I would charge the jury.

MR. VAN-LARE:  And that would be on Thursday, your Honor?

THE COURT:  That would be Thursday, but we don't meet on Friday.  Friday is a federal holiday, I'm not bringing the jury in on a federal holiday, which would mean they would have to start their deliberations on Monday.

MS. MOORE:  Yes, your Honor.

THE COURT:  We can hold the charge conference tomorrow afternoon.

MS. MOORE:  Yes, your Honor.

THE COURT:  We'll provide you with the draft charge sometime tomorrow morning, you can look at it lunchtime.  We

PROCEEDINGS                              465

can have charge conference in the afternoon and it's not

necessary for the parties to be here for the charge conference

unless you want them here.  All right.

MR. VAN-LARE:  We will explain that to them.

MS. MOORE:  Yes, your Honor.

THE COURT:  I'll inform the jury that due to

scheduling, we will finish the case on Thursday morning and

then we'll take it from there.

MS. MOORE:  Yes, your Honor.

THE COURT:  Anything else for today?

MR. VAN-LARE:  The only thing is for the expert

witness, your Honor.  I do have court cases I just pulled up

and I intend to use them for impeachment purposes.  I would

provide them to counsel.  I haven't provided them before now,

but he's an expert witness.

THE COURT:  You have cases?

MR. VAN-LARE:  Out of New Jersey two cases in which

the Court issued opinions admonishing him for false

litigation.

THE COURT:  Well, you can't ask them about, you

know, whether -- you can ask them proper questions about

whether they have testified before and whether they've ever

been admonished by a Court, you can figure that out subject to

any objections from the defense, but you're not going to bring

a case and talk to them about a case by a judge.

PROCEEDINGS                      466

MR. VAN-LARE:  No, not in that respect.

THE COURT:  Well, we'll see what you've got.  And we'll go from there.

MR. VAN-LARE:  Thank you, your Honor.

THE COURT:  Which is the expert witness, is this for Thursday?

MS. MOORE:  Yes, I believe Dr. Siegert will be called on Thursday.

MR. VAN-LARE:  Psychologist.

MS. MOORE:  He's our expert psychiatrist -- psychologist.

THE COURT:  As to Mr. Mayers?

MS. MOORE:  As to Mr. Mayers.

THE COURT:  And so you'll go what, into the middle of the morning tomorrow?  Or will it be longer than that?

MS. MOORE:  Thursday.

THE COURT:  No, no, I'm back on your witness for tomorrow.

MS. MOORE:  Tomorrow, probably I don't think -- yes, by the lunch break we should be finished with Mr. Bonnette, that's pending issues that come up or questions by Mr. Van-Lare.  With that caveat, I don't expect him to testify three to four hours, certainly one to two hours I think what we would expect from Mr. Bonnette.

MR. VAN-LARE:  I think I'll probably spend half of

PROCEEDINGS                    467

the time that you spent on him, because he's the union shop

steward, so I don't anticipate --

THE COURT:  I'm sorry, you have to talk to me --

MR. VAN-LARE:  I'm sorry.

THE COURT:  -- not to counsel.  I'm up here so you

talk to me.  You were saying.

MR. VAN-LARE:  I was saying that I think I will

spend half the time that she spends.  I don't expect to spend

too much time with him.

THE COURT:  I'm not understanding why your witnesses

for the defense are not available, you know, for a four-day

trial because they're traveling.  This I don't understand.

They've just got to be -- I just don't understand it.  So

explain it to me.  I don't understand it.

The cadence of the trial is whatever it happens to

end up, and so now I'm going have the jury come in a second

week because your witnesses are traveling.  I could have

finished this trial on Thursday potentially and -- but I don't

understand.  Why are they traveling when they should be coming

to court.

Should I have said they must sit out there for three

days so the Court is not going to be burdened with having to

go into a second week?  Is that what you're telling me?  That

from now on whenever I hold a trial, I've got to hold people,

you know, as prisoners in the lobby so I can get the trial

PROCEEDINGS                        468

done?

