Case 1:17-cv-06303-NGG-MMH   Document 117-4   Filed 12/03/22   Page 1 of 96 PageID #: 3702

472

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------x
                                        17-CV-6303(NGG)
BELVIN ET AL.,

                                        United States Courthouse
          Plaintiffs,                   Brooklyn, New York

          - versus -                    November 9, 2022
                                        9:30 a.m.
ELECTCHESTER MANAGEMENT,
LLC,

          Defendant.
-------------------------------x

                TRANSCRIPT OF CIVIL CAUSE FOR TRIAL
          BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
             UNITED STATES SENIOR DISTRICT JUDGE
                        BEFORE A JURY

APPEARANCES
Attorney for Plaintiffs:

                              LAW OFFICES OF ALBERT VAN-LARE
                              125 Maiden Lane, Suite 510
                              New York, New York 10038
                              BY:  ALBERT VAN-LARE, ESQ.


Attorney for Defendant:
                              WILSON ELSER MOSKOWITZ
                              EDELMAN & DICKER LLP
                              150 East 42nd Street
                              New York, New York 10017-5639
                              BY:  MARIELLE ALECIA MOORE, ESQ.
                                   CORRINE SHEA, ESQ.


Court Reporter:               LEEANN N. MUSOLF, RPR, CCR
                              Phone:  718-613-2374
                              Fax:    718-613-2267
                              Email:  lmusolf.edny@gmail.com




Proceedings recorded by mechanical stenography.  Transcript
produced by Computer-aided Transcription.

*LEEANN N. MUSOLF, RPR, CCR*
*Official Court Reporter*

(In open court.)

THE COURTROOM DEPUTY:  Cause on trial.  Beginning with the plaintiffs, please state your appearances for the record.

MR. VAN-LERE:  Albert Van-Lare for the plaintiffs.

Good morning, Your Honor.

THE COURT:  Plaintiffs are here.

MS. MOORE:  Marielle Moore for the defense, and Ms. Shea is in the building gathering our first witness.

THE COURT:  Oh, okay.  All right.  Please be seated, everybody.  Here she is.

All right.  So, how are we doing in the witness department?

MS. MOORE:  Well, Your Honor, we have Mr. Bonnette here and ready to go and Mr. Mundo landed at LaGuardia Airport about ten minutes ago and is in route now so we'll have Mr. Bonnette, Mr. Mundo, and Dr. Siegert will be here tomorrow at 9:30 in the morning ready to go.

THE COURT:  Great, that's fine.  Glad to hear it.  And we will have drafts of the charge and the verdict sheet for you at the break this morning and when you've completed testimony on these two witnesses, we'll have a charge conference, we'll have a little time in between so you can actually look at the charge and the verdict, draft verdict sheet.

474

Anything from plaintiff?

MR. VAN-LERE:  Not at this time, Your Honor.

THE COURT:  What's that?

MR. VAN-LERE:  Not at this time, Your Honor.

THE COURT:  Okay, very well.  All right, the jury is here so let's get started.  And where is the first witness?

MS. SHEA:  He's waiting outside, Your Honor.

THE COURT:  Why don't you just bring him into the courtroom and have him sit in the gallery.

(Jury enters the courtroom.)

THE COURT:  Please be seated, everyone.

Good morning, members of the jury.

THE JURY:  Good morning.

THE COURT:  All right.  We'll continue with the defense case this morning.

The defense may call it's next witness.

MS. SHEA:  Your Honor, we call Mr. Richard Bonnette.

THE COURT:  Mr. Bonnette, please come up.

THE COURTROOM DEPUTY:  Please state and spell your full name for the record.

THE WITNESS:  Richard T. Bonnette, B-O-N-N-E-T-T-E.

THE COURT:  You may inquire.

(Continued on next page.)

BONNETTE - DIRECT - SHEA                    475

(Witness takes the witness stand.)

**RICHARD BONNETTE**, called as a witness, having been first duly

sworn/affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. SHEA:

Q    Good morning.

A    Good morning.

Q    Could you please introduce yourself to the jury?

A    My name is Richard Terrance Bonnette.

Q    Who is your current employer?

A    Electchester, LLC.

Q    What is your current title and position at Electchester?

A    I provide services to the buildings as a porter and I'm a
shop steward for the union that represents the men in the
building.

Q    Can you clarify for the jury what union that is, please?

A    As a shop steward?

Q    Yes, the name of the union.

A    32B-J is the name of the union.

Q    How did you come to be employed by Electchester?

A    In 1984, I became employed by Electchester by my father.
I was in the middle between the NYPD, I was looking to be a
police officer and the job at Electchester came up and I took
it.

Q    And you said you began at Electchester in 1984, is that

BONNETTE - DIRECT - SHEA                        476

correct?

A     Yes.

Q     At that time, were you employed by one of the individual housing companies?

A     Yes, Fourth Housing.

Q     When did you become a shop steward?

A     I officially became a shop steward in 2003.  I was initially proposed to be a shop steward in 1993.

Q     Can you explain what happened between 1993 and 2003 when you actually got shop steward?

A     I -- my activities with the union, I fell under the to the lag of a gentleman named Sal Miller.  He was a shop steward, he took me under his wing and he taught me about, you know, union activities, participating in union events and, you know, represent -- how to represent the -- how to speak to management and going out everyday or whenever there was an event to go to.

Q     What are your responsibilities as a shop steward?

A     Responsibilities of a shop steward is -- I'm almost, I'm the liaison between management and the union.  I'm the eyes and ears of the union.  So I represent the men that are employed in the building.  So if anyone has a problem with management, or if anybody has a problem with the supervisor, they come to me, and my job is to speak to management or the supervisor to basically solve the problem.

BONNETTE - DIRECT - SHEA          477

When it's more severe, a suspension or a termination, the union, then, gets involved and I pass it on to the union and then they take it from there. But see, the thing is -- it's not that I only deal with grievances or problems, I also deal with information, you know, I give the guys information on what's going on with the union pertaining benefits and pension and so on and so forth.

Q    Do you like being a member of a union?

A    Yeah, 38 years.

Q    Can you please tell the jury a little bit about your specific union involvement, any extra awards or, you know, involvement with the union outside of your role with Electchester?

A    Yes, that's interesting. I've won three accommodations from the union for performance, I also worked up at union on a temporary basis back in 2011. They offered me a full-time position. I turned it down because I felt I was more valuable in the building. Also, I'm on the executive board of the union, I sit on the executive board and I've sat on the electoral board.

Q    So is it fair to say that you take your role as the liaison between the employees and at Electchester very seriously?

A    Yes.

Q    You've touched on this a little bit, but in your capacity

BONNETTE - DIRECT - SHEA                    478

as a shop steward, what happens when you receive a complaint from an Electchester employee?

A    Well, he comes to me with the complaint, I listen to him, then I do my written investigation in-house.  I, then, reach out to the supervisor, if it's pertaining to the supervisor, or then I'll reach out to the management.  We'll sit down, we'll discuss the issue, and we'll try to resolve it.

Q    Have you ever made a complaint to the union -- oh, actually, let me back -- I withdraw that question.

        Do you know Mr. Belvin?

A    Yes.

Q    How do you know Mr. Belvin?

A    Through our employer, Electchester Management.

Q    And do you know Mr. Mayers?

A    Yes.

Q    How do you know Mr. Mayers?

A    Through our employment with Electchester.

Q    Can you please, for the record, point to or identify who Mr. Belvin is.

A    Mr. Belvin is the gentleman in the yellow shirt.

Q    And Mr. Mayers?

A    He's the one in the blue and white shirt.

        THE COURT:  All right.

Q    Thank you.

        THE COURT:  The witness has identified the

BONNETTE - DIRECT - SHEA          479

plaintiffs in this case.

Q    Have you ever made a complaint to the union about Mr. Belvin?

A    Yes.

Q    Can you, please, explain why.

A    2017, I believe it was January, sometime January of 2017, there was an altercation between me and Mr. Belvin in the parking lot of Second Housing.  He -- basically, he threatened me.

Q    Can you please explain how?

A    Me and Mike Mayers, we had just punched out for lunch and me and Mr. Mayers we were walking parallel -- the parking lot is garages and parking spots, we were walking parallel to the garage, once we left the garage space, Mr. Belvin and Mr. Jenkins J, they were walking in your direction, I left Mike to go speak to Mr. Jenkins.  Mr. Jenkins had been walk can with Mr. Belvin.

As I was speaking to Mr. Jenkins, Mr. Belvin continued to walk towards Mr. Mayers.  Mr. Belvin had proceeded to yell out Jenkins not to listen to me, that I wouldn't do anything to help him.  Mr. Jenkins was telling me, ignore him, don't pay him any mind.  Mr. Belvin kept yelling out, he's not going to help you, he's no good, so on and so forth.

Eventually, I told Mr. Belvin I said how about you

BONNETTE - DIRECT - SHEA                    480

keep walking and just keep my name out of your mouth.  Mr.

Mayers was actually grabbing Mr. Belvin to hold him back

basically to keep him quiet.  He started to walk away and

Mr. Belvin says to me, why don't you come across the street, I

have something for you, I'll see you across the street.

That's it.

Q    Did you document this incident?

A    Yes, I did.

Q    How did you document this incident?

A    Well, first -- my first reaction was to speak to the

union, so I contacted 32B-J.  They instructed me to go to

management.  I spoke to management.  I had to, then, place --

put it in writing, and then it was delivered to upper

management and it was dealt with from that point.

          MS. SHEA:  Your Honor, at this time, I would like to

please show the witness the exhibit that's previously been

marked for identification purposes as Defendant's Exhibit JJ.

          THE COURT:  All right, go ahead.

Q    Mr. Bonnette, can you see this document on your screen?

A    Yes.

Q    Are these the complaints that you submitted to

Electchester?

A    This is one of them, yes, and this is --

Q    Is this the other one?

A    This is the other one, yes.

*LEEANN N. MUSOLF, RPR, CCR*
*Official Court Reporter*

Q    Did you submit these complaints on or about the dates on the top of these emails?

A    Yes.

MS. SHEA:  Your Honor, at this time, I would like to move to introduce Defendant's Exhibit JJ into the record.

MR. VAN-LERE:  Plaintiff has no objection, Your Honor.

THE COURT:  All right.

Defense Exhibit JJ is received in evidence and published to the jury.

(Defense Exhibit JJ, was received in evidence.)

(Exhibit published.)

Q    So this is the first incident.  Could you please explain to the jury.

A    The Key Food incident, yes.  Me and a fellow employee, Mr. David Hewit, we were going to key offend for lunch.  As we were entering Key Food we recall exiting Key Food.  Mr. Belvin yelled out, speaking to Dave, I don't know why you hang out with this back stabbing motherfucker, you know, expletive.  At this point, me and Mr. Hewit, we continued to walk into Key Food.  No words were exchanged or anything like that.

Q    Okay.  And can you please explain this email to the jury?

THE COURT:  This is the second email dated January 29th of 2017?

MS. SHEA:  Yes, Your Honor.

BONNETTE - DIRECT - SHEA                    482

THE COURT:  Go ahead.

A     Okay.  This incident took place in the early morning hours.  I had just gotten to the job.  I had just gotten to the property.  I had parked my car.  Mr. Belvin had been walking to his place of employee.  He saw me park my car, turned around, came up to me as I was exiting my car and started yelling at me and he's calling me a punk ass mother F-er, you know.

Q     Mh-hmm.

A     I then, in turn, said why don't you keep walking and where I stand is where a man stands, I don't look for problems.  Where you stand is where you stand, so do me a favor and just keep walking.  Mr. Belvin, he said nothing else after that.  He did turn around and he continued on his way.

Q     And what was the result of these complaints?

A     The -- the incident in the parking lot, he was suspended, and these two I think he was also suspended for.  I believe they were put together, it was a grievance of harassment put together, and he was suspended -- written up and suspended for them.

Q     And after that disciplinary action, were there any further instructions, to your knowledge?

A     The -- after the incident in the parking lot, part of his stipulation was he wasn't allowed to walk within this premise of Second Housing to --

*LEEANN N. MUSOLF, RPR, CCR*
*Official Court Reporter*

BONNETTE - DIRECT - SHEA                    483

Q    Do you recall a time after that instruction when Mr. Belvin came onto Second Housing?

