Case 1:17-cv-06303-NGG-MMH    Document 117-5    Filed 12/03/22    Page 1 of 131 PageID #: 3798

568

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------x
                                        17-CV-6303(NGG)
BELVIN ET AL.,
                                        United States Courthouse
            Plaintiffs,                 Brooklyn, New York

            - versus -                  November 10, 2022
                                        9:30 a.m.
ELECTCHESTER MANAGEMENT,
LLC,

            Defendant.
------------------------------x

             TRANSCRIPT OF CIVIL CAUSE FOR TRIAL
         BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
            UNITED STATES SENIOR DISTRICT JUDGE
                      BEFORE A JURY

APPEARANCES
Attorney for Plaintiffs:

                          LAW OFFICES OF ALBERT VAN-LARE
                          125 Maiden Lane, Suite 510
                          New York, New York 10038
                          BY:  ALBERT VAN-LARE, ESQ.


Attorney for Defendant:
                          WILSON ELSER MOSKOWITZ
                          EDELMAN & DICKER LLP
                          150 East 42nd Street
                          New York, New York 10017-5639
                          BY:  MARIELLE ALECIA MOORE, ESQ.
                               CORRINE SHEA, ESQ.


Court Reporter:           LEEANN N. MUSOLF, RPR, CCR
                          Phone:   718-613-2374
                          Fax:     718-613-2267
                          Email:   lmusolf.edny@gmail.com




Proceedings recorded by mechanical stenography.  Transcript
produced by Computer-aided Transcription.

*LEEANN N. MUSOLF, RPR, CCR*
*Official Court Reporter*

(In open court; jury not present.)

THE COURTROOM DEPUTY:  Case on trial.

Beginning with the plaintiffs, please state your appearances for the record.

MR. VAN-LARE:  Albert Van-Lare for the plaintiffs.

Good morning, Your Honor.

THE COURT:  Good morning, sir.  And your clients are both here.

Good morning.

MS. MOORE:  Good morning, Your Honor.

Marielle Moore for the defendant.

MS. SHEA:  Good morning.

Corrine Shea for the defendant.

MR. PREZIOSO:  Good morning.

Thomas Prezioso.

THE COURT:  Good morning.

Let me just ask, Mr. Van-Lare, have you received the final jury instructions and the verdict sheet?

MR. VAN-LARE:  I did, Your Honor.

THE COURT:  Anything else?

MR. VAN-LARE:  No, nothing on that.

THE COURT:  Has the defense received it as well?

MS. MOORE:  Yes.

THE COURT:  Last night.  Everything copacetic?

MS. MOORE:  Yes, Your Honor.

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

Proceedings                570

THE COURT:  Okay.  Very good.

Is there something --

MR. VAN-LARE:  I do have a report to make to the Court.

This morning I was going down to the restroom and I saw a gentleman -- I didn't realize it was a juror that passed me.  I said:  Hi.  And then I kept going, he didn't answer, and then it occurred to me that it was a juror.

THE COURT:  You didn't have a conversation with this person.

MR. VAN-LARE:  No, no.  I just said hi, and he didn't respond, and then I realize:  Oh, my God, it's a juror.  I came and I told counsel what happened.  I never had any discussion.

THE COURT:  All right.

MS. MOORE:  Yes, Your Honor, he did tell us what happened, and I'm confident that the juror was not affected by that interaction.

THE COURT:  Okay.  Thank you very much.

Who will be closing for the defense?

MS. MOORE:  I will be.

THE COURT:  Ms. Moore?

MS. MOORE:  Yes.

THE COURT:  Very good.

MS. MOORE:  Your Honor, did you want to hear what I

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

Proceedings                                    571

propose to say to the jury about the expert witness?

THE COURT:  Yes.  Tell me.

MS. MOORE:  After careful consideration of all of the evidence and testimony presented at trial, defendants are satisfied that expert testimony is not necessary and therefore the defendant rests.

THE COURT:  I think that's fine.

Is that fine with you?

MR. VAN-LARE:  Yes, it's fine with me.

THE COURT:  I just need to make an explanation to the jury about why something I told them was going to happen is not happening.  And I think -- otherwise it's a question.  It reminds me of a trial, early in my career here, where I wore a business suit during a trial and when -- after the trial and after the verdict, I went in to the jury members to thank them in the jury deliberation room to thank them for their service, and I said:  Do you have any questions?  And one of the jurors raised his hand, he said:  We've been wondering all this time why you don't wear your robe.  So I don't want them thinking about something that's not relevant to what they need to address.  That's the reason why --

MS. MOORE:  Understood.

THE COURT:  -- I think it's important to do this.

MR. VAN-LARE:  One more question, Your Honor.

THE COURT:  Yes.

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

Proceedings                                            572

MR. VAN-LARE:  I do want to make reference to a paragraph in our stipulated facts.  I wanted to ask you if that's okay.  I know they have not received it, the stipulated facts.

MS. MOORE:  I have an objection to that.  The stipulated facts aren't in evidence.

THE COURT:  Right.  Only what's in evidence may be mentioned to the jury.

MR. VAN-LARE:  Okay.

THE COURT:  If you had provided the material during the trial, you know, then you could provide that to the jury --

MR. VAN-LARE:  Thank you, Your Honor.

THE COURT:  -- in your argument.

MR. VAN-LARE:  Thank you.

THE COURT:  Okay.  All right.  About half an hour?

MR. VAN-LARE:  Yes.  Probably less.

THE COURT:  All right.  And, Ms. Moore, how are you going -- are you going to wear the microphone?  You are not going to hold it.

MS. MOORE:  No.  I will wear it.

MR. VAN-LARE:  I'm wearing one already.

THE COURT:  I see you are wearing one, but --

MS. MOORE:  Yes.

THE COURT:  Otherwise we put the standing mic over

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

Proceedings                                                  573

there if you didn't want to wear the microphone.

MS. MOORE:  I don't mind wearing it as long as it works.

THE COURT:  That's fine.

Let's bring in the jury then.

MS. MOORE:  Oh, Your Honor, we do have a motion to make.  We would like to move for judgment as a matter of law.

THE COURT:  Go ahead.

MS. MOORE:  With respect to Mr. Mayers, there's been no evidence whatsoever of any race discrimination or hostile work environment against Mr. Mayers.  He didn't testify about it and no one else claimed on his behalf that he was discriminated against or subjected to a hostile work environment.  There's no adverse employment action with respect to Mr. Mayers.  He wasn't even medically cleared to return to work at the time he received the so-called termination letter.  Once he was cleared, he went back to work immediately.  There's no evidence of any inference of discrimination.  Mr. Mayers wasn't even working for Electchester when he claims he was supposed to receive this bonus; he was on disability leave.  And there's been no evidence that anyone else got a bonus who wasn't on the payroll like Mr. Mayers was not.

With respect to Mr. Belvin, at most, he has presented evidence of petty slights and trivial

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

Proceedings                                        574

inconveniences.  He failed to take advantage of Electchester

's complaint and reporting procedures.  Prompt remedial action

was always taken every time that he did avail himself of those

procedures, and he wasn't treated less well because of his

race.  Other people were written up for similar infractions,

including for the use of racially insensitive or derogatory

words.

          There were legitimate business reasons for all of

his write-ups and suspensions, and there was no adverse

employment action.  He was paid back for every day that he

lost except for when he threatened his co-workers, which is

certainly a legitimate business reason for a suspension or

other discipline.  And there's been no evidence presented

whatsoever of any pretext for any of the suspensions or

write-ups.  And for those reasons, the defendant moves for

judgment as a matter of law on all the claims at trial.

          THE COURT:  Thank you.

          Mr. Van-Lare?

          MR. VAN-LARE:  Your Honor, starting with Mr. Mayers,

she said he was not medically cleared.  Management did not

even look into that.  All they did was go ahead and write him

a termination letter.  It's not like anyone ask him to send in

a doctor's note and he didn't send it.  Mr. Mundo testified

that he went ahead, he wrote it, and, oh, God, he said it's an

error.  The jury has to make a decision as to whether that is

Proceedings                                   575

actually an error because the letter itself copied the HR representative, Ms. Wong.  So it's not like Mr. Mundo on his own just wrote it.  And, of course, he should have checked the status, if he was going to send it, of the employee.  He was aware that Mr. Mayer was out for cancer treatment.  And the whole company was aware.  They testified that they contributed money to him.  So you would think they would have checked out what they were doing, and the jury has to make a call on that.

He said it he wasn't working for Electchester.  He was working for Electchester.  He just happened to be out during that period on approved medical leave.  He was paid for the following year bonus.  He work half the year.  They came up with the explanation that if you are not on payroll, you will not be paid for that year, but the reality is, there's no procedure in writing.  They have no evidence to back that up. They are just saying it.  There's no proof that that was a procedure, and there's no rationale to that as well.

She said -- counsel said Belvin didn't follow the complaint procedure.  Your Honor, there was no complaint procedure.  The evidence was clear that until 2015 -- and it was late in 2015, October 28, 2015, was when they adopted the so-called policy that they showed.  And Mr. Prezioso testified that the managers had the people designated to receive EEO complaints.  The manager didn't know that -- what it was. That was a conflict.  Some of them even testified that they

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

Proceedings                                                        576

don't know what the procedure is like, so if these -- if this is the process and nobody knew, how could an employee even know?

And, at any rate, Mr. Belvin went to his assistant manager at that time to complain.  The assistant manager, from the testimony, went to Mr. Prezioso and, of course, Mr. Prezioso testified that Mr. Ed Wiley was given responsibility to follow up and check on these things.  So it's not like he didn't know or he didn't follow the procedure.  He followed whatever procedure they had -- they didn't even have it established.  He followed the procedure that he could follow and it got to management.

Even counsel -- general counsel -- Mr. Mundo was aware of it.  He testified he was aware.  He testified he spoke to Mr. Prezioso.  He knew what was going on.  She said they have a legitimate business reason.  They have not demonstrated a legitimate business reason for what they did to Mr. Prezioso, and I think you should deny the motion.

THE COURT:  All right.  Thank you.

I'm going to deny the motion with regard to both of the plaintiffs and allow the jury to consider the evidence in the case.

So, that having been taken care of, let's bring in the jury.

I'm going to -- my deputy points out that you didn't

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

Closing Argument - Van-Lare                577

technically rest your case in front of the jury, so I will

just ask you to do that.

            MS. MOORE:   Sure.

            In the statement that I was going to say, it does

say at the end -- and I'm sorry if I forgot to say it -- and

therefore the defendant rests.

            THE COURT:  Okay.  That's fine.  That's good.

            (Pause.)

            (Jury enters.)

            THE COURT:  Please be seated:

            Good morning, members of the jury.

            THE JURY:  Good morning.

            THE COURT:  Ms. Moore.

            MS. MOORE:  Yes, Your Honor.

            After careful consideration of all of the evidence

and testimony presented at trial, defendant is satisfied that

expert testimony is not necessary and therefore the defendant

rests its case.

            THE COURT:  Thank you very much.

            Mr. Van-Lare, anything further from the plaintiffs?

            MR. VAN-LARE:  Nothing further from the plaintiffs,

Your Honor.

            THE COURT:  Okay.

            Thank you.

            At this time, the next step in the trial is for the

Closing Argument - Van-Lare                578

parties to give you their final statements and arguments on

behalf of their clients, and therefore we'll start with the

plaintiffs.

Mr. Van-Lare, you may close for your clients.

MR. VAN-LARE:  Thank you, Your Honor.

May it please the Court.

Good morning, ladies and gentlemen of the jury.

Again, as you recall, my name is Albert Van-Lare,

and I first spoke to you directly in this manner when you came

in initially, and I told you at that time that the plaintiff

in this case, they have the burden of proof.  We brought the

case, so it's our responsibility to persuade you.  The burden

of persuasion rests with plaintiffs, and this morning, I want

to summarize the argument and to further argue that the

plaintiffs have satisfied that burden.

Very shortly, at the end of this presentation, both

by the plaintiffs and by the defendant, you will get your

charging instruction as to the law and as to the facts you

will apply, and it will be based only on the evidence that has

been presented during this trial.

There are laws involved in this case.  We have

federal laws, we have state law, and we also have city law.

All three laws are applicable.  All three laws have penalties,

and all three laws have remedies that they provide.

So let me give you an example in this manner.  And

Closing Argument - Van-Lare                    579

this is the plaintiffs' view of how this may be applicable.

There's a grandfather who owns a 50-story apartment building, and that 50-story apartment building, he decides to give one floor -- the 10th floor -- to his son, and told his son:  You may have the 10th floor.

The son has a son who will be a grandson, and he gave the grandson one apartment on the 10th floor.  So father owns a 50-story building, gave the 10th floor -- which has ten apartments -- to his son, and the son decides to give one apartment out of the ten to his own son.

So you have a grandfather, a father, and a son.  So look at the 50-apartment building as the federal government of the United States with 50 states.  New York is the 10th floor. It's one of the states.  And New York City is an area, a geographical territory, in the state of New York.

So look at New York City as a grandson and look at the 10th floor as the state of New York, and then look at the entire 50-story as representing the 50 states.  That's how you have to conceptualize it.  And this -- a demonstrative example from the plaintiffs to you, if you look at it that way, the grandfather, for example, told the son when he gave him the building:  I am giving it to you in this condition.  You may not have anyone consume beer, B-E-E-R, on the 10th floor.  I don't care what you do.  It's all given to you, but I don't want anyone on the 10th floor -- or in any of my building --

Closing Argument - Van-Lare                    580

consuming beer, period. That's my only condition.

The son accept it. Took the apartment -- I mean took the floor, and then the son made his own rule, which, in this case I said would be the state of New York, right, and the son says: Look, you may not consume beer, and you may not consume any kind of wine, period. That's my law here. Not just beer. Nobody is going to consume on the 10th floor beer or wine. That's my law.

So, if you are in the building, no beer. If you are on the 10th floor, no wine, no beer.

And then the son who got one apartment on the 10th floor, which would be the City of New York, made his own rule: You know what, there's no consumption of alcohol, period, in this apartment.

So, conceptually, that's how I want you to look at it. The federal government makes its own law, and when they make law, Congress makes that law for us, that law is applicable in all 50 states of United States, and all this territory. Depending on where you live, anywhere where the United States Government has jurisdiction, federal law applies.

And then in terms of the son, anywhere in New York State, New York law apply. It doesn't apply in Connecticut. It doesn't apply once you go by the Hudson into the great state of New Jersey, but it does apply everywhere in the state

Closing Argument - Van-Lare                    581

of New York.

And, of course, we are incorporated by boroughs forming the City of New York. So any city law applies within the five borough. The mayor and city counsel together make law for us, and the law we make in the City of New York does not apply. Once you cross over from Queens into Nassau County, it doesn't apply because it's not a part of the five boroughs. So that's how I want you to look at the applicable laws here.

And each jurisdiction have penalties. So you going in and you consume beer, the man will kick you out because he told you, you can't do it.

You go on the 10th floor and you consume beer, and you excuse me wine, you will be penalized by the 10th floor separately from the building. And the same thing goes for the apartment. So look at this conceptually.

I also want to say to you that about 152 years ago -- and that was in 1870 -- the Congress of United States -- and Congress makes law, right? And the president signs it, and then it becomes a piece of law. In 1870, the Congress of the United State pass during the reconstruction era the old civil right law. You may see it as you listen to the charges. That law we refer to as 42 U.S.C. 1981, and it's commonly called Section 1981. It was made at the time when the United States had just concluded the Civil War. Blacks have been

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

Closing Argument - Van-Lare                582

freed.  It was very difficult getting regular employment, and Congress decided that -- and it's not my language.  It was the statutory language at that time -- that every person shall be entitled to make and enforce contract like a white person.  Because, at that time, not everyone was allowed, and that is the exact language in the statute, not my language.

And, of course, if you think back to 1870, it was a language that was in use that way.  And that law has been on the book for a long time, and there was a conflict as to whether the law even applied to employees because it says to make and to enforce contracts.  And that contract can be written, it can be oral.  It doesn't have to be in writing.

If I need a baby-sitter to take care of my son because I go to work, I can say:  Come.  Sit in my living room.  Let's talk.  I'm going to pay you $200 a week and you say:  Okay, I accept it.  I'm going to babysit for you.  It's a contract.  You don't have to actually write it out.  As long as there's an agreement, it's an understanding, and both have just agreed that this is what you do.  And that law has been in effect, and Congress pass another law, the Civil Right Restoration Act, 1991, and clearly and precisely intent to make the right to make and enforce contract applicable to all people, including employees.

So that's how that law came into being.  And in 1964, Congress pass the Civil Right Act.  The Civil Right Act

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

Closing Argument - Van-Lare                    583

has a portion called Title VII, which is what created the

EEOC, and it says we are going to give employees a right to

complain, so you can go to the EEOC and then you can move on

from there.

And the old Civil Rights, which was based on race

discrimination, in 1964 Congress decided to expand it.  By

"expand," come up with law that says, look, no discrimination

based on race, sex, and so on and so forth.  This was 1964.

So it's very clear that United States Government intend to

abolish all forms of discrimination in the workplace.

And New York City has done the same thing.  And the

State of New York has done the same thing.  And these are the

laws applicable today that you are going to have to apply the

facts of this case to using your ordinary everyday common

sense as citizens.  You've listened to the case, and you can

make a determination as to whether we've met our burden of

proof in this particular instance.

I want to go to Mr. Mayers.  Mr. Mayers has brought

this case alleging discrimination against him based on refusal

to pay him bonus as well as termination.  You've listened to a

lot of evidence as to why the termination that was written,

and you also listened to Mr. Mayers explain how he felt when

he received that letter of termination.

Counsel ask several times during her direct

examination if anyone told Mr. Mayers -- and Mr. Mayers was

Closing Argument - Van-Lare              584

asked too -- whether or not he was fired because of

disability, and I believe everybody responded in negative.

