**FILED**
IN CLERK'S OFFICE
U.S. District Court E.D.N.Y.
5/22/2023
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

MICHAEL BELVIN and MICHAEL MAYERS,

                Plaintiffs,

     -against-

ELECTCHESTER MANAGEMENT, LLC,

                Defendant(s).

**MEMORANDUM & ORDER**
**17-CV-6303 (NGG) (MMH)**

NICHOLAS G. GARAUFIS, United States District Judge.

Pending before the court is Defendant Electchester Management, LLC's ("Electchester") motion for judgment as a matter of law and motion for a new trial (Mot. for New Trial (the "Mot.") (Dkt. 116)). For the reasons that follow, Electchester's motion for judgment as a matter of law is DENIED and Electchester's motion for a new trial is GRANTED IN PART, unless Plaintiff Michael Belvin agrees to a remittitur as described below.

## I. BACKGROUND

Belvin and fellow Plaintiff Michael Mayers brought this suit on October 29, 2017, alleging various violations of federal, state, and city employment law. (*See generally* Compl. (Dkt. 1).) Following discovery, Electchester moved for summary judgment, which was granted in part and denied in part. (*See* Dec. 10, 2020 M&O (Dkt. 52).) Specifically, the court held that the Plaintiffs had adduced sufficient evidence from which a reasonable juror could conclude that Electchester was liable on each of Belvin and Mayers's hostile work environment claims and racial discrimination claims premised on a hostile work environment. (*Id.* at 16, 19, 26, 30-31.) Similarly, sufficient evidence supported Belvin's claim for retaliation, (*id.* at 33), and Mayers's claim for disability discrimination. (*Id.* at 41, 43.) The Plaintiffs' remaining claims were dismissed. (*Id.* at 47.)

Jury selection commenced on November 2, 2022, and opening statements were made on November 7, 2022. (Nov. 2, 2022 Minute Entry; Nov. 7, 2022 Minute Entry (Dkt. 106).) Over the course of three days of testimony, the Plaintiffs called four witnesses, including both Belvin and Mayers; Electchester called five defense witnesses. (*See* Nov. 7, 2022 Minute Entry; Nov. 8, 2022 Minute Entry (Dkt. 108); Nov. 9, 2022 Minute Entry (Dkt. 109).) Electchester moved for a directed verdict after the close of the Plaintiffs' case, and again after Electchester completed its defense presentation of evidence. (Nov. 8, 2022 Minute Entry; Nov. 10, 2022 Minute Entry (Dkt. 110).) Both were denied. (Nov. 8, 2022 Minute Entry; Nov. 10, 2022 Minute Entry.)

After deliberating, the jury completed a "Final Jury Verdict Form," (Dkt. 112), and submitted a verdict in favor of the Plaintiffs. (Nov. 10, 2022 Minute Entry.) The jury found Electchester liable on Belvin's federal and state claims for a hostile work environment, and awarded $0 in actual damages, $25,000 in compensatory damages, and $500,000 in punitive damages; they also found Electchester liable on Belvin's New York City Human Rights Law ("NYCHRL") claim for hostile work environment, and awarded an additional $25,000. (Final Jury Verdict Form at 3, 13.) The jury also found Electchester liable for retaliation against Belvin, and awarded $50,000 in damages for the federal and state claims, and $25,000 for the NYCHRL claim. (*Id.* at 15-16.) The jury finally found Electchester liable for Mayers's claim for federal and state disability discrimination, and awarded $100,000 for his termination and $1,000 for his denial of bonus, as well as $25,000 for the NYCHRL claim for disability discrimination. (*Id.* at 17-19.) The jury found Electchester not liable on the remaining claims—both Plaintiffs' claims for racial discrimination, Mayers's claims for hostile work environment, and Mayer's NYCHRL claim (*Id.* at 3-4, 6, 9, 13.)

This motion followed.