I mean, it's not one witness, it's two witnesses. They're both on travel, what the heck is that?  That's not acceptable.  But what I ought to do, frankly, is take your testimony, tell you to call the next witness and if the next witness doesn't show up, that's the end of your case.  That's what I should do.  And I'm considering doing it.

I set this trial down and you should have had your witnesses available when we needed them.  And they're traveling.  Why couldn't they travel yesterday?  This is a court.  I'm not a travel service.  So they should show up whenever they are done with their vacation.

Where are they?  Where are they?  I want to know, put on the record where are they and why couldn't you get them here this week on a schedule that the Court set?  When did you tell me that they wouldn't show up until Thursday?

MS. MOORE:  Well, your Honor, we did inform the witnesses when the trial was and told them under no uncertain terms that they were to be present.  We did previously inform the Court that Mr. Vito Mundo was going to be on vacation until I believe it was the eighth.  We informed the Court --

THE COURT:  Today is the eighth.

MS. MOORE:  And --

THE COURT:  And tomorrow is the ninth, so where is he?

MS. MOORE:  He is in -- right now as of 6 p.m. he's probably right now in the air.

THE COURT:  Well, get him here tomorrow.  If you don't get him here tomorrow, you can forget about him.

MS. MOORE:  Well, he's landing in Florida tonight.

THE COURT:  He's what?

MS. MOORE:  He's landing in Florida.

THE COURT:  Tell him to get on a plane, get here tomorrow morning.  Where is he?  Is in Palm Beach, is he in Miami?

MS. MOORE:  I'm not certain.

THE COURT:  Well -- and I would add, there's a hurricane coming to Florida.  I don't even know when that's happening.  I'm not putting this trial off until next week.  Get him here tomorrow morning.  We'll put him on the witness stand tomorrow afternoon.  That's all.  It's a two-hour flight from Palm Beach or Miami or Daytona Beach or wherever.  There are nonstops, lots of them.  That way we only have one witness on Friday, the psychologist, and then we might get this trial over on Friday -- Thursday, rather.  That's the solution.

He's on vacation.  Are we on vacation?

See you tomorrow.

MR. VAN-LARE:  Thank you, your Honor.

(Whereupon, the trial adjourned at 5:20 p.m. to resume Wednesday, November 9, 2022 at 9:30 a.m.)

470

I N D E X

WITNESS                                          PAGE


**MICHAEL MAYERS**

DIRECT EXAMINATION     BY MR. VAN-LARE     239

CROSS-EXAMINATION      BY MS. MOORE        248

REDIRECT EXAMINATION   BY MR. VAN-LARE     271


**THOMAS PREZIOSO**

DIRECT EXAMINATION     BY MS. MOORE        282

CROSS-EXAMINATION      BY MR. VAN-LARE     324

REDIRECT EXAMINATION   BY MS. MOORE        350

RECROSS-EXAMINATION    BY MR. VAN-LARE     352

REDIRECT EXAMINATION   BY MS. MOORE        354


**ANTHONY CAIOZZO**

DIRECT EXAMINATION     BY MS. MOORE        358

CROSS-EXAMINATION      BY MR. VAN-LARE     406

REDIRECT EXAMINATION   BY MS. MOORE        430


**JOSEPH CAPASSO**

DIRECT EXAMINATION     BY MS. SHEA         433

CROSS-EXAMINATION      BY MR. VAN-LARE     451

471

E X H I B I T S

| PLAINTIFF | PAGE |
|-----------|------|
| 37        | 243  |

E X H I B I T S

| DEFENSE | PAGE |
|---------|------|
| GG      | 298  |
| D       | 378  |
| E       | 379  |
| I       | 388  |
| S       | 393  |
| T       | 394  |
| Y       | 399  |
| AA      | 449  |