A    Absolutely.  I don't -- I don't remember the date or the month or time of year, I don't remember, but I remember the incident.  I was walking over to Fourth Housing to meet with a couple of guys to speak to them about some union activities I wanted them to come out with me on.

As I'm walking, I see Mr. Belvin going -- he -- he had already entered the Second Housing property, within the Second Housing property.  So now he's in the parking lot area. I -- I'm already across the street.  I turn around, I see him. He looks back at me and then I immediately made a phone call to Mr. Joe Capasso.

Q    Thank you.  In your capacity as a shop steward, did Mr. Belvin or Mr. Mayers ever complain to you about monkeys or stuffed animals?

A    Mr. Belvin did.

Q    Can you please explain?

A    Mr. Belvin had spoke to me about there was in-house racism going on amongst the men.  He sent me a picture, he told me he had evidence of this activity, and he sent me a picture of a -- of a stuffed gorilla.  When I asked him, when did this happen so that I can then do what I have to do in my capacity as a shop steward to speak to the members to try to find out what's going on.  Mr. Belvin had told me it happened

upward up to a year ago, anywhere between eight months to a year ago.  And I remember saying to Mr. Belvin, why would you bring to this my attention eight months later.  I don't remember the time, but I know it was in -- I know it was more than six months.

Q   Did he say anything else when you were asking --

A   He told me that he spoke to the supervisor at that time, Mr. Juan Martinez, he brought it to his -- to him.  He said Juan was supposed to have taken -- given it to -- brought it to management's attention, but he told me Juan wouldn't -- Juan didn't do that because Juan was racist against black people.

Q   In your capacity as a shop steward, did Mr. Belvin or Mr. Mayers ever lodge any complaints to you about a picture of President Obama?

A   Never.

Q   In your capacity as a shop steward, did Mr. Belvin or Mr. Mayers ever complain to you that another employee of Electchester Management called him the N-word?

A   No.

Q   In your capacity as a shop steward, did Mr. Belvin complain about an employee named David Bourgade?

A   Yes.

Q   Can you please explain this incident?

A   It was around -- right before Christmas.  I got a call

BONNETTE - DIRECT - SHEA                    485

from Mr. Belvin right before I was leaving to go home.  I didn't answer the phone, I was tied up.  The Monday after the holidays, I came in and it was brought to my attention that in the storage room in the building that Mr. Belvin was working in, Mr. Bourgade and another employee were in that room doing whatever work that they were assigned to do.  Mr. Belvin went into the room and David Bourgade spoke -- said to him, hey, boy, but he -- he said it in a comical way, I mean.

Q    And what did you do after this complaint?

A    I spoke to David Bourgade and it went to management and David Bourgade was suspended.  There was a hearing within the Housing and David Bourgade was suspended for one day.

Q    So it's accurate to say you were involved in this investigation into Mr. Belvin's complaint?

A    Yes.

Q    Did you ever learn that Mr. Mayers had been diagnosed with cancer?

A    Yes.

Q    Do you recall any card or collection going around Electchester for Mr. Mayers while he was out on leave?

A    Yes.

Q    Did you contribute?

A    Yes, I did.

Q    Did you witness another incident where Mr. Mayers used the N-word when speaking with his foreman?

BONNETTE - DIRECT - SHEA                486

A    Yes.

Q    Can you please explain?

A    We had a supervisor at the time, his name was Enis, forgive me, I don't remember his last name.  Mr. Mayers had wanted me to come to -- to the shop to speak to me, with Enis, about an issue that was taking place across the street in the First Housing where he's employed.

When I get there, Mr. Mayers was -- he was waiting for me.  When I get to the shop, him and Enis -- Mr. Enis are already in the shop.  I'm coming in, he starts explaining the issue.  Enis told Mr. Mayers the issue didn't involve him and why was he over in that area.  He hadn't reached out on the radio to say that he was going into that specific area.  Once Enis said that, Mr. Mayers, he chuckled, backed up, then stepped forward, Mr. Enis was sitting down, may have stood over him, and he says to him, what I am, your N slave.

He said it aggressively.  Well, once he said that, I -- I told Mr. Mayers to go home.  And, you know, he walked out, he left, but Enis was very distraught after that.

Q    Did Mr. Mayers ever call you the N-word?

A    Yes, he did.

Q    Can you please explain?

A    We were having a meeting in the park.  There were union personnel that was coming to this meeting, we were trying to resolve some issues.  I was sitting down at a -- the

BONNETTE - DIRECT - SHEA                    487

checkerboard table.  It's a stone table in the park.  I don't know if you guys are aware of that.  And I was sitting.  Mr. Mayers was standing.  He -- I had said -- he -- he was making a comment about me doing my job.  I said to Mr. Mayers, you seem to have all the answers.  He steps to me, in an aggressive fashion, and he stands over me and he says, do your job, N-word.

Q    Did other employees complain to you about Mr. Mayers bullying them?

A    Yes.

Q    What did you do with these complaints?

A    I had them -- they -- I had them write down their complaints.  You have to put -- you have to log it, so it has to be put down -- you have to write it, you have to document it.  They wrote down the incidents that have happened -- would happen with them and Mr. Mayers and they brought it to, you know, they gave it to me and I passed it on to management.

MS. SHEA:  Your Honor, I'd like to show the witness what's been previously marked for identification purposes as Defendant's Exhibit EE.

THE COURT:  Go ahead.

Q    Mr. Bonnette, can you see these documents on your screen?

A    Yes.

Q    Can you please identify these -- I'm going to, actually, scroll.  There's seven pages, so let me scroll first.

*LEEANN N. MUSOLF, RPR, CCR*
*Official Court Reporter*

              Did you see all of that?

A     Yes.

Q     Are these the complaints given to you by other employees?

A     Yes.

Q     And, that, you gave to management at Electchester?

A     Yes.

          MS. SHEA:  Your Honor, I would like to move to enter Defendant's Exhibit EE into evidence.

          MR. VAN-LERE:  I have no objection, Your Honor.

          THE COURT:  All right.

          Defense Exhibit EE is received in evidence and published to the jury.

          (Defendant's Exhibit EE, was received in evidence.)

          (Exhibit published.)

Q     Mr. Bonnette, I'm going to ask you questions about each of these.  As they are seven pages, I'm going to take it one by one, okay?

A     Okay.

Q     Do you recall Mr. Brian -- actually, can you please identify who Mr. Brian Goldberg is for the jury?

A     Mr. Brian Goldberg, he's no longer with Electchester, but he was once an employee of Electchester Management.

Q     What was his role?

A     He was a handyman.

Q     And can you please explain what his complaint was?

                    LEEANN N. MUSOLF, RPR, CCR
                       Official Court Reporter

BONNETTE - DIRECT - SHEA                489

A     His complaint, it was in reference to Mike coming into the shop and always sputtering white privilege.  And, basically, Mr. Goldberg, that was his main complaint, that Mike would always talk white privilege.

Q     And Mr. Louis Jaramillo.  Could you please identify who Mr. Louis Jaramillo is?

A     Louis Jaramillo, he was also an employee of Electchester Management.  His complaint -- Louis Jaramillo, he didn't speak English that well.  He was a little overweight and Mike liked to poke fun at him for his weight.  Not for his language actually but more for his weight.  He was a pretty hefty man.

Q     Okay.  Moving on to the next one.  This one appears to be handwritten by Khaheem Merriman.

A     Yes.

Q     Can you please identify who Khaheem Merriman is?

A     Khaheem Merriman was also an employee of Electchester in a handyman capacity.  His -- his letter was written, not in reference to Mike poking fun of him or making fun of him personally, his letter was written more so he was -- he felt uncomfortable with the antics that would take place in the shop from Mr. Mayers.

Q     Was that regarding any -- withdrawn.

         Can you please identify who Mr. William Lee Elliot is?

A     Handyman at Electchester.

BONNETTE - DIRECT - SHEA                    490

Q    What was Mr. Elliot's complaint?

A    Mr. Elliot's complaint was similar to Mr. Merriman's. He -- you know, to be, you know, to come to work to do your job, and to always have an individual constantly talking about race and making fun of others, it's -- it makes people uncomfortable.

Q    What race is Mr. Elliot?

A    He's White, White American.

Q    And I'm sorry, I forgot to ask, what race is Mr. Merriman?

A    Black.

Q    And Mr. Jaramillo?

A    Hispanic.

Q    And Mr. Goldberg?

A    White.

Q    Thank you.  Can you please identify who Mr. Aldo Torres is?

A    Aldo is a porter.  He's employed with Electchester.  He's Hispanic.  He would also constantly -- Mike would play with Aldo, pull on his key ring and he's -- he's kind of a little short in stature, you know, Mike would make fun of that.  Mike would make fun of his language.  He speaks English, but he speaks with an accent.

Q    Can you please identify who Mr. Martires Saliche is, who I believe is also known as Danny?

BONNETTE - DIRECT - SHEA                491

A     Yes.  He's a handyman.  He's Hispanic.  He's the same --
it's the same basic complaint of Mike making fun of the
Hispanic guys and Danny felt uncomfortable with it.

Q     And Mr. Gio Trocchia, can you please identify who Mr. Gio
Trocchia is?

A     Mr. Gio Trocchia, he's white.  He's an employee.  He's a
handyman.  His write up is a little different than the others.
There was an incident between him and Mr. Mayers by -- I
believe it was by the time clock where the guys punch in and
out.  Mr. Mayers pat him on his backside and said to him,
you're my favorite little white boy.

Q     And it was your testimony that these employees gave these
complaints to you and you gave them to management, is that
correct?

A     Yes.

Q     To your knowledge, how did Electchester Management
respond to these complaints?

A     Well, the -- the -- all right, the complaint with Gio
Trocchia, Mike was suspended for that.  The other ones, he --
he was spoken to by upper management.  There was a meeting
that we participated in where they spoke to him about that and
told him, basically, to stop that behavior.

          MS. SHEA:  Your Honor, I'm just going to review my
notes.  I think I'm almost done with this line of questioning.

          THE COURT:  All right, thank you.

BONNETTE - DIRECT - SHEA                    492

Q    Mr. Bonnette, how did Mr. Mayers talk about white privilege?

A    He would walk into the shop, everyone would be in the shop, you know, preparing to go back to work after lunch, Mike would come in and he would -- he would just start clowning around and he would always say to the -- to the white employees, oh, you guys have nothing to worry about, you guys fall under white privilege, you guys are good, you can do no wrong.

Q    And how did Mr. Belvin talk about race in a way that made others uncomfortable?

A    Mr -- well, Mr. Belvin, he -- he didn't really -- Mr. Belvin didn't really deal with the guys, he basically stayed off to himself, but he would -- he would make comments, like, when we would talk, he would -- he would make comments to me.  He would always say that Hispanics are stupid, they're not smart people.  He would always say that white people can never be trusted.  You can never trust a person who is white. He -- he once told me that -- never to use the bathroom after a white person.

            (Continued on the following page.)

DIRECT EXAMINATION

BY MS. SHEA: (Continuing.)

Q    And why is that?

A    He said because white people had parasites that would -- that would attack black people.

MS. SHEA:  Thank you, Your Honor.  No further questions at this time.

THE COURT:  Cross-examination.

CROSS-EXAMINATION

CROSS-EXAMINATION

BY MR. VAN-LARE:

Q    Good morning, sir.

A    Good morning.

Q    How are you?

A    I'm good.

Q    My name is Albert Van-Lare and I represent the two plaintiffs in this case.

Mr. Bonnette, you are the steward for the union that the two plaintiffs belong to; correct?

A    Yes.

Q    And your job as a shop steward is to represent your members; correct?

A    Yes.

Q    And these two individuals are your members; correct?

A    Yes.

BONNETTE - CROSS - VAN-LARE                494

Q    They have been your members since they came to work for Electchester; correct?

A    Yes.

Q    You, in fact, began to work for Electchester before they became employed; correct?

A    Correct.

Q    And your job as a shop steward is to advocate for the interest of your own members; correct?

A    Yes.

Q    And your job is to protect your members; correct?

A    Yes.

Q    Were you elected or appointed as a shop steward?

A    I was appointed.

Q    Who appointed you?

A    32BJ.

Q    Is there a committee or the executive board?  How is the appointment done?