Nobody told him that.  We don't have situations, generally, in

this area of law where someone walks up to you and say:  Hey,

I'm going to get rid of you -- or you're fired -- because you

are disabled.  I'm going to fire you because you are pregnant.

You are going to get fired -- nobody says anything like that.

If they do, there would be no need to have it on trial.

There's the facts.  Direct evidence.  It usually doesn't

happen like that in the workplace.

So, of course, that is begging the question:  Did

they tell you you were terminated because you have a

disability?  Of course they won't tell you that.  Nobody tells

you that.

Mr. Vito has testified -- Mr. Mundo, I should say,

has testified, and Mr. Mundo's testimony was that he made a

mistake; that it's a simple error; and as soon as we found

out, we corrected it.  They call me, I spoke to the Union, and

I told the Union guy, whose name is Mr. India, we'll fix it.

And he fix it.  And, therefore, you should not pay attention

to that.  It wasn't anything done maliciously.  It wasn't done

in retaliation.  It was really a honest mistake.

Ladies and gentlemen of the jury, don't buy that.

Nobody is going to sell you the Brooklyn Bridge.

Mr. Mundo testified that he's an attorney with 15

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

Closing Argument - Van-Lare                585

years' experience in the area of employment practice before coming to Electchester, and he had decades of experience at Electchester, very seasoned professional.  Very knowledgeable man in the area of law.  He had enough knowledge and experience in law to know the right thing.

So he also said, by the way, he said voluntary employee -- he work as volunteer; he doesn't get paid.  But not just that.  He said big corporation with a lot of employees, worth billions of dollars, with a lot of buildings, and you just wonder why someone who is not an employee is making all the final calls talking about dysfunctional employment environment.  But, nevertheless, he made that call, and when he did it -- you are going to see the exhibit.  I believe it's Exhibit 37.  That exhibit, letter of termination, at the bottom it says:  Copy.  Ms Wong.

Ms. Wong is the HR person, so even if Mr. Mundo makes a mistake, you think another official working in HR will pick up that error.  Everybody was aware that Mr. Mayers was out sick.  How do I know that?  Every manager here that testified -- even their managers -- testified that they contributed money, an employee gets it.  You know, people want to do something to help him because he's going to be out of paycheck.  He's probably going to be on disability, and, you know, people like to do whatever it might be just to help out, and it happened in this case.  You know, the managers over

there, $20, some 35, and Mr. Prezioso can give a hundred dollars.  And that's a good thing.

So they know he was sick, and you would think someone that has that kind of situation at least before you fire him you will talk with someone:  Oh, by the way, how long has Mr. Mayers been out?  What is his status?

Take a look at that letter.  You are absent or you've been absent for more than 30 days, your Union contract says you can't, and goodbye.  Most employers even have the heart to say:  We wish you success.  If, you know, they have to fire you and they don't have any choice in your future, or profession, or whatever.  Just send a letter out.  Nobody cares.  Was sent by mail.

Look, they have a right to run their company whatever way they want.  What they cannot do is run the company in a way that collides with law.  But at least someone could have said:  Reach out to a manager.  Who is his supervisor?  Whose is his manager?  Find out what's going on with him, because we may have to send him this letter, and I don't want to shock his conscience.  Nobody did, and that's exactly what happened.

And guess what?  He tells them that it was not true that he's been out sick for more than a year, and then they said:  Oh, my gosh, I screwed up.  It was a mistake.

(Continued on the following page.)

Closing Argument - Van-Lare                587

(Continuing.)

MR. VAN-LARE:  Now, a worker who relies on this insurance and who has rent to pay and has been out for a substantial amount of time trying to recover, goes to the mailbox, open the mailbox, and what's what you see.  He told you how he felt, with tears.  He says, oh, my God, what does the future hold, where am I going.  And that's why he brought this claim of emotional distress and that particular time, what he went through.  And that is one of the reasons, actually, not the only reason.

By the way, nobody has shown you any evidence of the contract that says when you are out more than a year, you are gone and that there are no exceptions, at all.  Everybody walks in here and says that's what it says, that's what it says, it's in the CBA, Collective Bargaining Agreement.  But they haven't shown it to you, we haven't seen it.  Don't take their word for it.  You are to judge them on the basis of the statements they have made to you.

And then, one of the most ridiculous argument that has been made; he did not complain to anyone that he didn't receive a bonus.  Come on, that's just outright mean.  You know what the man is going through.  You know what he -- you contributed money to him, and he's going through this process of chemotherapy and radiation and everything, and you are saying, oh, he didn't complain, as if that would make a

*LEEANN N. MUSOLF, RPR, CCR*
*Official Court Reporter*

Closing Argument - Van-Lare                588

difference.

And then they came up with this argument that, we have a policy and the policy says if you are not on payroll when that money is being paid, you are not going to get paid. Well, that falls flat on his face. You can say whatever you want after-the-fact, right? But they didn't provide any evidence that that is the policy.

And you know why they didn't provide the evidence? Because it doesn't exist. If it sounds like it's not true or it doesn't make sense, it's probably not true. They were quick to point to employee manual, they were quick to draw your attention to 32B-J contract, and then they came up with this ridiculous story that if you're not on payroll, you don't get paid.

Now, you also are aware, or you've seen evidence of monkey in the workplace. Mr. Mayers is not the individual who took a picture of the monkey and he has not testified to that. But, ladies and gentlemen of the jury, you don't have to be Black to be offended by that image. You don't have to be Chinese to be offended if there is discrimination against Chinese people, and, honestly, you don't have to be a pregnant woman to understand that discrimination on the basis of pregnancy is just bad and illegal.

And, of course, for any other protected category in this country, it's just as simple. You can be offended by

racist behavior against people who are not part of your race, that's possible, and you can be offended by racist behavior even if it's not directed at you, if it permeates the environment and is everywhere. And some of the workers are trying to testify that they don't like that environment, it's just bad. And that's exactly what is going on at Electchester. You just wonder why Electchester became so bad. On paper, it's a good corporation. And don't get me wrong, people who work at Electchester are union people who believe and advocate for the rights of workers.

In fact, one of the reasons those complexes were built is to provide opportunities for people, don't get me wrong. However, people who manage it, the people they put in charge are doing a horrible job, A-R-E, are doing a horrible job. Not just in the past, they did one in the past and they continue to do so, and we cannot let them get away with that.

Mr. Mayers has a claim, like I said, for emotional distress, and I've given you an example. When he was fired, it was very bad for him, and I told you that. He was also denied bonus and he wasn't paid. He worked there for 19 years, not at that time, but as of now. This was back in 2015, so that's about seven years ago, about 12 years at that time. That's a substantial amount of time. And they want you to also believe that, you know, that he's a bad employee. Nobody in America keeps an employee for 12 years, not wait

Closing Argument - Van-Lare                    590

until 19, if they're useless, not productive, or whatever.

Same thing about the general manager who testified here, oh, we discovered he wasn't good, so we fired him. Not that they're correct, but that's what an employee would do if you are not good. No one is going to pay you to keep working for them and you're doing a nasty job. It doesn't happen. They'll fire you. They have the right to fire you. It doesn't matter whether you're in the union or not. Jermone -- Jerome Jenkins was fired. He was in the union. Ed Wiley was fired. And you listened to Mr. Prezioso's own testimony, Ed Wiley was an incompetent manager, that's why he fired him. So don't let them tell you that Mr. Mayers was not a good employee. He was a good employee. He is a good employee. He continues to be a good employee and he's still employed by Electchester as today -- as of today.

He has courage. It takes courage to go through what he went through, and he brought an action. A lot of people would just say, look, they are the employer, they are big, I won't do anything, you know, and they are reluctant to leave because they are afraid of retaliation. But he did it because he knows that the law protects him against retaliation.

So when he went to his boss and said, listen, this is a note from my doctor, I need time out. What did his manager Mr. Wiley tell him --

MS. MOORE: Objection.

Closing Argument - Van-Lare                591

THE COURT:  Overruled.

Go ahead.

MR. VAN-LARE:  What did he tell him?  I have to consult with the other employees so I can reschedule the working situation so to give you time.  And he testified that he was devastated by the fact that other people have to know of his cancer condition.  He has no need to do that.  You, as an employer.  Even if you're not required by law, come on, it's common sense.  They're -- most people want their medical history protected.  Most people.  Maybe there are individuals who don't care if you take a microphone and you stand on the corner of 14th Street and Broadway and Union Square and say, I have cancer, I have AIDS.  Maybe there are people who don't care, but most Americans don't want that exposed.  And he told you he was devastated by that.  He felt bad and depressed.

And now, what is more even more disturbing is they tried to portray this guy who worked for them 19 years now as a racist; oh, he called people names, he said nasty things.  That's how they tried to portray him, his own employee.  An employer has a duty, has an obligation to get rid of people who promote racism at the job.  If you try to correct them and they don't listen and you fire them, no one would give you a problem because that's a justifiable reason.  No one has a right to go to work and begin to treat other people differently or harass them because of their race.  And that's

*LEEANN N. MUSOLF, RPR, CCR*
*Official Court Reporter*

Closing Argument - Van-Lare                592

what they tried to portray falsely about this man.  And it was done by witnesses who came after him.

Fortunately, we got the facts.  Vito Mundo, General Counsel, testified that, we investigated the matter and we found no bullying and other stuff.  And he summarized it for you; he plays around a lot and he got out of hand and we warned him not to joke around too much -- back then don't do it.  But he didn't intend to bully anybody, he didn't bully anybody.  That was their own investigation.  Not his investigation, not something by his employer.  Their own legal department called in the workers, interviewed them, and they concluded that there was no act of bullying, but he plays around a lot, and he was warned and that's when they shook hands in the shop.  Everybody, you know, decided to let it go because it was understood after management got involved.

So he is not a racist.  He lives in the complex he testified, he works in the complex.  He's been there for 19 years doing a good job for this employer.  So, that is Mr. Mayers.  And you don't have to see the monkey with your own eye to be offended.  Just coming to work and information getting around, people being uncomfortable with is enough.  Like I said, you don't even have to be black.

The workplace cannot be subjected to that condition in 2022 in America today.  It's just dead wrong.  No one should go through that, whether they work for Electchester or

Closing Argument - Van-Lare                   593

for any employer in this state or in this country.  So the

fact that Mr. Belvin didn't see the monkey -- sorry,

Mr. Mayers didn't see the monkey or didn't take a picture of

the monkey or didn't give testimony in that regard does not

mean that he cannot be a victim of that situation.  I could be

Indian, I could be born in India and I could be deeply

offended by that if I'm an employee.  Every employee could

have gone after Electchester for their negligence in pursuing

this matter and doing the right thing.  So it's not about race

or what you saw or what you didn't see.

Mr. Belvin, he's a good worker.  Mr. Prezioso

testified to that.  You have an opinion to express, he said

he's a good worker.  And he has to be a damn good worker.

Nobody works in a place for 24 years and they're a bad person

or a bad employee.  I mean, it's just not even making sense,

and if it doesn't make sense, it's probably not true.  That's

how you have to look at it.  Mayers, 19 years, Belvin 24

years, and then you are telling me he's this, he's that.

Well, guess what?  None of this really became a serious issue

until these two guys went to the EEOC.

And you saw what the evidence has showed you,

nothing happened in early 2000 or since '99 when he came, but

beginning from 2015, and he went to the EEOC around May of

2015.  Take a look at all of your exhibits.  That's when all

the answers begin to connect.  There was so much written up

Closing Argument - Van-Lare                594

that they even brought him up on charges for using headphones

in violation of company rules and policy, and that was even

done prior to the adoption of the policy.  The policy was

adopted on May -- on October 28, 2015, and you have write-ups

that went -- that went out before that referring to some

policy.

Management testified here, Mr. Prezioso, Mr.

Caiozzo, Mr. Capasso, no one, not a single person could point

to an existing company policy prior to October 28, 2015.  Mr.

Prezioso did his best to explain that Mr. Caiozzo came from

where he was previously employed with some personal rules and

policies and they tried to use that to start something.

The original housing complex was built in 1940.

Caiozzo didn't join them until 2008, 2006, somewhere

thereabout, and they had no policy.  And Mr. Prezioso was

asked on cross-examination, if you don't know your policy, how

would an employee even know what the procedures are?  He said,

I don't know.  That was his response.  And he was right.  He

was being frank and honest with that answer.  I will get to

him in a second because he also told you, I'm the general

manager, but Mr. Mundo runs the show, I didn't hire my own

manager who reported to me, I didn't interview him when he was

interviewed, I just saw him when he showed up as the manager.

What did he say; Mr. Mundo runs the show.

And Vito Mundo sat right there and told you, I am

not even an employee of Electchester. I do volunteer work to help them as general counsel. Yet he hires people, he fires people, and he does so many things from the testimony you listened to. He's not even officially a paid employee. Talk about a disfunctional management situation. Now you understand why there was so much dysfunctionality over there. Who is in charge? Who do you go to? Even Vito Mundo denies that he calls the shots. Well, I got to talk with the president, well, I got it from the president or something, so no one is, clearly, in charge. On paper, yes, we have managers, we have general managers. General manager, a general manager. And when you talk and you get to the bottom, then you see what the company really looks like.

Mr. Belvin brought his own complaint and it's really a lot about harassment with the monkey and being linked to him and his family and matters like that. He went to his shop steward -- and we'll get to his shop steward in a minute. He went to his own shop steward and said, listen, there's a problem here. The shop steward said, well, I think it came to me six or eight months after so I said -- I didn't do anything. That was the shop steward. A guy appointed to represent his interest.

By the way, unions are established to advocate and empower and to represent workers and to negotiate contracts to protect their job. Job security is one of the most important

things for the unions and he was a microscopic representation of 32B-J in that work. He likes the work so much that he got better career prospect, if you believe it by the way, and you shouldn't, that he got better career prospect that was good; well, I left it because I wanted to go back to Electchester. I think I can help even more at Electchester.

You saw the gorilla man and images of the monkeys. He also went, Mr. Belvin, to his manager at that time, Mr. Martinez, Juan Martinez, and Juan Martinez went straight to Mr. Prezioso to complain about this. And he told Mr. Prezioso, and his reaction, according to Martinez, was, well, he didn't care for whatever the reason might be. And, of course, Juan Martinez went back to do his own job. And that is the culture in Electchester, and this cannot continue. An employer cannot continue to do that. And Mr. Prezioso didn't do anything about it.

Well, he did, by his testimony. He called Ed Wiley. And Ed Wiley is the manager that Mr. Prezioso described as an incompetent manager that had to be fired. He gave him the task to investigate the monkey in question. Mr. Wiley came back and said, I saw no monkey, and that was the end of it. He didn't see a monkey, he didn't see a monkey, and he didn't do anything after that. That is how they reacted to that kind of situation.

Nobody, not a single person to this day spoke to

Closing Argument - Van-Lare                597

Mr. Belvin about the experience with the monkey.  To this day, not one person said, Mr. Belvin, what's going on?  Where did you see the monkey?  When was the first time you saw it?  Did you take a picture?  What evidence do you have?  What time of the day did this happen?  When was the last time you were in that room and was anybody there when you saw it?  Do you have witnesses?  We've got to do something because it's a room or an area where only some employees have access to.  So it's not like a general area anyone in the building can go to.  None of that ever happened to this day.

Mr. Belvin had alleged that Mr. Mundo told him to drop his EEO charges, and if you drop it, we can do something.  That's allegation against Mr. Mundo.  Of course, Mr. Mundo was here and denied it.  Mr. Mundo says it didn't happen.  You listened to Mr. Mundo and you observed him during his testimony, and your own judgment as factual jurors who will determine the facts in this case, you have to determine whether you actually believe Mr. Mundo or you believe Mr. Belvin on that matter.

You saw the way, in the plaintiffs' opinion, how Mr. Mundo twisted his own testimony.  He even wanted you to believe that what you -- and read it with your own eyes, on the EEOC charges, was not what it says.  One of the fact -- and you get to see that exhibit, I'll get to it again -- was the EEOC is going to discontinue your case, or whatever the

Closing Argument - Van-Lare                           598

language was, but the language was clear that we have not seen

the respondent violate or didn't violate the statute.

There was the shop steward who came here to testify,

and that is Mr. Richard Bonnette. Like I said before,

Mr. Bonnette is the union representative. You advocate, as a

union representative, for your own members and you protect

them. And he attempted to do it from various documents that

have been shown to you, he was admitted as a union rep, and he

also testified that he had represented Mr. Belvin and, in

fact, Mr. Mayers. But he testified, specifically, about

Mr. Belvin and Mr. Mayers, that he represented them. He was

their union rep. And he came here and he gave testimony that

didn't make any sense, didn't make any sense.

You have a problem at work, you go to your union rep

and you say, hey, this is my issue with management, I need

your assistance, I need your help, let's go. And you find out

that this union rep is too friendly with management. And

Mr. Belvin told him, and he admitted it on the stand, that I

didn't want to represent him.

So there has always been conflict because of that

between him and Belvin. Belvin was very vocal with him and

said, look, I don't think you are doing a good job. He may

have said it in a language, according to him, that is not the

most professional to use on-the-job, but when you have someone

representing you, and at the same time, you believe they are

Closing Argument - Van-Lare                599

not doing what they should be doing, which is advocating on your behalf, not on anybody else's behalf, not talking to the other party, you have a right to confront them.

And he admitted that Belvin told him, I don't want you to represent me. He'll tell you that. It's in the documents that you're going to get. An investigation was done and it was made clear to management that he did not want this man to represent him.

Richard Bonnette told you that he got all the workers together because the workers came to him to complain about harassment, which is, essentially, bullying, from Mr. Mayers. He gathered them together. That's what he said. They came to him and said, let's write the notes, put it in writing, let's do that.