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 50, "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may . . . grant a motion for judgment as a matter of law against the party[.]" Fed. R. Civ. P. 50(a)(1). Such a motion may be made at any time before the case is submitted to the jury, *id.* at 50(a)(2), and if not granted, may be renewed within 28 days of the entry of judgment or discharge of the jury. *Id.* at 50(b). Such a renewed motion "may include an alternative or joint request for a new trial under Rule 59," and the court may allow all judgment on the jury verdict, order a new trial, or direct the entry of judgment as a matter of law. *Id.*

"A movant's burden in securing Rule 50 relief is particularly heavy after the jury has deliberated in the case and actually returned its verdict." *Cross v. New York City Transit Auth.*, 417 F.3d 241, 248 (2d Cir. 2005).[1] Such a motion may only be granted "if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded persons could not arrive at a verdict against it." *Kinneary v. City of New York*, 601 F.3d 151, 155 (2d Cir. 2010). "In reviewing a Rule 50 motion, a court may consider all the record evidence, but in doing so it must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Cross*, 417 F.3d at 247. In other words, the court "must give deference to all credibility determinations

---

[1] When quoting cases, and unless otherwise noted, all citations and quotation marks are omitted, and all alterations are adopted.

and reasonable inferences of the jury[.]" *Caruolo v. John Crane, Inc.*, 226 F.3d 46, 51 (2d Cir. 2000).

Federal Rule of Civil Procedure 59 allows for the court to "grant a new trial on all or some of the issues." Fed. R. Civ. P. 59(a)(1). This decision is committed "to the sound discretion of the trial judge." *Jennings v. Yurkiw*, No. 14-CV-6377 (SMG), 2018 WL 5630454, at *5 (E.D.N.Y. Oct. 31, 2018). The standard for granting a new trial is "less stringent than Rule 50," as the court may independently weigh the evidence "even if there is substantial evidence supporting the jury's verdict." *Finkel v. Zizza & Assocs. Corp.*, No. 14-CV-4108 (JS) (ARL), 2022 WL 970670, at *4 (E.D.N.Y. Mar. 31, 2022). Nonetheless, "jury verdicts should be disturbed with great infrequency," *ING Glob. v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 99 (2d Cir. 2014), and "[a] motion for a new trial ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Medforms, Inc. v. Healthcare Mgmt. Sols., Inc.*, 290 F.3d 98, 106 (2d Cir. 2002).

## III. DISCUSSION

### A. Inconsistent Jury Verdict

Electchester argues that a new trial is warranted under Rule 59 because the jury's conclusions were "fundamentally inconsistent." (Mot. at 11.) Following summary judgment, Belvin's only remaining claim for race discrimination was premised on the presence of a hostile work environment at Electchester. (*See* Dec. 10, 2020 M&O.) The court thus instructed the jury that, "[t]o prove . . . that they were subjected to a hostile work environment, Mr. Belvin or Mr. Mayers must prove the elements that also constitute their claims for hostile work environment." (Final Jury Charge (Dkt. 102) at 9.) After full deliberations, the jury noted on the "Final Jury Verdict Form" that Belvin had proven

his hostile work environment claim, but failed to prove the hostile work environment element for his race discrimination claim. (Final Jury Verdict Form at 3-4.)

This motion implicates the difference between a special verdict and a general verdict with written responses, addressed in Federal Rules of Civil Procedure 49(a) and (b) respectively. *See* Fed. R. Civ. P. 49. A special verdict under Rule 49(a) asks "the jury [to] answer[] primarily factual questions for the benefit of the trial court which then applies the law to those answers;" that is, the jury is not asked the question of ultimate liability. *Lavoie v. Pac. Press & Shear Co., a Div. of Canron Corp.*, 975 F.2d 48, 53 (2d Cir. 1992). By contrast, a general verdict with written responses issued pursuant to Rule 49(b) asks the jury to answer interrogatories *and* address liability on each legal theory, and leaves the trial court to enter judgment based on the jury's responses. *Id.*

Rule 49(a) does not specify what occurs when the answers to a special jury verdict are inconsistent, but the Second Circuit has stated that "ineluctably inconsistent" answers warrant a new trial, *Tolbert v. Queens Coll.*, 242 F.3d 58, 74 (2d Cir. 2001) (citing *Brooks v. Brattleboro Mem'l Hosp.*, 958 F.2d 525, 529 (2d Cir. 1992); *Auwood v. Harry Brandt Booking Office, Inc.*, 850 F.2d 884, 891 (2d Cir. 1998)), unless "there is a view of the case that makes the jury's answers consistent." *Id.* (citing *Atl. & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355, 364 (1962)). By contrast, Rule 49(b), in discussing general verdicts with written responses, specifically states that "[w]hen the answers are inconsistent with each other and one or more is also inconsistent with the general verdict, judgment must not be entered; instead, the

court must direct the jury to further consider its answers and verdict, or must order a new trial." Fed. R. Civ. P. 49(b)(4).[2]