A    The appointment is done through activity.  You show -- once you become a union member, if you -- if you become active in union activity, if you participate in union events and you show the wherewithal that you are an upstanding union member, you will -- you are then appointed if you're interested or if there's a position available.  You are then sworn in by the union.

Q    And in the time that you've been with Electchester, you

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

have shown a lot of interest in union work; correct?

A    Repeat.

Q    I said:  In the time that you've been --

MR. VAN-LARE:  Let me rephrase that.

Q    During your employment with Electchester, you have shown a lot of interest in union work --

A    Yes.

Q    -- on behalf of your members; correct?

A    Yes, I have.

Q    And you just testified that, in fact, you are appointed at one point to temporarily work as a full-time union official; correct?

A    Yes.

Q    But you chose to come back to Electchester because you believe you can be more effective working in the buildings; correct?

A    Yes.

Q    You became a shop steward in 2003; is that correct?

A    That's correct.

Q    Is there any other individual at Electchester who is a shop steward other than you?

A    At this moment, no.

Q    Okay.  But during your tenure as a shop steward, are you the only person who was a shop steward, or at one time you work concurrently with somebody else?

BONNETTE - CROSS - VAN-LARE                    496

A    Yes.  There was three of us.  There was Mr.  Sal Miller,

and a Mr. John Petrocelli.

Q    Do you know why those two individuals are no longer shop

steward?

         MS. MOORE:  Objection.

         THE COURT:  Sustained.

Q    Did Mr. Belvin ever express to you that he has no

confidence in your role as a shop steward?

A    He had expressed to me that he had no confidence in --

yes.

Q    And you, in fact, represent employees when they get into

trouble; correct?

A    Yes.

Q    If an employee does something wrong and management

believes they need to be cautioned or disciplined, they ask

them to bring their shop steward in; correct?

A    Yes.

Q    And you go there and you advocate for the members, try to

let management know whatever the position of that individual

is; correct?

A    Yes.

Q    And, in fact, you have represented Mr. Belvin during his

employment; correct?

A    Yes, I have.

Q    And you have represented Mr. Mayers as well during his

BONNETTE - CROSS - VAN-LARE                497

employment; correct?

A    Yes, I have.

Q    In fact, some of this disciplinary action that have been referred to today by counsel are actions in which you sat on his side as his representative; correct?

A    On the side of?

Q    I'm sorry?

A    Could you repeat?

Q    Oh, sure.

A    Okay.

Q    Some of the actions that counsel went through with you where Mr. Mayers and Mr. Belvin were disciplined, they were activities in which you represented them; correct?

A    Yes, yes.

Q    And, as a union rep who represented them, you chose to come here today and discredit them -- discredit them on a matter that you previously represented them on; correct?

        MS. MOORE:  Objection.

        THE COURT:  You may answer.

A    I wasn't -- I'm not here to discredit anyone.  I'm here to tell the truth.

Q    Who ask you to come here?

A    Counsel.

Q    Did counsel tell you why you needed to be here?

A    I was told of this -- the -- the hearings that was going

BONNETTE - CROSS - VAN-LARE                498

on and if I could speak on behalf of the membership that I represent.

Q    It's your testimony that you came here to speak on behalf of union members?

A    Absolutely.

Q    Correct?

A    Absolutely.

Q    The union authorize you to come here and speak on its behalf?

A    32BJ?

Q    Authorize you --

A    No.

Q    -- to come here and speak on their behalf?

A    No.

Q    You are here as an employee to speak on your own behalf; isn't that true?

A    I'm here to speak on behalf of the membership of Electchester, LLC that I am a part of and that I represent as a shop steward.

Q    At what time did you have a meeting with your members to get authorization to come here and speak on their behalf?

A    When the -- the members -- the documents that we went through --

Q    That's not my question, sir.  My question is simple.

THE COURT:  Wait a minute.  He has a right to answer

BONNETTE - CROSS - VAN-LARE                    499

the question that you asked, and if you want his answer

stricken, you can ask after he finishes his answer, but you

can't interrupt his answer to your question.

You may answer the question.

THE WITNESS:  Thank you.

A    The documents that were presented forward of the

complaints that the members wrote says it all because I would

like to say, you asked me if I represent Mr. Mayers and

Mr. Belvin, or had I represented Mr. Mayers and Mr. Belvin in

the past because I was their shop steward.  I said yes.  But

you have to also understand something.  I also represent the

other 63 men that work in that building.

Q    My question to you, sir, is:  At what time -- if you

did -- did you hold a meeting with your members that

authorized you to come and testify for management today?

A    I'm not testifying for management.

Q    Oh, who are you testifying for?

MS. MOORE:  Objection.

THE COURT:  Sustained.

Next question.

Q    You said you had an altercation with Mr. Belvin in 2017.

Do you remember that?

A    Yes.

Q    Mr. Belvin actually had a disagreement with you and it

was a verbal disagreement; isn't that true?

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

BONNETTE - CROSS - VAN-LARE          500

A     And what was that disagreement?

Q     I'm sorry?

A     What was that disagreement?

          THE COURT:  No, you don't get to ask questions.

          THE WITNESS:  I'm sorry.

Q     You testified --

          THE COURT:  Just answer the question.

          Do you understand the question?

          THE WITNESS:  Yes.

          THE COURT:  What's the answer?

A     I didn't -- I don't remember having a verbal disagreement with Mr. Belvin .

Q     The controversy at the parking lodge, that did not involve any physical attack on you; correct?

A     Correct.

Q     Mr. Belvin, according to you, told Mr. Jerome that you do not do a good job as a union rep; correct?

A     Correct.

Q     That's his opinion; you agree with that?

          MS. MOORE:  Objection.

          MR. VAN-LARE:  The question is withdrawn, Your Honor.

          THE COURT:  Okay.

Q     Do you agree that the union member has a right to express an opinion that it don't approve of the job the representative

BONNETTE - CROSS - VAN-LARE                    501

is doing?

A    Yes.

Q    Mr. Belvin actually never told you:  Why don't you come across the street, I have something for you.  What Mr. Belvin told you is:  If you have time, let's have lunch and talk.

Isn't that what he said?

A    Absolutely not.

MS. MOORE:  Objection.

THE COURT:  Next question.

Q    You said Mr. Belvin spoke to you about an issue that involved monkey -- or monkeys -- in the work area; correct?

A    Right.  Monkey, yes.

Q    M-O-N-K-E-Y, one monkey.

A    Yes.

Q    Do you remember approximately when Mr. Belvin approach you about this?

A    I cannot remember exactly when he approached me, no.

Q    Can you approximate, if you can?  Three years?  Four years?  Can you?  If you can.

A    It would have been around -- it was sometime in 2015.

Q    Okay.  And when Mr. Belvin approach you and you told him why did you wait for -- you're not quite sure how many months, but it could be six or eight months, you said; Right?  When you told him that, did you take any action after that?

A    No.

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

Q     You did not approach any management staff to say: Mr. Belvin has brought up a complaint and I want management to look into it.  You didn't do that.

A     No.

Q     Counsel show you Exhibit EE, and Mr. Bonnette, Exhibit EE contain a lot of cross, vicious, and disturbing languages expressed by so many employees; you agree with that?

        MS. MOORE:  Objection.

A     Yes.

        THE COURT:  Overruled.  Answer stands.

        Go on.

Q     And did this employee actually tell you in their own words that these statements were made to them or that you simply collected what they wrote?

A     Are you talking about --

Q     Exhibit EE, which is the letters from a group of employees that you took to management.

A     I was present for basic -- all of that when Mr.  Mayers would come into the shop and make the comments.  It wasn't as -- it wasn't like the gentleman brought it to me and just told me.  I was there.

Q     Mr. Bonnette, all of these statements within this section were all written on November 30th, 2017; correct?

A     Correct.

Q     Who got the workers together to write it?

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

BONNETTE - CROSS - VAN-LARE                    503

A    The workers wanted to meet with me.  The workers wanted to sit down and talk to me about it.  They had -- they had enough.

Q    Now, you -- do you know if Mr. Mayers made the complaint to management two days before these letters were written?

A    No.

Q    Did management direct you to collect and get these letters together?

A    What happened is that when I spoke to the men, I told each individual they had to put it in writing so that I can take it to management, and then management could move forward on how to deal with these issues.

Q    Did you approach Mr. Mayers, for example, to tell him that the use of these phrases that he was alleged to have used is something very disturbing that you do not tolerate, and the union will have to do something about it?

A    When Mr. Mayers had the incident with Enis, I spoke to Mr. Mayers about using the words, and he told me he could use it.  He could speak like that because he's black.  And I told Mr. Mayers -- I said to Mr. Mayers:  Not on the job.  We shouldn't behave like that at work.

Q    Mr. Bonnette, Mr. Belvin never told you at any time that Hispanics are stupid; isn't that true?

A    Absolutely 100 percent false.  Mr. Belvin always told me that Hispanics were stupid.

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

Q    Did you say "always"?

A    Mr. Belvin told me that every time he spoke about Hispanics.

Q    Did you ever report that?

A    This was a conversation between me and Mr. Belvin.

Q    You believe that to be a private discussion when an employee, who is a member of your union, approaches you as a representative and tells you Hispanic people are stupid, you think that's a private conversation that should be left alone?

A    Absolutely.  What he's saying to me between me and him is between me and him.  He's not going around telling -- saying anything to the Hispanic employees about their intelligence or lack of.  There's no complaints there in regards to Mr. Belvin saying anything derogatory against Hispanics.  This is -- the conversation is what took place between me and Mr. Belvin.

Q    And it's your testimony that this conversation took place many times.

A    Absolutely.

Q    Mr. Bonnette, when you told the jury that Mr. Belvin told you that you never use the bathroom after a white person, that is just not true; correct?

A    Mr. Belvin told me:  You should never use the bathroom after a white person because they have parasites that attack black people.

        That's what he told me.

BONNETTE - CROSS - VAN-LARE                    505

Q    Do you know if Mr. Belvin lives with a white person in his house?

A    I can't -- could you repeat that?

Q    Oh, sure I can.

     Do you know if Mr. Belvin lives with a white person in his house?

A    Yes.

Q    Tell me what you know about that.

A    The only thing I know is his wife is -- is white.

     MR. VAN-LARE:  Thank you, Your Honor.

     I have no further question for this witness.

     THE COURT:  Any redirect?

     MS. SHEA:  No, Your Honor.

     THE COURT:  Very well.  The witness is excused.

     You may stand down, sir.

     (Witness excused.)

     MS. MOORE:  Your Honor, Mr. Mundo's arrival is scheduled for around 10:50 at which time we will be ready to go.

     THE COURT:  Okay.

     Members of the jury, couple of things.  The next witness is going to arrive at around 10:50, according to counsel.  He flew in this morning from out of state, and so I understand that there are delays due to weather in the Florida area, and there's very bad weather down there, so we'll --

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

PROCEEDINGS 506

what we'll do is we'll recess until 10:50, but before we recess, let me just tell you what we have in mind for the rest of today and tomorrow so that you're prepared.

Official Court Reporter

The witness who will testify next is the last witness that we have for today, and so when that testimony is completed, we'll adjourn for the day so that we can prepare -- I will meet with the parties regarding the jury charge that I will give you tomorrow when all the testimony is completed, and you will then be able to deliberate starting tomorrow afternoon.

The way it will work is we have one witness tomorrow morning, who is an expert witness. At the completion of that testimony, I understand that the defense plans to rest; is that right?

MS. MOORE: Yes, Your Honor.

THE COURT: And then we will proceed to have closing arguments. The plaintiff's counsel will speak first. The defense counsel will speak second, and then there will be a rebuttal by the plaintiff's counsel at which point I will then give you the charge as to the law and then you will -- you will retire to consider your verdict.

You will receive when you -- when you retire to consider your verdict, you will each receive a copy of the

*Denise Parisi, RPR, CRR*

jury charge so you don't have to write anything down while I give you the jury charge.  You will each have a copy of that. You will each have a copy of the verdict sheet, which it's a long verdict sheet because of the nature of the charges in this case requiring you to make many decisions, and you will -- it will be very clear from the jury charge and from the verdict sheet what you have to do.  And you'll also get all the evidence that's been admitted, so you will have a copy of the evidence in the jury room with you.  You can refer to that evidence.  And then you will retire to consider your verdict.