But we found out that that is actually a lie. A lie. It's not quite how it happened. He went to complain -- he's the shop steward. He went to complain about Mr. Mayers to the managers; exactly what Mr. Mundo testified to, and the managers told him go put it in writing, and then he collected the people together. That's what he did. Talk of the union rep.

And then it had all kind of nasty language and whatever was said. These people all wrote it on the same day, and you are going to see that exhibit, it's Defendant's Exhibit EE, and some of those -- I think it's Mr. Merriman,

Closing Argument - Van-Lare                    600

Shane Merriman.  Mr. Merriman said Mr. Mayers has a good heart, he's a nice person.

And then it was alleged by Mr. Goldberg that Mr. Mayers used language that is considered racist, but Mr. Goldberg is not here to testify.  We don't know what Mr. Goldberg would have said on cross-examination.  You did not hear Mr. Goldberg.  You just hear this manager say this is what Mr. Goldberg said, and now that we've find out -- find out how this information was collected, is, at best, dubious, D-U-B-I-O-U-S.  You can't rely on dubious information from a disfunctional work environment.  A work environment does not get more disfunctional than what we have here.

Actually, Mr. Goldberg's statement is on Exhibit EE, and it's Bates stamped on the bottom 1651, and Mr. Merriman, it's in Exhibit EE, Bates stamped 1653, he described Mr. Mayers as kindhearted, never disrespected me.  That's what he wrote to the shop steward who wanted them to get together and go against him.  And you just wonder why a shop steward would be like that.  He sat here with a nice suit, nice speech, nice English grammar, but take off all the gloves behind that and scrape off all the skin behind his testimony and get to the bottom, you'll find out that is a lot of horse manure.  Yeah.

And as I said to you before, Mr. Mundo testified that he came to managers and they told him to put it in

writing.  That's what this guy is doing.  I'm not going to --

I'm not going to call him a double dealer, but he looks like

one.  And, clearly, clearly, everybody writing their complaint

on the same day shows that this was choreographed and

orchestrated.  And, by the way, there have been allegations

against Mr. Mayers and Mr. Belvin that they did something

either unprofessional or inappropriate at work that caused the

management to have a meeting either to caution them or to

discipline them, and he represented them in those hearings.

So when Mr. Belvin was brought up on charges, one of

the things they said, and a lot -- they had a lot of them, but

one of them was that he was disruptive.  When you think of

someone being disruptive a meeting, you think of someone

trying to not cooperate, trying to be rude, trying to

interrupt the meeting and not really participate.

I asked Mr. Prezioso to tell the jurors what he

meant when he said Mr. Belvin was disruptive; oh, I was told

by the contractor he did not raise up his hand before he

spoke.  If that's not retaliation, what could that be?  Come

on.  I'm at a meeting and I didn't raise up my hand, it's

probably a nice thing to do to get attention of whoever was

running the meeting, may I say something, that's good.  But,

you know, in this kind of meeting, people jump in sometimes

and they just say something.  I mean, that's not rude,

especially whatever you are saying is relevant to what is

Closing Argument - Van-Lare                602

going on; may I ask a question, and go on.  He didn't raise his hand and we have to write him up and threaten him with termination the next time you do this.

Mr. Caiozzo testified, and his testimony was he was not aware that Belvin made any race complaint until it came out in the press.  He had saw something in the press, there was publication on this case, and that's how he found out.  That's what he claimed.  But he was shown copies of his own deposition, and Ed Wiley spoke to him about it, and Wiley was investigating some form of stuffed animal.  He even refused to use the word "monkey."  He doesn't know anything.

But, you know, which employer do you know in America that goes around investigating a stuffed monkey that someone brought to work at a job.  We all have stuffed animals like some of -- some kind, that doesn't bother anybody, why would management bother with that.

But, again, let's use our common sense.  If one manager says to another manager, I have to go investigate a complaint of a stuffed monkey in the room, or wherever, doesn't your own curiosity say, wait a minute, what are you investigating about a stuffed monkey?  He didn't ask anything, like all the managers did at Electchester, nobody asked anything.  If I don't ask, I guess I don't know.

(Continued on the following page.)

LEEANN N. MUSOLF, RPR, CCR
Official Court Reporter

(Continuing.)

MR. VAN-LARE:  If I don't ask, I guess I don't know. And I am going behave in a way that if the issue comes up, I can find some explanation that sounds reasonable.  It's an old tactic in the C.

MR. VAN-LARE:  A book.  It's called plausible deniability.  I'm going to deny it.  You know, it will get denied probably, believe in him.

In this instance, when each of those managers had their deposition read to them, they realize that they were given incomplete information.  In the case of Mr. Prezioso, he did give an explanation that he's not aware.  His memory was refreshed.  And it was asked:  Is your memory in 2022 better than your memory in 2019, which is sometimes how it actually works for most human beings.  And he told you the managers are designated to be -- receive CEO complaint.

And it's actually very difficult to explain why you punish an employee for coming to work early and why you punish an employee for staying to finish his work.  It's -- it doesn't make sense.  It really has to be a dysfunctional environment.  If you say to the employee:  Thank you very much.  You took your time how you did this.  No, we're going to write you up.  That sounds like evidence of harassment to me.

Although, technically, he would tell you to come to

Closing Argument - Van-Lare                604

work from 7:00 to 4:00, and you show up at 6:30 or 6:00 a.m., I don't think you should be punished for that. He did explain his reasoning, though. That's Mr. Caiozzo. His reason was we do this because of safety reason. Look, if it's -- if the place is unsafe at 6:00 a.m., it is unsafe at 7:00 a.m. If it is unsafe at 3:00 a.m., it's unsafe at 2:00 a.m. There's no rationality to that. It doesn't make sense. The guy is going to work 7:00 to 4:00, so if he comes in at 6:00, what safety -- he couldn't explain any safety anyway. Or that I just drop the phrase "we did it for safety reason." Never give me one example of how somebody got harmed because they came to work an hour early, or whatever the time was.

Juan Martinez was the first witness to testify in this case. Nice gentleman. Was an intern manager at one point, and he also was assistant manager, and foreman. He supervise Mr. Belvin, and he was the one that reported the monkey initially. But, as is the case with this company, it's not clear what the reason is. They tried to run him down without any valid reason. He tried to shake us off, or some nonsensical representation like that, for a man that asked you to give him more money. What's wrong with that?

By his own testimony, when he took his time, Mr. Mundo, they decided to incorporate under that one umbrella the different housing unit that constitute that work in Electchester Management, LLC. And he explained the reason, We

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

Closing Argument - Van-Lare                605

can buy supplies in bulk together as one entity and we can do a lot of savings.  Of course, you can imagine how that will cause the supervisor to take that.  Now I have more work.  I was working for one, maybe two housing unit, now I have more responsibility.  If you wouldn't give him money, then you don't have money to give you.  If you want to be a little bit nasty, you can tell him if you don't like what we pay you, you can exercise your option, right?  You can tell him that.  I don't suggest that, but I'm just saying, if you don't want to give an employee more money, you can always tell them look for another job, but that was not enough for them.  They had to tell Mr. Martinez -- I don't know if he told him, but he had to tell you:  Oh, he was trying to shake us up for more money. There's nothing wrong if you're asking for money.  If you don't have it, you don't have it.

So, as you all know, management employees were aware of what was going on here with the monkeys and the general bad situation with the employees at work, and they did nothing. Nothing.

They all testified that because of COVID in the last three years, they never hold any kind of EEO training.  None. People having this problem.  We know you could do this eventually now.  Employees come to work every day.  It's not if you are committed to it.  So the situation is likely to keep going, and you cannot give them a pass on this.  If you

Closing Argument - Van-Lare                606

find that they haven't performed the obligation, you most hold them responsible.

So, ladies and gentlemen, as you look at this case, you are going to be charged by the Judge to follow the law, and he's going to tell you the evidentiary standard you have to follow here, which is what we call preponderance of the evidence.  This is not a criminal case where you have to go by -- not beyond a reasonable doubt.  This is just preponderance of the evidence.

In other words, you look at the evidence from plaintiffs, you look at the evidence from the defendant, and you just have to weigh it slightly.  If it's 51 percent in favor of the plaintiff, you find for the plaintiff.  If it's 50.2, you find for the plaintiff.  It just has to be slightly more, that's all.  It doesn't have to be out of balance or higher.  That's all.

And you are going to have to go through that when you retire into your room to deliberate and discuss everything that has been presented to you so far.  And they're going to come here and tell you you have no damages.  You don't get subjected to this kind of situation and have no damages.  Yeah, it's true that they came to work and they got paid because they worked.  It is true that Mr. Mayers was out not because of anything that the employer cause, but he had his old illness, that's why he didn't get paid for one year, so

Closing Argument - Van-Lare          607

that has nothing to do with the employer, that's true.  But when you are subjected to a barrage of attack like this, that is damage.  That is something you experience, and it shouldn't go for free.

And, of course, the law allows you to send a strong message as to the intent of the framers of these different statutes that I explained to you initially.  You can hold them responsible.  They can be punished for their negligence and refusal to seriously address this situation.

And throughout the period you have been sitting here and listening to them, they haven't told you what they have actually done to make sure that this kind of situation won't happen.  You all have your own experience, where you walk, like we all do, you know, we live our daily life, we have our experiences, and you're supposed to use your own life experience as you deliberate to figure out whether what happened here is what the law allows, or what the law doesn't allow.  You will be instructed, like I said, as to how you approach that.

Now, Mr. Belvin was given a three-day suspension because he threw garbage in a particular direction, and counsel made so much deal out of that, ask every witness about that issue.  Did he do this?  Did he do that?  It's not necessary.  You know what?  They have a procedure to deal with issues like this if an employee did something bad and you

punish him, and the employee believed it's not a right punishment, that he somewhat should not have been punished that way.  Yeah, the procedure is file a grievance, and he did.  And the last grievance was going to the arbitrator and the arbitrator has the final say.  That's just the way it works.  This has been litigated.  The arbitrator has said: Look, I don't believe it was insubordinate.  He clearly ruled that.  And you are going to see that when you begin to deliberate, he clearly explain it.  Exhibit 32.  Plaintiff Exhibit 32.  He said it.  He was not insubordinate.  There was no insubordination and then they keep dragging on the same thing.  Look -- and they ask all the witnesses sitting there: Oh, do you know who makes the decision?  Are you going to be respected?  Yeah, right.  But you have the problem following up on what the arbitrator ask.

So ladies and gentlemen, you are going to get your charge very soon and you are going to get the statutory standard that is involved.  These plaintiffs, because of the way the law is written, have to prove that they belong to a particular protected category.  In this case, especially for the hostile work environment, they have to prove that they're black.  The managers are aware they suffered damages, and I consider serious damages just being exposed to this situation and going through what they have gone through.  You don't have to lose a paycheck because of this before you can be subjected

Summation - Moore                                      609

to hostile work environment.

Thank you very much, ladies and gentlemen of the jury.  I am done.

THE COURT:  Very well.

Ms. Moore, you may close for the defense.

MS. MOORE:  Thank you, Your Honor.

Testing.

THE COURT:  All right.

MS. MOORE:  Ladies and gentlemen, we want to thank you for being here today.  We have handed you -- handed you a big responsibility and you showed up here every single day and listened to us tentatively with an open mind.

You are now tasked with determining the merits of both plaintiffs hostile work environment claims, Mr. Belvin's retaliation claim, and Mr. Mayers' disability discrimination claim.

To assist you, you will be provided with this jury verdict form which asks you to decide, yes or no, on a series of questions.  All we ask is that you carefully consider all of the evidence presented to you at trial as you fill out this form and that you use your common sense.

The judge is going to tell you the law shortly that you should apply to the facts of this case, but before he does that, let's talk a little bit about the facts.

Let me tell you why the plaintiffs have not met

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

their burden of proof.  Now, Mr. Belvin's attorney has told you that Mr. Belvin was subjected to a hostile work environment.  There are two questions on your jury verdict form that I want to focus on.

Question Number 2 on the jury verdict form asks: Has Plaintiff Belvin proven by a preponderance of the evidence that he suffered a hostile work environment, i.e., sufficiently severe and pervasive to alter the terms and conditions of his employment by creating an abusive work environment.

And Question Number 56 asks:  Has Plaintiff Belvin proven by a preponderance of the evidence that he was treated less well than other employees in a way that was more than trivial in substantial or petty?

Ladies and gentlemen, I submit to you that the answer to both of those questions, based on the evidence presented to you at trial, is no.

Now, Mr. Belvin's attorney told you that Mr. Belvin's workplace was full of monkeys and racial slurs, but that's not what the evidence presented to you at trial shows.

Mr. Belvin's EEOC complaint doesn't say anything about monkeys, or an action figure nailed to the wall, or President Obama.  It doesn't say he was called the N-word.  It doesn't say he was called boy or moreno, even after he amended

Summation - Moore                                    611

it.  Ask yourselves:  Why, if Mr. Belvin was experiencing all of these terrible things, didn't he tell that to the EEOC?  Because it didn't happen.  What did happen?  What does the evidence show?  Well, the evidence shows that Mr. Belvin complained about a stuffed monkey on his locker.  The evidence shows that nobody but Mr.  Belvin ever saw this alleged monkey, and even though he supposedly had pictures of it, nobody saw those until much, much later.

Mr. Belvin claims he told Juan Martinez about the monkey, and Mr. Martinez told Thomas Prezioso, and Mr. Prezioso said he didn't want to hear it, but that's just not credible.

First of all, Mr.  Martinez was demoted, and he's angry at Electchester for demoting him.

And, second, the shop steward, Mr. Bonnette, told you that Mr. Belvin said Mr. Martinez didn't do anything about the monkey on the locker.

What really happened, ladies and gentlemen, and what the evidence shows, is that Mr.  Belvin complained to Ed Wiley.  Mr. Wiley called Mr. Prezioso and Mr. Prezioso called Vito Mundo.  Mr. Mundo directed Mr. Wiley and Mr. Prezioso to investigate, and so they did.  They didn't find any monkey, they interviewed all the employees who used the locker room Mr. Belvin claimed the monkey was in, and nobody had seen or knew anything about it.

You saw a photo of a plastic monkey.

Now, Mr. Belvin claims he complained about that plastic monkey to Mr. Prezioso and Mr. Martinez.  Well, Mr. Martinez had no recollection of that, which is strange, because he's Mr. Belvin's witness.

And Mr. Belvin said at his deposition that he never complained to anyone about the plastic monkey, so, his story changed.

You also saw a picture of an action figure.  Jimmy Superfly Snuka, a WWE wrestler from the island of Fiji, and Mr. Belvin changed his story about that too.  Maybe it was hanging up when he began working there in 1999, or maybe it showed up after his wife came to work with him.  There are 63 porters at Electchester Management.  A quarter of them are black or African-American, and 75 percent of them are not white, but Mr. Belvin assumed -- that's his word, "assumed" -- that this action figure on the wall was him.  There is zero evidence connecting this doll to Mr. Belvin, and there is nothing discriminatory about an unclothed doll.

Now, how did he say this doll on the wall made him feel?  He said he thought it was childish and stupid.  He didn't say he was disturbed.  He didn't say that it prevented him from working.  Mr. Belvin has to prove that the terms and conditions of his employment were altered.  He thought it was childish, but not so much that he moved -- he was moved to do

Summation - Moore                          613

anything about it.  He didn't take it down.  And he didn't ask anyone else to take it down.  I submit to you that these are not the actions of a person experiencing a hostile work environment.

Now, what about these alleged racial slurs?  The evidence shows that Mr. David Bourgade told Mr. Belvin: What's up, boy?  Like the rapper, Flavor Flav.  It was stupid, and it offended Mr. Belvin.  And Mr. Belvin complained, and his complaint was thoroughly investigated.  The report is in evidence.  You will consider that report during your deliberation, and Mr. Bourgade was written up and suspended.

What Mr. Belvin didn't tell you was that he was also written up because he told Mr. Bourgade they were going to throw down.  Mr. Belvin got a verbal warning for his threat and it was noted in the report that his threat was understandable under the circumstances.  Regardless, Electchester Management has a zero tolerance policy against threats of assault.  You have the rules before you in evidence.  You can see.

The evidence shows that Mr. Belvin's co-worker complained about Mr. Belvin getting up in his face and telling him:  I don't want to hear it.  I'm not in the mood.  When asked if he did this.  Mr. Belvin complained for the first time, ever, that he was being called moreno for years, he said.  Yet he never complained about it until his co-worker

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

Summation - Moore                           614

complained about him.  Ultimately, Mr. Belvin and his

co-worker shook hands, and they said they were both cool with

it.

So what's really left of Mr. Belvin's hostile work

environment claim?  A complaint about a monkey on a locker

that was investigated but not substantiated; a complaint about

the word "boy" that was investigated and addressed; and a

complaint about the word "moreno" that was also investigated

and addressed.  That simply is not enough to find that he was

subjected to a hostile work environment.

In fact, Mr. Belvin can't even prove that he was

treated less well because of his race, which is what the City

Human Rights Law requires him to do.  Mr. Belvin called his

co-worker a racial slur, and he was written up.  Mr. Belvin's

co-worker called him moreno, and he was written up.  Everyone

was treated the same.

Now, Mr. Mayers is claiming that he, too, was

subject to a hostile work environment.

Question Number 14 on the jury verdict form asks:

Has Plaintiff Mayers proven by a preponderance of the evidence

that he suffered a hostile work environment, i .e.,

sufficiently, severe, and pervasive to alter the terms and

conditions of his employment by creating an abusive working

environment?  Question Number 61 asks:  Has Plaintiff Mayers

proven by a preponderance of the evidence that he was treated

Summation - Moore                                       615

less well than other employees in a way that was more than

trivial, insubstantial, or petty?

Once again, ladies and gentlemen, based on the

evidence presented to you at trial, the answer to both

questions is no.