This case involved a general verdict under Rule 49(b): the verdict form asked the jury "yes" or "no" questions of fact which, if answered pursuant to the directions on the form, would inform the jury's general verdict on liability and prompt the jury to provide a recommended amount of damages. As the text of the rule makes clear, "Rule 49(b) speaks to the procedure to be followed when a general verdict is inconsistent with the special interrogatories; it does not expressly enact a procedure for reconciling inconsistencies *among* verdicts." *U.S. Football League v. Nat'l Football League*, 644 F. Supp. 1040, 1046 (S.D.N.Y. 1986); *see also Jarvis v. Ford Motor Co.*, 283 F.3d 33, 56 (2d Cir. 2002) ("Rule 49(b) is inapplicable here because the alleged inconsistency was not among responses to interrogatories regarding 'issues of fact,' but between two general verdicts based on different legal theories."). In regard to Belvin's hostile work environment claim, there is no inconsistency between the special interrogatories and the general verdict: the jury found that Belvin had proven each element of the claim, concluded that Electchester was liable, and awarded damages. (Final Jury Verdict Form at 1-3.) Separately, it also found that Belvin had failed to prove the adverse employment action element of his race discrimination claim, and declined to find Electchester liable on that claim. (*Id.* at 6.) What Electchester raises here is an inconsistency between one special interrogatory related to the hostile work environment claim and another special interrogatory related to a separate legal theory. This is not addressed by Rule 49(b).

---

[2] Although not relevant for this motion, Rule 49(b)(3) adds that "[w]hen the answers are consistent with each other but one or more is inconsistent with the general verdict, the court may" approve the appropriate judgment according to the answers, direct the jury to further consider its answers and verdict, or order a new trial.

Even if such an inconsistency were sufficient to warrant relief under Rule 49(b), though, the Second Circuit is clear that a party waives such an objection if they fail to raise it before the jury is discharged. *Kosmynka v. Polaris Indus., Inc.*, 462 F.3d 74, 83 (2d Cir. 2006) ("It is well established that a party waives its objection to any inconsistency in a jury verdict if it fails to object to the verdict prior to the excusing of the jury."); *see also Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 46 (2d Cir. 2015) (finding waiver of right to contest inconsistencies in a jury verdict where the moving party failed to object before the court excused the jury); *U.S. Football League*, 644 F. Supp. at 1046 n.4 ("[P]laintiffs have waived their right to invoke that rule's protection by failing to raise the question of inconsistency before the jury was discharged."). "The timely objection requirement is not merely a technicality—it serves to give the court and the opposing party the opportunity to correct an error in the conduct of the trial." *Anderson Grp.*, 805 F.3d at 46. The only exception to waiver is where the inconsistency constitutes "fundamental error" that is "so serious and flagrant that it goes to the very integrity of the trial." *Am. Tech. Ceramics Corp. v. Presidio Components, Inc.*, 490 F. Supp. 3d 593, 624-25 (E.D.N.Y. 2020); *see also Anderson Grp.*, 805 F.3d at 49. But as discussed above, the inconsistency was between findings of fact on two different legal theories, rather than an issue between the factual findings and the conclusion on liability, so there is no indication the conclusions on liability were incorrect and therefore no "fundamental error" occurred.[3] As Electchester failed to raise the purported inconsistency while the jury still could have fixed it, this argument has been waived and this ground for relief is unsuccessful.

---

[3] "[T]he fundamental error standard of review is stringent." *Hurdle v. Board of Educ. for City of N.Y.*, No. 01-CV-4703 (HB), 2003 WL 22080721, at *4 (S.D.N.Y. Sept. 9, 2003). For instance, in *Armstrong ex rel. Armstrong v. Brookdale Univ. Hosp. & Med. Ctr.*, 425 F.3d 126, 136 (2d Cir. 2005), the