If you haven't reached a verdict by the end of the day tomorrow, you will return on Monday, because Friday is a holiday, to continue your deliberations.

So that's basically where we are at this point in the trial.  We're moving it along.  The parties are very cooperative in moving it along, and, as I've said before, we appreciate your service as jurors and the time that you're spending with us, so we're doing everything we can to facilitate getting the trial completed and handing it over to you for your deliberations.

So, at this point, we will recess for about 15 minutes, and as soon as the next witness arrives in the courthouse, we'll call you back in.

All rise for the jury.

(Jury exits.)

*Denise Parisi, RPR, CRR*

PROCEEDINGS                                          508

THE COURT:  Please be seated, everyone.

With regard to the next witness, how much time on direct?

MS. MOORE:  Probably pretty similar to Mr. Bonnette just now.

THE COURT:  An hour?

MS. MOORE:  To be safe.

THE COURT:  And --

MR. VAN-LARE:  Less than that.

THE COURT:  Okay.  So we should be able to complete the testimony of the next witness before lunch, right?

MS. MOORE:  Sounds like it.

THE COURT:  And I will give you a couple of hours at lunchtime to review the draft charge and the draft verdict sheet, and then we'll come back around three o'clock and go over the charge -- the draft charge and the draft verdict sheet and try to square that away this afternoon.

Is that agreeable?

MR. VAN-LARE:  Very agreeable, Your Honor.

MS. MOORE:  Yes, Your Honor.

THE COURT:  Good.  All right.  We'll take a break. Please inform Mr.  Reccoppa when your witness arrives.

MS. MOORE:  Yes, Your Honor.

THE COURT:  Thank you.

(A recess in the proceedings was taken.)

*Denise Parisi, RPR, CRR*

(In open court; Jury not present.)

THE COURT:  The witness is present I take it?

MS. MOORE:  Yes, Your Honor.

THE COURT:  All right.  We're going to distribute the draft materials.  You're not going to do anything with them until the witness is done, so we'll distribute them at the end of testimony this morning.

Let's call in the jury.

(Jury enters the courtroom.)

THE COURT:  Please be seated, everyone.

The defense may call it's next witness.

MS. MOORE:  The defense calls Mr. Vito Mundo.

THE COURTROOM DEPUTY:  Please have a seat.  And please state and spell your full name for the record.

THE WITNESS:  Vito Vincent Mundo.  V-I-T-O, middle initial V, Mundo, M-U-N-D-O.

THE COURT:  You may inquire.

MS. MOORE:  Thank you, Your Honor.

(Continued on next page.)

(Witness takes the witness stand.)

**VITO MUNDO,** called as a witness, having been first duly sworn/affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. MOORE:

Q    Good morning.

A    Good morning.

Q    Would you, please, introduce yourself.

A    Sure.  My name is Vito Mundo.  I was just recently retired.  I was general counsel for the Joint Industry Board, the electrical industry, for 25 years.  Prior to that, I was in private practice for 15 years, and I've represented the Joint Board for ten years.

Q    What is the Joint Industry Board?

A    The Joint Industry Board is an administrative employee benefit plans negotiated between Local Union No. 3, the IBW, the Electrical Workers of New York, and the signatory employers.  So we administer health and welfare plans, pension plans, annuity plans, 401k, just for the electrical industry, covering the five boroughs of New York and Westchester County.

Q    How do you come to work for the Joint Industry Board?

A    I was originally with the firm Donald Menagh.  It became Menagh, Trainor, Mundo, and Falcone.  The firm had represented the Joint Board for many years.  Donald Menagh grew up with -- is Harry Van Arsdale Jr.'s attorney.  And I had worked there

MUNDO - DIRECT - MOORE                    511

for 15 years as a partner.  And then there came a time -- and as part of my duties, several things:

First, I did a lot of work as a union attorney representing the utility workers, the Con Ed employees, Local 1 and 2 employees, representing the union, and representing the Joint Board, I started taking on more of their responsibilities, doing the ERISA work and other issues with the electrical industry.

There came a time when I decided I wanted to leave the firm and the then, director of finance, who I worked with closely, and the chairman of the Joint Board, said, you know what, before you go anywhere, we've talked, for years, to bring somebody in-house as general counsel.  We never have. And they asked me to come on board as general counsel.  So a very easy transition.  So it was everything I did in the City at my old firm, I was just doing now in Queens as in-house counsel.

Q    And as an attorney for The Joint Industry Board, as the general counsel, though, did you also serve as the general counsel for Electchester Management, LLC?

A    I did.  When I was -- even prior to Electchester Management, LLC coming into effect, in private practice, issues would come up with Electchester.  I would handle some of the issues.  Electchester was built by Local 3 and the electrical contractors.  They funded it, to put up the money,

*LEEANN N. MUSOLF, RPR, CCR*
*Official Court Reporter*

MUNDO - DIRECT - MOORE                512

initially, as an affordable housing, limited dividend co-op.

It operated, initially -- up until 2007 or so, it was five separate housing companies, all operating independently. At that time, I was on staff at the Joint Board as counsel, and the business manager of the union had asked the Chairman, Larry Jacobson, and myself to take a look at the overall operation of Electchester because there were -- it seemed like there was a lot of waste. Which we did.

And we advised that instead of having five separate companies running each individually, we should set up our own management company, which we did, called Electchester Management, so that we can buy in bulk for the five housing companies. Because right now -- or prior to that, each housing company would negotiate for themselves, for oil contracts, for snow removal, salt, whatever. So by combining it, we were able to cut down the costs.

In addition, the office personnel, instead of each of the housing companies have their own bookkeepers, their own secretaries, we combined it into one office that handles everything coming in for all five housing companies, and then it's -- again, everything is divvied up between each of the housing companies.

So, as a result, I was part of the creation of Electchester Management back in 2007. And it's basically a -- it wasn't really -- it wasn't a paid position. It was

MUNDO - DIRECT - MOORE                513

basically pro bono.  The industry asked us to take this on, it's for the betterment of everybody in the industry.  So I ended up becoming counsel for it.

We also do have outside counsel that has more experience in the housing laws and dealing with New York State Housing, who we've had handle all those issues, but I handle general issues that come up.

Q    Okay.  So, what were your duties, exactly, as the general counsel for Electchester Management?

A    Basically, on an as-needed basis.  Mostly labor issues that came up with them.  You know, if there was a grievance or an arbitration, if I get a call from the manager saying can you help us out with this, what should we do, looking for guidance.  I would advise them, legally, on what we should do with that, as well as on other contracts, you know, work going on in the buildings.  I would review contracts and assist in revising the contracts and them signed.

Q    Did your duties as general counsel for Electchester Management include answering discrimination complaints that come in through government agencies?

A    Yeah.  Well, any of the complaints that came in like that would all be sent to me and either I would handle it or one of the other attorneys that worked with me.  There were three attorneys at The Joint Industry Board.  I was general counsel, and two associate counsel.  So depending on who was doing what

MUNDO - DIRECT - MOORE                514

at the time, one of us would handle it.

And, actually, there was a point in time where we had an attorney Jerry Fillippatos that worked for me who had worked for me when -- with me when I was in private practice, whose speciality was discrimination, mostly on the plaintiff's side, and a lot of these cases, I would have him handle because he was more experienced in the discrimination area.

Q    What would responding to those types of complaints from those agencies such as the EEOC involve?

A    First, is just to investigate.  There are allegations made by the EEOC, and, basically, they're just taking the complainant's statements, without knowing anything else, and sending it on as a proposed claim.  We would then investigate, find out the story, talk to the managers, talk to whoever else was involved, as far as if a foreman was involved or a co-worker was involved, and then we would prepare our response to the EEOC complaint.

Q    What would the response include in it, generally speaking?

A    More into specifics, denial of the allegations, and more into the specifics of why we deny it.  And, in fact, the claims that were brought initially, were all denied by the EEOC.  So none of them ever went any place.  Again, they get the complaint, it's just based upon the individual's allegations.  They don't really investigate it until after

MUNDO - DIRECT - MOORE                    515

they get a response, and then they'll investigate and -- in the cases I'm aware, of the charges were all dropped and never went forward with anything.

Q    Do you know the plaintiff in this case, Michael Belvin?

A    I am -- I met Michael, both Michaels, Belvin and Mayers.

Q    How do you know Mr. Belvin and Mr. Mayers?

A    They're employees at Electchester.  I only got to know them only because there was several issues we had over the years with them, whether they were union grievances that were filed, and once the union was involved with it, the managers would come to me and get me involved.

So, over the years, I was involved with them, and it seemed like they were coming up with -- they were pushing the buttons every time on issues trying to make something out of things that were not, so the managers would consult with me before they did anything with -- regarding either one.

Q    Did you ever learn that Mr. Belvin had complained about a stuffed monkey attached to his locker?

A    I learned of the allegation.  I received a call from the general manager, Tom Prezioso, saying that it was reported to him, there's an allegation of a stuffed monkey.  I said, immediately, get the manager.  At the time, it was Ed Wiley for that housing, get him over there immediately, see what's going on and see what's there, and speak to the people that are -- that use that locker room.

I got a call back from Tom later that day that Ed had gone there right away, there was no stuffed monkey or anything else, any stuffed animal was hanging around in the locker room, and Ed had spoken to other employees who used the locker room, and nobody had any idea what they were talking about.

Q    Did Mr. Belvin file a complaint with the EEOC against Electchester Management?

A    I believe he did.

Q    And did you receive that complaint?

A    It was probably -- the management would have gotten it and it would have come to me first, yes.

Q    And were you responsible for responding to that complaint?

A    Well, our office had Jerry Fillippatos handle it.

Q    And did Jerry Fillippatos submit a response to the EEOC complaint on behalf of Electchester Management?

A    Yes, he did.

Q    And what was the outcome of Mr. Belvin's EEOC complaint?

A    It was dismissed.  There was no -- they found no reason to go forward with it.

Q    I'm going to show you a document that's been marked for identification purposes as Defendant's Exhibit LL.

        MS. MOORE:  If I may, Your Honor?

        THE COURT:  Go right ahead.

*LEEANN N. MUSOLF, RPR, CCR*
*Official Court Reporter*

MUNDO - DIRECT - MOORE                    517

MS. MOORE:  I'm having some technical difficulties.

Q    Can you see the document, Mr. Mundo?

A    Yes, I can.

Q    Are you familiar with this document?

A    It's a standard form from the EEOC when they dismiss a case.

Q    Did you receive a copy of this document as general counsel of Electchester Management?

A    I don't know if it was mailed directly to me at the time or it sent to Jerry Fillippatos since he was the one who responded on behalf of Electchester, but I'm aware of it, yes.

Q    Okay.  Do you know when Electchester received a copy of this document?

A    I don't know.  I'm assuming the -- 2000 -- July 31, 2017, was the date it was sent out by the district director.  So probably sometime in August of 2017.

MS. MOORE:  I'd like to move to admit this document, which was previously marked for identification as Defendant's Exhibit LL into evidence.

MR. VAN-LERE:  No objection.

THE COURT:  All right.

Defense Exhibit LL is received in evidence and published to the jury.

(Defense Exhibit LL, was received in evidence.)

(Exhibit published.)

*LEEANN N. MUSOLF, RPR, CCR*
*Official Court Reporter*

Q    Mr. Mundo, what does this document indicate?

A    That the EEOC issued the following determination.  Based upon its investigation, the EEOC is unable to conclude that the information contained established violations of the statute.  This does not certify the respondent is in compliance with the statute.  No finding was made as to any other issues that might be construed as having been raised by this charge.

Basically, they find no reason to go forward, so they issued this letter saying they're dismissing the claim with the EEOC.  If the individual wants to sue on their own, it's up to them.

Q    Did you ever tell Mr. Belvin to drop his EEOC complaint and his writeups would go away?

A    Absolutely not.

MS. MOORE:  I have no more questions about this exhibit, Your Honor.

THE COURT:  All right.

Q    Did Mr. Mayers file a complaint at EEOC against Electchester Management?

A    Yes, he did.  I believe there was a couple of people may have signed on at that time to Michael Mayers complaint.

Q    Did you receive that complaint?

A    Again, it would have come to me, you know, it would have gone to the management company first, then it would have come

to me.

Q    And did Electchester Management respond to Mr. Mayers's EEOC complaint?

A    Yes.