In fact, you have not seen or heard any evidence

whatsoever that Mr. Mayers -- Mr. Mayers -- was subjected to a

hostile work environment.  He didn't testify that he suffered

any race discrimination.  No one testified on his behalf that

he suffered race discrimination.  Why?  Because it did not

happen.

Mr. Mayers didn't testify that he saw any monkeys.

He didn't testify that he was called names.  He didn't testify

that he experienced anything at all that would amount to a

hostile work environment.  All you heard from Mr. Mayers was

that he was told to clean his building.

Well, it's Mr. Mayers's job to clean the building.

He is a porter.  Porters clean the buildings.

You have also heard that Mr. Mayers called his

co-workers fat, made fun of their accents, slapped them on the

butt and told them:  You're my favorite white boy, called his

shop steward the N-word, and screamed the N-word in his

foreman's face.  Is that really the behavior of someone

suffering under a hostile work environment?

Now, let's look at Mr. Belvin's retaliation claim.

Summation - Moore                                    616

You heard a lot of testimony about Mr. Belvin's write-ups.

Mr. Belvin's attorney told you these write-ups were frivolous.

Question 68 on your jury verdict form asks you to decide whether Mr. Belvin has proven by a preponderance of the evidence that there was a causal connection between his EEOC complaint and the write-ups.  In other words, has Mr. Belvin proven that he was written up because he filed a complaint with the EEOC?  Well, what does the evidence show?  The evidence shows, once again, that the answer is no.  The evidence shows that every single one of Mr.  Belvin's write-ups is based on a specific violation of Electchester 's rules.  The rules are there in evidence.  You can see them for yourselves.  And the managers testified that these rules were discussed often at safety meetings and that they have been enforced since the company was formed and Anthony Caiozzo came in from Manhattan.  And Mr. Belvin admitted that he broke these rules.  He was on the property three hours past the end of his shift.  Nobody even knew that he was there.

Ladies and gentlemen, you can't just show up at your job at Chipotle or Starbucks and just start working whenever you want.  It doesn't make any sense.  Why would Electchester Management be any different?  There's not one bit of evidence that these write-ups had anything to do with Mr. Belvin's EEOC complaint.  Electchester's witnesses explained each and every one of these write-ups to you in detail.  Not only that, but

Summation - Moore                                    617

the evidence presented to you at trial shows that all of

Electchester's employees were treated the same.

Mr. Belvin testified that he was written up for

being on the property outside of his regular shift without

authorization. He admitted he was on the property outside of

his regular shift without authorization, and the evidence

shows that other employees were written up for that, too.

Mr. Belvin testified he was written up for not wearing his

winter jacket, which the evidence shows he also lied about,

and the evidence shows that other employees were also written

up for that.

And what about Mr. Belvin's suspensions? The

evidence presented to you at trial shows that Mr. Belvin

through a trash bag 30 feet -- 30 feet was his estimate --

across a pedestrian walking path, and when the general manager

-- the general manager of the company he works for -- asked

him to please stop doing that, he asked the general manager:

Why should I? It is hard to imagine any job that would

tolerate this type of behavior, and yet Mr. Belvin was paid

for his three days with only a written warning.

The evidence presented to you at trial shows that

Mr. Belvin had a real problem understanding how to handle

asbestos. It shows he carried off a piece of contaminated

flooring in his pocket. It also shows he caused a big seen

about some wallpaper or something that didn't even have

Summation - Moore                    618

asbestos in it.  So he was suspended.  And, once again, he was paid back for the day that he lost.

The evidence presented to you at trial also shows that Mr. Belvin abused and threatened his shop steward, Mr. Bonnette.  You have the investigative report and the evidence, and you can review it.  You can see that Mr. Mayers -- Mr. Mayers, a plaintiff in this case -- was a witness in that investigation.  The evidence shows that Mr. Mayers had to hold Mr. Belvin back.  It's all in the report.  Take a look at it.  Mr. Belvin was told not to set foot in Mr. Bonnette's work area again, and he did it anyway.  And where -- where is the adverse employment action that Mr. Belvin has to prove.  Mr. Belvin was paid back for every day he lost except for when he threatened his co-workers with violence, which, I think we can all agree, is fair.

Now, Plaintiff Mayers is claiming that he didn't get a bonus in 2014 because he's disabled, but the evidence shows that Mr. Mayers didn't get a bonus because he wasn't on the payroll at the end of 2014.  Mr. Mayers was on disability leave.  He wasn't even being paid by Electchester.  It's as simple as that.

Under the City human rights law, Mr. Mayers has to prove that he was treated less well because of his disability.  There's no evidence that anyone else got a bonus who wasn't on the payroll.  And why would they?  If you are not on the

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

Summation - Moore                          619

payroll you don't get paid regardless of why you're not on the payroll.  Now it's true that Mr. Mayers never complained to Electchester about his bonus, but he also never complained to the EEOC about it.  Two separate EEOC complaints and not one word about the bonus.

Now, Question Number 82 on your jury verdict form asks:  Has Plaintiff Mayers proven by a preponderance of the evidence that the denial of all or part of his 2014 bonus occurred under circumstances giving rise to an inference of disability discrimination?

The answer to that question, based on the evidence, is no.  There's no evidence of any discriminatory intent whatsoever.  In fact, three of the managers you heard testified that they donated to Mr. Mayers's cancer fund.

Now, Mr. Mayers is also claiming that his employment was terminated because he is disabled.  On your jury verdict form, there is a question that I want you to consider very carefully.

Question Number 76 on your jury verdict form asks you to decide if Mr. Mayers suffered any adverse employment action.  He didn't.  Mr. Mayers wasn't even fired.  You don't have to take my word for it.  Mr. Mayers testified that the Collective Bargaining Agreement with his union, Local 32BJ, says that Electchester Management had to hold his position open for one year.  The evidence shows that Electchester did

Summation - Moore                         620

that.  Mr. Mayers did not work for a full calendar year, so Mr. Mundo sent him a letter letting him know it had been a year.

But the evidence also shows that Mr.  Mundo did not know when he sent the letter that Mr. Mayers had used some vacation days and some sick days before his disability leave officially began.  It was a mistake.  Mr. Mayers testified that he even forgot that he used some vacation days and some sick days until someone reminded him.

So that's what we're talking about here.  One mistaken letter that was immediately retracted, and other people received the same letter.  Mr. Mayers wasn't treated less well because of his disability.  He was treated the same as everyone else.

Question Number 77 on your jury verdict form asks: Has Plaintiff Mayers proven by a preponderance of the evidence that his termination occurred under circumstances giving rise to an inference of disability discrimination?

The answer to this question, once again, is no. Where is the evidence of discrimination here?  Where is the evidence that Electchester intended to discriminate against Mr. Mayers because of his disability?  There is none.  It doesn't make any sense.  Why would all three managers you heard from -- Thomas Prezioso, Joseph Capasso, and Anthony Caiozzo -- all donate money to Mr. Mayers's cancer fund if

they wanted to fire him?  And why would they deny him money because he has cancer?  And why would Electchester immediately let him come back to work if they didn't want him there?

And the evidence shows that Mr. Mayers didn't miss a single day of work.  He has no damages.  He wasn't even medically cleared to return to work until after he received this letter.  When he was medically cleared, he returned to the same job with the same pay, and the same benefits within a matter of days.

Ladies and gentlemen, the evidence shows that Mr. Belvin and Mr. Mayers have been employees of Electchester Management for 15 years and employees at that property for many more years than that.  They are still employed now.  They want you to believe that for all this time, all these years they were harassed and discriminated against.  Why did they stay for 15 years if it was so bad?  What happened, ladies and gentlemen, is that Electchester Management came in and laid down some rules, and these two men resented it.  They haven't produced any credible evidence to support their claims, but you don't have to take it from me.  You have all of the evidence before you.  You can see it for yourselves, and I know that your common sense will guide you to make the right decision.

Thank you very much for your time, ladies and gentlemen.

Rebuttal - Van-Lare                   622

(Continuing.)

THE COURT:  All right.  Rebuttal?

MR. VAN-LARE:  Ladies and gentlemen of the jury, counsel, once again, has addressed the bonus issue and the claim that he wasn't on payroll, but she has not pointed to any evidence that says you have to be on payroll to get his bonus.

It should be made clear, by the way, the bonus does not come from money that belongs to Electchester.  The bonus comes from money that tenants or cooperators contribute together and then give to management and then is shared among the employees.  So it's not money that Electchester awards to employees from their own pockets.

And like I said previously, he was paid, though he worked half of the year in 2015, and no evidence exists anywhere to support this payroll idea.  Of course they did change his termination and he was reinstated.  That does not mean that he didn't suffer any damage and counsel argued that why he stayed there so long if the place is as bad as they are now claiming.  I'm not sure how to respond to that, but we all that know that everyday we wake up in this country and we go to work.  It's not because we love what we do.  Some people are very fortunate and they love what they do and some people will even do it if they're not paid.  But most people who wake up everyday and go to work, they do it for one primary reason,

Rebuttal - Van-Lare                    623

and we all know it, they have to pay their bills.  That's why

they work.

If you ask a lot of people, would you rather change

jobs and get paid more if we find you something else, a lot of

people would say yes.  So a lot of people stay at their job

because it's the only way they have to pay their bills.  They

have to make an honest living.  That's why people work.  So to

suggest that they should have left or why they stay so long,

it's not a fair argument.

Plus, we have reviewed the whole history of

employment discrimination law.  That is the intent of the

people who wrote the law; so that people would not have to

leave if something is going on that they don't like.  They

have evidence to seek remedy.  The alternative is not walk

away from your job if you don't like it.  That's not how it

works in this country.

And counsel also said, well, we wouldn't take him

back if they didn't back they want him there.  They didn't

take him back because they wanted to.  They took him back

because Mr. India told him, you cannot do that.  You can't,

because he didn't go -- that's why they took him back.  They

didn't take him back because they wanted to.

Yes, managers donated money to him when he was sick.

Yeah.  And I don't mean to make light of it, you know, they

felt for him and most of them gave him $20, somebody gave him

Rebuttal - Van-Lare                    624

$25, somebody else gave him $100.  It's something they got from their heart and income, and he appreciates that, but, this is not about the individual managers.

And, in fact, under the Civil Rights Law, what is generally called Title VII of 1964, you cannot even hold individuals responsible under most laws.  You hold the employer responsible.  The managers work for the employers and the employer, also, is supposed to control the activities and the actions of the employees, so we hold the employers responsible, but we point out the inadequacies and the violations by the manager or anybody else.

But, ultimately, you have to hold the employers responsible.  You are not going to hold Mr. Prezioso personally responsible.  You are not going to hold Mr. Caiozzo responsible.  You are not going to hold Mr. Mundo responsible.  And you are not going to hold Mr. Capasso responsible.  The employer is responsible for their action and that is what the law and the judge is going to direct you to do.  No individual manager is going to be held liable for whatever conduct may have taken place here.

And, then, the argument has been made he wasn't medically cleared.  I don't know what that even has to do with anything.  Nobody asked him for his medical situation before he fired them.  I wish that argument had come up at that time and somebody had called him and said, are you able and ready

*LEEANN N. MUSOLF, RPR, CCR*
*Official Court Reporter*

to come to work?  He wasn't given that.  He was fired.

And, of course, it came up during his cross-examination, oh, you went to your doctor and you got notes.  Well, I don't know what he discussed with his doctor, but if I'm a porter and I clean a building and I've got something from my employer that I'm going to be fired, if I'm resuming the next day, I'll probably tell my -- my doctor, I'm -- to go to work, I got go to work.  I don't know what happened here.  But the reality of the case is he was just let go for the wrong reason, and now they're trying to sell you a breach.  They're trying to tell you this is all a mistake.

No one has even shown any remorse until yesterday, Mr. Vito Mundo apologized.  Apology is good, but when I'm in treatment and I'm suffering from cancer and you just told me you are done with your medical benefit, no insurance.  Well, even if you terminate me and you came back two hours later, I'm going to feel very devastated, and you don't know what could have happened to my state of mind.  You can't assume that everything is okay.  That's not how you're supposed to treat people.  You're supposed to treat people with dignity and make sure you know what you're doing.

These people are written up for not wearing a jacket, they are written up for wearing a headphone.  You saw all kinds of matters that should have been brought up.  Nobody brought up Mr. Mundo for this mistake.  Ms. Wong was there,

Proceedings                                        626

nobody did anything.  God forbid.  It's Mr. Mayers or

Mr. Belvin that will be treated differently.  And, of course,

you cannot believe the argument that he was treated like

everybody else.  He wasn't.  He wasn't, at all.  And you

should see from the evidence, that he was treated differently,

no question about it.

THE COURT:  All right.

Members of the jury, we're going to take a

five-minute break and then I will give you the charge as to

the law that you must follow when evaluating the evidence that

you have heard in this case.

All rise for the jury.

(Jury exits the courtroom.)

THE COURT:  Please be seated.

Have the parties put together the evidence?

MR. VAN-LARE:  We have it, Your Honor.

MS. SHEA:  Yes, Your Honor.

THE COURT:  All right.  Just keep it right there.

And you believe that this is the evidence in this case,

correct?

MR. VAN-LARE:  Correct, Your Honor.

MS. SHEA:  Yes.

THE COURT:  All right.

So once I've charged the jury and they retire, we'll

also give them the bundle of evidence that's on counsel's table, and, also, each juror will get a copy of the charge and a copy of the verdict sheet.  Only the foreperson's verdict sheet will have the signature block on it.

And I'm going to instruct the clerk to advise the jury that they are not to bring their notes into the courtroom for the charge to the jury because they're going to get all pf the material in the end.  I want them to listen.  I don't want them to write.  So I just wanted to let you know that Mr. Reccoppa will instruct the jury since I haven't already -- haven't done so today.  I think I mentioned it earlier.

All right.  Five minutes.  Thank you, everybody.

MR. VAN-LARE:  Thank you.

(A recess was taken.)

THE COURT:  Call in the jury.

(Jury enters the courtroom.)

THE COURT:  Please be seated, everyone.

Members of the jury, thank you for your attention as you heard the evidence in this case.  I will now instruct you on the law that you must apply.

It is your duty to follow the law as I give it to you, even if you do not believe it should be the law.  If any attorney has stated any legal principles different from what I explained in my instructions, you must follow my instructions. You must not ask anyone else about the law.  You must not

CHARGE OF THE COURT 628

consider any advice about the law from anyone else but me.

On the other hand, you, the jury, are the sole and exclusive judges of the facts. It is your fundamental duty to decide from all of the evidence you have heard and exhibits that have been submitted what the facts are.

As the sole judges of the facts, you must decide which of the witnesses you believe, what portions of their testimony you accepted, and what weight to give to that testimony.

In the course of the trial, it has been necessary for me to rule on the admission of evidence and on motions made about the applicable law. You must not conclude from anything I said during the trial that I favor one party over the other. On occasions, I may have asked questions of a witness. You should attach no special significance to these because they were asked by the Court. I will instruct you about the law to apply to this case, but it is your function, not mine, to determine the facts.

In these closing instructions, I will begin with some general instructions that apply in every case. For example, I'll explain how to weigh the burden of proof and how to judge the believability of witnesses, and then I will give you some specific rules of law about this particular case. Finally, I will explain to you the procedures you should follow in your deliberations.

CHARGE OF THE COURT                                           629

When you retire to the jury room, you will be provided with a Verdict Sheet that contains a series of questions.  Answer each question based upon the facts as you understand them.  Please answer the questions as they are asked on the Verdict Sheet in order.  You should not decide who you think should win in the abstract, and then work backwards to answer the questions on the Verdict Sheet.  Your answers and your verdict must be unanimous.  And each of you will get a copy of this sheet so you will be able to read it as you are working through it.

Under your oath as jurors, you must be guided solely by the evidence during the trial, without regard to the consequence of your decision.  You must perform your duties at jurors without bias or prejudice as to any party.  The law does not permit you to be governed by sympathy, prejudice, or public opinion.  All parties expect that you will carefully and impartially consider all of the evidence, follow the law as it is now being given to you, and reach a just verdict, regardless of the consequences.  All persons and entities are equal before the law.

Please remember that a person who brings a lawsuit seeking damages is not necessarily entitled to judgment in his or her favor.  The a plaintiff has a right to make legal claims, but the plaintiff bears burden of proving those claims at trial.  In a civil action, such as this one, the burden is

CHARGE OF THE COURT                                  630

on the plaintiff to prove every essential element of his claim

by a preponderance of the evidence.  If the proof fails to

establish any essential element of plaintiff's claim by a

preponderance of the evidence, the jury should find for the

defendant as to that claim.

To establish something "by a preponderance of the

evidence" means to prove that it is more likely than not; it

is true, more likely than not.  In other words, a

preponderance of the evidence means an amount of evidence

that, when considered and compared to the evidence opposed to

it, produces in your minds the belief that what is sought to

be proved is, more likely than not, true.

Please understand that the preponderance of the

evidence does not refer to the number of witnesses, the number

of exhibits, or the amount of time each party used in making

its case.  The phrase refers to the quality of the evidence,

the weight of the evidence, and the effect that it has on your

minds.  The law requires that in order for one of the

plaintiffs to prevail on a claim, the evidence that supports

that claim must appear to you to be more nearly representing

what took place than the evidence opposed to the plaintiff's

claim.  If it does not, or if you are unable to say that there

is a preponderance on either side, then you must decide the

question in favor of the defendant.  It is only if the

evidence favoring the plaintiff's claim outweighs the evidence

CHARGE OF THE COURT                           631

opposed to it that you can find in favor of the plaintiff.

Additionally, when you go to the deliberation room, you must weigh the evidence as to each plaintiff as an individual.  You must weigh the evidence, deliberate, make findings, and render decisions as to all of Mr. Belvin and Mr. Mayers's claims, treating each of Mr. Belvin and Mr. Mayers as an individual in deciding each claim.  Then, you will complete a Verdict Sheet that corresponds to each claim.  Stated differently, in order to find the defendant liable on any individual plaintiff's claim, you must find that the individual plaintiff has met his evidentiary burden as to the defendant on that claim.  If you do not find that an individual plaintiff has met his evidentiary burden as to the defendant on a particular claim, you may not find the defendant liable to the plaintiff on that claim.