7

### B. Sufficiency of the Evidence

Electchester raises three separate claims that amount to contesting the sufficiency of the evidence presented at trial—that is, arguments that the evidence was so deficient, no reasonable jury could have concluded Electchester was liable, or at least that a significant miscarriage of justice occurred warranting a new trial. *First*, Electchester argues that the only evidence presented on Belvin's hostile work environment claim amounted to "petty slights or minor annoyances" and therefore was legally insufficient. (Mot. at 14 (quoting *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 (2d Cir. 2011).) *Second*, Electchester argues that no evidence supported the jury's verdict on Belvin's claim for retaliation, because Belvin only provided evidence of disciplinary actions taken against him for violation of workplace rules and (after successfully contesting some of the discipline) was not ultimately punished for any such violations. (*Id.* at 15-16.) Further, Electchester argues that they successfully rebutted the inference of discrimination by pointing to other employees—who had not engaged in protected activity—who were punished for some of the same violations as Belvin. (*Id.* at 16.) *Third*, Electchester argues that the evidence could not support the verdict on Mayers's disability discrimination claim because it showed no adverse effect from his termination (since he was reinstated), that Mayers's termination and denial of bonus were motivated by non-discriminatory reasons (a clerical error and neutrally applied workplace policy, respectively), and that no

---

verdict sheet included an error which treated a defense to recovery as an element of recovery, such that when the jury answered "no" to the defense, the verdict sheet instructed them to cease deliberating and return a verdict of no liability. Because the error in the verdict sheet potentially reversed the jury's verdict, the Second Circuit held that "it misinformed the jurors in a critical way and undermined the integrity of the trial," found fundamental error, and remanded for a new trial. *Id.* The context before the court in this case bears no resemblance to that egregious mistake.

employees were treated less well than non-disabled employees. (*Id.* at 23-24.) None of these arguments have merit, and the court declines to disturb the jury verdict.

The legal arguments that Electchester raises were, for the most part, addressed in the court's Memorandum and Order denying Electchester's motion for summary judgment in relevant part.[4] (*See generally* Dec. 10, 2020 M&O.) For instance, Electchester similarly argued at summary judgment that Belvin's evidence of hostile work environment amounted to trivial annoyances. (*Id.* at 16-17.) The court concluded that that evidence—testimony that he was "on the receiving end of racist language" and "found toy monkeys or images of monkeys placed in his various work areas on multiple occasions"—was enough to deny summary judgment. (*Id.* at 16-17.) The law is clear that "several factors" influence whether such evidence amounts to a hostile work environment, including not just "the frequency of the discriminatory conduct" but also "its severity" and whether it is humiliating. (*Id.* at 15-16 (citing *Terry v. Ashcroft,* 336 F.3d 128, 148 (2d Cir. 2003).) This same evidence was presented to the jury, who was instructed on this law, and—according to their

---

[4] In denying the relevant portions of Electchester's motion for summary judgment, the court was concluding that sufficient evidence existed to support a jury verdict in favor of the Plaintiffs. *See* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is *no genuine dispute as to any material fact* and the movant is entitled to judgment as a matter of law."). The same evidence that warranted that conclusion at summary judgment was presented to the jury, which "expressly and impliedly resolved [the questions of fact] . . . contrary to the defendant's position." *D.A. Elia Constr. Corp. v. U.S. Fid. & Guar. Co.*, No. 95-CV-190E(H), 1996 WL 484200, at *1 (W.D.N.Y. July 31, 1996). Accordingly, there is no basis for the court to change its prior conclusions regarding the legal sufficiency of the Plaintiffs' evidence. *Redmond v. St. John's Univ.*, No. 86-CV_2322, 1989 WL 16069, at *3 (E.D.N.Y. Feb. 17, 1989) ("[A] motion for summary judgment should be regarded as the equivalent of a trial motion for a directed verdict[.]").

verdict—plainly concluded the epithets and incidents were sufficiently severe to overcome the relative lack of frequency. Accordingly, there is no legal basis for the court to conclude that "the jury's findings could only have been the result of sheer surmise and conjecture," *Kinneary*, 601 F.3d at 155, such that judgment is a matter of law is warranted, nor that "the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice" requiring a new trial. *Medforms*, 290 F.3d at 106.

Similarly, the court concluded at summary judgment that the series of disciplinary actions immediately preceding and after Belvin filed a complaint with the Equal Employment Opportunity Commission (the "EEOC") could constitute an adverse effect for the purposes of retaliation. (*See* Dec. 10, 2020 M&O at 35.) Frequent, consistent, and rigorous enforcement of minor rule violations can constitute a change in working conditions, even if none result in monetary penalties or suspensions, and can raise an "inference of retaliation," particularly where—as with Belvin—many of the related punishments are ultimately vacated after the employee is forced to contest them. (*Id.*) Further, although Electchester presented evidence that other employees (who had not engaged in protected activity) were sanctioned for some similar behavior, it did not show any employee who was punished or investigated as frequently as Belvin. Belvin also testified that Vito Mundo, Electchester's general counsel, explicitly told him that the various disciplinary actions would "go away" if he dropped his EEOC complaint. (*See* Ex. 2 to Opp. (Dkt. 117-2) at 164 ("[Mundo] made mention to me about the case in regards to another matter . . . and said that – that all your write-ups could go away if you just drop your EEOC case. It could make things better for you").) Mundo testified and denied this exchange occurred, (Ex. 4 to Opp. (Dkt. 117—4) at 47), but the jury was entitled to credit Belvin's testimony and conclude that, despite Electchester's claims to the contrary, the aggregate punishments