Q    Do you know what the outcome of Mr. Mayers's EEOC complaint was?

A    Yes, like Belvin's complaint, it was dismissed.

Q    I'd like to show you a document that's been marked for identification purposes as Defendant's Exhibit MM.  Can you see that document, Mr. Mundo?

A    Yes, I can.

Q    Are you familiar with this document?

A    Yes.  It's the same type of standard dismissal notice that the EEOC sends out, the same as in Mr. Belvin's case.

Q    Did you receive -- did Electchester Management, LLC, excuse me, receive a copy of this document?

A    Yes.

Q    Do you know when, people Electchester Management, LLC received a copy of this document?

A    This was signed by the district director on the same date of July 312017 so we would have received it soon there after sometime in August of 2017.

        MS. MOORE:  Your Honor, I would like to move to admit this document previously marked for identification as Defendant's Exhibit MM into evidence.

MUNDO - DIRECT - MOORE                    520

MR. VAN-LERE:  No objection, Your Honor.

THE COURT:  All right.

Defense Exhibit MM is received in evidence and published to the jury.

(Defense Exhibit MM, was received in evidence.)

(Exhibit published.)

Q    Mr. Mundo, what does this document indicate?

A    Same as in Michael Belvin's case, that the EEOC investigated, they found no reason to go forward so they were dismissing charges against Electchester and issues what's called a right to sue letter.  If they want to go out -- if the individual wants to go out on their own, they're free to go out on their own to sue.

Q    Did you ever tell Mr. Mayers to drop his EEOC complaint?

A    Absolutely not.

MS. MOORE:  I have no more questions about this exhibit, Your Honor.

THE COURT:  Very well.

Q    Mr. Mundo, I'd like to show you a document that's been previously admitted into evidence as Plaintiff's Exhibit 30. Can you see the document?

A    Yes.

Q    Are you familiar with this document?

A    Yeah, this was a -- the memorandum that Jerry Fillippatos.  His real name -- he's Greek, his real name

is Parisis Fillippatos, but he goes by Jerry prepared after

doing the investigation regarding an issue between Michael

Belvin and David Bourgade, another employee of Electchester.

Q    When did Mr. Fillippatos prepare this document?

A    It's dated January 20, 2016.

Q    And did you review this document at around that time?

A    I would have seen it around that time, yes.

Q    Why did Mr. Fillippatos prepare this document?

A    There was a complaint by Mr. Belvin that -- regarding

something that Mr. Bourgade said.  According to Mr. --

according to both of them, Mr. Belvin and Mr. Bourgade, that

Mr. Bourgade said to Mr. Belvin, hey boys, like Flavor Flav,

kidding around, and Mr. Belvin took that as offensive and

issued a complaint to Electchester.  So we felt we had an

obligation to investigate it, which we did.  Jerry was

assigned to it, he investigated it.  This is a memorandum of

the investigation of what he found.

Q    Do you recall what the investigation involved?

A    He spoke to the individuals involved, he spoke to the

managers regarding, you know, what occurred, spoke to

Mr. Bourgade and he admitted that's what he said but he didn't

mean it in an offensive way.  He thought he was being funny,

again, like Flavor Flav, we would say it, did not mean it in

any discriminatory way or anything.  But, obviously, Michael

Belvin took it in a feeling that it was discriminatory towards

MUNDO - DIRECT - MOORE                        522

him.  And, in fact, Mr. Bourgade had, repeatedly, tried to

apologize for it.  But we took action based upon that

statement was made.

Q     Who is Flavor Flav?

A     He's, like, a -- he's not an actor -- yeah, I guess,

he's, like, a comedian, actor.  He wears the big clock going

around his neck on a chain.

Q     Understood, thank you.  Did Electchester Management

discipline Mr. Bourgade as a result of this incident?

A     We did.

Q     What was the discipline that Mr. Bourgade received?

A     He was suspended, I believe one day.

Q     Did Electchester Management also give Mr. Belvin a verbal

warning?

A     We did because Mr. Belvin made threats to him and said

basically let's throw down regarding -- there was a witness

there, and threatening him, like -- he even admitted pointing

to Mr. Belvin and he said, we'll take this up after work.

According to the witness and Mr. Bourgade, he said, you know,

you say that again, we're going to throw down, meaning we're

going to fight about it.

          So he was given a written warning saying that's not

appropriate behavior at work to make threats like that.

Q     I'd like to show you a document that's been admitted into

evidence as Plaintiff's Exhibit 23.  Can you see the document

*LEEANN N. MUSOLF, RPR, CCR*
*Official Court Reporter*

MUNDO - DIRECT - MOORE                    523

on your screen?

A    Yes.

Q    Are you familiar with this document?

A    I'm familiar with it.  I became more familiar with it later on, about a year after this.

Q    And who prepared this document?

A    Again, Jerry Fillippatos, one of the attorneys that worked with me at The Joint Industry Board.

Q    Do you know when Mr. Fillippatos prepared this document?

A    It's dated February 3rd, 2017.

Q    Did you review it at or around that time?

A    We talked about it.  Jerry brought me up to date on what was going on back then.

Q    Why was this document prepared?

A    There was an issue where Mr. Belvin had made threats to another employee, to Richard Bonnette who was a shop steward, threats of physical violence.  So there was a complaint made about it.  We investigated it, I had Jerry investigate it. And there was a written stipulation and agreement between the parties where Mr. Belvin was not to go on the premise of Second Housing, which is where Mr. Richard Bonnette worked. He was supposed to keep distance from him and not be on that property since he didn't work in that building, he had no reason to be there.

Q    Why was Mr. Belvin no longer around to go on the ground

MUNDO - DIRECT - MOORE                524

of Second Housing?

A    Because of the physical threats he made to a co-employee.

Q    And did the -- and those physical threats, were those revealed over the course of Electchester's investigation?

A    Yes.

Q    Did Mr. Belvin go on to enter Second Housing Company anyway?

A    Approximately, a year later, there was an incident where Mr. Belvin was on Second Housing's property when Richie was outside and made some comments and it got back to us that he was -- he was there on the property when Richie was outside. And, again, it's a signed agreement where he said he would not enter.  It was agreed to back in 2017, he agreed he would not enter onto the property.

Q    And was Mr. Belvin disciplined for entering Second Housing after being instructed not to do so?

A    Yes, he was.

Q    Do you know what discipline he received for that?

A    I believe it was a suspension.  I don't know if it was one day or two days.

Q    Did you ever learn that Mr. Mayers's coworkers complained he was bullying them?

A    Yes.

Q    How did you learn this?

A    The shop steward, Richard Bonnette, had come to

MUNDO - DIRECT - MOORE                          525

management saying that several of the co-workers were complaining that Mr. Mayers was bullying them.  Management brought it to us and I said, well, if they want to put in a complaint, they got to put it in writing.  We're not just going to go off and let somebody say this is what happened.  I want to see something in writing.  A day or two later, the shop steward, Richard Bonnette, presented letters from four or five individual co-workers complaining of Mr. Mayers bullying them.

Q    I'd like to show you a document that's been admitted into evidence that was marked for identification purposes as Defendant's Exhibit EE.  Can you see these on your screen, Mr. Mundo?

A    Yes, I can.

Q    I'm just going to scroll through them and give you a chance to lay your eyes on each one.  Are these the complaints that Electchester Management received?

A    Yes.

Q    Do you know when, approximately, Electchester Management received these complaints?

A    That would have been the end of November 2017.  The letter is dated 11/30/2017.

Q    And were these complaints investigated?

A    Yes, they were.

Q    Who investigated them?

MUNDO - DIRECT - MOORE                526

A     So, rather than having anybody that's been involved with any situations with Mr. Mayers or Mr. Belvin investigate it, I spoke to the chairman of the Joint Board and one of the assistant chairmen, Humberto Restrepo, is assistant to the Chairman at the Joint Board, he, also, is -- he's Colombian so he speaks Spanish.  A lot of these workers are Spanish, so they felt it was better to have him meet with him, let him investigate it, because it really wasn't a legal issue, it was more of getting his statements as to what occurred.

And that's what we did, we had Mr. Restrepo interview these individuals.

Q     What was the outcome of Mr. Restrepo's investigation?

A     The outcome was that, after talking to these people, he felt more -- he said what he got out of it, wasn't more bullying but that Mike Mayers likes to kid around and push the envelope too far and they feel intimidated by it, but it wasn't like he threatened him, you know, bully wise like that, physically, but he likes to pull pranks, he likes to do these things, but he carries it too far, and that's what they were upset with.

Q     Okay.  So, as a result of Mr. Restrepo's investigation, did you -- first of all, withdrawn.

Did you inform Mr. Mayers of the outcome of Mr. Restrepo's investigation?

A     Yes.  I set up a meeting for Mr. Mayers, general manager

MUNDO - DIRECT - MOORE                527

Tom Prezioso, myself, and we advised Mr. Mayers this is not a disciplinary hearing, but you're free to have someone from the union here if you want.  He declined, he came up by himself.  And I said to him, Mike, this is not a disciplinary hearing.  I said there's nothing -- there's no action being taken, just telling you what occurred.  Individuals made complaints about you bullying them, we had it investigated, and it ends up it's more of pranks you pull, joking, playing around, pushing it too far.  And his response to me was, I know, my daughter tells me all the time I'm a big kid and I kid around too much.  I got to stop it.

I said Mike, it's not appropriate for the workplace, so just change your behavior going forward and cut it -- cut out the extra kidding around and joking around.  And he said no, I apologize, I agree.  We shook hands and that was the end of it.

(Continued on the following page.)

*LEEANN N. MUSOLF, RPR, CCR*
*Official Court Reporter*

DIRECT EXAMINATION

BY MS. MOORE:(Continuing.)

Q    And was Mr. Mayers written up as a result of this investigation?

A    No.  And I told him that right from the beginning:  This is not a disciplinary hearing.  There's no write-up.  I'm just telling you, this is what occurred, this is what's coming back to us, and it's not appropriate for the workplace.

And he agreed.  He said:  No problem.  We shook hands.  And that was it.

Q    At some point when you worked for Electchester Management, did Mr. Mayers go out on disability leave?

A    He did.

Q    Do you know when he went out on disability leave?

A    I don't know the exact dates, no.

Q    Do you know why he did?

A    Unfortunately, he had cancer.

Q    While Mr. Mayers was out on disability leave, was he being paid by Electchester Management?

A    No.  He had been on disability -- New York State Disability.

Q    So who was paying him?

A    It would have been through New York State Disability.

Q    Are Electchester Management employee bonuses paid out through Electchester Management's payroll system?

Mundo - Direct - Moore                    529

A     Yes.  It's a -- not part of the bargaining agreement, not required, but they do pay a year-end bonus to individuals that are on the payroll at the end of the year.

Q     So if someone is not on the payroll at the time that the bonuses are distributed, they would not receive a bonus?

A     That's correct.

Q     I would like to show you a document that's been marked for identification -- I'm sorry -- I would like to show you a document that has been admitted into evidence as, I believe, Plaintiff's Exhibit 37.

          (Exhibit published.)

Q     Do you see that on your screen?

A     Yes, I do.

Q     Mr. Mundo, did you write this letter?

A     I did.

Q     Did you write this letter around the date that's across the top?

A     Yes.

Q     Why did you write this letter?

A     We had another employee, a Dominick Sarachi (ph), a Caucasian Italian gentleman that had been out for just over a year.  I was advised by management that he was out for a year, and according to the Collective Bargaining Agreement with 32 BJ, we don't have to hold the position for someone -- well, we only have to hold the position for up to a year.  We had

                    *Denise Parisi, RPR, CRR*
                    *Official Court Reporter*

Mundo - Direct - Moore                  530

several people out.  We were shorthanded.  We were paying overtime to cover shifts that would have otherwise been covered by the individuals.  So it came up first with this individual with Dominick Sarachi, and as I was preparing the letter for him and I said:  Do we have anybody else in this situation?  And I was told:  Yes.  Mike Mayers has not been working since -- whatever the date was, it was just at that year mark.

So the same letter that I sent to Dominick regarding us not holding his position is the same letter I sent to Mr. Mayers basically saying that we couldn't guarantee his position; however, when he's available or ready and able to come back to work, if we have a position available, he's more than welcome to come back.

Q    Did you make a mistake by sending Mr. Mayers this letter?