In determining whether any fact has been proven by a preponderance of the evidence in the case, you may consider the testimony of all the witnesses regardless of who may have called them, and all of the exhibits that have been admitted in evidence, regardless of who may have produced them.  You may not, however, rely on any evidence that I instructed you to disregard at any point during the trial.  Any evidence that was excluded was not legally admissible, and therefore should not be considered.

At times during the trial, I have sustained

objections to questions asked without allowing the witness to answer. You must not draw any inference or conclusion from an unanswered question. Do not speculate as to what the witness would have said if permitted to answer the question. The law requires that your decision be made solely upon the evidence that was properly put before you.

Certain things are not evidence, and should be disregarded when you are deciding the facts. Nothing said or done by the Court is evidence. In addition, opening and closing arguments by the lawyers are not evidence, nor do they provide instructions on the law that you are to apply in this case. They are intended only to assist you in an understanding of what the evidence has shown, from each party's perspective, and the parties' arguments about the law.

I will now give you some rules about the various types of evidence, and about how to evaluate the testimony of witnesses. After that, I will discuss the plaintiffs' specific claims against the defendant, and finally, what the plaintiffs must prove in order to prevail.

In your deliberations, you may consider both direct and circumstantial evidence. As I explained to you at the start of the trial, evidence is direct when the facts are shown by exhibits that are admitted into evidence, or by testimony that is sworn to by witnesses who have actual knowledge of the facts, by the exercise of their senses such

CHARGE OF THE COURT                      633

as testimony of an eyewitness.  Evidence is circumstantial if

is tends to prove or disprove a disputed fact by proof of

other facts.  The law makes no distinction between direct and

circumstantial evidence, but simply requires that your verdict

be based on a preponderance of all the evidence, both direct

and circumstantial.

As I have said, you are required to base your

decision on the evidence that was admitted at trial.  You may,

however, draw reasonable inferences from the testimony and

exhibits.  An inference is not a suspicion or a guess.  It is,

rather, a logical, factual conclusion that you might

reasonably draw from other facts that have already been

proven, whether through direct or circumstantial evidence.

In drawing inferences, you should exercise your

common sense.  There are times when, looking at the same piece

of evidence, the plaintiffs may ask you to draw one set of

inferences, while the defendant asks to you draw another.  It

is for you to decide what facts have been proven, and what

inferences you will draw from those facts.

You have listened to the testimony of a number of

witnesses.  You are the sole judges of the credibility or

believability of each witness and the weight to be given to

his other her testimony.

In reaching that decision, you may take into

consideration factors like the witness's demeanor, attitude,

and behavior; any interest the witness may have had in the outcome of the case; and the witness's relationship with any party in the case.  You may also consider the witness's inclination to speak truthfully or not, as well as the probability or improbability of the witness's statements in light of all of the other facts and circumstances in evidence.  In short, you may give the testimony of any witness exactly as much weight and value as you believe the testimony of the witness is entitled to receive.

If, based on all of the evidence, you believe that a witness testified falsely concerning some important fact, you have the right to reject that witness's testimony, especially if you believe the witness has deliberately attempted to deceive you.  You may choose to disregard the witness's testimony as to that specific fact, or you may decide that the witness was generally not believable and reject the witness's entire testimony.  Of course, there is always the possibility that a witness simply made a mistake.  It's normal for people to forget things, or remember certain things inaccurately.  An inadvertent mistake by a witness does not necessarily mean that the witness was not telling the truth as he or she remembers it.  So, if a witness has made a misstatement, you need to consider whether the misstatement was an intentional falsehood or simply an innocence lapse of memory.  You may also consider whether the statement concerned an important

fact in the case, or only an unimportant detail.  As with all other types of evidence at the trial, it is up to you to decide who to believe and how much weight to put on each witness's testimony.

Where the testimony is conflicting and irreconcilable, and the jury has no reason to suspect the credibility of the witnesses, you may resort to other types of evidence in the case in determining the preponderance of the evidence.  In other instances, you may find that the testimony of a single witness is enough to prove a particular fact, even if a greater number of witnesses may have testified to the contrary, if after considering all the other evidence you find that a single witness is wholly credible.

In evaluating the credibility of witnesses, you should take into account any evidence that a witness may benefit in some way from the outcome of the case.  That kind of interest may sway a witness to testify in a way that advances his or her own interests.  For example, the plaintiffs and the defendant are parties to the action, so they are obviously interested witnesses.  Also, any witnesses who are currently employed by the defendant may be considered interested witnesses because of their existing relationship.  Similarly, any witnesses who are suing the defendant in other actions may be considered interested witnesses.

If you find that a witness may have an interest in

CHARGE OF THE COURT                                    636

the outcome of this trial, you should bear that factor in mind when evaluating the credibility of that witness's testimony. Of course, a witness's interest in the outcome of the trial does not automatically mean that their testimony must be disbelieved. An interest witness is not necessarily less believable than a disinterested witness. There are many people who, no matter what their interest in the outcome of the case may be, would not testify falsely. It is for you to decide based, on the witness's demeanor on the stand and any other facts you find relevant, whether or not the testimony has been influenced intentionally or unintentionally by his or her interests. You may, if you consider it proper, under all of the circumstances, discount the testimony of such a witness, even though it is not otherwise challenged or contradicted. However, you are not required to reject the testimony of such a witness and may accept all or such part of his or her testimony as you find reliable, and reject such part as you find unworthy of acceptance.

You have heard evidence relating to the defendants' conduct after plaintiffs started this lawsuit by filing their complaint. This evidence may include evidence of changes in personal personnel practices that occurred at some point after this lawsuit was filed. You may consider such changes made to the employer's employment practices, but you should also consider that changes adopted after being sued may be the

CHARGE OF THE COURT 637

result of the lawsuit, or may be temporary.  Such actions do not necessarily prove that the defendant did not previously discriminate, or that it does not continue to discriminate.

You also heard discussion of testimony that witnesses gave during depositions.  A deposition is a procedure where the attorneys for one side may question a witness or an adversary party under oath, before a court stenographer, prior to trial.  You may consider the testimony of a witness given at a deposition according to the same standards you would use to evaluate the testimony of a witness given at trial.

You were permitted to take notes during the course of this trial.  You may not show your notes to any other juror.  You may not substitute your notes from your own recollection of the evidence in the case.  Also, the fact that a particular juror has taken notes does not entitle that juror's views to greater weight than the views of any other juror.  If, in the course of your deliberations, your recollection of part of the testimony should fail, you may request that a portion of the transcript of these proceedings be provided to you.  Please be as specific as possible regarding what portion you wish to review.  And if you wish to review a portion of the transcript of the trial, all you need to do is have your foreperson or member of the jury write down whose testimony you're interested in, what part of the

CHARGE OF THE COURT                    638

testimony on direct or cross-examination you're interested in

and, hand it to be Marshal who will be guarding the jury

during deliberations.  It will be given to the Court.  I'll

share it with the parties, and we will identify the part of

the transcript, and then we'll make copies of that part of the

transcript and send them into you to review in the

deliberation room.  It may take a little time to find the

actual portions that you're asking for, but be as specific as

you can so that we can get right to work and get you the

materials that you want.  This is your right.  And if you have

a fuzzy recollection about something and you want the

transcript portion on that particular issue for a particular

witness, we'll get it to you, but please be as specific as

possible.

       Okay.  Now, I will instruct you on the law that

controls the claims in this case.  Plaintiffs allege that they

were subjected to a hostile work environment based on their

race, in violation of federal law, the law of New York State,

and the law of New York City.  Plaintiff Michael Belvin also

alleges that he was retaliated against for filing a complaint

with the Equal Employment Opportunity Commission, the EEOC,

and that such retaliation in violation of federal law, the law

of New York State, and the law of New York City.  Plaintiff

Michael Mayers separately alleges that he was discriminated

against on the basis of his disability, in violation of

federal law, the law of New York State, and the law of New York City. I will list all of the plaintiffs' claims, then walk through them one by one to define the elements of each claim.

Before we discuss those claims, however, I want to highlight a key feature about the defendant in this action. Electchester Management, LLC, which I will just call "Electchester," is not a natural person; it is a corporation. The mere fact that one of the parties is a corporation does not mean it is entitled to any lesser consideration by you. All litigants are equal before the law, and corporations, big or small, are entitled to the same fair consideration as you would give any other individual party.

Corporate entities, like Electchester, can only act through real people who are operating as its agents or employees. In general, a corporate entity may be liable for the actions of employees who are acting in the scope of their authority as employees. Even if an action is forbidden or illegal, you may still decide that the action was taken within the scope of the person's employment, if they took the action as part of doing their job. And, if the action was taken within the scope of the person's employment, you may find that the corporate entity should be legally responsible. You may find, for example, that Electchester acted through Mr. Prezioso at various times, or through other employee or

CHARGE OF THE COURT                    640

officer or director that you have heard about in this trial.

All of this will be spelled out for in more detail shortly, and on the Verdict Sheet.  Some of the questions may seem very similar, so please pay close attention to slight differences in wording.  Those differences speak to the different standards required under different laws, and it is your duty to make sure that your verdict captures those subtle distinctions.

Now let's turn to the substance of the plaintiffs' legal claims.  The plaintiffs allege that:

Electchester subjected Mr. Belvin and Mr. Mayers to a hostile work environment on the basis of their race, in violation of Title VII of the federal Civil Rights Act of 1964; Section 1981 of the federal Civil Rights Act of 1866; and the New York State Human Rights Law as codified in the New York Executive Law; and the New York City Human Rights Law as codified in the Administrative Code of the city of New York;

Electchester discriminated against Mr. Belvin and Mr. Mayers on the basis of their race by subjecting them to a hostile work environment in violation of Title VII of the federal Civil Rights Act of 1964; Section 1981 of the federal Civil Rights Act of 1866; and New York State and New York City Human Rights Laws, it is further alleged;

It is also further alleged that Electchester retaliated against Mr. Belvin for filing a complaint with the

CHARGE OF THE COURT                    641

Equal Employment Opportunity Commission in violation of Title VII of the federal Civil Rights Act of 1964 and the New York State and New York City Human Rights Laws; and;

Further alleged that Electchester discriminated against Mr. Mayers on the basis of his disability by denying him his bonus for 2014 and by erroneously terminating him in violation of the federal Americans with Disability Act and the New York City Human Rights Law.

Some of these laws have the same standard or proving employment discrimination.  However, here are a few key differences, including:

Differences between federal and state laws, on the one hand, and the city law on the other; and;

Differences between the claims on race, and the claims based on retaliation, and the claims based on disability.

I will point these differences out to you as I go.

We will start with hostile work environment on the basis of race and discrimination due to hostile work environment on the basis of race.

Let us begin with the plaintiffs' claims of hostile work environment and discrimination due to hostile work environment on the basis of race.  I will first describe the elements of these two claims under the federal and state laws. For reasons I describe below, the elements of these two claims

can be analyzed together. And I will describe the elements of the corresponding claims under the New York City Human Rights Law. We'll start then with Title VII Section 1981 and the New York State Human Rights Law.

Each of the plaintiffs, Mr. Belvin and Mr. Mayers, assert claims against Electchester that they were discriminated against by being subjected to a hostile work environment due to their race, under Title VII of the federal Civil Rights Act of 1964, Section 1981 of the Civil Rights Act of 1866, and the New York State Human Rights Law. These laws make it illegal, quote, to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin, end quote.

The federal and state laws have the same elements, so please apply the same standard in assessing each one. To prove their claim of racial discrimination due to a hostile work environment in the case, Mr. Belvin and Mr. Mayers must prove the following elements by a preponderance of the evidence:

First, that Mr. Belvin and/or Mr. Mayers are members of a protected class, i.e., black or African American;

Second, that Mr. Belvin or Mr. Mayers, or both, was qualified to perform the essential functions of his position as a porter;

Third, that Mr. Belvin or Mr. Mayers, or both, were subjected to an adverse employment action, specifically that they were subjected to a hostile work environment, and;

Fourth, that the adverse employment action occurred in circumstances giving rise to an inference of discriminatory intent.

To prove the third element, that they were subjected to a hostile work environment, Mr. Belvin or Mr. Mayers must prove the elements that also constitute their claims for hostile work environment. Those elements require Mr. Belvin or Mr. Mayers, or both, to prove by a preponderance of the evidence that:

First, that Mr. Belvin and/or Mr. Mayers are members of a protected class, i.e., black or African American;

Second, that plaintiffs were subjected to conduct that was sufficiently severe and pervasive that it altered the terms and the conditions of the plaintiffs' employment by creating an abusive working environment;

Third, that the conduct occurred because of Mr. Belvin or Mr. Mayers's membership in the protected class i.e., because of their race, and;

Fourth, that Electchester knew or should have reasonably known about the conduct and failed to take reasonably prompt and appropriate corrective action.

(Continued on the following page.)

Charge of the Court                          644

(Continuing.)

THE COURT:  To further explain, plaintiffs' claim of racial discrimination relies on plaintiffs proving a hostile work environment.  Accordingly, you should first consider whether plaintiffs have proven, to a preponderance of the evidence, every element necessary for a hostile work environment claim.  If they have not done so, you should rule for Electchester on both the federal and state hostile work environment claims and the federal and state racial discrimination claims.  You should still analyze the New York City Human Rights Law claims separately.  If either of the plaintiffs have proven the elements required for their hostile work environment claim, then you should rule for the plaintiff and continue to consider their racial discrimination claim.

I will discuss the elements of hostile work environment claims and racial discrimination claims in more detail now.

The plaintiffs must prove all of the elements of hostile work environment to succeed on those claims, and all of the elements of racial discrimination, including the hostile work environment claims to succeed on those claims.  Thus, if you find that they have failed to prove any one, you must find for Electchester on that claim from the plaintiff.

First, Mr. Belvin and Mr. Mayers must each show that they are members of a class protected by law, as I have

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

Charge of the Court                    645

already mentioned, the law forbids discrimination on the basis of race.

Second, Mr. Belvin and Mr. Mayers must prove that they were subjected to a hostile work environment.  Events constituting a hostile work environment may include intimidation, ridicule, or insults.  Teasing, offhanded comments, or isolated incidents are generally not enough.  A hostile work environment can exist when a series of related, serious incidents create an abusive or hostile workplace. Sometimes, if a single incident is extraordinarily severe, that incident alone can rise to the level required for a finding of a hostile workplace.  In other words, a hostile work environment exists when an event, or a series of events, are sufficiently severe or pervasive to have altered the employee's working conditions and created an abusing working environment.

The plaintiffs must show that the conduct was objectively severe or pervasive.  Regarding whether the conduct was objectively pervasive, you heard testimony regarding a number of events that plaintiffs assert occurred at Electchester.  When you consider the evidence of multiple incidents in determining whether a hostile work environment existed, you should reflect on whether the events were episodic, that is, unrelated, individual occurrences, or sufficiently continuous and connected.

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

Case 1:17-cv-06303-NGG-MMH    Document 117-5    Filed 12/03/22    Page 79 of 131
PageID #: 3876
Charge of the Court                    646

Regarding whether the conduct is objectively severe, plaintiffs must prove that the conduct created an environment which a reasonable person would find hostile or abusive.  To determine whether the plaintiffs were subjected to objectively severe or pervasive conduct, you should look to all of the circumstances, including the frequency and severity of the conduct; whether the conduct was physically threatening or humiliating, or consisted of merely a stray offensive comment or statement; and whether it unreasonably interfered with the employee's work performance.

Additionally, the plaintiffs must prove that they subjectively perceived the environment as hostile or abusive; that is, that they felt the conduct they faced was hostile or abusive.  In determining this point, you may consider the effect that the conduct had on the plaintiffs' mental or emotional state.

In summary, you should consider whether the plaintiffs have proven by a preponderance of the evidence, that is, proven that it is more likely than not, that the conduct discussed occurred and that, considering all of the circumstances, that conduct was objectively and subjectively severe or pervasive enough to create a hostile or abusive environment at Electchester.  If either Mr. Belvin or Mr. Mayers has not proven this element, that plaintiff is not entitled to prevail on their federal or New York State claims

Case 1:17-cv-06303-NGG-MMH   Document 117-5   Filed 12/03/22   Page 80 of 131
PageID #: 3877
Charge of the Court                   647

for hostile work environment.

Third, if Mr. Belvin and/or Mr. Mayers established that the conduct created a hostile work environment, they must show that the conduct occurred because of their race.  Some comments or situations you heard testimony regarding may necessarily concern race, such as the use of racial slurs or direct references to Mr. Belvin or Mr. Mayers's race.  For other conduct, the parties may have asked you to draw inferences from the evidence regarding whether the conduct concerned race.

You must determine whether Mr. Belvin, Mr. Mayers, or both proved that it was more likely than not that their race was a motivating factor in the conduct.  If either Mr. Belvin or Mr. Mayers has not proven this element, that plaintiff is not entitled to prevail on their federal or New York State claims for hostile work environment.

Fourth, each of Mr. Belvin and Mr. Mayers must show a specific basis for imputing the conduct that created the hostile work environment for him to Electchester.  In other words, they must prove to a preponderance of the evidence that the corporation Electchester can be considered responsible for the employees' conduct.

There are two different ways that Electchester may be considered responsible for the conduct.  First, the conduct must be imputed to Electchester if Mr. Belvin or Mr. Mayers

Case 1:17-cv-06303-NGG-MMH    Document 117-5    Filed 12/03/22    Page 81 of 131
PageID #: 3878
Charge of the Court                          648

were subjected to a hostile work environment created by their immediate supervisor or anyone with a higher authority over them.  Second, the conduct must be imputed to Electchester if the hostile work environment was created by their peers or colleagues at their same level, but Electchester or high-ranking officials at Electchester had actual knowledge of the conduct and created the hostile work environment, or -- let me reread that.