and investigations were intended to retaliate against Belvin for filing his EEOC complaint.

Finally, Electchester's arguments regarding Mayers's disability discrimination claims were similarly already rejected by the court. (*See* Dec. 10, 2020 M&O at 41-42, 43-44.) In that opinion, the court noted that Electchester "admits that it terminated [Mayers] in accordance with the CBA because of his absence, which was a direct result of his cancer treatment," and that the only question in such a context is whether Mayers could have performed the essential functions of his job "with reasonable accommodations." (*Id.* at 41-42.) The jury was instructed in accordance with this law, as one required element was: "[Mayers] was otherwise qualified for the position he held and was able to perform the essential functions of that position, with reasonable accommodations if he needs them[.]" (Final Jury Charge at 17.) At trial, the evidence showed that Mayers, upon learning of the termination, asked to be (and was) medically cleared and was able to immediately "return[] to work in the same position[.]" (Mot. at 23-24.) Sufficient evidence was therefore presented for the jury to conclude that, had Electchester simply asked Mayers if he was able to return to work (certainly a "reasonable" accommodation), he would have taken the necessary steps to do so, and the termination—plainly an adverse effect even though he was ultimately reinstated—could have been avoided.

Finally, Mayers presented evidence that he was terminated and denied his bonus because of his disability; indeed, Electchester agreed that the motive for both was Mayers's absence, which was "a direct result" of his disability. (Dec. 10, 2020 M&O at 41-42.) Electchester provided witness testimony regarding a non-discriminatory justification for both actions—enforcement of company policy regarding absences (in the case of the termination, a mistaken enforcement (Ex. 4 to Opp. at 59-60))—but the

jury was free to determine this was not credible, and the court will not disturb that credibility finding.

Accordingly, the evidence presented at trial—accepting the jury's inherent credibility determinations—was sufficient for a reasonable jury to conclude Electchester was liable on these claims.

### C. Reasonableness of the Damages Awards

Next, Electchester argues that various damages awards—the compensatory damages awarded to Belvin, the punitive damages awarded to Belvin, and the compensatory damages awarded to Mayers—were unreasonably excessive as a matter of law and must be reduced or warrant a new trial. (Mot. at 20-26.) A court has discretion to "overturn[] verdicts for excessiveness and order[] a new trial without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur)." *Lore v. City of Syracuse*, 670 F.3d 127, 176-77 (2d Cir. 2012). In reviewing such a motion on federal claims, "a court's review of a compensatory damage award is 'narrow,' and a jury's award may be set aside as excessive only when the award is 'so high as to shock the judicial conscience.'" *Graham v. City of New York*, 128 F. Supp. 3d 681, 713 (E.D.N.Y. 2015) (quoting *Leo v. Long Island R.R. Co.*, 307 F.R.D. 314, 321-22 (S.D.N.Y. 2015) and citing *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 162 (2d Cir. 2014)). For New York claims, "an award is excessive or inadequate if it deviates materially from what would be reasonable compensation," *id.* (citing *Stampf v. Long Island R.R Co.*, 761 F.3d 192, 204 (2d Cir. 2014)), a "more exacting review" than the federal "shocks the conscious" standard. *Patterson v. Balsamico*, 440 F.3d 104, 119 (2d Cir. 2006). For any claim, courts review awards in comparable cases. *See, e.g., Stampf*, 761 F.3d at 204 (citing examples). Where a damages award was not segregated between state and federal claims, courts use the standard which provides the most complete recovery. *Graham*, 128 F. Supp. 3d at 714.