A    What happened was, after I sent the letter, I got a call from the business agent from Local 32BJ, and they said that the letter is premature, that Mayers was out on sick leave, or vacation, for a couple weeks before, so basically the letter was two weeks premature.  I checked with the payroll person. I was advised:  Yes, he was.  The first two weeks were covered by -- it was either vacation or sick leave, so his actual disability didn't start until two weeks later.

I got back to the union and said:  Our mistake.  My mistake.  I didn't check with payroll.  I was just told he

Mundo - Direct - Moore                           531

hasn't been at work since this date, which was the year, so we told him -- you know, when we receive the letter -- as soon as he got a letter -- we hadn't received anything on his medical, but after this, we then received the letter from his doctor saying that he was able to go back to work, and we put him back to work.

Q    Who at the union did you have this discussion with?

A    The business representative was -- his name was Michael India.

Q    Did anyone at Electchester Management attempt to argue with Mr. India that Mr. Mayers should not come back to work?

A    No, because once Mike called me and told me what the situation was, I checked with the payroll people -- our payroll person, and she verified that they were right, that originally the first two weeks wasn't part of disability.  He didn't start disability until after that.  He was on vacation or sick -- I don't recall if it was vacation or sick.

So, no, we acknowledged it, it was our mistake, we told him -- we withdrew the letter.  And, at that point, then he gave us a letter saying that -- from his doctor that he was fit to come back to work, and we put him back to work.  It was a couple weeks later, I believe.

Q    The Mike you spoke on the phone with was Mike India; correct?

A    Michael India, yes.  He's a business representative for

Mundo - Direct - Moore                   532

Local 32BJ, the SEIU.

Q    So before you spoke to Mr. India, had Mr. Mayers submitted any medical clearance to come back to work?

A    No.

Q    Would Mr. Mayers have been able to return from a disability leave without medical clearance?

A    No.

Q    Do you know how long passed from when you spoke to Mr. India and when Mr. Mayers returned to work?

A    I can tell you that it was probably a day or so from when Mike India first called me and I got back to him and said: You're right.  It was our mistake.  The letter is being rescinded.

        And I think it was probably another week or two before we got the letter from his doctor saying that he could come back to work.

Q    Do you know Juan Martinez?

A    Yes, I do.

Q    Was Juan Martinez?

A    Juan Martinez worked for Second Housing prior to Electchester Management being formed.  He was a foreman for Second Housing and basically was running a good part of Second Housing.  He, initially when Electchester Management was formed, stayed on as a foreman, but then there became issues. He basically tried to hold us up for money.  He thought that

he had us -- for lack of a better phrase -- he had us in a position where he could impose on us that -- and he demanded a lot more money, and we refused to pay him.  If he wanted to stay on, he could stay on as foreman, but this was his salary, and he wanted a huge increase.

He stayed on for foreman -- as foreman for a while as -- those were the initial stages of Electchester Management.  As we got ourselves established more, then we found out a lot of things were going by the wayside that was his responsibility, so we ended up breaking him down from a foreman back to a maintenance worker.  He was not happy about it.

Q    Did Mr. Martinez file a complaint with the EEOC against Electchester Management?

A    I believe I did.

Q    Was that after he was demoted?

A    Yes.

Q    What was the outcome of Mr. Martinez's EEOC complaint?

A    The complaint was dismissed by the EEOC similar as the other two letters.  They found no reason to go forward on it, so they dismissed the complaint after we responded, and that was the last of it.  He then went out on disability and ended up going out on permanent disability and never returning to work.

Q    Did Tom Prezioso ever harass Mr. Martinez?

Mundo - Direct - Moore                    534

A     Not that I'm aware of.

Q     Did Anthony Caiozzo ever harass Mr. Martinez?

MR. VAN-LARE:  Objection, Your Honor.

THE COURT:  Overruled.

You may answer.

A     Not that I'm aware of.

Q     Do you know who Jerome Jenkins is?

A     He was a employee of Electchester.  I believe he was a porter.

Q     Did Jerome Jenkins also file a complaint with the EEOC against Electchester Management?

A     Yes.

Q     Do you know what the outcome of Mr. Jenkins's EEOC complaint was?

A     It was dismissed by the EEOC finding no grounds to go forward.

Q     Did you ever ask Jerome Jenkins:  What's up with the EEOC?

A     No, not that I recall.  I mean, if I walked by him in the street, I wouldn't even know who he is, to be honest with you.

Q     Did Mr. Jenkins also file a grievance with 32BJ about the termination of his employment?

A     Yes, he did.

Q     Did he allege his termination was discriminatory based on his race in that grievance?

A    He did.

Q    What was the outcome of Mr. Jenkins 's grievance?

A    It was denied.  It never got up off the ground anyplace because we showed the union all the problems we were having with him at work.  He actually was being let go when -- we ended up hiring him -- we found out afterwards he was being let go from another company he worked for in the City, and we had hired him not knowing that, and his work performance was way less than what was expected.

Q    Do you know if Mr. Jenkins applied for unemployment after he was fired by Electchester Management?

A    He may have.  I really don't recall specifically.  Actually, I think he did apply and it was denied because we opposed it, and it was saying that he was terminated for cause.

MS. MOORE:  Your Honor, if I may confer with my colleague, I may have no further questions for this witness after that.

(Pause.)

MS. MOORE:  Your Honor, I have no further questions for this witness.

THE COURT:  Thank you.

All right.  Cross-examination.

MR. VAN-LARE:  Thank you, Your Honor.

MUNDO - CROSS - VAN-LARE                536

CROSS-EXAMINATION

BY MR. VAN-LARE:

Q    Good afternoon.

A    Good afternoon.  Good morning still.

Q    Good morning.  How are you, sir?

A    I'm doing well.

Q    Thank you very much.

You said you did not --

THE COURT:  I'm sorry, have you met the witness?

MR. VAN-LARE:  I'm sorry?

THE COURT:  Have you met the witness before?

MR. VAN-LARE:  I have, Your Honor.

THE COURT:  All right.  I'm just checking.  Do you know this --

THE WITNESS:  I was deposed by him.

THE COURT:  Oh, you were deposed.  Okay.  Very well. Thank you.

Go ahead.

MR. VAN-LARE:  Thank you, Your Honor.

Q    You are -- no.  You are retired now.  You are the former general counsel for Electchester Management, LLC; correct?

A    Yes.

Q    Did you say that job was voluntary?

A    I'm sorry, what was that?

Q    Did you say the job was voluntary?

A    Yes.

Q    You are not paid for it.

A    I was not paid for it.

Q    For how long did you have that job, sir?

A    As I said, I was one of the individuals that set up Electchester Management in 2007.  Prior to that, I've done things on and off for Electchester whenever they needed it all on a pro bono basis.

Q    Did you have responsibility as head of HR for Electchester Management, LLC?

A    No.

Q    Your role was confined only to that of general counsel.

A    Yes.  The legal issues that came up, yes.

Q    And that's it?

A    Yes.

Q    Do you know Mr. Prezioso?

A    I do.

Q    How do you know him, sir?

A    He's the general manager for Electchester.

Q    And he was never a lawyer that reported to you; correct?

A    No, he's not a lawyer.

Q    Did you tell him what to do in his daily responsibilities?

A    If he had a question on something, I would help him out or answer whatever I could.

Q    And do you know Mr. Wiley -- Ed Wiley?

A    I do.

Q    Who is Mr. Wiley?

A    He was a manager we had at First Housing for a few years.

Q    And he reported directly to Mr. Prezioso when he was employed?

A    Yes.

Q    Was he hired by you?

A    Not by me personally, no.

Q    No.  I don't mean you personally, but did you interview him for the job?

A    I did not.

Q    Do you know who did?

A    Dr. Finkel, who is the chairman of the Joint Industry Board and also serves as the president of Electchester Management, would have spoken to him.

Q    He did not report directly to you, did he?

A    No.

Q    You also said all of the charges by the employees on EEOC were dropped; correct?

A    Correct.

Q    You, in fact, said the EEOC found no reason to move ahead with the charges and they were dismissed; correct?

A    That's correct.

Q    Mr. Mundo, that's not what happened; correct?

MUNDO - CROSS - VAN-LARE                          539

MS. MOORE:  Objection.

A    No.  You're incorrect.

Q    Are you sure?

A    Yes, I am.  As far as I know.

Q    Counsel showed you some exhibits.  I will share them with you in a moment.  Let me put them up.

(Pause.)

Q    I am going to direct your attention, sir, to Defendant's Exhibit LL.  It was shown to you before, and it says: Dismissal and Notice of Rights to Michael Belvin.

Do you see that on your screen?

A    Yes, I do.

Q    And you, in fact, referred to this document at one time as one of the standard responses from the EEOC; did I get you right?

A    When they dismiss a case, yes.

Q    Sir, I'm going to refer you specifically to the second box.  It's right under the line that says:  The EEOC is closing its file on this charge for the following reason.

Do you see that?

A    No.  The second box says:  Your allegation did not involve --

Q    I'm sorry.

A    -- disability.

Q    I should make myself clear.  I'm talking -- okay.  You

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

MUNDO - CROSS - VAN-LARE                540

see where the name Michael Belvin is?

A    Yes.

Q    That's box one for this purpose.  And then there's a second box; do you see?

A    Yes.

Q    And that box has Thomas Perez, Investigator.

Do you see that?

A    Yes.

Q    Right under that box, there's a line all in caps:  The EEOC is closing its file on this charge for the following reason.

Do you see that?

A    Yes.

Q    Okay.  And right under that there's a box, which was not checked, and the box says:  This -- the facts alleged in this charge fail to state a claim under any of the statute enforced by the EEOC.

When you received this notice, that box was not checked; correct?

A    Yes.  It --

MS. MOORE:  Objection.

THE COURT:   -- never is checked.  If you're familiar with the EEOC responses, you will see that the response they give you is that they find no cause to go forward and they issue what's called a right-to-sue letter.

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

It's up to the individual.  The EEOC closes its file because it doesn't find any reason to go forward.

Q    You have never worked for the EEOC; correct?

A    No, but I have been responsible on several cases, not only for Electchester, but other issues --

Q    We'll get there, sir.

THE COURT:  I'm sorry, what was the question?

MR. VAN-LARE:  I ask him if he ever work for the EEOC and he responded.

THE COURT:  Okay.  He said he hadn't.

MR. VAN-LARE:  Yes.

Q    Now, let's look at the box that the EEOC actually checked.  The box says -- and I will read it out to you, sir: The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the -- that the information obtained establishes violation of the statutes, period.

This does not satisfy that the respondent is in compliance with the statutes.  The respondent in this case is your employee; agreed?

A    I read that before, but if you are familiar with the EEOC if you've done any work with them, you would know this is their dismissal.  It says right on top:  Dismissal and notice of rights.  That's the standard EEOC letter.  That's the box that the standard check goes in where they drop the charges.

MUNDO - CROSS - VAN-LARE                     542

Q    Sir, what -- let me finish my next question.

No finding is made as to any other issues that might be construed as having been raised in this charge.

Do you see that?

A    I do.

Q    So where in this letter did this say they don't have a case?

A    It says right on the top:  Dismissal and notice of rights.

As I said to you previously, if you've ever been involved in any cases with the EEOC, which I have been, that is their dismissal letter.  They are not proceeding any forward because they don't want -- forward because they don't find any reason to.  That's their dismissal letter, sir.

Q    This dismissal and notice of rights, and, again, there isn't any box that was checked; correct?

A    And if you listened to me before, I said:  It's their dismissal notice and their right to sue letter.

So if the individual wants to sue, they could sue on their own, but the EEOC is not going forward.  They find no reason to go forward with the case.

Q    Okay.  It doesn't say here that we find no reason to go forward; correct?

MS. MOORE:  Objection.

THE COURT:  Sustained.

MUNDO - CROSS - VAN-LARE                543

Q    You were asked if you no Mr. Juan Martinez and you responded affirmatively; correct?

A    Yes.

Q    Did you say he attempted to blackmail you?

A    I did not say the word "blackmail."  What I said is he tried to hold us up for more money thinking that we had to have him there and that we would have to pay him what he wanted.  I didn't say blackmail at all.

Q    What you mean by:  He tried to hold you up for more money?