Second, the conduct must be imputed to Electchester if the hostile work environment was created by their peers or colleagues at the same level, but Electchester or high-ranking officials at Electchester had actual knowledge of the conduct that created the hostile work environment, or should have known about the conduct, and did nothing to stop it.

In either context, Electchester may show that it should not be considered responsible for the conduct creating a hostile work environment by proving that Electchester exercised reasonable care to prevent and correct any harassing behavior, and Mr. Belvin and/or Mr. Mayers unreasonably failed to take advantage of any preventative or corrective avenues provided by Electchester.

The first point, that Electchester exercised reasonable care to prevent and correct any improper conduct, I ask you to determine whether Electchester had sufficient procedures in place for handling harassing or discriminatory

Charge of the Court                    649

conduct, such as anti-harassment or anti-discrimination policies and procedures; whether Electchester complied with and enforced those policies and procedures in response to any complaints; and whether Electchester promptly investigated and addressed any harassing or discriminatory conduct with the involved parties to prevent the conduct from continuing or recurring.  You may also consider whether the discriminatory or harassing conducts stopped after Electchester investigated and addressed the conduct.  However, if Electchester did not enforce its anti-discrimination policies, it is not a defense to show merely that it adopted those policies.

The second point that Mr. Belvin and Mr. Mayers unreasonably failed to take advantage of the avenues provided by Electchester, asks you to determine whether Mr. Belvin or Mr. Mayers failed to use Electchester's procedures, if any, to report or complain about the conduct at issue.

This is what is called an affirmative defense, which means that it is Electchester's burden to prove the relevant elements to a preponderance of the evidence.  There are two elements of this affirmative defense:  First, that Electchester acted reasonably in trying to prevent and correct the discriminatory conduct; and, second, that Mr. Belvin or Mr. Mayers failed to take advantage of the established venues to report or complain about the harassing conduct.  If Electchester failed to prove either of those elements to a

preponderance of the evidence, it has not proven its affirmative defense.

If either Mr. Belvin or Mr. Mayers has not proven that the conduct at issue in their respective situations should be imputed to Electchester, or if Electchester has proven its affirmative defense with respect to either Mr. Belvin or Mr. Mayers, that plaintiff is not entitled to prevail on their federal and New York State claims for hostile work environment.  However, if either Mr. Belvin or Mr. Mayers has proven that the conduct should be imputed to Electchester and Electchester has failed to prove its affirmative defense, and if either Mr. Belvin or Mr. Mayers has also proven other elements I just discussed, then Electchester is liable to that plaintiff on his federal and New York State claims for hostile work environment, and you will proceed to consider the amount of the respective damages which I will discuss shortly.

As I said before, to prove their racial discrimination claims, Mr. Belvin and Mr. Mayers must each prove that they were subjected to a hostile work environment. If they have proven their hostile work environment claim, you should then consider the remaining elements of a racial discrimination claim:  First, whether Mr. Belvin and Mr. Mayers were qualified to perform the essential functions of being a porter; and, second, whether the hostile work environment occurred in circumstances giving rise to the

Case 1:17-cv-06303-NGG-MMH   Document 117-5   Filed 12/03/22   Page 84 of 131
PageID #: 3881
Charge of the Court                        651

inference of discriminatory intent.

If either Mr. Belvin or Mr. Mayers has proven these elements to a preponderance of the evidence, they have establish established what is called a prima facie case for racial discrimination under federal and state law.  If Mr. Belvin or Mr. Mayers, or both, has failed to establish his prima facie case, you should then find for Electchester on the federal and state claims for race discrimination.

If a plaintiff has established a prima facie case, then you must consider whether Electchester has shown a non-discriminatory reason for its actions.  Finally, if you find that Electchester has shown a non-discriminatory reason for its actions, you must consider whether Mr. Belvin or Mr. Mayers has proven to a preponderance of the evidence that this explanation was merely a pretext, and intentional discrimination was at least a motivating factor for the adverse employment action.  If Electchester has shown a non-discriminatory, non-pretextual reason for the adverse employment accusation, you should find for Electchester on the plaintiffs' federal and state claims for racial discrimination.  But if Electchester has not presented a non-discriminatory reason, or a plaintiff has shown that non-discriminatory reason was a pretext, you should find for the plaintiff.

In summary, on your verdict sheet, you will see

Charge of the Court                          652

questions asking whether either Mr. Belvin or Mr. Mayers has proven he was subjected to a hostile work environment on account of his race, or suffered an adverse employment action on account of his race, under Section 1981, Title VII and the New York State Human Rights law.  If you find that either Mr. Belvin or Mr. Mayers has proven, by a preponderance of the evidence, that he was subjected to a hostile work environment on account of his race, and that the conduct can be imputed to Electchester, you should find for that plaintiff on the appropriate claim and mark "yes" on the verdict sheet.  If you find that either Mr. Belvin or Mr. Mayers has proven, by a preponderance of the evidence, that he was subjected to an adverse employment action on account of his race, you should find for that plaintiff on the appropriate claim and mark "yes" on the verdict sheet.  However, if you find that either plaintiff has failed to satisfy the elements I have just discussed, you should find for Electchester and mark "no" on the verdict sheet.

         The plaintiffs also raise claims of hostile work environment on account of their race under the New York City Human Rights Law.  We're talking about the New York City Human Rights Law now.  Unlike the federal and state laws we just discussed, the New York City Human Rights Law only asks whether a plaintiff has proven by a preponderance of the evidence that he has been treated less well than other

Charge of the Court                   653

employees because of his race. Petty, slight, or trivial inconveniences are still not enough but there's no requirement for the plaintiff to show that the conduct reached the level of being severe or pervasive or constituted an adverse employment action.

Claims brought under the New York City Human Rights Law must be construed broadly in favor of discrimination plaintiffs. Accordingly, it may be possible to find that Electchester's actions do not rise to the level of discrimination or hostile work environment under federal or state law, but their actions do constitute discrimination under the New York City Human Rights Law. By the same token, if you find that Electchester's actions violated federal an state law, then you must find that Electchester's actions violated the New York City Human Rights Law.

On your verdict sheet, you will see questions asking whether either Mr. Belvin or Mr. Mayers has proven that he was subjected to a hostile work environment and discriminated against on account of his race under the New York City Human Rights Law. If you find that either Mr. Belvin or Mr. Mayers has proven, by a preponderance of the evidence, that he was treated less well than other employees on account of his race, you should find for that plaintiff on the appropriate claim and mark "yes" on the verdict sheet. If, however, you find that either plaintiff has failed to satisfy any of these

Charge of the Court                                    654

elements, you should find for Electchester and mark "no" on

the verdict sheet for that plaintiff.

All right.  We're a little more than halfway

through.  I'm going to ask you to stand up and stretch.

(Pause.)

THE COURT:  Have a seat everybody.  I'm now going to

discuss retaliation for protected activity.

Mr. Belvin also brings a claim that he was

retaliated against for filing a complaint with the EEOC, in

violation of Title VII, Section 1981, the New York State Human

Rights law, and the New York City Human Rights Law.  As I did

before, I will discuss the federal and state claims first,

followed by the city claim, which is analyzed under a

different standard.  To prove a claim of retaliation under

Title VII, Section 1981 and the New York State Human Rights

law, Mr. Belvin must prove, to a preponderance of the

evidence, the following elements:  First, that Mr. Belvin

engaged in protected activity, and Electchester was aware of

that protected activity; second, that Mr. Belvin suffered a

materially adverse action; third, that Mr. Belvin showed a

causal connection between the protected activity and the

adverse action.

Filing a complaint with the EEOC is considered

protected activity under the law.  Accordingly, if you find

that Mr. Belvin proved to a preponderance of the evidence that

Charge of the Court                                      655

he filed such a complaint, and that Electchester was aware he did so, you should find that Mr. Belvin satisfied this element and continue to whether Mr. Belvin suffered a materially adverse action.

Next, you must determine whether Electchester took a materially adverse employment action against Mr. Belvin. There are many actions by an employer that might leave an employee displeased or dissatisfied, but that does not necessarily mean that the employee can bring a retaliation claim. That is why an adverse employment action must be material in nature to establish a violation. A materially adverse employment action means a significant change in employment status, including termination or demotion, or a decision that causes a significant change in wages, benefits, or career prospects. Mr. Belvin has put forward evidence that he was subjected to a series of frivolous or minor disciplinary actions. You have also heard testimony that these disciplinary actions addressed violations of workplace rules. Such disciplinary actions may constitute a materially adverse action if they constituted a change in employment status, and the change was significant. In other words, that Mr. Belvin would not have otherwise been disciplined for these actions and that the disciplinary action was significant enough to consider it a change in employment status. They may not constitute a materially adverse action if they were normal

Charge of the Court                          656

course enforcement workplace rules.

If you determine that Mr. Belvin has proven that the disciplinary actions constituted a significant change in employment status, he has satisfied this element and you should proceed to consider whether the materially adverse action was taken in retaliation for the filing of an EEOC complaint.  If Mr. Belvin has not proven the materially adverse action, you must find for Electchester on this claim.

Mr. Belvin must then also prove to a preponderance of the evidence that the disciplinary actions were taken against him in retaliation for the filing of an EEOC complaint.  This causal connection may be shown by direct evidence, indirect evidence, or both.  Direct evidence that the actions were retaliation would include statements that the disciplinary actions were instituted because Mr. Belvin filed an EEOC complaint, that the pending disciplinary actions would be resolved favorably if Mr. Belvin withdrew his complaint, or the new disciplinary actions would not be brought against Mr. Belvin if he withdrew his complaint.  Indirect evidence would include evidence that the disciplinary proceedings first began or increased in severity or frequency shortly after Mr. Belvin filed his EEOC complaint.  Indirect evidence would also include evidence that the disciplinary concerns raised by Electchester were unsupported, unsubstantiated, or otherwise baseless.

Charge of the Court                        657

If you determine that Mr. Belvin has proven, to a preponderance of the evidence, that he filed the EEOC complaint; that Electchester was aware of such a complaint; that Mr. Belvin suffered a materially adverse action; and that such materially adverse action was causally connected to the filing of the EEOC complaint, then Mr. Belvin has established what is called a prima facie case.  If Mr. Belvin failed to establish his prima facie case, then you should find for Electchester on the federal and state claims for retaliation. If he has established a prima facie case, then you must consider whether Electchester has shown a non-retaliatory reason for its actions, by evidence that the actions were taken for regular business reasons or taken against other employees who did not engage in protected conduct.  Finally, if you find that Electchester has shown that such a non-retaliatory reason for its actions, you must consider whether Mr.  Belvin has proven to a preponderance of the evidence that this explanation was merely a pretext, and retaliation was at least a motivating factor in the adverse employment action.

And your verdict sheet, you will see questions asking whether Mr. Belvin has proven that he was retaliated against for engaging in protected activity under Section 1981, Title VII, and the New York State Human Rights law.  If you find that Mr. Belvin has proven, by a preponderance of the

Charge of the Court                 658

evidence, that he was retaliated against for engaging in

protected activity, you should find for Mr. Belvin on the

appropriate claim and mark "yes" on the verdict sheet.  If,

however, you find that Mr. Belvin has failed to satisfy any of

the elements, you should find for Electchester and mark "no"

on the verdict sheet on the appropriate claim.

Mr. Belvin also brings a claim of retaliation under

the New York City Human Rights Law.  Such a claim is analyzed

similarly to the federal and state claims we just discussed.

However, instead of proving a materially adverse action,

Mr. Belvin must only prove, to a preponderance of the

evidence, that the retaliatory actions were reasonably likely

to deter a person from engaging in a protected activity.  As

with hostile work environment, claims brought under the New

York City Human Rights Law must be construed broadly in favor

of plaintiffs claiming retaliation.

On your verdict sheet, you will see questions asking

whether Mr.  Belvin has proven he was retaliated against for

taking protected activity under the New York City Human Rights

Law.  If you find that Mr.  Belvin has proven, by a

preponderance of the evidence, that he engaged in protected

activity and that, because of such activity he was treated

understand a manner reasonably likely to deter people from

taking that protected activity, you should find for Mr. Belvin

on his claim of retaliation and mark "yes" on the verdict

Charge of the Court                    659

sheet.  If, however, you find that Mr. Belvin has failed to satisfy any of these elements, you should find for Electchester and mark "no" on the verdict sheet for the retaliation claim.

Finally, Mr. Mayers brings claims for disability discrimination pursuant to the federal Americans With Disabilities Act and the New York City Human Rights Law.  As I did before, I will discuss these laws separately.

The Americans with Disabilities Act makes it unlawful for employers to discriminate against individuals because of their disability.  To succeed on this claim, Mr. Mayers must prove to a preponderance of the evidence the following elements:  That Mr. Mayers was disabled within the meaning of the Americans with Disabilities Act; that he was otherwise qualified for the position he held and was able to perform essential functions of that position, with reasonable accommodations if he needs them; and that Mr. Mayers suffered an adverse employment action because of his disability.

As with earlier claims, if Mr. Mayers has not proven any one of these elements, you should find for Electchester.

Under the Americans with Disabilities Act, a person has a disability if they have, quote, A physical or mental impairment that substantially limits one or more of the major life activities of such individual, end quote.  Whether an individual has a disability is determined on a case-by-case

Charge of the Court                                    660

basis; there is no diagnosis that is automatically a disability or not a disability.

The definition includes two requirements:  The individual's impairment must limit a major life activity such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, or working; and that the impairment must be substantial, meaning that the person is either completely unable to perform the activity or is significantly restricted on how they can perform that activity, as compared to the average person.  It is not enough to prove that the individual must merely perform the task differently than the average person; there must be a significant restriction on how they perform the task.

You have heard testimony regarding Mr. Mayers's diagnosis with leukemia.  You are asked to determine whether Mr. Mayers has proven, to a preponderance of the evidence, that Mr. Mayers was diagnosed with leukemia and that illness substantially limited his ability to engage in major life activity.  If you find that Mr. Mayers has proven to a preponderance of the evidence that he was disabled under the meaning of the Americans with Disabilities Act, you should continue to the next element; if not, you must find for Electchester on these claims.

Next, Mr. Mayers must show that he was able to perform the essential functions of his job as a porter, with

Charge of the Court                661

reasonable accommodations if he needs them.

Reasonable accommodations means any reasonable change to the work environment or to the way things are customarily done in the workplace that enables a qualified individual with a disability to perform the essential functions of the job held or to enjoy the same benefits and privileges of employment that are available to others who do not have disabilities. The reasonable accommodation may include job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modification of examinations, training materials or policies, the provision of qualified readers or interpreters, or other similar accommodations.

You should therefore consider whether Mr. Mayers has proven to a preponderance of the evidence that he was able to perform the job of a porter, whether with or without reasonable accommodations.

(Continued on the following page.)

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

Charge of the Court                    662

(Continuing.)

THE COURT:  The third element of a claim under the Americans with Disabilities Act is that the defendant discriminated against the plaintiff because of his disability.

Mr. Mayers claims two different adverse employment actions, each of which constituted a different claim under the Americans with Disabilities Act.  Accordingly, you will see those listed separately on the Verdict Sheet.  First, Mr. Mayers put forward evidence that he was denied his bonus in 2014 because he only worked half the year before going out on medical leave due to his leukemia diagnosis.  Second, Mr. Mayers put forward evidence that he was terminated because of his disability.  Electchester puts forward evidence disputing these claims.

To satisfy this element, Mr. Mayers must prove by a preponderance of the evidence that the disability was a determinative factor in Electchester's decision to deny his bonus in 2014 or to terminate him.  It may not have been the sole factor, but it must have been a decisive factor, meaning that but for consideration of the plaintiff's disability, the defendant would not have made the same employment decision. In order for the disability to have been a determinative factor in the defendant's decision, the defendant must have known that the plaintiff had a disability.  That means the person who made the decision to take the adverse action, knew

*LEEANN N. MUSOLF, RPR, CCR*
*Official Court Reporter*

                           Charge of the Court                    663

that the plaintiff had a disability.

An employer may not terminate an employee because of a disability, but may terminate the employee because the employee is unable to do the job, even if the reason the employee cannot do his job is because of the disability.  An employer may also terminate an employee for unacceptable behavior in the workplace, even if that behavior was the result of the employee's disability.

On your Verdict Sheet, you will see questions asking whether Mr. Mayers has proven he was discriminated against due do his disability under the Americans with Disabilities Act either when he was denied his bonus in 2014 or when he was terminated.  If you find that Mr. Mayers has proven, by a preponderance of the evidence, that he was disabled, qualified to perform the essential functions of his position with or without a reasonable accommodation, and was subjected to an adverse employment action on account of his disability, you should find for Mr. Mayers on that claim for disability discrimination and mark "Yes" on the Verdict Sheet.  If, however, you find that Mr. Mayers has failed to satisfy any of these elements, you should find for Electchester and mark "No" on the Verdict Sheet for those claims.

Mr. Mayers also brings claims for disability discrimination pursuant to the New York City Human Rights Law. The elements of these claims are similar to the federal

Charge of the Court                664

claims.  However, as I did before, I will explain the differences under the industry Human Rights Law.

First, the New York City Human Rights Law also requires that Mr. Mayers prove that he was disabled.  However, it defines a disability as "any physical, medical, mental, health or psychological impairment, or a history of record or such impairment."