1. Belvin's compensatory damages

Electchester first challenges the jury's awards of compensatory damages on Belvin's various claims. These awards were $25,000 for Belvin's federal and state hostile work environment claims, which were reviewed together; $25,000 for Belvin's NYCHRL hostile work environment claim; $50,000 for Belvin's federal and state retaliation claims, which were reviewed together; and $25,000 for Belvin's NYCHRL retaliation claim. (*See* Final Jury Verdict Form at 3, 13, 15-16.) Electchester argues that cumulatively, $125,000 far exceeds a reasonable award for garden variety emotional distress, the only source of damages that Belvin alleged. (Mot. at 17.)

There are a number of cases within this circuit finding comparable or higher damages awards to be reasonable for garden variety emotional distress, including some which remitted higher awards *to* comparable amounts. *See, e.g.*, *Duarte v. St. Barnabas Hosp.*, 341 F. Supp. 3d 306, 324-325 (S.D.N.Y. 2018) (ordering remittitur of jury award for garden variety emotional distress to $125,000); *Vera v. Alstom Power, Inc.*, 189 F. Supp. 3d 360, 379 (D. Conn. 2016) (same); *Bouveng v. NYG Cap. LLC*, 175 F. Supp. 3d 280, 334 (S.D.N.Y. 2016) (ordering remittitur of jury award for garden variety emotional distress to $150,000). That courts have ordered reductions of damages awards to amounts *higher* than that awarded to Belvin in this case strongly indicates that the jury award was reasonable and did not differ materially from a reasonable award.

Further, the Second Circuit has repeatedly rejected Electchester's argument that the proper range for emotional distress damages reaches a ceiling of approximately $35,000, (Mot. at 17-18), noting that New York courts have awarded significantly higher amounts even in garden variety emotional distress cases and therefore such awards do not constitute a material deviation

13

from reasonable amounts. *See Cross*, 417 F.3d at 258 ("[W]e reiterate that while many cases . . . reduce awards to $30,000 or below, others uphold awards of more than $100,000 without discussion of protracted suffering, truly egregious conduct, or medical treatment."); *Patterson*, 440 F.3d at 119-20 (upholding award of $100,000 in compensatory damages for emotional distress). In *Meacham v. Knolls Atomic Power Laboratory*, a case alleging age discrimination, the jury awarded damages for garden variety emotional distress to various plaintiffs; on the defendants' motion for remittitur arguing that the appropriate ceiling for such awards is $30,000, the district court capped these awards at $125,000. 185 F. Supp. 2d 193, 219-21 (N.D.N.Y. 2002). On appeal, the Second Circuit affirmed the district court's conclusion, stating that "New York cases vary widely in the amount of damages awarded for mental anguish" and added that "the passage of time since the cited cases were decided could reasonably support higher verdicts." *Meacham v. Knolls Atomic Power Lab'y*, 381 F.3d 56, 78 (2d Cir. 2004), *vacated on other grounds sub nom., KAPL, Inc. v. Meacham*, 544 U.S. 957 (2005). "When confronted with the range of mental anguish verdicts approved under New York law, [the Second Circuit did] not find the verdicts in this case to deviate substantially from verdicts awarded under similar circumstances." *Id.*

As the Second Circuit determined more than fifteen years ago that comparable verdicts were appropriate for garden variety emotional distress, and district courts within the circuit have regularly upheld higher amounts, there is no basis to disturb the jury's verdict. This conclusion is further bolstered by the fact that Electchester's argument relies on aggregating Belvin's damages awards across different claims. The verdict is further unassailable when properly understood as an award of $50,000 for hostile work environment claims and $75,000 for retaliation, rather than a single $125,000 verdict. (*See* Final Jury Verdict Form.) Such amounts fall well within the range of permissible damages

14

awards upheld in New York, and the court therefore cannot conclude that the jury materially deviated from the reasonable standard.

### 2. Belvin's punitive damages

Next, Electchester challenges the award of punitive damages to Belvin. The jury concluded that Belvin proved, to a preponderance of the evidence, that Electchester acted with malice or reckless indifference, and awarded $500,000 of punitive damages. (Final Jury Verdict Form at 3.) Electchester argues that this award was without legal support and manifestly unjust, and that the amount chosen was unconstitutionally excessive. (Mot. at 18-23.) Specifically, Electchester argues that the evidence failed to show malice of reckless indifference and therefore the jury had no basis for an award of punitive damages, and that even if such an award was warranted, the amount was excessive and the court must grant remittitur. (*Id.*)

Under Title VII, the jury may award punitive damages where it concludes that the employer acted in violation of the employee's federally protected rights with "malice" or "reckless indifference." *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 572-73 (2d Cir. 2011). The jury was instructed that "malice" means the employer was "motivated by ill will, a bad motive, or spite," and "[r]eckless indifference means that Electchester knew, or should have known, that its actions would cause illegal discrimination against employees." (Final Jury Charge at 21.) Courts have explained that malice or reckless indifference require evidence that the employer acted with "conscious knowledge it was violating the law" or that the conduct was "egregious" or "outrageous." *Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 102 (2d Cir. 2001). The actions of managerial employees can provide a basis for punitive damages against the employer, unless those actions contradict good faith efforts to comply with the law.

*Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 543-46 (1999). An employer may also defeat punitive liability by demonstrating the existence of an antidiscrimination policy and good faith efforts to enforce it. *Zimmermann v. Assocs. First Cap. Corp.*, 251 F.3d 376, 385 (2d Cir. 2001).

Electchester presented evidence of a corporate anti-discrimination policy, (Ex. 3 to Opp. (Dkt. 117-3) at 68-69), but it was only adopted in 2015. (*Id.* at 92-93.) Thomas Prezioso, Electchester's general manager, testified that prior to that point, Electchester utilized "scratched up policy" and never provided any written instructions to employees. (*Id.* at 93.) Prezioso also testified that some rules in the post-2015 policy were "commonly violated," but did not recall any significant increase in disciplinary writeups after distribution of the written policy. (*Id.* at 69.) The jury could reasonably infer from this testimony that, for much of the relevant time period, Electchester had no antidiscrimination policy and, for the remaining time, failed to enforce the policy in good faith. In light of these failures, it was similarly reasonable for the jury to conclude that Electchester knew—or should have known—that its failure to maintain a proper policy at all times, remedy discriminatory incidents, and discipline employees for discriminatory actions would violate federal law.

Further, Belvin presented evidence that Prezioso ignored discriminatory incidents of which Belvin complained, and as a manager, Prezioso's actions can warrant an award of punitive damages against Electchester. *Kolstad*, 527 U.S. at 545-46. The most egregious such incident involved a stuffed monkey which was hung from Belvin's locker; Belvin testified that Prezioso's response was "I don't want to hear nothing about that." (Ex. 2 to Opp. at 95-97.) Another manager, Anthony Caiozzo, further indicated at trial that he believed complaints of discriminatory language could be prompted by benign comments, explaining

that he now refuses to use the word "boy" in any context "because that's what they got us walking on pins and needles and eggshells." (Ex. 3 to Opp. at 192.)

Such a failure by management to remedy harassing behavior, combined with a lack of a corporate policy regarding harassment and knowledge that such conduct is unlawful, is sufficient to support an award of punitive damages. *See, e.g., Cush-Crawford v. Adchem Corp.*, 94 F. Supp. 2d 294, 300 (E.D.N.Y. 2000). On the basis of this evidence and the similar evidence presented throughout the trial, there was a sufficient basis for the jury to award punitive damages, and the court will not disturb that verdict or grant a new trial thereon.

With respect to the amount of punitive damages, Electchester argues that the award is unconstitutional. (Mot. at 20.) Awards of punitive damages are limited by the due process clause, because "[t]o the extent an award is grossly excessive, it furthers no legitimate purpose and constitutes an arbitrary deprivation of property." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 417 (2003). Whether a punitive damages award is constitutional is determined by three factors: "(1) the degree of reprehensibility of the tortious conduct; (2) the ratio of punitive damages to compensatory damages, and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases." *Lee v. Edwards*, 101 F.3d 805, 809 (2d Cir. 1996) (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)).

The degree of reprehensibility is determined by considering if the harm caused was physical injury; the conduct evinced indifference to or reckless disregard of health or safety; the target was financially vulnerable; the conduct was repeated or isolated; and the harm was inflicted due to "intentional malice, trickery, or deceit" as opposed to "mere accident." *MacMillan v. Millennium Broadway Hotel*, 873 F. Supp. 2d 546, 564-65 (S.D.N.Y. 2012)

17

(quoting *State Farm Mut. Auto.*, 538 U.S. at 419). Plainly, Electchester caused no physical injury and its conduct did not implicate health or safety; further, no evidence was presented regarding Belvin's financial peril. But the evidence shown at trial reflected not an isolated incident, but a pattern of racial abuse that included display of inappropriate and racist toys and symbols, as well as regular use of racial language which went unremedied. As already discussed, it was also reasonable for the jury to conclude that Electchester's failure to act was motivated by malice and was not a mere accident.