A    Prior to Electchester Management being taken over, he was the foreman for Second Housing and, basically, ran Second Housing.  His feelings were:  He knew everything about Second Housing; we didn't know anything about it; and if we wanted him to continue on, he wanted an exorbitant amount of money to stay on as the foreman.

Q    And you didn't pay him.

A    No, we did not.

Q    What is wrong if an employee asks for a raise?

         MS. MOORE:  Objection.

         THE COURT:  You may answer.

A    There's nothing wrong with asking for a raise, but he was disgruntled because he didn't get the money he wanted to get.

Q    You are aware, sir, that Mr. Belvin accused you of telling him to drop his EEOC charge and you can negotiate.

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

A    Well, I'm aware that he lied if he said that, because that absolutely never came out of my mouth, nor was it ever stated at any point in time.  So if you're telling me that's what he said, I can tell you that he lied.

Q    Are you sure that was a lie, sir?

A    Absolutely.

Q    Okay.

        Mr. Jenkins also alleged that at the meeting with you up the hill you said to him on his way out:  What's up with your EEOC?  And counsel ask you about that.  You still maintain your answer?

A    Absolutely.  It's two separate things.  I was there dealing with him on the grievance.  I've been practicing law for 40 years.  You don't mix one thing with the other.  Maybe somebody else may have, maybe you may, but I don't.  We had a grievance with the union, I handle that separately.  The EEOC, that was on its own course.  We have no control over that.

Q    Counsel showed you, I believe, an exhibit where a lot of employees complained about Mr. Mayers, and you had an investigation done on that.

        Do you remember that?

A    Yes, I do.

Q    That investigation, in fact, was documented in Plaintiff's Exhibit 23, which was shown to you by counsel, and your investigation concluded that Mr. Mayers play around a

MUNDO - CROSS - VAN-LARE                    545

lot, and he was warned to avoid unnecessary jokes, or jokes in bad taste at work; correct?

A    He acknowledged that he did, and he said that he would stop because it's not appropriate in the workplace.

Q    And it was your testimony, sir, that Mr. Bonnette, the shop steward, approach you about this issue; correct?

A    No.  What I said was:  Mr. Bonnette approached the managers and said several managers come to him complaining that Mr. Mayers was bullying them.  The managers then came and said to me:  What should we do.

Q    Do you know who these managers are?

A    Yes.

Q    Please identify them for the jury.

A    Thomas Prezioso is the general manager; Anthony Caiozzo is the manager of Third, Fourth, and Fifth Housing; and Joseph Capasso is the manager of First and Second Housing.

Q    And the managers then inform, to your knowledge, Mr. Bonnette to have it put in writing; correct?

A    To my knowledge, yes, because that's what I advised them to do.

Q    And then two days later he came back with the document that was shown to you; correct?

A    Either a day or two later, yes.

Q    Your investigation did find out that Mr. Mayers was not a bully; correct?

MUNDO - CROSS - VAN-LARE                546

A    Yes.  As I said, it wasn't bullying.  It was that he was carrying his practical jokes too far, and they felt intimidated by it, but it wasn't any kind of physical bullying or anything.

Q    And you are also aware that Mr. Bonnette is the union representative; correct?

A    He is the shop steward for the 32BJ; correct.

Q    And that the complaint brought by his own shop steward allege, among others, that he's a bully; correct?

A    No.  He brought forward what was -- what his membership -- the other employees brought to him, and he brought it to our attention.  That's his job.

Q    You said employees who happened to be out during a pay period that falls on Christmas time will not be paid the bonus that is collected; correct?

                MS. MOORE:  Objection.

                THE COURT:  Sustained.  You can restate the question accurately.

                MR. VAN-LARE:  Sure.

Q    You did state that there's a policy of awarding bonus to employees.

                Do you remember that?

A    Yes.

Q    And employees who are not on payroll when the bonus is distributed will not be paid.

MUNDO - CROSS - VAN-LARE                547

Do you remember that testimony, sir?

A     That's my understanding, yes.  Yes.

Q     Do you have a written policy that documents this?

A     I don't, because that's not my area.

Q     No, I don't mean you personally, sir, so let me correct myself.

Does Electchester Management, LLC have a policy that documents this?

A     I don't know.

Q     So where did you get that information from?

A     I was told by our payroll people that that's what happens.  If they're not on the payroll at the end of the year, then they don't get the bonus.  If we laid somebody off, or somebody hasn't been at work since June, we don't know if they're coming back or not, and they're not -- they don't get a bonus.  You don't send a check and say:  Here.  Thank you for working from January to June, but here's a bonus.  That's not how it works.

Q     But you do pay people who didn't work from January to June if they happen to be on payroll in December; right?

A     Yes.  My understanding is that they get a proportion of the bonus, a ratio based upon the time they worked during that year.

Q     Who in payroll told you about this unwritten rule?

A     Cindy Wong is the payroll person.

MUNDO - CROSS - VAN-LARE                    548

Q    You just testified that you know Mr. Juan Martinez; correct?

A    Yes.

Q    He was out for more than one year and he was not fired; correct?

A    He was out on disability.  I don't know how long.

Q    You know Mr. Sal Miller?

A    No.

Q    Do you know William Washington?

A    No.

Q    Bob Martin?

A    Who?

Q    Bob Martin?

A    Yes.  Bob Martin was the former manager of First Housing.

Q    He was out for more than a year, and he wasn't let go due to disability.  You know of that; right?

A    He was not in the bargaining unit.  He was part of management.  He was not a part of 32BJ.  He was not in the bargaining unit.

Q    Was he a member of Local 3?

A    I believe he was.  I'm not sure.  I don't know.  To be honest with you, I don't know.

Q    Does that rule apply to Local 3 members or just 32BJ?

A    The 32BJ contract is what governs the porters and the maintenance people.  It's their contract that states you only

MUNDO - CROSS - VAN-LARE                549

have to have the job -- keep the job for them for up to one year.  After 12 months, you don't have to continue the job if you have to fill it.

Q    Respectfully, sir, I was asking you if that rule applies to Local 3 members.

MS. MOORE:  Objection.

THE COURT:  Can you answer that?

THE WITNESS:  We -- they're not covered by the Collective Bargaining Agreement, so that rule would not specifically apply to them.  They're not part of that bargaining unit.

THE COURT:  The Bargaining Unit consists of whom?

THE WITNESS:  The Bargaining Unit consists of the porters and maintenance people.  They are a part of 32BJ of SEIU.

THE COURT:  And Local 3 is separate.

THE WITNESS:  Local 3 is the Electrical Industry. Management people are not part of the Bargaining Unit.  They could be still a member of Local 3, but they are not covered by the Collective Bargaining Agreement.

THE COURT:  I see.

The employees of Electchester Management, LLC are covered by the 32BJ contract.

THE WITNESS:  The porters and the maintenance people -- the office staff is the secretaries, bookkeepers.

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

They are part of Local 3 in what's called their Administration Division.  Those people are covered by the Collective Bargaining Agreement.  The individuals who are non-union, not covered by the Collective Bargaining Agreement, would be the managers:  Tom Prezioso, Anthony Caiozzo, Joe Capasso, and Shane Sultran (ph), who is not a manager but he's assistant to the managers.

THE COURT:  I see.

THE WITNESS:  They're management and not in any Bargaining Unit.

THE COURT:  I see.  All right.  Thank you.

Go ahead.

MR. VAN-LARE:  Thank you, Your Honor.

Q    Is there a reason why you didn't check Mr. Mayers' absence status before you mail out a letter of termination to him?

MS. MOORE:  Objection.

THE COURT:  You may answer.

A    No.  There was no reason.  I was -- I said it started with the first individual, Dominick, that was out for more than a year, that I was preparing the letter, and I asked:  Is there anybody else who hasn't been working for the last year? And I was told Mr. Mayers.  So I went and prepared the letter. I just never thought about checking with personnel, with the bookkeeper to see exactly the dates, so I was told the last

MUNDO - CROSS - VAN-LARE                    551

date that he worked, and I went based upon that.  So it was my

mistake.  I guess I should have checked to see, but I never

even thought about vacation or sick days.  I just went by the

last day he worked.

          (Continued on the following page.)

Q    (Continuing.) Who did you ask about the people who have been absent for a year?

A    Came to my attention, again, first from about this guy Dominic because we needed to fill these positions from, I believe it was Anthony Caiozzo, the manager, he was one of his employees.  And then I asked him is there anybody else, and he had mentioned Mr. Mayers.

Q    It was Mr. Caiozzo that mentioned Mr. Mayers to you?

A    When I asked him if there's anybody else that was out for a year, yes.

Q    Thank you.

        MR. VAN-LERE:  I have no further questions for the witness.

        THE COURT:  Redirect?

        MS. MOORE:  No, Your Honor.

        THE COURT:  The witness is excused.  You may stand down, sir.

        THE WITNESS:  Thank you, Your Honor.

        THE COURT:  You're welcome.

        (The witness was excused.)

        THE COURT:  Are there any further defense witnesses for today?

        MS. MOORE:  Not for today, Your Honor.

        THE COURT:  All right.  And tomorrow, you have one witness at 9:30, is that right?

PROCEEDINGS                              553

MS. MOORE:  Yes, that's correct.

THE COURT:  All right, thank you.

Members of the jury, we have one remaining witness for the defense who will testify tomorrow morning, and I've already gone over the schedule with you for tomorrow.

The one thing I didn't mention was that the Court will provide lunch for you in the jury room when you retire to consider your verdict, or assuming that we've finished with all the final steps before you consider your verdict, or we'll still provide lunch for you tomorrow so that we can move quickly through the day efficiently.  Mr. Reccoppa will discuss that with.  So, at this point, I'm going to adjourn for the day, ask you to be here tomorrow morning at 9:30 promptly.

And I remind you of certain important considerations that I give at the end of every day:

That you shouldn't read, listen to, or watch or access on the Internet or anywhere any accounts of this case, do not attempt any research about the case, do not -- using Google or any other form of Internet search engine, do not attempt -- do not visit any location that's been discussed during the course of testimony, do not discuss this case with anyone, including your fellow jurors, do not permit any other person to discuss the case in your presence, and you should not, however, discuss with your fellow jurors either that fact

*LEEANN N. MUSOLF, RPR, CCR*
*Official Court Reporter*

or any other fact you feel necessary to bring to the attention of the Court.

We'll see you tomorrow morning. Have a good afternoon. Thank you very much for your attention.

All rise for the jury.

(Jury exits the courtroom.)

THE COURT: All right, please be seated. My law clerk, Mr. Feder, will distribute to both sides the draft charge and the draft verdict sheet. I'd like to recess until 3:00 to give you the opportunity to read through everything. Then we'll have a charge conference.

As I said yesterday, it's not required that your clients be present for the charge conference, but they are certainly welcome to be present if they wish. But what I expect, if we get done with the testimony of the expert witness tomorrow morning, like 10:30 or 11:00, that we go right into -- after -- you can make a motion and have an opportunity to make a motion at that point, but after that, we'll go right into closing arguments and then the charge to the jury, and I expect the jury will have the case by the middle of the afternoon tomorrow.

Anything else from the plaintiff for the moment?

MR. VAN-LERE: Just my own curiosity, Your Honor, this is about the jury. They're going to get lunch today --

THE COURT: Tomorrow.

PROCEEDINGS                          555

MR. VAN-LERE:  Tomorrow to move fast, but I had an experience in another case where the jury actually got lunch everyday and that helped the process to move expeditiously.  I was wondering why you restricted it to just --

THE COURT:  Because those are the rules of the court.  We don't provide lunch everyday.  We only provide lunch during jury deliberations.

MR. VAN-LERE:  This was in the Eastern District, too.

THE COURT:  Well, I don't know, some judge may have followed his or her own rules.  I follow the Court's rules.  I do provide lunch everyday if the jury is semi-sequestered and being guarded by a marshal at all times, only in that case, but that's in a criminal jury trial involving where the Court has made the determination that for security reasons and to avoid anyone bothering jurors going to and from lunch, such as the press for instance, that we would have the jurors remain in the jury room during the lunch period of each day.  But that's not -- that wasn't requested here and this isn't a criminal case, so it's unlikely it would ever be requested in a civil case.  But thank you for bringing that to my attention.  Anything else, for now, from the defense?

MS. MOORE:  No, Your Honor.

THE COURT:  We'll see you all at 3:00.  Thank you, everybody.