Second, the New York City Human Rights Law also requires that Mr. Mayers prove that he was qualified to perform the essential functions of the job.  Third, Mr. Mayers must prove by a preponderance of the evidence that he was treated less well than non-disabled employees and that the circumstances give rise to an inference that this discrimination was an attributable to his disability.  This is a different standard from an adverse employment action.  Again, please understand that the New York City Human Rights Law is construed broadly in favor of discrimination plaintiffs.  Accordingly, it may be possible to find that Electchester's action as do not rise to the level of discrimination under the Americans with Disabilities Act, but that its actions do constitute discrimination under the New York City Human Rights Law.  By the same token, if you find that Electchester's actions violated federal law, then you must also find that Electchester's actions violated the New York City Human Rights Law.  Recall, however, that Mr. Mayers

Charge of the Court                665

must establish that the treatment was more than trivial, insubstantial, or petty.

On your Verdict Sheet, you will see questions ask whether Mr. Mayers has proven he was discriminated against due to his disability under the New York City Human Rights Law either when he was denied his bonus in 2014 or when he was terminated.  If you find that Mr. Mayers has proven, by a preponderance of the evidence, that he was disabled, qualified to perform the essential functions of his position with or without a reasonable accommodation, and was subjected to an adverse employment action on account of his disability, you should find for Mr. Mayers on his claim for disability discrimination and mark "Yes" on the Verdict Sheet.  If you, however, you find that Mr. Mayers has failed to satisfy any of these elements, you should find for Electchester and mark "No" on the Verdict Sheet for this claim.

I will now discuss damages.  Let's discuss monetary damages.  If either of the plaintiffs have proven by a preponderance of the evidence that Electchester is liable for at least one claim, then you must determine the amount of damages that that plaintiff is entitled to receive.  With damages, as with liability, the plaintiffs bear the burden of proving their case by a preponderance of the evidence.  I will discuss several types of damage awards with you: actual damages, compensatory damages, and punitive damages.  But

Charge of the Court                    666

first, two cautionary notes.

First, you should not infer that the plaintiffs are entitled to damages just because I am providing instructions on how to award damages.  You must decide on liability first.  I am instructing you on damages only so that you will have comprehensive guidance if you decide that the plaintiffs are, in fact, entitled to recovery.

Second, let me take you back to counsels' closing arguments.  You heard the attorneys discussing -- actually, you didn't hear the attorneys discussing specific dollar amounts that they believe would be appropriate compensation in this case, and so, this is a subject that is left to you to decide and it's for your determination if you find liability for any of the claims.

Let's discuss the different types of damages that are available to the plaintiffs.  First, you may decide to award "actual damages" meaning an amount of money that compensates plaintiffs for any economic loss that they suffered as a result of the Electchester's discrimination.  The key words here are "as a result of."  You may award actual damages only for injuries that the plaintiffs prove were substantially caused by Electchester's discrimination.

Your goal with regard to actual damages is to make the plaintiffs whole.  Thus, your calculation of actual damages must be fair and reasonable, and must be neither

Case 1:17-cv-06303-NGG-MMH    Document 117-5    Filed 12/03/22    Page 100 of 131
PageID #: 3897
Charge of the Court                        667

inadequate nor excessive.  Computing damages may be difficult, but you must not let that difficulty lead you to engage in arbitrary guesswork.  You should not award damages for speculative injuries, but only for those injuries that the plaintiffs have actually suffered or which are reasonably likely to suffer in the future.  On the other hand, the law does not require that the plaintiffs prove the amount of their losses with mathematical precision, but only with as much definiteness and accuracy as circumstances permit.

Plaintiffs are not permitted to recover actual damages more than once for the same injury.  You need only calculate actual damages once, even if you find that the plaintiffs have successfully proven multiple claims.  As you will see from the Verdict Sheet, we do not ask you to calculate actual damages separately under each claim.

If you find that the Electchester discriminated against the plaintiffs, but that the plaintiffs have failed to prove actual damages, you may choose to award "nominal damages."  That means a token award of one dollar.  You should award nominal damages if you conclude that the only injury plaintiffs suffered was the deprivation of their rights under the discrimination laws, without any economic harm as a natural consequence of that deprivation.

Next, we will discuss "compensatory" damages, so called because their purpose is to award just and fair

                              Charge of the Court                    668

compensation for any loss from the defendant's violation of a plaintiff's rights.  In employment discrimination cases, a successful plaintiff is entitled to compensatory damages for emotion pain, suffering, inconvenience, loss of enjoyment of life, and mental and physical anguish, as long as those harms result from the defendant's conduct.  These are sometimes referred to as "pain and suffering" damages.

There is no exact standard for fixing compensation to be awarded for pain and suffering.  The law does not require the plaintiffs to prove the amount of their losses with mathematical precision, but only with as such definiteness and accuracy as circumstances permit.  In determining the amount of damages, you should be guided by dispassionate common sense.  You should use sound discretion in fixing an award of damages, drawing reasonable inferences from the facts in the evidence.  You may not award damages based on sympathy or speculation or guesswork.

As with actual damages, the plaintiffs bear the burden of proving compensatory damages by a preponderance of the evidence.  As with actual damages, you have the option of awarding "nominal damages" of one dollar if you find that the plaintiffs have failed to prove that they suffered emotional harm as a result of Electchester's discrimination.

Plaintiffs are also seeking "punitive damages" on their Title VII claims.  Punitive damages are awarding over

Charge of the Court                    669

and above any actual or compensatory damages.  The purpose of

punitive damages is both to punish the wrongdoer for its

actions, and also to deter employers from similar misconduct

in the future.

For plaintiffs' claims of racial discrimination and

hostile work environment under federal law, you must choose to

award punitive damages if you find that Electchester only

violated -- I'm sorry, if you find that Electchester not only

violated plaintiffs' rights, but that it acted with malice or

reckless indifference of their rights.

An act, or a failure to act, is done with "malice"

if it is motivated by ill will, bad motive, or spite.

"Reckless indifference" means that Electchester knew or should

have known that its actions would cause illegal discrimination

against employees.  In other words, you must find that

Electchester discriminated in the face of a perceived risk

that its actions would violate federal or city law.

You are not required to award punitive damages.  If,

however, you find that punitive damages are merited, you must

decide an amount.  There are a few solid guideposts on making

that determination.  You should consider questions such as:

How offensive was Electchester's conduct?  How much did you

award in actual and compensatory damages?  Does the combined

total of those damages seem appropriate in light of the nature

and extent of the harm caused?

*LEEANN N. MUSOLF, RPR, CCR*
*Official Court Reporter*

Charge of the Court                    670

So I have now outlined for you the rules of law that apply to the case, and the processes by which you must way the evidence and decide the facts.  In a few minutes you will retire to the jury room for your deliberations.  Remember, you must all agree on the verdict.  Your verdict must be unanimous.  Your deliberations will be secret: you will never have to explain your verdict to anybody.

Your role, to reach a fair decision based on the law and the evidence, is an important one.  I remind you that you took an oath to render a judgment impartially and fairly, without prejudice or sympathy, solely upon the evidence in the case and the applicable law.  You must keep this in mind when determine the facts.  All parties to a civil lawsuit, in this case, two private individuals and a corporation, are entitled to a fair trial.  They are equal before the law.  As you deliberate, remember that the dispute between the parties is, for them, a very important matter.  They, and the court, rely on you to give full and fair consideration to the issues and evidence before you.  Your only interest is to seek the truth from the evidence in the case.

When you return to the jury room, I will send you all the exhibits that were received in evidence so that you have them during your deliberations.  I will also provide each of you with a copy of these jury instructions.  You must consider the instructions as a whole and not single out any

*LEEANN N. MUSOLF, RPR, CCR*
*Official Court Reporter*

Charge of the Court                    671

one instruction as stating the law.  If you wish to have any portion of the testimony repeated, please indicate that to me in a note and provide it to the Marshal who will be guarding you, who will provide it to Mr. Reccoppa.  Please be as specific as possible in describing which portion of the transcript you wish to review.  If you need to ask me a question or to communicate with me during your deliberations for any reason at all, send me a note through the Marshal or my courtroom deputy, Mr. Reccoppa.  I will either reply in writing or bring you back into the courtroom to answer your questions.

You have collective duty to deliberate together. Each of you must decide the case for yourself, but only after full and fair consideration of the evidence with other members of the jury.  When you're in the jury room, make an effort to listen to each other as you discuss the evidence in the case. And while you're discussing the case, please be open to re-examine your own opinions, and to changing your mind if you become convinced that you are wrong about something.  However, do not give up your honest beliefs solely because others think differently, or merely to finish the case.  Your goal is to reach agreement on an unanimous verdict, so long as you can do so without violating your individual judgment and your conscience.

You will not discuss this case with anyone outside

Charge of the Court                                    672

the jury room.  That includes your fellow jurors.  You will only discuss the case together, when all of the jurors are in the room, with no one else present, behind the closed door. At no other time is there to be any discussion about the merits of the case.

The first thing you need to do when you get into the jury room is to select one of you as the foreperson.  The foreperson will help guide your deliberations and will speak for you here in the courtroom.  Traditionally, Juror Number One acts as the foreperson.  However, if Juror Number One does not wish to serve as the foreperson, then I suggest that you select another jury member to act as your foreperson.  In order for your deliberations to proceed in an orderly fashion, you must have a foreperson, but his or her vote is of no greater weight than that of any other juror.

When you retire to the jury room, you will be given the Verdict Sheet, right here, which will contain a series of questions, as I have noted through these instructions.  You must answer these questions unanimously, based on the preponderance of the evidence.  The foreperson will write the jury's unanimous answer in the spaces provided on the Verdict Sheet.  The Verdict Sheet is intended to be self-explanatory, and it contains many written instructions that remind you of the standards for certain claims, as well as instructions that explain how all the answers fit together.  For example, the

Charge of the Court                    673

answer for some questions depend on the answers you gave to

prior questions.  If you have any questions about the Verdict

Sheet, or if you need clarification on the meaning of a

particular instruction, do not hesitate to ask me.

Bear in mind that you are never to reveal to any

person, not even to the Court, how the jury stands,

numerically or otherwise, on any aspect of your deliberations,

until after you have reached a unanimous verdict.  At

conclusion of your deliberations, the foreperson should check

the Verdict Sheet carefully to make sure that the jury has

followed all instructions, and that you have accurately

answered all questions that need to be answered.  Then, the

foreperson will sign and date the Verdict Sheet.  At that

time, you should simply send me a note saying, quote, we have

reached our verdict, end quote.  When you are summoned back to

the courtroom, please bring the Verdict Sheet with you.  The

foreperson will be asked to read the answers on the Verdict

Sheet in response to my questions.  And each of you will get a

copy of the Verdict Sheet, but only the jury foreperson will

get a copy of the Verdict Sheet with a place to put the date

and to put that person's signature.  Everyone else will have

the Verdict Sheet without that portion of the last page.

Your oath sums up your duty, and that is:  Without

fear or favor to any person, you will well and truly try the

issues in this case according to the evidence given to you in

Charge of the Court                    674

court, and the law as I have described to you.  I thank you

for performing this critical duty in support of our system of

criminal justice.

We're almost done.  Please remain seated for a brief

moment while I confer with the attorneys to see if there are

any additional instructions they would like me to deliver to

you prior to your deliberations.

(Continued on the next page.)

(Sidebar conference.)

SIDEBAR CONFERENCE                675

(The following occurred at sidebar.)

THE COURT:  My recollection is nobody said anything about actual amounts.

MS. MOORE:  I agree.  That's correct.

THE COURT:  You didn't mention any specific figures for damages.

MR. VAN-LARE:  I did not.

THE COURT:  What?

MR. VAN-LARE:  I did not.

THE COURT:  You did not.  So that section has to be deleted.  So we're going to have to delete it.

Do you have anything on the jury instructions?

MR. VAN-LARE:  No, I don't have anything.

THE COURT:  Do you have anything?

MS. MOORE:  No, Your Honor.

THE COURT:  So we can complete the process and have the jury retire to consider its verdict, okay?

MS. MOORE:  Yes, Your Honor.

THE COURT:  Okay, good.  Thank you.

(End of sidebar conference.)

(Continued on the next page.)

676

MR. VAN-LARE:  (In open court; Jury present.)

THE COURT:  Very well.

I understand lunch will be here soon, and let me just say this:  We're going to take our lunch at 1:00, and so if you send us a note at 1:30, we're not going to get to until 2:00.  But when we get it and we're here, we'll act on it expeditiously if you have a request.

But, generally, I require the jury, if you have not reached a verdict today, if you want to go home at 5:00 or 6:00, but I never have a jury deliberate past 6:00 at night. And tomorrow is a federal holiday, so if you don't happen to reach verdict today, then we'll just come back Monday at 9:30, but I will bring you out to dismiss you at the end of the day, all right?

Will the Marshal come forward.

(Whereupon, the marshal was sworn.)

THE COURTROOM DEPUTY:  Thank you.

THE COURT:  Very well.

The jury may retire to consider its verdict.

All rise.

(Jury retires to deliberate at 1:00 p.m.)

THE COURT:  Please be seated.

I think we're going to have to reprint the charge to take that section out and renumber the paragraphs after that.

MS. MOORE:  Yes, Your Honor.

*LEEANN N. MUSOLF, RPR, CCR*
*Official Court Reporter*

677

THE COURT:  All right.  So we'll take care of that.

The parties have agreed as to the evidence, correct?

MR. VAN-LARE:  Yes.

MS. SHEA:  Yes, Your Honor.

THE COURT:  All right.  So please hand my clerk -- you can give it to Mr. Reccoppa, and the Verdict Sheets, you can send the Verdict Sheets in also.  Do we have the Verdict Sheets?  The one for the foreperson, do you want to put a note on that one or just put -- they will find it.  And just advise the jurors that we'll have the charge in a few minutes, but they're going to have lunch anyway.

All right.  So if you're going out, make sure Mr. Reccoppa has a cellphone for you.  Between 1:00 and 2:00, we're having lunch, but you need to be here from 2:00 on.

MS. MOORE:  Yes, Your Honor.

THE COURT:  All right.  Thank you, everybody.

(A luncheon recess was taken.)

Proceedings                        678

A F T E R N O O N   S E S S I O N

(In open court; Jury not present.)

THE COURTROOM DEPUTY:  Case on trial.

THE COURT:  You can be seated.

We have two notes.  The first note, which has been marked as Court Exhibit Number 5, states:  Can the jury be provided be benchmarks slash guidelines for damages, actual, compensatory, punitive.

(Court Exhibit 5, was received in evidence.)

And the second note, marked as Court Exhibit Number 6, states:  Can you further define, quote, adverse employment action, end quote.

(Court Exhibit 6, was received in evidence.)

THE COURT:  Anyone have any suggestions about how we respond?

MR. VAN-LARE:  I think with reference to the first one, you made it clear to the jury that it's within their own discretion and while I'm not sure the Court can give a guideline on what they have to decide in that particular regard, so you may want to reemphasize the instruction you gave them the last time.

MS. MOORE:  Your Honor, I'm not certain what guidelines are available either, except for with respect to the Title VII claim.  And as far as ideas of defining adverse employment action, we could look into our own draft jury

Proceedings 679

instructions and if it would further clarify, but --

MR. VAN-LARE: On the adverse action, Your Honor, I think any action language to deter the plaintiff in engaging in a protected activity in the future --

MS. SHEA: That's retaliation.

MR. VAN-LARE: I'm sorry?

MS. SHEA: That's the definition of retaliation.

MS. MOORE: I don't -- I would object to that because I don't think it's correct under the law.

THE COURT: Well, the only thing I would ever do is refer them back, generally speaking, refer them back to some part of the charge. And as to the first, I don't think that I can give them benchmarks and guidelines, all right? This is totally within their discretion to do whatever fits within the instructions in the charge. There's nothing more that I could actually say, than repeat definitions, and those definitions are in the charge. So we would have to respond, I would think, by saying, you know --I'm going to take a look -- I don't have the charge in front of me, so let me take a look at the charge. I thought it was down here. I must have taken it back upstairs, so. I'll get my copy.

(Pause in proceedings.)

THE COURT: With regard to damages, the only thing that I could do that would seem to me, unless you think otherwise, you tell me what you think, is refer them back to

Proceedings                                        680

that portion of the charge and indicate that the question of

damages should be addressed by applying the charge to the

evidence that has been provided to the jury during the trial.

That's all I can do.  Whatever the evidence is, they

have to consider, and then they have to apply the Court's

instruction about damages to that evidence and reach whatever

conclusions they reach, if they get that far.  I don't know --

there's nothing else that I can do.

I can't give them guidance about how to address

questions, you know, how to apply the evidence to the question

of damages.  I mean, that's really totally up to the jury.  It

may not be clear to the jury, but it's up to the jury.  They

may have to work their way through it, it would seem to me.

And if you think otherwise, just let me know what you think

MR. VAN-LARE:  Plaintiff agrees that that is within

the jurisdiction of the jury.

THE COURT:  Well, I'm going to refer them to that

part of the -- I would -- my view is that I would refer them

back to those pages of the jury charge and indicate that their

analysis should be based on the instructions that I've given

and the evidence that's been presented.

MS. MOORE:  Yes, Your Honor.  I think that sounds

like, to defendant, the right thing to do.

Perhaps the same would be appropriate for the

question about material -- or adverse employment action.  I

see in the charge there on the bottom of page 22.  Perhaps the

Court could redirect them to that portion of the charge with

respect to their second question, as well.

THE COURT:  All right.  Well, let me take a look at

it when it comes back here.

(Pause in proceedings.)

THE COURT:  And with regard to the question, can you

further define adverse employment action, that is covered on

page 22 at the bottom of the page, small "B."  So I would

simply refer the jury to that.

Is that agreeable?

MS. MOORE:  Yes, Your Honor.

MR. VAN-LARE:  And it goes up to page 23.

THE COURT:  Yes.  22(b) goes from 22 to 23, okay?

MR. VAN-LARE:  Thank you.

THE COURT:  All right.

This is the note:  To the jury, with regard to your

request for, quote, benchmarks slash guidelines for damages, I

refer you to Section Three pages 31 to 34 of the jury charge

and direct you to apply any relevant evidence to those

instructions.