Courts have upheld higher awards in cases that bear some similarity to the present facts. In *Greenbaum v. Handelsbanken*, 67 F. Supp. 2d 228, 269-70 (S.D.N.Y. 1999), the court upheld an award of $1.25 million in punitive damages because the "jury could have inferred from some of [a manager's] comments and other comments made by high-level GMs that [defendant] was not only negligent regarding [plaintiff's] federally protected rights but was acting with malice," because the conduct was repeated, and because the plaintiff was ultimately retaliated against when she complained. Similarly, in *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1283 (11th Cir. 2008), an award of $500,000 was upheld in part due to the pattern of misbehavior. In *Goldsmith*, though, the harm included economic harm and the plaintiff showed economic vulnerability, *Goldsmith*, 513 F.3d at 1283, while in *Greenbaum*, the plaintiff was denied promotions and ultimately transferred to a less desirable position. *Greenbaum*, 67 F. Supp. 2d at 269-70;.

In any event, the award of punitive damages is excessive because of the ratio between punitive and compensatory damages. The $500,000 in punitive damages that the jury awarded were for Belvin's Title VII claim for hostile work environment, on which it also awarded $25,000 in compensatory damages. (Final Jury Verdict Form at 3.) This results in a ratio between punitive and

compensatory damages of 20:1. "[I]n practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *State Farm Mut. Auto.*, 538 U.S. at 425. Further, an "award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety." *Thomas v. iStar Fin., Inc.*, 652 F.3d 141, 149 (2d Cir. 2011) (quoting *State Farm Mut. Auto.*, 538 U.S. at 425). Considering ratios utilized in other cases, the court holds that the degree of reprehensibility represented here—considering the malicious and repeated violation of Belvin's federal rights, alongside the lack of physical or economic injury—a 4:1 ratio is appropriate. *See MacMillan*, 873 F. Supp.2d at 566, 569 (allowing an award of "nearly four times the remitted compensatory damages amount" despite noting this "might be close to the line of constitutional impropriety" and a finding that "the defendant's conduct . . . was by no means as reprehensible as that in many other employment discrimination cases"); *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 165-67 (2d Cir. 2014) (using a 2:1 ratio and noting that "[w]here the compensatory award is particularly high," as in this case where the jury awarded $1.32 million in compensatory damages, a 4:1 ratio raises more concerns); *Iannone v. Frederic R. Harris, Inc.*, 941 F. Supp. 403, 415 (S.D.N.Y. 1996) (remitting a jury award of punitive damages with a ratio of 10:1). Accordingly, a punitive damages award of $100,000 is proper in this case, and the court will grant a new trial limited to the issue of damages unless Belvin agrees to a remittitur to that amount.

### 3. Mayers's compensatory damages

Finally, Electchester argues that the jury's award of $126,000 in compensatory damages to Mayers for his disability discrimination claims was excessive. (Mot. at 25-26.) $1,000 of this award was attributed to Mayers's claim for denial of bonus, and

$125,000 to his termination, from which he was ultimately reinstated; accordingly, Electchester argues that the award must be attributable to garden variety emotional distress damages, and is excessive for the same reasons raised with respect to Belvin. (*Id.*)

Mayers testified that upon receiving his termination letter, he was suicidal. (Ex. 2 to Opp. at 215.) He was specifically concerned with losing his healthcare while out of work on disability leave and receiving ongoing treatment for cancer, and thought this could prevent treatment. (*Id.* ("It was like one of the scariest things of my life because my children weren't ready for me to go. I have a little cat that depends on me. I was crushed.").) The jury could reasonably conclude that a higher award was warranted considering the emotionally charged context of the discrimination Mayers faced, and as discussed above, an award of $125,000 falls within the reasonable range of awards for emotional distress damages. Accordingly, the compensatory damages awarded to Mayers were not unreasonably excessive.

## IV. CONCLUSION

For the aforementioned reasons, Electchester's motion for judgment as a matter of law is DENIED. Electchester's motion for a new trial is GRANTED solely on the issue of Belvin's award of punitive damages unless Belvin agrees in writing by the date two weeks from the date of this order to accept a remittitur reducing the punitive damage award to $100,000.

SO ORDERED.

Dated:     Brooklyn, New York
           May 22, 2023

                                    /s/ Nicholas G. Garaufis
                                    NICHOLAS G. GARAUFIS
                                    United States District Judge