*LEEANN N. MUSOLF, RPR, CCR*
*Official Court Reporter*

A F T E R N O O N   S E S S I O N

(In open court; Jury not present.)

THE COURT:  Please be seated.

So both sides have received the draft jury charge, correct?

MR. VAN-LERE:  Yes, Your Honor.

MS. MOORE:  Yes, Your Honor.

THE COURT:  Okay.  And the proposed jury verdict form?

MR. VAN-LERE:  We did receive them, Your Honor.

THE COURT:  Okay.  So let's just go over the charge and I'll do it page by page and when I get to a page where you have an issue, we can stop and talk about it.  Is that agreeable?

MR. VAN-LERE:  It is, Your Honor.

THE COURT:  Okay, good.

The jury charge.

Page one.

Two.

Three.

Four.

MS. MOORE:  Your Honor, if I may interrupt?  And my apologies.

We don't really have defendants page by page considerations, so if defendant does, then please continue to

go through page by page, but our only concerns have to do with things that we would like to see in, that aren't in --

THE COURT:  In the what?

MS. MOORE:  Our only concern is there are a couple of things we would like to address that are not in the instructions.  So --

THE COURT:  Do you have anything to correct in the instructions?

MR. VAN-LERE:  We adopt them, Your Honor.  I have no corrections.

THE COURT:  All right.  So the only -- it's easier, I'm glad you told me that because I would just go through the whole thing, you would not say anything, and then I would leave.  So tell me what you want in the instructions and give -- do you have copies of what you want in the instructions?  I take it, is part of what you gave me?

MS. MOORE:  Yes.

THE COURT:  Okay.  Why don't you tell me.

MS. MOORE:  Sure.  The instruction we would like to have included that was not included but was in our initial decision, is the plaintiff-specific findings instruction.  And we understand throughout that it's delineated that both or either, that it's differentiated --

THE COURT:  Do you have a microphone?

MS. MOORE:  I'm sorry, I turned it off.  I can

CHARGE CONFERENCE                         558

repeat.

THE COURT:  All right.  You can sit down.  You don't have to stand.

MS. MOORE:  Oh, okay.  In our initial submission, we included an instruction on plaintiff-specific findings and while we understand that throughout, the individual defendants are delineated as -- plaintiffs are delineated as separate entities.  We would like a plaintiff-specific instruction that ensures that the jury understands that each individual plaintiff must meet all of the elements of each individual plaintiff's claim as an individual plaintiff.

THE COURT:  So you want a paragraph that says that?

MS. MOORE:  Yes, Your Honor.

THE COURT:  All right.  Where is that in your draft so we can take a look at that?

Do you have an objection to that?

MR. VAN-LERE:  No, I don't have an objection, although, I think it's clear enough.

THE COURT:  Well, I don't have any problem adding that somewhere.

MS. MOORE:  Thank you, Your Honor.  That's on page 12 of our submission.  And the other consideration is actually something we can remove, is that we longer need the expert witness instruction because we are no longer going to call Dr. Siegert after consideration, over the break, of our case

and the testimony given, in light of Mr. Mayers's damages and actually we can just close tomorrow.  And I know you had dismissed the jury before and you had explained to them that there would be another witness.  And we're very sorry for that, but it took some assessing after the day's testimony.

THE COURT:  Well, yeah -- my only concern about that is I told them that there would be an expert witness and how do you propose I handle there's not going to been am expert witness, other than when I ask you about your next witness, you say, we've chosen to rest at this time and will not be calling any further witnesses, or whatever you want to say.  But I think since you informed me you're going to have an expert, I don't want to leave them thinking there's something odd about the fact that you're not calling an expert witness.

MS. MOORE:  Right.

THE COURT:  That's my only -- I'm concerned for you, that I don't want them going into the jury room thinking why didn't they actually call this witness.  And if you can figure out how to do that in a way that doesn't disparage the plaintiffs --

MS. MOORE:  Sure.

THE COURT:  -- is neutral, let me know, after you've consulted on that, in the morning.

MS. MOORE:  Okay, yes, Your Honor, we can do that.  Thank you.  And that is the extent of our suggested or desired

CHARGE CONFERENCE
560

revisions to the jury instructions.

THE COURT:  All right.  Where would you like that other instruction to go, about -- I don't know that it's necessary, but as counsel has said, it's really not necessary, but if you want -- I don't have a problem with that because that's the law; each plaintiff has to prove his case separately from the other plaintiff.

MS. MOORE:  I think you could include it in the burden of proof section, it would make sense, to me, there or somewhere maybe between or before or after burden of proof. But I think it would make sense to put it -- to even embed it in the burden of proof section the way Your Honor's instructions are laid out.

THE COURT:  Okay.  We'll take a look at page 12 of your submission and try to fold it in there, okay?

MS. MOORE:  Thank you, Your Honor.

THE COURT:  Do you have anything on the --

MR. VAN-LERE:  I have nothing else to add.

THE COURT:  -- on the charge?

MR. VAN-LERE:  No, Your Honor.

THE COURT:  Okay.  So let's move on to the quite extensive verdict form.

Does anyone have anything on the verdict form?

MR. VAN-LERE:  I do not, Your Honor.

THE COURT:  Do you?

*LEEANN N. MUSOLF, RPR, CCR*
*Official Court Reporter*

CHARGE CONFERENCE                                    561

MS. MOORE:  We do, Your Honor.

THE COURT:  What's that?

MS. MOORE:  So, in the part two, race discrimination section.

THE COURT:  Hold on, let me get there.

MS. MOORE:  Sure.  Page six.

THE COURT:  I'm there.

MS. MOORE:  It's more of a conceptual overarching consideration.  So, in our submission to the Court of our proposed jury form, we had included in this claim the Faragher-Ellerth defense, you know, the different elements of the Faragher-Ellerth defense.  Because as Your Honor's instruction specify on page 19, plaintiffs really have to prove they were subject to a hostile work environment to succeed on the race discrimination claim, and, therefore, our defense would be available, our Faragher-Ellerth defense would be available to that claim, as well.

That's our position.

THE COURT:  So how would you change this?

MS. MOORE:  Well, we would revert to our previous structuring of the document, which did include, in the questions with the -- the questions -- the Faragher-Ellerth questions on the former embedded and the path through the form was changed to reflect the addition of those questions.

THE COURT:  So, where are they in the first section?

CHARGE CONFERENCE                                562

MS. MOORE:  In the first section, the Faragher-Ellerth questions are -- sorry, Your Honor, just one moment if you don't mind.

THE COURT:  I will point out that the verdict sheet requires the jurors to treat the plaintiffs separately on all these claims.  In other words, what we would add to the charge itself is just -- is reflected in the verdict sheet in terms of separating out the two defendants, one from the other.

MS. MOORE:  Understood.

In our initial --

THE COURT:  Hold on.  Just hold on.

MS. MOORE:  Sure, sorry.

THE COURT:  All right.  So my clerk is indicating that it appears that you want six and seven on page two to be added to the part two; is that basically it?

MS. MOORE:  Yes, but I believe it's four through seven.  Those are the four elements of the Faragher-Ellerth defense, and to have that in the race discrimination claim, as well, it would be --

THE COURT:  It's redundant but that's okay.

Do you have a problem with that?

MR. VAN-LERE:  No, I don't, Your Honor.

THE COURT:  Let's just do it.  It just makes it longer.

MR. VAN-LERE:  My only concern, I know that in their

original submission they had used the standard clear preponderance of the evidence, and I hope the word clear will be delineated.  That's all.

THE COURT:  Yes.  Well, the word clear -- the term that we use is preponderance of the evidence.  The word clear, it's not, as I understand it, it's either a preponderance or it's not a preponderance.  So we're adding a condition that's not in the law by saying clear preponderance.  If they find more than 50 percent, that's preponderance.  It should be clear to them if they do that.

I mean, I will just -- that's why we deleted the word clear because we didn't think it added any meaning, that the question would -- I can just see the jury coming back with a question, what is the difference between a preponderance and clear preponderance, and I wouldn't have an answer to that and I don't think there's an answer to that in the law, frankly.

MS. MOORE:  Understood, Your Honor, and upon review of the Court's preponderance instruction, we are satisfied with the removal of the word clear from the verdict form, which it appears it was.  We don't have any objection.

THE COURT:  All right, sir.  So we're going to add four, five, six, and seven on page two, to the part two in the appropriate location.

MS. MOORE:  Yes, Your Honor.

THE COURT:  And where is that?  Is that after 25?

CHARGE CONFERENCE                    564

Paragraph 25?  I just want to put it in the right place.

MS. MOORE:  I believe it would become -- it would be after paragraph 22, is the way we had it in our submission. Excuse me, sorry, I'm having a hard time.  It would be after 30.  My apologies, I misspoke.

THE COURT:  All right, we'll take a look at it.  I know what you're driving at, so let us take a look at that.

MS. MOORE:  Thank you, Your Honor.

THE COURT:  I don't have any problem adding it to the second -- you know, to part two.

MS. MOORE:  Thank you.

MS. SHEA:  Thank you.

THE COURT:  Even though it's redundant, that's fine.

THE COURT:  Anything else on the verdict sheet?

MS. MOORE:  No, Your Honor, that is it for the verdict sheet for the defendant.

THE COURT:  Anything --

MR. VAN-LERE:  Nothing from us, Your Honor.

THE COURT:  All right.  So we'll make the revisions and -- rather the editions, all right?  And then we'll circulate the final to you tonight, and then tomorrow morning, we'll go right into closing arguments.

How long is your closing argument?

MR. VAN-LERE:  Probably, I'll try to have about a half-hour.

CHARGE CONFERENCE                                      565

THE COURT:  All right.

And your closing?

MS. MOORE:  I imagine it will be about the same.

THE COURT:  All right.

And then you get a rebuttal.

MR. VAN-LERE:  Yes, Your Honor.

THE COURT:  Try to make the rebuttal shorter than the closing.

MR. VAN-LERE:  Definitely.  Definitely.

THE COURT:  There have been times here where the rebuttal has been longer than the closing and I always find that interesting.

So the jury will get the case in the morning.

MS. MOORE:  It sounds like it, Your Honor.

THE COURT:  Well, I mean late morning because it will take about an hour to read the charge to the jury.  And then what we will do -- oh, what we will do is we'll send in a copy of the charge for each of the jurors, a copy of the verdict form for each of the jurors, only one of the verdict forms will have the signature block for the foreperson, all right, and I'll tell the jury about that, and we'll send in the evidence.

What I would like you to do, since there aren't that many items in evidence, I would like you to -- the two sides to make copies of the evidence and agree with each other,

*LEEANN N. MUSOLF, RPR, CCR*
*Official Court Reporter*

CHARGE CONFERENCE                    566

review it together, and then we'll send the evidence into the jury along with the verdict sheet and the charge.  I don't think we need to have it done electronically, there wasn't that much evidence, but make sure your evidence is properly labeled.  It should say -- and Mr. Reccoppa can give you little stickers for your evidence if you need them.  It should say Plaintiff's Exhibit, whatever number it is, Defense Exhibit, whatever letter it is, all right?

MS. MOORE:  Yes, Your Honor.

THE COURT:  So that the jury isn't confused, okay?

MS. MOORE:  Yes.

THE COURT:  Is there anything else for this afternoon?

MR. VAN-LERE:  Nothing from us, Your Honor.

MS. MOORE:  No, Your Honor.

THE COURT:  Okay, good.  All right, we'll see you tomorrow morning at 9:30.  Take care.

*     *     *     *     *

(Proceedings adjourned at 3:24 p.m. to resume on November 10, 2022 at 9:30 a.m.)

*LEEANN N. MUSOLF, RPR, CCR*
*Official Court Reporter*

567

                              I N D E X

WITNESS                                  PAGE


**RICHARD BONNETTE**

DIRECT EXAMINATION      BY MS. SHEA          475

CROSS-EXAMINATION       BY MR. VAN-LARE      493


**VITO MUNDO**

DIRECT EXAMINATION      BY MS. MOORE         510

CROSS-EXAMINATION       BY MR. VAN-LARE      535



                         E X H I B I T S

DEFENSE                                      Page

JJ                                           481

EE                                           488

LL                                           517

MM                                           520

*LEEANN N. MUSOLF, RPR, CCR*
*Official Court Reporter*