With respect to your request to, quote, define

adverse employment action, end quote, I refer you to the

portion of the jury charge on pages 22 and 3 under the heading

B, Materially Adverse Action.

Proceedings                      682

MS. MOORE:  Yes, Your Honor.

THE COURT:  Is that agreeable?

MR. VAN-LARE:  Accepted, Your Honor.

THE COURT:  Okay.  We need to make a copy of this and get Joe to give it to the jury.

Okay, thank you, everybody.

MR. VAN-LARE:  Thank you, Your Honor.

MS. MOORE:  Thank you.

(Continued on the following page.)

(In open court; Jury not present.)

THE COURT:  Case on trial.

We've received a note at -- I don't know what time this note came in, but the note said, it's Exhibit 8, you've seen it.  It said:  "We have six questions remaining.  We should come to a decision by 5:40."

You saw that?

(Court Exhibit 8, was received in evidence.)

MS. MOORE:  Yes, Your Honor.

THE COURT:  Okay.  And now, Court Exhibit 9:  We have reached a verdict.

(Court Exhibit 9, was received in evidence.)

So let's call in the jury.

And I would say that it's a complicated verdict sheet so it's going to take a little while to go through it, and I'm going to have my clerk help me to take a quick look at it first to see if it's actually in a form that can be -- where the verdict can be actually taken or they have to go back --

MS. MOORE:  Yes, Your Honor.

THE COURT:  -- or come back.

(Jury enters the courtroom.)

THE COURT:  All right.  The foreperson should remain standing, everyone else may be seated.

Mr. Foreperson, has the jury reached a verdict?

Proceedings                                            684

THE FOREPERSON:  Yes, we have, Your Honor.

THE COURT:  All right.  Would you hand the Verdict Sheet to the clerk.

Okay.  The clerk will publish the verdict.  We'll go through it slowly because it's a multipart verdict.

THE COURTROOM DEPUTY:  Part 1, Hostile Work Environment claims under Title VII 1981 and NYSHRL.  Plaintiff Michael Belvin.

Has Plaintiff Belvin proven by a preponderance of the evidence that he is in the protected category, i.e., black African American, yes or no?

THE FOREPERSON:  Yes.

THE COURT:  All right.  And you should read, if you answered "Yes," proceed to Question 2.

THE COURTROOM DEPUTY:  Okay.

Has the Plaintiff Belvin proven beyond a preponderance of the evidence that he suffered a hostile work environment, i.e., sufficiently severe and pervasive to alter the terms and conditions of his employment by creating an abusive working environment, yes or no?

THE FOREPERSON:  Yes.

THE COURTROOM DEPUTY:  Question 3:

Has Plaintiff Belvin proven by a preponderance of the evidence that the conduct which created a hostile work environment was because of his membership in the protected

*LEEANN N. MUSOLF, RPR, CCR*
*Official Court Reporter*

category, i.e., because of his race, yes or no?

THE FOREPERSON:  Yes.

THE COURTROOM DEPUTY:  We're going to move to Question 4:

Has Plaintiff Belvin proven by a preponderance of the evidence that the creation of a hostile work environment was due to the harassment by a supervisor, yes or no?

THE FOREPERSON:  No.

THE COURTROOM DEPUTY:  Question 5:

Has Plaintiff Belvin proven beyond a preponderance of the evidence that Electchester or hire-ranking officials had actual knowledge of the conduct that created a hostile work environment, or should have known about the fact and did nothing to stop it, yes or no?

THE FOREPERSON:  Yes.

THE COURTROOM DEPUTY:  I will proceed to Question 6. Question 6:

Has Electchester proven by a preponderance of the evidence that it exercised reasonable care to prevent and promptly correct the harassing conduct, yes or no?

THE FOREPERSON:  No.

THE COURTROOM DEPUTY:  All right.  Proceeding to Question 7:

Has Electchester proven by a preponderance of the evidence that Plaintiff Belvin unreasonably failed to take

Proceedings                                                  686

advantage of any preventative or corrective opportunities

provided by Electchester or otherwise unreasonably failed to

avoid harm, yes or no?

                THE FOREPERSON:  No.

                THE COURTROOM DEPUTY:  Proceeding to Question 8.

Question 8:

                Has Plaintiff Belvin proven by a preponderance of

the evidence that he actually experienced emotional distress

as a result of a hostile work environment, yes or no?

                THE FOREPERSON:  Yes.

                THE COURTROOM DEPUTY:  Moving on to Question 9:

                What amount of actual damages, if any, do you award

the Plaintiff Belvin for his hostile work environment claim?

                THE FOREPERSON:  Zero dollars.

                THE COURTROOM DEPUTY:  Question 10:

                What amount of compensatory damages, if any, do you

award Plaintiff Belvin for his hostile work environment claim?

                THE FOREPERSON:  $25,000.

                THE COURTROOM DEPUTY:  Proceeding to Question 11:

                Has Plaintiff Belvin proven by a preponderance of

the evidence that Electchester violated his rights and acted

with malice or reckless indifference to these rights, yes or

no?

                THE FOREPERSON:  Yes.

                THE COURTROOM DEPUTY:  Moving on to Question 12:

*LEEANN N. MUSOLF, RPR, CCR*
*Official Court Reporter*

What amount of punitive damages, if any, do you award Plaintiff Belvin for his hostile work environment claim?

THE FOREPERSON:  $500,000.

THE COURTROOM DEPUTY:  Proceeding to Part 1(b), Plaintiff Michael Mayers.

Has Plaintiff Mayers proven by a preponderance of the evidence that he is in the protected category, i.e., black African American, yes or no?

THE FOREPERSON:  Yes.

THE COURTROOM DEPUTY:  Moving on to Question 14:

Has Plaintiff Mayers proven by a preponderance of the evidence that he suffered a hostile work environment, i.e., sufficiently severe and pervasive to alter the terms and conditions of his employment by creating an abusive working environment, yes or no?

THE FOREPERSON:  No.

THE COURTROOM DEPUTY:  We'll now move to proceed to Part 2.  Part 2.  Race Discrimination, Disparate Treatment Claims under Title VII 1981 and the NYSHRL.  Plaintiff Belvin:

Has Plaintiff Belvin proven by a preponderance of the evidence that he is in the protected category, i.e., black African American, yes or no?

THE FOREPERSON:  Yes.

THE COURTROOM DEPUTY:  Moving on to question 26:

Has Plaintiff Belvin proven by a preponderance of

the evidence that he was qualified to perform the essential functions of his position as a porter, yes or no?

THE FOREPERSON:  Yes.

THE COURTROOM DEPUTY:  Question 27:

Has Plaintiff Belvin proven by a preponderance of the evidence that he suffered an adverse employment action, yes or no?

THE FOREPERSON:  No.

THE COURTROOM DEPUTY:  All right.  Now, we have to move on to Part 2(b).  Proceeding to Part 2(b), Plaintiff Mayers:

Has Plaintiff Mayers proven by a preponderance of the evidence that he is in the protected category, i.e., black African American, yes or no?

THE FOREPERSON:  Yes.

THE COURTROOM DEPUTY:  Has Plaintiff Mayers proven by a preponderance of the evidence he was qualified to perform the essential functions of his position as a porter, yes or no?

THE FOREPERSON:  Yes.

THE COURTROOM DEPUTY:  Moving on to Question 42:

Has Plaintiff Mayers proven by a preponderance of the evidence that he suffered an adverse employment action, yes or no?

THE FOREPERSON:  No.

Proceedings                                        689

THE COURTROOM DEPUTY:  Now, we have to move on to Part 3.

THE COURT:  That's on page 12.

THE COURTROOM DEPUTY:  Part 3.  NYCHRL Claims, Plaintiff Belvin:

Has Plaintiff Belvin proven by a preponderance of the evidence that he is in the protected category, i.e., black African American, yes or no?

THE FOREPERSON:  Yes.

THE COURTROOM DEPUTY:  Moving on to Question 50:

Has Plaintiff Belvin proven by a preponderance of the evidence that he was treated less well than other employees in a way that was more trivial, insubstantial, or petty, yes or no?

THE FOREPERSON:  Yes.

THE COURTROOM DEPUTY:  Moving on to Question 57:

Has Plaintiff Belvin proven by a preponderance of the evidence that he was treated less well than other employees because of a discriminatory intent or motive, yes or no?

THE FOREPERSON:  Yes -- pardon me.  Yes.

THE COURTROOM DEPUTY:  Moving on to Question 58.

Has Plaintiff Belvin proven by a preponderance of the evidence that he actually experienced emotional distress as a result of a discriminatory conduct, yes or no?

Proceedings                    690

THE FOREPERSON:  Yes.

THE COURTROOM DEPUTY:  Moving on to Question 59.
What amount of damages, if any, do you award Plaintiff Belvin
for his NYCHRL claims?

THE FOREPERSON:  $25,000.

THE COURTROOM DEPUTY:  Okay.  Proceeding to Part
3(b), Plaintiff Mayers:

Has Plaintiff Mayers proven by a preponderance of
the evidence that he is in the protected category, i.e., black
African American; yes or no?

THE FOREPERSON:  Yes.

THE COURTROOM DEPUTY:  Question 61:

Has Plaintiff Mayers proven by a preponderance of
the evidence that he was treated less well than other
employees in a way that was more than trivial, insubstantial,
or petty; yes or no?

THE FOREPERSON:  No.

THE COURTROOM DEPUTY:  All right.  Now, we have to
move on to Part 4.  Part 4:  Plaintiff Belvin's Retaliation
Claims.  Question 65:

Has Plaintiff Belvin proven by a preponderance of
the evidence that he engaged in a protective activity, i.e.,
filed a charge of discrimination with the Equal Employment
Opportunity Commission, EEOC; yes or no?

THE FOREPERSON:  Yes.

Proceedings                                                691

THE COURTROOM DEPUTY:  All right.  Moving on to Question 66.

Has Plaintiff Belvin proven by a preponderance of the evidence that he suffered an adverse employment action, yes or no?

THE FOREPERSON:  Yes.

THE COURTROOM DEPUTY:  Moving on to 67.  Question 67:

Has Plaintiff Belvin proven by a preponderance of the evidence that Electchester took action reasonably likely to deter a person from engaging in a protected activity, yes or no?

THE FOREPERSON:  Yes.

THE COURTROOM DEPUTY:  Moving on to Question 68.

Has Plaintiff Belvin proven by a preponderance of the evidence that there was a casual connection between his engagement in the protected activity or the adverse employment action or action reasonably likely to deter a person from engaging in protected activity, yes or no?

THE FOREPERSON:  Yes.

THE COURTROOM DEPUTY:  Moving on to Question 69:

Has Electchester proven by a preponderance of the evidence that it exercised reasonable care to prevent and promptly correct the retaliatory conduct, yes or no?

THE FOREPERSON:  No.

*LEEANN N. MUSOLF, RPR, CCR*
*Official Court Reporter*

Proceedings                                692

THE COURTROOM DEPUTY:  Moving on to Question 71:

Has Plaintiff Belvin proven by a preponderance of the evidence that he actually experienced pain, suffering, and emotional distress as a result of the retaliation, yes or no?

THE FOREPERSON:  Yes.

THE COURTROOM DEPUTY:  Moving on to Question 72:

What amount of damages, if any, do you award to Plaintiff Belvin for his federal and state retaliation claims?

THE FOREPERSON:  $50,000.

THE COURTROOM DEPUTY:  All right.  Moving on to Question 73:

What amount of damages, if any, do you award to Plaintiff Belvin for his NYCHRL retaliation claims?

THE FOREPERSON:  $25,000.

THE COURTROOM DEPUTY:  Okay.  Now, we're proceeding to Part 5.  Part 5.  Mayer's Disability Discrimination Claims, ADA.

Has Plaintiff Mayers proven by a preponderance of the evidence that he has a disability, i.e., a physical or mental impairment that substantially limits one or more major life activities or record of such impairment, yes or no?

THE FOREPERSON:  Yes.

THE COURTROOM DEPUTY:  Proceeding to Question 75:

Has Plaintiff Mayers proven by a preponderance of the evidence that he was otherwise qualified to perform the

*LEEANN N. MUSOLF, RPR, CCR*
*Official Court Reporter*

Proceedings                                          693

essential functions of his position as a porter, yes or no?

THE FOREPERSON:  Yes.

THE COURTROOM DEPUTY:  Moving on to Question 76:

Has Plaintiff Mayers proven by a preponderance of the evidence that he suffered an adverse employment action when he was terminated, yes or no?

THE FOREPERSON:  Yes.

THE COURTROOM DEPUTY:  Moving on to Question 77:

Has Plaintiff Mayers proven by a preponderance of the evidence that his termination occurred under circumstances giving rise to an inference of disability discrimination, yes or no?

THE FOREPERSON:  Yes.

THE COURTROOM DEPUTY:  Moving on to Question 78:

Has Electchester presented a legitimate nondiscriminatory business reason for its decision to terminate Plaintiff Mayers, yes or no?

THE FOREPERSON:  No.

THE COURTROOM DEPUTY:  Question 80:

What amount of damages, if any, do you award to Plaintiff Mayers for his disability discrimination claim for termination?

THE FOREPERSON:  $100,000.

THE COURTROOM DEPUTY:  Proceeding to Question 81:

Has Plaintiff Mayers proven by a preponderance of

the evidence that he suffered an adverse employment action due

to denial of all or part of his 2014 bonus, yes or no?

THE FOREPERSON:  Yes.

THE COURTROOM DEPUTY:  Moving on to Question 82:

Has Plaintiff Mayers proven by a preponderance of

the evidence that the denial of all or part of his 2014 bonus

occurred under circumstances giving rise to an inference of

disability discrimination, yes or no?

THE FOREPERSON:  Yes.

THE COURTROOM DEPUTY:  Moving on to Question 83:

Has Electchester presented a legitimate

nondiscriminatory business reason for its decision to deny all

or part of Plaintiff Mayers's bonus in 2014, yes or no?

THE FOREPERSON:  No.

THE COURTROOM DEPUTY:  Moving on to Question 85:

What amount of damages, if any, do you award to

Plaintiff Mayers for his Disability Discrimination claim?

THE FOREPERSON:  $1,000.

THE COURTROOM DEPUTY:  All right.  Proceeding to

Part 5(b), NYCHRL.  Question 86:

Has Plaintiff Mayers proven by a preponderance of

the evidence that he has any physical, medical, mental, or

psychological impairment, or a history or record of such

impairment, yes or no?

THE FOREPERSON:  Yes.

Proceedings                                    695

THE COURTROOM DEPUTY:  Moving on to Question 87:

Has Plaintiff Mayers proven by a preponderance of

the evidence that he was otherwise qualified to perform the

essential functions of his position as a porter, yes or no?

THE FOREPERSON:  Yes.

THE COURTROOM DEPUTY:  Moving on to Question 88:

Has Plaintiff Mayers proven by a preponderance of

the evidence that he was treated less well than other

nondisabled employees, yes or no?

THE FOREPERSON:  Yes.

THE COURTROOM DEPUTY:  Moving on to Question 89:

Has Plaintiff Mayers proven by a preponderance of

the evidence that he was treated less well than nondisabled

employees under circumstances giving rise to an inference of

disability discrimination, yes or no?

THE FOREPERSON:  Yes.

THE COURTROOM DEPUTY:  And Question 90:

What amount of damages, if any, do you award to

Plaintiff Mayers for his Disability Discrimination claim under

NYCHRL?

THE FOREPERSON:  $25,000.

THE COURT:  All right.

The clerk will collect the Verdict and the

foreperson may be seated.  The clerk will poll the jury.

THE COURTROOM DEPUTY:  Ladies and gentlemen of the

Proceedings                          696

jury, having heard the verdict as given by your foreperson,

Juror Number 1, is that your verdict?

      JUROR NO. 1:  Yes.

      THE COURTROOM DEPUTY:  Juror Number 2?

      JUROR NO. 2:  Yes.

      THE COURTROOM DEPUTY:  Juror Number 3?

      JUROR NO. 3:  Yes.

      THE COURTROOM DEPUTY:  Juror Number 4?

      JUROR NO. 4:  Yes.

      THE COURTROOM DEPUTY:  Juror Number 5?

      JUROR NO. 5:  Yes.

      THE COURTROOM DEPUTY:  Juror Number 6?

      JUROR NO. 6:  Yes.

      THE COURTROOM DEPUTY:  And Juror Number 7?

      JUROR NO. 7:  Yes.

      THE COURTROOM DEPUTY:  Jurors are polled, Judge.

      THE COURT:  Members of the jury, this concludes your

service of jury duty.  The Court wants to thank you for your

attention to this case and your efficiency of coming in on

time and your ability to listen carefully to the testimony and

follow the Court's instructions.  And so I'm going to, at this

time, have you retire and with the thanks of the Court.

      I will, before you leave, I'm going to come in and

just say a few words to you informally, but this concludes

your jury service and you are excused from service at this

Proceedings                                          697

time.

All rise for the jury.

(Jury exits the courtroom.)

THE COURT:  Due to the lateness of the hour, I assume that the defense will be making post-trial motions, and would the parties please discuss with each other a schedule for post-trial motions and we'll have the defense send the Court a letter about the motion schedule.

MS. MOORE:  Yes, Your Honor.

THE COURT:  Okay.  Thank you very much, everyone.

MR. VAN-LARE:  Thank you.

THE COURT:  Have a good night.

MR. VAN-LARE:  You, too.

(Whereupon, the matter was concluded.)

*LEEANN N. MUSOLF, RPR, CCR*
*Official Court Reporter*

INDEX                                                          698

E X H I B I T S

| Court | Page |
|-------|------|
| 5     | 678  |
| 6     | 678  |
| 8     | 683  |
| 9     | 683  |

*LEEANN N. MUSOLF, RPR, CCR*
*Official Court Reporter*